UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEANNA JOHNSON,

     Plaintiff,               Case No. 19-cv-10167

v.                         Honorable Gershwin A. Drain

FORD MOTOR COMPANY,      Magistrate Elizabeth A. Stafford
a Delaware corporation,

     Defendant.

---

| STERLING ATTORNEYS AT LAW, P.C. | KIENBAUM HARDY VIVIANO |
|---|---|
| Carol A. Laughbaum (P41711) | PELTON & FORREST, P.L.C. |
| Attorneys for Plaintiff | Elizabeth P. Hardy (P37426) |
| 33 Bloomfield Hills Pkwy., Ste. 250 | Thomas J. Davis (P78626) |
| Bloomfield Hills, MI 48304 | Attorneys for Defendant |
| (248) 644-1500 | 280 N. Old Woodward Ave. |
| claughbaum@sterlingattorneys.com | Ste. 400 |
| | Birmingham, MI 48009 |
| | (248) 645-0000 |
| | ehardy@khvpf.com |
| | tdavis@khvpf.com |

---

**Defendant's Motion for Summary Judgment**


**(Redacted Version with Placeholders Pending Plaintiff's Motion to Seal)**

Defendant Ford Motor Company moves this Court, under Rule 56, for entry of summary judgment. In support of the motion, Ford states:

1.      Johnson filed her Amended Complaint on December 9, 2019. R. 46.

2.      For the reasons set forth in the accompanying brief, there is no genuine dispute as to any material fact arising out of the claims stated in Johnson's Complaint, and Ford is entitled to judgment as a matter of law.

3.      On January 16, 2020, counsel for Defendants explained the nature of the motion and relief it would be seeking, and also notified Plaintiff's counsel of its intent to file pertinent portions of medical records deemed automatically confidential under the protective order. Plaintiff's counsel responded on January 20 that it did not concur in the relief requested. Plaintiff's counsel also indicated that she would file a motion to seal the medical records. Per the protective order, R. 20, Pg ID 130-31, this motion is filed with placeholder exhibits for the medical records at this time.

<div style="margin-left:40%">

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.

By: */s/ Elizabeth Hardy*
    Elizabeth Hardy (P37426)
    Thomas J. Davis (P78626)
    Attorney for Defendants
280 N. Old Woodward Ave., Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com

</div>

Dated: January 21, 2020

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEANNA JOHNSON,

     Plaintiff,

v.

FORD MOTOR COMPANY,
a Delaware corporation,

     Defendant.

Case No. 19-cv-10167

Honorable Gershwin A. Drain

Magistrate Elizabeth A. Stafford

---

STERLING ATTORNEYS AT LAW, P.C.
Carol A. Laughbaum (P41711)
Attorneys for Plaintiff
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500
claughbaum@sterlingattorneys.com

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.
Elizabeth P. Hardy (P37426)
Thomas J. Davis (P78626)
Attorneys for Defendant
280 N. Old Woodward Ave.
Ste. 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com

---

**Defendant's Brief in Support of its Motion for Summary Judgment**

**Statement of the Issues Presented**

1. Under Michigan law, an employee cannot engage in quid pro quo sexual harassment unless they are the alleged victim's supervisor, and took a tangible employment action causally related to the rejection of sexual advances. Here, the alleged harasser was not Plaintiff Johnson's supervisor as defined in Michigan law, and his alleged "denial of training" is not a tangible job action. Should the Court dismiss the quid pro quo claim?

2. Under Michigan law, an employer is only liable for co-worker harassment if it had adequate notice of the harassment, and after receiving notice, fails to promptly and adequately remedy the harassment. Here, Johnson reported harassment on November 25, 2018 and the alleged harasser was suspended the next day, and later fired. Because these acts are a "prompt and adequate" remedy as a matter of law, should the Court dismiss the co-worker harassment claim?

3. Johnson also claims she gave earlier, unaddressed notice of sexual harassment to Richard Mahoney, who she believes reported it to William Markavich. But she admits that she told Mahoney not to address the issue, and ignored Markavich's request for information about her claims. Because a plaintiff who reports harassment to an employee but does not want them to address it waives notice, should the Court reject Johnson's co-worker harassment claim based on these alleged reports?

4. Under Michigan law, a report of sexual harassment does not provide adequate notice to an employer unless it is made to "higher management," defined as someone who can "effectuate change" in the workplace by disciplining the harasser. Mahoney was not "higher management" per this definition. Should the Court hold that the alleged report to Mahoney was inadequate to put Ford on notice of alleged co-worker harassment as a matter of law?

5. Under Michigan law, a report of sexual harassment must be specific. An employer is not put on notice of sexual harassment through generic references to problems with a co-worker, or even to "harassment" without more. Here, Johnson has no evidence that Markavich was ever told of "sexual" harassment and admittedly refused to give him details. Should the Court hold that there was no adequate notice to Markavich on this record?

6. Johnson also pleads a racial harassment claim, claiming that some of the allegedly sexual offensive comments by her harasser referred to her race. But the alleged comments are not sufficient to rise to the level of *racial* harassment as a matter of law. Further, she first reported racial comments in her November 25, 2018 complaint, and that complaint was remedied the next day. Should the Court dismiss Plaintiff's racial harassment claim?

7. Johnson also tries to hold Ford liable for a tort claim of sexual assault allegedly perpetrated by her harasser. Under Michigan law, an employer cannot be responsible for criminal acts of an employee unless it knew that employee engaged in similar criminal conduct in the past, and had a propensity for engaging in that conduct. No such evidence appears in this record. Should the Court dismiss the sexual assault claim?

# Table of Contents

Controlling Authorities ................................................................................v

Introduction ................................................................................................1

Factual Background ....................................................................................1

    A.    Johnson is hired by Ford on June 25, 2018, after now-admitted resume fraud. ..........................................................1

    B.    Johnson almost immediately brings a (non-sexual) harassment concern to receptive HR supervisor Les Harris. ..................................................................................2

    C.    Johnson moves to B-Crew and begins working with co-worker Nick Rowan, who she claims harassed her. ...............3

    D.    On November 25, 2018, Johnson complains about Rowan to manager LaDawn Clemons. .......................................5

    E.    Harris interviews Johnson and suspends Rowan on November 26, 2018. ..................................................6

    F.    Johnson calls Harris to make new allegations and, the next day—through her lawyer—stops cooperating in Harris's investigation. ...................................................6

    G.    Ford completes its investigation and terminates Rowan. ....................8

    H.    Johnson files a lawsuit, and in her complaint and later testimony, makes new, inconsistent allegations. ..................................8

Argument ..................................................................................................9

I.    There was no quid pro quo harassment. .......................................9

    A.    As Rowan was not Johnson's supervisor, Ford cannot be held vicariously liable for his actions on a quid pro quo theory. .............................................................10

    B.    Johnson's "de facto" supervisor theory rests on inapplicable law that would not apply regardless. ..................12

C.    The alleged "denial of training" was not a tangible job
      action. ................................................................................................14

II.   Ford immediately remedied the alleged harassment after
      Johnson reported it, precluding liability under a hostile
      environment theory.........................................................................................15

      A.    Johnson admitted she did not want Markavich or
            Mahoney involved, and under Michigan law that vitiates
            notice to Ford.........................................................................................17

      B.    An alleged report to Mahoney—a senior process coach
            without power to discipline Rowan—is not sufficient
            notice to Ford.........................................................................................17

      C.    Even accepting Johnson's story about Markavich, she
            would not have put Markavich on adequate notice of
            sexual harassment.................................................................................19

III.  Johnson does not state a racial harassment claim, and in any
      event, her complaint referencing race was promptly remedied...................21

IV.   Johnson's attempt to hold Ford responsible for Rowan's alleged
      sexual assault mere days before his suspension is contrary to
      Michigan law. ...............................................................................................23

Conclusion .......................................................................................................25

# Controlling Authorities

## Cases

*Barhouma v. Athenian Assisted Living, Ltd.*,
2015 WL 5437786 (N.D. Ohio Sept. 15, 2015) ........................................... 12, 13

*Burton v. Ford Motor Co.*,
2003 WL 21279588 (Mich. Ct. App. June 3, 2003) ...........................................18

*Byers v. Honeytree II Ltd P'ship*,
2010 WL 481011 (Mich. Ct. App. Feb. 11, 2010).............................................18

*Carmon v. Lubrizol Corp.*,
17 F.3d 791 (5th Cir. 1994)................................................................................1

*Chambers v. Trettco, Inc.*,
463 Mich. 297 (2000) ............................................................... 9, 10, 11

*Curtis v. Hanger Prosthetics & Orthotics, Inc.*,
2002 WL 1378228 (W.D. Ky. June 25, 2002) ...................................................15

*Douglas v. Caldera*,
29 Fed. Appx. 257 (6th Cir. 2002) .....................................................................14

*Elezovic v. Bennett*,
274 Mich. App. 1, (2007) ........................................... 11, 15, 17, 19, 20

*Foster v. Ohio Bell*,
2009 WL 4697733 (Ohio Ct. App. Dec.10, 2019)...................................... 12, 13

*Hamed v. Wayne County*,
490 Mich. 1 (2011) ........................................................................ 23, 24

*Hartleip v. McNeilab, Inc.*,
83 F.3d 767 (6th Cir. 1996)............................................................................9, 14

*Holland v. Best Buy Stores, L.P.*,
2018 WL 4679610 (E.D. Mich. Sept. 28, 2018) ................................................10

*Iceberg v. Whole Foods Mkt. Grp., Inc.*,
914 F. Supp. 2d 870 (E.D. Mich. 2012)............................................................14

*Kalich v. AT & T Mobility, LLC*,
    679 F.3d 464 (6th Cir. 2012) ................................................................18

*Kauffman v. Allied Signal, Inc., Autolite Div.*,
    970 F.2d 178 (6th Cir. 1992) ................................................................16

*Keever v. Mediation Ctr. of San Joaquin*,
    2015 WL 75194 (E.D. Cal. Jan. 6, 2015) ............................................22

*Lindsey v. Whirlpool Corp.*,
    295 F. App'x 758 (6th Cir.2008) .........................................................14

*Mathews v. Massage Green LLC*,
    2016 WL 1242354 (E.D. Mich. Mar. 30, 2016) ..................................21

*Radtke v. Everett*,
    442 Mich. 368 (1993) ..........................................................................11

*Sheridan v. Forest Hills Pub. Sch.*,
    247 Mich. App. 611 (2001) ........................................................ 18, 19

*Smith v. City of New York*,
    2008 WL 1970316 (S.D.N.Y. May 6, 2008) .......................................22

*Vance v. Ball State*,
    570 U.S. 421 (2013) .............................................................................11

*Wyatt v. Nissan N. Am., Inc.*,
    2019 WL 6682197 (M.D. Tenn. Dec. 6, 2019) ...................................22

*Zackery v. Auto Air Composites, Inc.*,
    1993 WL 146687 (W.D. Mich. Feb. 17, 1993) ...................................10

## Statutes

MCL 37.2013(i) ...........................................................................................9

## Introduction

On November 25, 2018, Plaintiff Deanna Johnson reported that her co-worker Nick Rowan was harassing her. Ford suspended Rowan within a day, and fired him after an investigation. That is "what a company *ought* to do when faced with allegations that an employee has been subjected to sexual harassment," and holding Ford "liable after it has taken such action would produce truly perverse incentives benefitting no one…." *Carmon v. Lubrizol Corp.*, 17 F.3d 791, 795 (5th Cir. 1994).

Johnson nevertheless raises several theories to try to hold Ford liable, all of which fail as a matter of law. She claims Ford should be vicariously liable, but such liability is unavailable because Rowan was not Johnson's supervisor. Johnson also claims she put Ford on notice at some unspecified time before November 25, 2018 and that Ford did not address the harassment. But she did not report sexual harassment to an appropriate employee for notice purposes under Michigan law. Finally, under Michigan law, Ford is not responsible for Rowan's alleged sexual assault, which was outside the scope of his employment duties. Summary judgment should be granted as to all of Johnson's claims.

## Factual Background

**A.     Johnson is hired by Ford on June 25, 2018, after now-admitted resume fraud.**   Johnson applied for a job with Ford as a salaried production supervisor (now known as a "process coach") on May 26, 2018. Ex. A, Pl's Dep.

284-86 & Dep. Ex. 11; Ex. B, Mahoney Dep. 20-21. Production supervisors are first-level supervisors of Ford's hourly assembly-line workers, including the hourly "team leaders." Ex. C, Markavich Dep. 25-30, 43:21-23. Johnson's application and resume claimed that she had seven years' experience as a production supervisor at Cadillac Plastics. Ex. A, Pl's Dep. Ex. 11. Unbeknownst to Ford, Johnson was lying. She was not a supervisor at Cadillac Plastics, and she only worked there two *months*. *Id.* at 304-09, 330 & Dep. Ex. 13 at 39-40, 53-55. She testified that she "smudged" the truth to get a "better position," and that she had *never* been a production supervisor in the automotive industry before. *Id.* at 304-05, 335. Johnson also had never worked at Triton, the "current" job listed on her resume. *Id.* at 287. Her last job was with Peter/Lacke, where she was fired within a few months for threatening physical violence towards a co-worker she claimed used derogatory language. *Id.* at 288, 297-98. She could not explain why she left Peter/Lacke off her resume. *Id.*

Unaware of her resume fraud, Ford hired Johnson as a salaried production supervisor on June 25, 2018. Ex. A, Pl's Dep. 98-100. She was assigned to the engine line, on the A Crew—the morning shift—and assigned to training with fellow production supervisor Darnell Wilson. Ex. A, Pl's Dep. 105.

**B.    Johnson almost immediately brings a (non-sexual) harassment concern to receptive HR supervisor Les Harris.**    Shortly after she was hired, because her resume suggested supervisory experience in a paint department, she was

interviewed for a Paint process coach position. Ex. D, Harris Dep. 12-13; Ex. A, Pl's Dep. 111. After the interview, she filed a complaint under Ford's anti-harassment policy with Salaried Personnel Supervisor Les Harris, claiming the interviewer treated her with hostility and disrespect. Ex. A at 111; Ex. D at 13-14. Harris began an investigation, which resulted in discipline for the lead interviewer. Ex. D at 13, 17. Johnson admits that Harris responded appropriately, was receptive to her complaint, and didn't make her fear retaliation. Ex. A at 112-13.

**C.** **Johnson moves to B-Crew and begins working with co-worker Nick Rowan, who she claims harassed her.** After a few weeks, Johnson rotated to the B-Crew afternoon shift. Ex. A, Pl's Dep. 108. While on B-Crew, she began working with fellow production supervisor Nick Rowan. *Id.* Initially, Johnson did not have a problem with Rowan, but she claims that at some point he became an "asshole." *Id.* at 383-84. She alleges around the end of August, he started asking her for pictures (although her produced texts from August contain no express requests for pictures). *Id.* at 142-43; *see* Ex. E, Pl-Rowan text exchanges at 3196-3205.

Johnson alleged that Rowan ultimately sent her a "picture of his erect penis" and that after "receiving the penis picture, [she] became ill, passed out, and sought medical treatment at Beaumont Hospital." R. 46, ¶¶ 26-27. But while such an image appears in Johnson's text messages dated September 13, 2018, Ex. E at 3211 (redacted), Johnson did not pass out at work until nearly a week later, on September

19, 2018.[1] *See* Ex. G, Records Decl. ¶ 3.a. And Johnson told Ford and Beaumont

[                    Temporary redaction per Protective Order                    ]. *Id.*; Ex.

H, Beaumont Records at 1459. Johnson also had other text message exchanges with

Rowan where he was sexually suggestive, with Johnson frequently responding with

smiling emojis, banter, or teasing of her own. *See* Ex. E, Pl-Rowan Texts, at 3215-

16, 3229-30, 3142, 3155-57. But Johnson also testified to other texts with Rowan

that are entirely unsubstantiated by Johnson's own records. For instance, she alleges

Rowan texted her asking for pictures of her vagina "several times a week, every day

just about, every single day." Ex. A, Pl's Dep. 256-57. Not one such text appears in

Johnson's production, let alone several such texts each week. *See generally* Ex. E.

Three months later, Johnson moved to the C-Crew, and ultimately to the

chassis 4/5 line, a different line from Engine where she had worked previously. Ex.

A, Pl's Dep. 99, 107, 110; Ex. B, Mahoney Dep. 38. Johnson continued to text

Rowan for help with work matters. *See* Ex. E, Pl-Rowan Texts at 3171-77. She

claims that on November 16, 2018, Rowan grabbed her breast in the area where she

and other process coaches had office space. *Id.* at 3178; Ex. A, Pl's Dep. 143.

Rowan, at deposition, claimed that his hand accidentally touched Johnson's thigh,

and that he never touched her breast. Ex. F, Rowan Dep. 88, 126-27. The day after

---

[1] Rowan claims the nude photo (and one other in underwear) were of him, and on his phone, but that he did not send them to her. Ex. F, Rowan Dep. 82-84, 105-07. He suggests Johnson sent them to herself, as she had access to his phone. *Id.* at 70-71.

the alleged assault, Rowan texted Johnson—in the middle of a longer conversation—that he was "[s]orry for [his] hand slippage yesterday," with Johnson responding with joking banter and further conversation.[2] Ex. E, Pl-Rowan Texts 3177-3181. Over the next few days, Johnson texted Rowan to wish him a happy Thanksgiving and ask work-related questions. *Id.* at 3182-3186. In one of the conversations, Rowan sent a photo of himself with his shirt unbuttoned. *Id.* at 3185. Her last text conversation with Rowan was work-related. *Id.* at 3185-86.

**D.     On November 25, 2018, Johnson complains about Rowan to manager LaDawn Clemons.**     During the November 25, 2018 evening shift, Johnson approached Crew Operations Manager LaDawn Clemons, who reported directly to the Assistant Plant Manager. Ex. A, Pl's Dep. 126; Ex. I, Clemons Dep. 6, 35, 54. As recounted by Clemons in a statement Johnson admitted was "all accurate," Johnson told Clemons—after hesitating over fears she would be called a snitch—that Rowan had solicited explicit pictures from her, and that he had sent her explicit pictures of himself. Ex. A, Pl's Dep. 126-27 & Dep. Ex. 2. Johnson did not show Clemons any evidence of her claims. *Id.* Clemons reported this conversation to Les Harris the next day. Ex. D, Harris Dep. 30; Ex. I, Clemons Dep. 53.

---

[2]Johnson wrote "is hand slippage even in the dictionary[,] smarty pants[?]," asked Rowan if she looked like a pirate that day (because [Temporary redaction per Protective Order]   ), and finally asked Rowan for advice on whether she was right to leave work that day as a result, thanking him for his answer. Ex. E, Pl-Rowan Texts 3177-3181; Ex. F, Rowan Dep. 124-26, Ex. G, Records Decl. ¶ 3.b at Ford 00445-446.

**E.     Harris interviews Johnson and suspends Rowan on November 26,**
**2018.**   Upon receiving Clemons's report, Les Harris arranged an interview with
Johnson after she arrived for work that evening. Ex. D, Harris Dep. 42; Ex. A, Pl's
Dep. 114. Johnson gave a statement to Harris which Johnson admits was an accurate
account of the conversation off by only a few words at most.  Ex. A at 168-69 &
Dep. Ex. 3. In that statement, Johnson forwarded Harris photos Rowan allegedly
sent her, and told Harris that Rowan had said "I've never had any chocolate lately,"
referenced her "mounds," and asked to see a picture of her breasts. *Id.* & Ex. D at
53:5-15. She also claimed to have seen pictures and videos on Rowan's phone of
him engaged in sex acts with other women working at the plant. Ex. A, Pl's Dep.
Ex. 3. This was the only face-to-face meeting Johnson had with Harris. Ex. D at 24.

Harris then interviewed Rowan and took a statement. *Id.* at 31, 93:3-7 & Dep
Ex. 1 at 114-116. Rowan told Harris that the photos of the erect penis and the bikini
underwear were of him, but that he did not send it to Johnson and suggested that she
used his phone to send them to herself. *Id.*, Dep. Ex. 1 at 00114-116. Rowan admitted
sending the photo with his shirt unbuttoned, but otherwise denied Johnson's
allegations. *Id.* Harris suspended Rowan pending his investigation. Ex. D at 104.

**F.     Johnson calls Harris to make new allegations and, the next day—**
**through her lawyer—stops cooperating in Harris's investigation.**   The day after
Johnson's in-person interview, she emailed Les Harris claiming that she did "not say

everything" the day prior. Ex. A, Pl's Dep. 176-77 & Dep. Ex. 5. Harris called Johnson; thereafter, he summarized their conversation in an email, with Johnson agreeing it was accurate except for one change she asked him to make. *Id.* at 184-87 & Dep Ex. 6; Ex. D, Harris Dep. 61.

In this new statement, she claimed that she had told senior process coach Richard Mahoney about Rowan and showed him one of the pictures. Ex. A, Pl's Dep. 184-86 & Dep. Ex. 6. Mahoney allegedly said "you two should go ahead and get married or something," but asked if she wanted him to talk to Rowan, and that Johnson "told him no because I was scared and didn't want retaliation." *Id.* at Pl's Dep. Ex. 6. Johnson speculated that Mahoney shared their conversation with Markavich because Markavich allegedly asked her "from 1-10 how bad is it between you and [Rowan]," and when Johnson said "100," he said "Oh God, I don't want to know." *Id.* She went on to claim that she did not want Markavich involved either, because of an earlier argument when Markavich allegedly said, after Johnson missed work to care for her mother, that he didn't "give a fuck" about her mother. *Id.*

Following the call, Johnson authorized Ford to retrieve Rowan's texts from her phone, and a meeting was scheduled the next day to permit the retrieval. Ex. D, Harris Dep. 121-22 & Dep. Ex. 2 at 354-56. But the next day, Johnson's counsel emailed Harris and told him not to communicate with Johnson further, ending her cooperation into the investigation. Ex. D at 107:3-7 & Dep. Ex. 1 at 00182-83.

**G.    Ford completes its investigation and terminates Rowan.**  Despite Johnson's non-cooperation, Ford's investigation continued. Harris interviewed Markavich and Mahoney, who both denied that Johnson complained about sexual harassment by Rowan. Ex. D, Harris Dep. 31-32, 95:15-18, 99:7-10 & Dep. Ex. 1 at 00120-125. Both thought Johnson and Rowan had a friendly work relationship for the most part, with any complaints by Johnson being non-sexual in nature. Ex. B, Mahoney Dep. 83-88 & Dep. Ex. 4; Ex. C, Markavich Dep. 112-115 & Dep. Ex. 2.

Harris sought to obtain Rowan's phone for forensic investigation, but Rowan refused. Ex. D, Harris Dep. 95:10-14 & Dep. Ex. 1 at 00117-119. Harris sent his investigative materials to Mario Spadafora at Ford World Headquarters, who performed some additional interviews and ultimately decided that Rowan should be terminated. *Id.* at 103; Ex. J, Spadafora Decl. ¶ 3. Rowan was terminated for violating Ford policies on December 21, 2018. Ex. G, Records Decl. ¶ 3.c.

**H.    Johnson files a lawsuit, and in her complaint and later testimony, makes new, inconsistent allegations.**  Johnson filed this lawsuit in January 2019, and in the course of the litigation made new claims not reported to Harris. At deposition, Johnson was asked "what do you claim you told Mr. Markavich about Mr. Rowan?" Ex. A, Pl's Dep. 152. She said that she told Mahoney "I can't do it over here anymore. You guys got to move me." *Id.* Mahoney then went to talk to Markavich, but Johnson "did not hear what they were talking about." *Id.* Markavich

came back and asked "how bad is it between you and Nick Rowan?" *Id.* at 152-53.
Johnson said "100" on a scale of 1-10, with Markavich saying he didn't want to hear
it; he then walked away. *Id.* at 153. At this point, Johnson referenced out loud
Rowan's "weenie." *Id.* Finally, she claims that Markavich sent her a text asking her
to "write down everything [Rowan] did and we'll handle it tomorrow." *Id.* at 153-
54. She testified that she did not recall responding, or having any other exchanges
with Markavich thereafter regarding issues with Rowan. *Id.* at 154-55.

## Argument

### I.    There was no quid pro quo harassment.

In Michigan, quid pro quo harassment requires proof (1) that a person was
subjected to unwelcome sexual conduct or communication, and (2) that her employer
or its agent used her submission to or rejection of the proscribed conduct as a factor
in a decision affecting her employment. MCL 37.2013(i); *Chambers v. Trettco, Inc.,*
463 Mich. 297, 310 (2000). The second prong requires proof of a "tangible (adverse
or otherwise) employment action that was shown to be causally related to plaintiff's
submission to or rejection of" the sexual harassment. *Chambers*, 463 Mich. at 317.
This can only happen when the alleged harasser "is in a position to offer tangible job
benefits in exchange for sexual favors or, alternatively, threaten job injury for a
failure to submit." *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 775 (6th Cir. 1996)
(citing Michigan law). Thus, "a tangible employment action is an indispensable

element of quid pro quo harassment, and only persons with supervisory powers could ever effectively make such a decision." *Chambers*, 463 Mich. at 321.

### A.   As Rowan was not Johnson's supervisor, Ford cannot be held vicariously liable for his actions on a quid pro quo theory.

Johnson's claim that Rowan engaged in quid pro quo harassment, and that Ford is vicariously liable for his conduct, should be rejected outright. Johnson's quid pro quo theory is that Rowan had the power to train her but refused to do so because Johnson rejected his advances. R. 27, Mot. to Amend, Pg ID 389-90.  But the notion that vicarious liability should attach over acts by an employee whose sole power over the alleged victim is training is flatly incompatible with *Chambers*. As noted, quid pro quo claims require a "tangible employment action," which is the kind of job decision that "only persons with supervisory powers could ever effectively make." 463 Mich. at 321. But training is not something that can only "effectively" be done by someone with supervisory powers; case law is replete with examples of co-workers training colleagues.[3] Failure to train cannot be a "tangible employment action" as defined in *Chambers*, and thus cannot support a quid pro quo claim.

Additionally, Michigan law—including *Chambers* itself—explicitly describes what sort of power a harasser must have before vicarious liability may be imposed:

---

[3] *See, e.g.*, *Holland v. Best Buy Stores, L.P.*, 2018 WL 4679610, at *9 (E.D. Mich. Sept. 28, 2018) (legitimate to expect employee to "teach, coach, and train his coworkers"); *Zackery v. Auto Air Composites, Inc.*, 1993 WL 146687, at *1 (W.D. Mich. Feb. 17, 1993) (describing use of co-workers to train new employee).

-10-

the power to hire, fire, promote, demote, and discipline. In *Chambers*, the Court noted that vicarious liability is warranted in quid pro quo cases because the harasser "by definition, uses the power of the employer to alter the terms and conditions of employment." *Id.* at 311. But vicarious liability is *inappropriate* when the harasser "acts outside 'the scope of actual or apparent authority to hire, fire, discipline, or promote.'" *Id.* In *Radtke v. Everett*, vicarious liability was permitted against an individual defendant because he could "hire and fire plaintiff and [] control her working conditions, maintained her discipline, paid her wages, and owned the corporation that employed her." 442 Mich. 368, 397 (1993). And in *Elezovic v. Bennett*, the Michigan Court of Appeals found that supervisory power means having control over the "promotions, bonuses, overtime options, raises, shift and job assignments, and terminations" of the alleged victim. 274 Mich. App. 1, 12 (2007).

This definition of a "supervisor" has since been adopted by the United States Supreme Court. In *Vance v. Ball State*, the Supreme Court held that the "authority to take tangible employment actions is the defining characteristic of a supervisor," and that an employee who "did not have the power to hire, fire, demote, promote, transfer, or discipline" the plaintiff was not a supervisor, even if the employee was authorized to direct the employee's daily tasks. 570 U.S. 421, 425, 431-32 (2013).

Here, Rowan—being a process coach, just like Johnson—did not have the power to hire, fire, transfer, promote, demote, discipline, or otherwise impose any

tangible changes in Johnson's employment status. Ex. L, Markavich Decl. ¶ 3; Ex. F, Rowan Dep. 158. He was not Johnson's supervisor, and thus he could not have engaged in quid pro quo harassment.

> **B.**   **Johnson's "de facto" supervisor theory rests on inapplicable law that would not apply regardless.**

Johnson's efforts to avoid the obvious flaw in her theory—that only a victim's supervisor can engage in quid pro quo harassment, and Rowan was not her supervisor—rests on the word game that Rowan was her "de facto" supervisor. But that is meaningless. She concedes Rowan was not her supervisor on paper, and does not claim that Rowan had the power to fire, discipline, or demote her, and the like. Rather, she claims he could train and assist her with supervising hourly workers. R. 45, Opinion, Pg ID 645; R. 42, Pl's Br., Pg ID 607-08. But by the plain meaning of the words, to be a "de facto" supervisor Rowan would need the unwritten—but actual—authority to fire, discipline, and the like. He did not have such authority.

Moreover, *Barhouma v. Athenian Assisted Living, Ltd.*, 2015 WL 5437786 (N.D. Ohio Sept. 15, 2015) does not support Johnson's "de facto" decision-maker theory. *Barhouma* cites only a single Ohio case interpreting Ohio's civil rights statute. *Id.* at *4 & nn. 66-67 (citing *Foster v. Ohio Bell*, 2009 WL 4697733, at *4 (Ohio Ct. App. Dec.10, 2019)). That case—*Foster*—in turn, relied on the federal law since rejected by *Vance* in 2013 that a supervisor need not be able to take tangible actions like hiring or firing. *Id.* And regardless, the Michigan Supreme

Court, in *Chambers*, has long rejected the idea that a supervisor need not be able to take tangible employment actions. *Supra* at 9-10. *Barhouma* is not good law.

But even accepting the *Foster/Barhouma* "de facto" decision-maker theory, it is inapplicable here. Both cases shared the same fact pattern: (1) the plaintiff suffered a tangible job action—failure to promote in *Foster*, and termination in *Barhouma*—performed by an actual supervisor who was *not* the harasser; but (2) the harasser allegedly had a "significant influence" on the actual decision-maker. *Foster*, 2009 WL 4697733 at *4; *Barhouma*, 2015 WL 5437786, at *1-2, *5. But here, Johnson's actual supervisor Markavich never took tangible employment action against her—she was not demoted, docked in pay, disciplined, or anything of the sort—and thus there was no tangible decision Rowan could have "significantly influenced."

Indeed, Johnson's bare motion-to-amend allegation that Rowan "reported negative feedback to higher level Ford agents with respect to Johnson's performance" that "jeopardized Plaintiff's ability to remain employed at Ford," R. 42, Pg ID 611, has no record support. Johnson's supervisor Markavich testified that he thought she was doing a good job. Ex. C, Markavich Dep. 41. And after her training with Rowan ended, she was moved from the Engine line to the Chassis 4/5 line, which both Markavich *and* Johnson agreed was a more favorable line, and a promotion. *Id.*; Ex. A, Pl's Dep. 369. In other words, contrary to her bare allegation that Rowan's alleged lack of training "jeopardized" her job, Johnson—in her own

-13-

words—said she was *promoted* to a better line while at Ford. The *de facto* supervisor allegation is unsupportable on the summary judgment record.

### C.   The alleged "denial of training" was not a tangible job action.

Even if—contrary to Michigan law—Rowan was legally a supervisor capable of quid pro quo harassment, the alleged denial of training here is not legally adverse because failure to train is not even a tangible job action. *See Hartleip*, 83 F.3d at 771, 775 (citing Michigan law and rejecting quid pro quo claim despite harasser being responsible for training.) This is so even when the harasser is a supervisor—which Rowan was not. *See Iceberg v. Whole Foods Mkt. Grp., Inc.*, 914 F. Supp. 2d 870, 880 (E.D. Mich. 2012) (holding supervisor's excluding plaintiff from training sessions was not a tangible employment action in a quid pro quo case.)

Johnson tried to distinguish *Iceberg* by claiming that it only involved "a few training sessions," while she was allegedly denied "basic, ongoing training needed to learn and succeed on the job." R. 42, Pg ID 612; R. 45, Opinion, Pg ID 647 (noting same). This argument is beside the point—*Iceberg* did not make the distinction Johnson asserts. Further, many courts have held that a denial of training is not even adverse unless it leads to a failure to promote or the like. *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 768 (6th Cir.2008) ("failure to provide plaintiff with extra training does not constitute an adverse employment action."); *Douglas v. Caldera*, 29 F. App'x 257, 258–59 (6th Cir. 2002) (denial of training not materially adverse unless

-14-

it actually resulted in a denial of promotion or opportunity for advancement); *Curtis v. Hanger Prosthetics & Orthotics, Inc.*, 2002 WL 1378228, at *4 (W.D. Ky. June 25, 2002) ("deprivations of training opportunities do not constitute an adverse employment action under Title VII."), *aff'd,* 101 F. App'x 61 (6th Cir. 2004).

But, as Johnson's post-Rowan promotion shows, *supra* at 13-14, there was no adverse consequences from the alleged lack of training, and her bare allegation that Rowan denied her basic training she needed to "succeed" is factually unsupported. If anything, it was Johnson's utter lack of prior production supervisor experience (which she lied to Ford about, *supra* at 2) that led to her lengthy training. She admitted that training for a process coach ordinarily took only two to three weeks, Ex. A, Pl's Dep. 104:9-11, and trained for several weeks before Rowan was even in the picture. *Supra* at 2-3. For her part, Johnson filibustered when asked to explain what training Rowan failed to give her, saying at one point she didn't know. Ex. A, Pl's Dep. 398-407. And ultimately, Johnson contradicted her counsel's in-court representation that Rowan denied her *all* training she needed to succeed, *see id.* at 402-03, 410. The quid pro quo claim should be rejected for this reason too.

## II.     Ford immediately remedied the alleged harassment after Johnson reported it, precluding liability under a hostile environment theory.

In Michigan, an employer's duty to remedy co-worker harassment is triggered when the plaintiff provides the employer with "adequate notice" of the alleged harassment. *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 426 (2005). Upon receiving

-15-

notice, an employer is only liable if it "failed to take prompt and adequate remedial action" thereafter. *Chambers,* 463 Mich. at 313. Here, notice occurred on November 25, 2018 when Johnson complained to LaDawn Clemons, and was remedied the next day when HR's Les Harris suspended Rowan and later terminated him. *See supra.* Such immediate suspension within a day of notice, followed by termination, is plainly prompt and adequate as a matter of law. *See, e.g.*, *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 185 (6th Cir. 1992). Ford thus cannot be held liable for co-worker harassment based on the November 25 report.

Johnson's attempt to avoid dismissal, in the face of this prompt and adequate resolution of her complaint, is to allege that she put Ford on notice *earlier* than November 25, 2018, and that Ford did not act promptly as measured by that earlier date. R. 46, Amd. Compl. ¶¶ 27-31. She claims she told her co-worker Mahoney, who told supervisor Markavich, of the alleged (sexual) harassment at unspecified times in the weeks or months prior to November 26, 2018.[4] But even accepting Johnson's testimony at face value, she does not establish adequate notice to Ford.

---

[4]Johnson's accusations have increased in severity with each retelling of the tale. As of her December 19, 2019 deposition, Johnson has sunk to launching false personal attacks, rooted in racial stereotypes, against African-American co-worker Richard Mahoney, who she says uses threatening "street lingo" and has "goons" that she fears he might send to assault her. See Ex. A, Pl's Dep. 419-22. In reality, Mahoney is a grandfather who hasn't been in a fight since grade school, and who was supportive of and friendly with Johnson, as shown in their texts. Ex. B, Mahoney Dep. 9, 126; *see, e.g.*, Ex. K, Pl-Mahoney Texts at 2173, 2177-2180, 2188.

### A.    Johnson admitted she did not want Markavich or Mahoney involved, and under Michigan law that vitiates notice to Ford.

The Court should first reject Johnson's argument because, by her own admission, she waived any argument of notice to Ford by admitting that she did *not* want Mahoney to talk to Rowan about his alleged conduct, and did not want Markavich to be involved either. Ex. A, Pl's Dep. 186-87 & Dep. Ex. 6. This admission constitutes a waiver, precluding Johnson's claim as a matter of law.

In *Elezovic*, the Michigan Supreme Court held that "the victim of harassment 'owns the right' whether to notify the company and start the process of investigation. Until the employee takes appropriate steps to start the process, it is not started." 472 Mich. at 427. Thus, even when a party reports harassment to an appropriate manager (and she did not, *see infra* at Part II.B), if the party does *not* want that manager to take further action, it is considered a waiver of notice and does not support an ELCRA claim against the employer. *Id.* at 427-28. Given Johnson admittedly did *not* want Mahoney and Markavich to bring her complaint forward—and, indeed, ignored Markavich when he asked her for details about her claim, *supra* at 9—she has waived the right to claim she put Ford on earlier notice of her harassment claim.

### B.    An alleged report to Mahoney—a senior process coach without power to discipline Rowan—is not sufficient notice to Ford.

Under Michigan law, a report of alleged harassment to another employee does not provide adequate notice to an employer unless the employee is "higher

-17-

management." *Sheridan v. Forest Hills Pub. Sch.*, 247 Mich. App. 611, 622 (2001);

*Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 474 (6th Cir. 2012) (recognizing

*Sheridan* standard). To be "higher management," the employee must "have actual

authority to effectuate change in the workplace" with respect to "hiring, firing, and

disciplining *the offensive employee*." *Sheridan*, 247 Mich. App. at 622-23 (emphasis

added). This "definition is consistent with [the Michigan] Supreme Court's analysis

of harassment alleged by 'supervisors.'" *Id.* Thus, even a report to an "immediate

supervisor, even one who might handle issues arising during the performance of their

jobs, is insufficient to trigger the employer's liability." *Byers v. Honeytree II Ltd*

*P'ship*, 2010 WL 481011, at *3 (Mich. Ct. App. Feb. 11, 2010). Thus, for example,

in *Burton v. Ford Motor Co.*, the Court held that a nurse's report of harassment to

her direct supervisor—one who oversaw her day-to-day work—was insufficient

where there was no record evidence that nursing supervisor had the power to

effectuate change through the discipline or firing of the harasser. 2003 WL

21279588, at *1 (Mich. Ct. App. June 3, 2003).

     *Sheridan* itself is uncommonly similar both factually and legally to this case.

As here, (1) the plaintiff complained to HR, which promptly investigated and

terminated the harasser; (2) the plaintiff immediately went on medical leave after

reporting; and (3) then sued the employer for damages anyway, claiming she had

provided notice before going to HR: the plaintiff, a custodian, claimed she told the

*head* custodian of the harassment. 247 Mich. App. at 613-14. But the head custodian could not effectuate change by firing or disciplining the offending employee; thus, the report to the head custodian was inadequate notice to the employer. *Id.* at 615.

Just as *Sheridan* involved a custodian reporting to the head custodian, this case involves a process coach (Johnson) who allegedly reported to the senior process coach (Mahoney). As senior process coach, Mahoney's primary duty was to actually perform each process coach's job if that coach was absent, and to provide direction on quality matters and safety requirements, like ensuring employees wore their protective equipment. Ex. B, Mahoney Dep. 14-15, 18-19. But like the head custodian in *Sheridan*, the senior process coach Mahoney could not effectuate change in the workplace by firing or disciplining the offending employee Rowan. Ex. C, Markavich Dep. 149-150 & Ex. L, Decl. ¶ 4. As a matter of law, Johnson's alleged reporting of harassment to Mahoney was not adequate notice to Ford.

### C.   Even accepting Johnson's story about Markavich, she would not have put Markavich on adequate notice of sexual harassment.

Under Michigan law, notice to a supervisor must be sufficient to make that person aware that *sexual harassment* is at issue. Thus, for instance, in *Elezovic*, the Michigan Supreme Court held that even an employee who used the terms "harassment" and "hostile environment" in a written complaint did not sufficiently provide notice of *sexual* harassment to the employer. 472 Mich. 408, 428–29; *accord Sheridan*, 247 Mich. App. at 611 (complaint that co-worker "bothered" her, without

-19-

directly stating there was harassment "of a sexual nature" insufficient.) The insufficiency of a generic report is particularly acute when, as here, the plaintiff has complained of non-sexual harassment in the workplace before, and knows how to allege sexual harassment. *Elezovic*, 472 Mich. at 428-29.

Here, Johnson *had* complained of non-sexual harassment by other Ford employees during her short time on the job (and to the most appropriate person, Les Harris). *Supra* at 2-3. And she knew how to allege sexual harassment, having sued a previous employer in state court for sexual harassment less than two years before joining Ford. Ex. A, Pl's Dep. 204. Her claimed report to Markavich, however, rests on vague and speculative testimony that Markavich had second-hand notice of Johnson's claims. Given the *Elezovic* standard, this evidence is insufficient.

As discussed in detail at pp. 8-9, Johnson's most recent story as recounted at deposition was that (1) she made generic complaints to Mahoney about needing to move from Rowan, without even using the word "harassment," let alone "sexual" harassment; (2) Mahoney said something to Markavich, but she doesn't know what; (3) Markavich asked a question about "how bad" things were, without referencing sexual harassment; (4) after Markavich walked away, Johnson said the word "weenie" in reference to Rowan, without any indication that Markavich heard it; and (5) after that, Markavich *asked* what Rowan had done, and Johnson did not tell him.

At best, this testimony requires speculation as to what Mahoney said to Markavich, and as to whether Markavich even heard Johnson's alleged weenie comments, and understood it to be sexual in nature.[5] But Johnson's own allegations refute such understanding: Markavich *did not know* and had to ask what her specific problems with Rowan were, and she declined to tell him. Given that, under *Elezovic*, a plaintiff must show specific reporting of *sexual harassment* to provide adequate notice to her employer, these thin claims—even if believed—are insufficient.

## III. Johnson does not state a racial harassment claim, and in any event, her complaint referencing race was promptly remedied.

Johnson also tries to recast some of the alleged sexual harassment as "racial" harassment in order to bring a federal Section 1981 claim. R. 46, Amd. Compl. ¶¶ 55-63. A Section 1981 racial harassment claim requires, among other things, proof of "sufficiently severe or pervasive" harassment based on race, and proof that the defendant knew of the racial harassment and failed to act. *Mathews v. Massage Green LLC*, 2016 WL 1242354, at *6 (E.D. Mich. Mar. 30, 2016) (citing cases).

---

[5]Johnson has tried to spin non-sexual text messages out-of-context as sexual. For instance, she claimed Mahoney's text to "kiss and make up" with a subordinate—used in its ordinary, non-sexual way—was about Rowan, and a "horrible, foul" thing to say. *Compare* Ex. A, Pl's Dep. 148-49 *with* Ex. B, Mahoney Dep. 156-58; Ex. K at 002170-71. The word "weenie," used in the workplace to refer to extra hourly workers at a particular line who could be reassigned for the day to other areas, was another word Mahoney has texted that Johnson's counsel tried to claim had a sexual connotation. *See* Ex. B at 62-63 (questioning suggesting sexual connotation); *but compare* Ex. B, Mahoney Dep. at 179-183 & Mahoney Dep. Ex. A.

Here, the sole factual basis for this racial harassment claim is that Rowan referred to Johnson's breasts as "black mounds" or "black mountains," and said she was a "chocolate jolly rancher." Ex. A, Pl's Dep. 211-213. While such comments are inappropriate and offensive, the context is plainly sexual and do not establish a *racially*-hostile environment. Several courts have so held when addressing similar efforts to recast sexual comments as racial harassment. *See Wyatt v. Nissan N. Am., Inc.*, 2019 WL 6682197, at *4 (M.D. Tenn. Dec. 6, 2019) (calling plaintiff "brownie bite" and referencing "chocolate skin" insufficient for race harassment claim); *Keever v. Mediation Ctr. of San Joaquin*, 2015 WL 75194, at *8 (E.D. Cal. Jan. 6, 2015) (several references to women as "chocolate" does not establish racial harassment); *Smith v. City of New York*, 2008 WL 1970316, at *12 (S.D.N.Y. May 6, 2008) (references to plaintiff as a "Nubian black brother" and "milk chocolate bunny" not severe enough to establish racial harassment). The handful of similar alleged comments here do not constitute severe or pervasive racial harassment.

But even if sexual references alluding to Johnson's race could establish racial harassment, Ford promptly remedied her complaint: Johnson referenced the "chocolate" statement in her report to Harris, and Rowan was suspended the same day. *Supra* at 6-8. Unlike with her sex-based claims, moreover, Johnson did not allege to have mentioned Rowan's references to "chocolate" and the like to Mahoney or Markavich. *See, e.g.*, Ex. A, Pl's Dep. 137-38 (claiming she told Mahoney about

-22-

"sexual things"). There was thus no report of *racial* harassment to Mahoney, or evidence Markavich would have known that Johnson was claiming *racial* harassment. The first and only report of alleged racial harassment was remedied the very next day, and thus Ford did not "fail to act" upon receiving the notice.

## IV. Johnson's attempt to hold Ford responsible for Rowan's alleged sexual assault mere days before his suspension is contrary to Michigan law.

Johnson's final count alleges that Ford should be liable for Rowan's alleged "sexual assault and battery," based on her allegation that "[o]n one occasion, Rowan grabbed [her] breast, and then apologized for his hand slipping." R. 46, ¶ 65. Based on Johnson and Rowan's text messages, the incident occurred on November 16, 2018—a few days before Rowan was suspended. *Supra* at 4-5, 6. But directly-controlling Michigan law precludes her attempt to hold Ford liable for Rowan's alleged assault, and summary judgment should be granted on this count.

In *Hamed v. Wayne County*, the Michigan Supreme Court addressed whether an employer could be vicariously liable for its employee's sexual assault "committed during working hours but plainly beyond the scope of his employment." 490 Mich. 1, 5 (2011). In *Hamed*, a deputy sheriff with supervisory authority over a female inmate offered her better treatment in exchange for sexual favors, and when she resisted, he sexually assaulted her. *Id.* at 6-7. The Supreme Court held, however, that an employer cannot be vicariously liable for an employee's torts that are beyond the scope of the employer's business. *Id.* at 10-11. And sexual assault is beyond the

-23-

scope of employment: it is an "independent action accomplished solely in furtherance of [the attacker's] own criminal interests" that does not "in any way" benefit the employer, particularly where behavior violates defendant's policies and the criminal law. *Id.* at 11-13.

The only exception, the Supreme Court held, is if the employer knew or should have known about the employee's "propensities and criminal record before that employee committed an intentional tort." *Id.* at 12. That, in turn, requires "actual or constructive knowledge of prior similar conduct," *and* "actual or constructive knowledge of the employee's propensity to act in accordance with that conduct." *Id.* And the Court made clear that neither "[c]omments of a sexual nature" nor mere "aggressive tendencies" are enough to put an employer on reasonable notice of criminal sexual conduct. *Id.* at 13, 16. Because the *Hamed* employee had—at most— shown a propensity to act aggressively, and to disobey work protocols, the employer was not on reasonable notice that the employee would commit sexual assault as a matter of law, and vicarious liability was impermissible. *Id.* at 16-17.

*Hamed* directly controls here. Johnson alleges that Rowan made sexual comments to her before the alleged November 16, 2018 assault—and claims that he would punch his cubicle walls. Ex. A, Pl's Dep. 393. But *Hamed* made clear that such claims, even if substantiated, would be insufficient. There is no evidence that Rowan had engaged in sexual assault in the past, let alone that Ford was aware of it.

And sexual assault is, of course, contrary to Ford's policies in addition to being criminal. Ex. G, Wilcox Decl. ¶ 4. Any sexual assault by Rowan would not have been within the scope of his employment, and would not have been foreseeable to Ford as a matter of law. Summary judgment is appropriate on this claim.

## Conclusion

The Court should grant summary judgment on all claims.

<div align="right">

/s/ Elizabeth Hardy
Elizabeth Hardy (P37426)
Thomas J. Davis (P78626)
Attorneys for Defendants
280 N. Old Woodward Ave., Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com

</div>

Dated: January 21, 2020

353985

-25-

## Certificate of Service

I hereby certify that on January 21, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

<div style="text-align:right">

*/s/ Elizabeth Hardy* _____
Elizabeth Hardy (P37426)
Kienbaum Hardy Viviano
 Pelton & Forrest, P.L.C.
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI  48009
(248) 645-0000
E-mail:  ehardy@khvpf.com

</div>

353985