UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DEANNA JOHNSON

       Plaintiff,

vs.

FORD MOTOR COMPANY,
*a Delaware corporation;*

       Defendant.

Case No. 2:19-cv-10167
Hon. Gershwin A. Drain
Mag. Judge Elizabeth A. Stafford

_____/

| | |
|---|---|
| Carol A. Laughbaum (P41711)<br>STERLING ATTORNEYS AT LAW, P.C.<br>Attorneys for Plaintiff<br>33 Bloomfield Hills Pkwy., Ste. 250<br>Bloomfield Hills, Michigan 48304<br>(248) 644-1500<br>claughbaum@sterlingattorneys.com | Elizabeth P. Hardy (P37426)<br>Julia Turner Baumhart (49173)<br>Thomas J. Davis (P78626)<br>KIENBAUM, HARDY, VIVIANO,<br> PELTON & FORREST, P.L.C.<br>Attorneys for Defendant<br>280 N. Old Woodward Ave., Ste.400<br>Birmingham, MI 48009<br>(248) 645-0000<br>ehardy@khvpf.com<br>jbaumhart@khvpf.com<br>tdavis@khvpf.com |

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Deanna Johnson, by her attorneys Sterling Attorneys at Law, P.C., opposes Defendant's Motion for Summary Judgment as set forth in the accompanying Brief and exhibits and requests an Order denying that motion in its entirety.

Respectfully Submitted,
STERLING ATTORNEYS AT LAW, P.C.

By:____/s/Carol A. Laughbaum_____
          Carol A. Laughbaum (P41711)
          Attorney for Plaintiff
          33 Bloomfield Hills Pkwy., Ste. 250
          Bloomfield Hills, MI 48304
          (248) 644-1500

Dated:  February 25, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————

DEANNA JOHNSON

       Plaintiff,

vs.

FORD MOTOR COMPANY,
*a Delaware corporation;*

       Defendant.

Case No. 2:19-cv-10167
Hon. Gershwin A. Drain
Mag. Judge Elizabeth A. Stafford

_____/

Carol A. Laughbaum (P41711)
STERLING ATTORNEYS AT LAW, P.C.
Attorneys for Plaintiff
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, Michigan 48304
(248) 644-1500
claughbaum@sterlingattorneys.com

Elizabeth P. Hardy (P37426)
Julia Turner Baumhart (49173)
Thomas J. Davis (P78626)
KIENBAUM, HARDY, VIVIANO,
 PELTON & FORREST, P.L.C.
Attorneys for Defendant
280 N. Old Woodward Ave., Ste.400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
jbaumhart@khvpf.com
tdavis@khvpf.com

_____/

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## STATEMENT OF ISSUES PRESENTED

Whether Defendant's Motion for Summary Judgment in this Fact Intensive Case Involving Quid Pro Quo and Hostile Work Environment Sexual Harassment, Racial Harassment, and Assault and Battery Should be Denied?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Radtke v Everett*, 442 Mich 368 (1993)

*Chambers v Trettco, Inc*, 463 Mich 297; 614 NW2d 910 (2000)

*Jackson v Quanex Corp,* 191 F3d 647 (6th Cir 1999)

*Barhouma v Athenian Assisted Living,* 2015 WL 5437796 (ND OH 2015)

*Scarbary v Georgia Dept of Nat Res*, 2017 WL 1132726 (WD KY 2017)

*Clay v United Parcel Service, Inc.,* 501 F3d 695 (6th Cir 2007)

*Jordan v City of Cleveland*, 464 F3d 584 (6th Cir 2006)

*Hersh v Kentfield Builders*, 385 Mich 410 (1971)

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ................................................................. i

CONTROLLING OR MOST APPROPRIATE AUTHORITY ................................... ii

INDEX OF AUTHORITIES ...................................................................................... v

OVERVIEW ............................................................................................................ 1

PERTINENT FACTS .............................................................................................. 1

    A.    Plaintiff is Hired as a Ford Supervisor ............................................ 1
    B.    Plant Management Hierarchy ......................................................... 2
    C.    Plaintiff's Bosses Assign Nick Rowan, a Long Term Supervisor with a History of Sexually Inappropriate Behavior and Workplace Violence, to Teach Plaintiff her Job ............................................................... 3
    D.    Rowan Subjects Plaintiff to Constant Sexual and Racial Harassment Which Plaintiff Reports to her Supervisors ...................................... 5
    E.    Plaintiff's Supervisor Threatens Her When She Again Says that Rowan Needs to be Taken to HR ("You've Only Been Here a Hot F---king Minute") .......................................................................................... 12
    F.    Plaintiff Meets with Crew Operations Manager LaDawn Clemons, a Point Person for Sexual Harassment Issues at the Plant; Mahoney and Markavich Burst In .......................................................................... 13
    G.    Plaintiff's Supervisors Move Her Away from Rowan, and then Shuttle her Back and Forth from Rowan's Area ........................................... 14
    H.    Rowan Assaults Plaintiff, Violently Grabbing her Breast ............... 15
    I.    Plaintiff Continues to Report Rowan's Sexual Harassment (to Higher Management and HR) Despite her Supervisor's Directive to "Lie, I did" ....... 15
    J.    Ford Demands to Search Plaintiff's Home ..................................... 18
    K.    Plaintiff Goes on a Medical Leave ................................................ 19

LAW AND ANALYSIS .......................................................................................... 19

    Summary Judgment Standards ................................................................. 19

    I.    COUNT I:  Hostile Work Environment Sexual Harassment in Violation of Michigan's Elliott-Larsen Civil Rights Act (ELCRA) ................... 19

II.     COUNT I: Quid Pro Quo Sexual Harassment in Violation of Michigan's
        ELCRA ............................................................................................... 24

        A.     Ford Granted the Harasser (Rowan) De Facto Supervisory
               Authority Over Plaintiff .................................................................. 25
        B.     Denying a Plaintiff Training to Learn her Job Duties (Adverse
               Decision) Can Support a Quid Pro Quo Claim ................................... 27

III.    COUNT II:  Racial Harassment/Racially Hostile Work Environment in
        Violation of 42 USC 1981 ...................................................................... 29

IV.     COUNT III: Sexual Assault and Battery in Violation of Michigan
        Common Law ...................................................................................... 31

RELIEF REQUESTED ............................................................................. 32

INDEX OF AUTHORITIES

Case Law

*Anderson v Liberty Lobby, Inc,* 477 US 242 (1986)..............................................................19

*Barhouma v Athenian Assisted Living,* 2015 WL 5437796 (ND OH 2015) .........................26

*Carrero v New York City Housing Authority,* 890 F2d 569 (2d Cir 1989) ......................24, 27

*Chambers v Trettco, Inc,* 463 Mich 297; 614 NW2d 910 (2000) ...................................21, 24

*Clay v United Parcel Service, Inc.,* 501 F3d 695 (6th Cir 2007) .........................................30

*Coley v Consolidated Rail Corp,* 561 F Supp 645 (ED MI 1982)..........................................22

*Cruz v New York State Dept of Corrections,* 2014 WL 2547541 (SD NY 2014) .................27

*Elezovic v Bennett,* 274 Mich App 1; 731 NW2d 452 (2007)..............................................20

*Elezovic v Ford,* 472 Mich 408 (2005) ...............................................................................23

*Gostanian v Bendel,* 1997 WL 214966 (SD NY Apr. 25, 1997)..........................................27

*Hamed v Wayne Co,* 490 Mich 1 (2011) .............................................................................31

*Harris v Forklift,* 510 US 17 (1993) ...................................................................................29

*Hawkins v Anheuser Busch,* 517 F3d 321 (6th Cir 2008)....................................................21

*Hernandez v Jackson, Lewis, Schnitzler & Krupman,* 997 F Supp 412 (SD NY 1998)........27

*Hersh v Kentfield Builders,* 385 Mich 410 (1971) ..............................................................32

*Heskin v Insite Advertising Inc.,* 2005 WL 407646 (SD NY 2005)......................................27

*Jackson v Quanex Corp,* 191 F3d 647 (6th Cir 1999) .................................21, 22, 27, 29 30

*Johnson v Ford Motor Company,* 2019 WL 6649245 (ED MI 12/06/19) .............................26

*Jordan v City of Cleveland,* 464 F3d 584 (6th Cir 2006) ....................................................31

*LaMarca v City of Niagara Falls,* 2016 WL 8674161 (WD NY 2016)...................................27

*MacMillan v Millennium Broadway Hotel,* 2011 WL 4357523 (SD NY 2011) .....................22

*Martin v Jones,* 302 Mich 355 (1942) ................................................................................31

*Pena v Ingham County Road Comm'n,* 255 Mich App 299 (2003)......................................30

*Perks v Town of Huntington,* 251 F Supp 2d 1143 (ED NY 2003) ......................................27

*Pitter v Community Imaging Partners, Inc,* 735 F Supp 2d 379 (D MD 2010).....................28

*Radtke v Everett,* 442 Mich 368 (1993) ...........................................................20, 21, 29, 30

*Robinson v Tendercare,* 2008 WL 11355460 (ED MI 2008) ...............................................24

*Satterfield v State of Tenn,* 295 F3d 611 (6th Cir 2002).....................................................19

*Scarbary v Georgia Dept of Nat Res,* 2017 WL 1132726 (WD KY 2017) ...........................26

*Sheridan v Forest Hills Pub Sch,* 247 Mich App 611; 637 NW2d 536 (2001) ..........20, 23, 24

*Smith v Rock-Tenn Services, Inc,* 813 F3d 298 (6th Cir 2016) ...........................................31

*Sykes v Fed Ex Freight E,* 2019 WL 3530828 (Mich App) ..................................................21

*Woods v Dept of Corr,* 2018 WL 1611444 (Mich App) .......................................................22

Statutes, Court Rules, Misc.
MCL 37.2103 (i)(i-iii) ..................................................................................................

## OVERVIEW

Plaintiff DeAnna Johnson is a 55 year old African American woman. She alleges severe *quid pro quo* and hostile work environment sexual harassment, racial harassment, and assault and battery. Ms. Johnson's claims arise out of her treatment at Defendant Ford Motor Company (Dearborn Truck Plant) where she worked as a Production Supervisor.

In late November 2018, Ms. Johnson was forced to take an extended and unpaid medical leave due to her untenable and toxic work environment which her supervisors were well aware of but failed to address. In fact, they exhibited appalling and callous indifference, ignored her complaints, and threatened her (*e.g.*, "*[J]ust f---k him and get it over with"; "I don't give a f--k about you"; 'You've only been here for a hot f---king minute… I have kids to take care of. I have a wife. And you're running around here saying s --t. You better watch what you say).* (**Ex A**, First Amended Complaint and *infra*). Ford has since terminated Ms. Johnson's employment.

## PERTINENT FACTS

### A.    Plaintiff is Hired as a Ford Supervisor

In late June 2018, Ford hired Plaintiff DeAnna Johnson to supervise hourly (line) workers in Final Assembly.

As a new Production Supervisor (also called Process Coach) Johnson received orientation, and then on-the-job training, working closely with and shadowing an experienced, higher seniority Supervisor to learn the job (**Ex B**, Johnson 98; 104-106, 398-399; **Ex G**, Markavich 31; **Ex D**, Clemons 24). Her responsibilities included understanding F-150 truck

1

parts and the assembly process, trouble-shooting breakdowns to ensure that the line kept running, ensuring safety,  issuing discipline, interacting with the UAW, payroll paperwork, manpower paperwork, production paperwork (required every hour), learning/memorizing a myriad of Ford numbered "codes," and more (Ex B, Johnson 104-106, 399-400, 402). Keeping the line running was *the* critical focus. The plant is expected to produce 600 trucks a day, and a line stoppage costs Ford approximately $14,000 a minute (Ex G, Markavich 25-28, 61; Ex F, Mahoney 106).[1]

### B.    Plant Management Hierarchy

Johnson was the only black woman, and the only woman, on her team (Ex C, Johnson Decl. ¶3). She reported both to MPS Rich Mahoney and Mahoney's boss, Team Manager Billy Markavich (Ex B, Johnson 88, 240-243; Ex H, Rowan 18).

Plaintiff's position and official reporting structure (lowest to highest) was as follows: Process Coach/Supervisor (Plaintiff's position) → Senior Process Coach/MPS (Mahoney) →Team Manager (Markavich) → Area Manager → Production Manager/Crew Operations Manager (Clemons) → Assistant Plant Manager → Plant Manager (Ex D, Clemons[2] 17; 21-22; Ex G, Markavich 20-23, 33; Ex H, Rowan 18).

---

[1] Ford mentions but omits key facts regarding the HR complaint Ms. Johnson made during her orientation. At the time, Johnson had no supervisor or team and worked out of the HR Department. She reported an issue to HR/Salaried Personnel Supervisor Les Harris as Harris was effectively her boss. Ford agreed the complaint was meritorious (Ex B, Johnson 111-112; 145-146; Ex E, Harris 5, 11-14, 17-18, 21-22).

[2] Clemons is the highest level Ford person deposed in this case. The entire plant (2000 people per shift) report to her through a dotted-line (Ex D, Clemons 6,8-9).

Markavich was typically in meetings eight hours a day rather than on the floor, leaving Mahoney in charge of running Plaintiff's team (**Ex F**, Mahoney 15, 18; **Ex G**, Markavich 50, 89-90). Markavich admits that the Supervisors/Process Coaches (like Plaintiff) considered <u>Mahoney</u> their boss, and that Mahoney "owned the entire floor" in Markavich's absence (*Id* at 90). Mahoney gave orders and directives to the Supervisors, was responsible for their safety, could write them up, and could relocate them (*Id* at 50, 89-90; **Ex F**, Mahoney 110-111, 155-156, 176; **Ex D**, Clemons 93). Echoing the reporting structure testified to by Markavich and Clemons, Supervisor Nick Rowan also confirmed that he reported directly to Mahoney (and then Markavich) (**Ex H**, Rowan 18-19). *See also* **Ex B**, Johnson 240-243, 266-267(*I know he [Mahoney] was referred to as one of my bosses – someone that I had to listen to; he told me what to do*").[3]

C. **Plaintiff's Bosses Assign Nick Rowan, a Long Term Supervisor with a History of Sexually Inappropriate Behavior and Workplace Violence, to Teach Plaintiff her Job**

Ford admits that there is a learning curve for a new Supervisor, who may require 3-4 months of training by a more senior Supervisor to learn the job (**Ex G**, Markavich 31; **Ex D**, Clemons 24). Johnson was assigned to the frame/engine line, and initially trained with a Supervisor who was helpful, and with whom she had no problems (**Ex B**, Johnson 98; 104-106, 398-399; **Ex G**, Markavich 31; **Ex D**, Clemons 24).

---

[3] Given these facts, Ford's claim that Mahoney was not Plaintiff's supervisor (in an attempt to discount the many sexual harassment concerns she raised with him) is lacking in candor. At a very minimum, a question of fact exists on this point.

In July 2018, Mahoney and Markavich informed Ms. Johnson that she would be training with, and following/shadowing Nick Rowan, an experienced (13 year) Ford Supervisor (Ex C, Johnson Decl. ¶4; Ex B, Johnson 108-110; Ex H, Rowan 14-15). As such, Ford placed Rowan in a position to evaluate Johnson's performance, and report back to her supervisors how well she was doing (Ex G, Markavich 36). Mahoney and Markavich made clear that new Supervisors who did not catch on to the job fast enough would be fired or moved out (Ex C, Johnson Decl. ¶5).

Ford documents and testimony confirm that, for years, Ford had reports that Rowan maintained sexual relationships with women in the plant, including hourly women who reported to him ("6 or 7 girlfriends"), and for which Ford relocated Rowan several times. (Ex D, Clemons 71-73, 79-89). Johnson soon learned that Rowan had a history of workplace violence, and personally observed his terrible temper. She saw that Rowan's work cubicle was covered with dents and, with many others, witnessed Rowan going on punching rampages, slamming his fist into metal file cabinets, poles, chairs, etc. (Ex B, Johnson 246, 250, 259-265, 391-393) (*I needed information [from Rowan] about my job… [so] I always tried to be nice to him. I didn't want to look like his file cabinets*).

From the time she began training under Rowan, Ms. Johnson was subjected to constant sexually inappropriate comments directed both to her, and the hourly, female employees Rowan supervised (Ex B, Johnson 142; Ex C, Johnson Decl. ¶ 6-8) (*Hey, if you bend over like that again you're going to find something in you,* etc.). Rowan made his sexual comments openly, including in front of Mahoney and Markavich, who laughed (*Id).* Johnson

admonished Rowan, and began complaining to Markavich about Rowan's behavior. (Ex B,

Johnson 168, 235-236) (*I said, 'This guy, Nick … If no one's going to write him up, he's going*

*to get in trouble. He's over there talking about his genitals and saying really nasty things'*).

Markavich brushed off Ms. Johnson's complaints about Rowan's lewd conduct (*Id* at 236)

(*He's just different*; *That's just Nick*). Concurrent with her complaints about Rowan, Markavich

became increasingly nasty to Johnson, subjecting her to repeated cursing sessions, typically

followed up by apologies (Ex B, Johnson 85-86, 194-195, 234-235). The evidence shows that

despite Rowan's outrageous behavior, Ford gave him a pass and allowed his antics to

continue unchecked because Rowan was experienced, skilled, and kept the line moving (Ex

G, Markavich 39-41; Ex D, Clemons 32-33, 79-80).

D.     Rowan Subjects Plaintiff to Constant Sexual and Racial Harassment
       Which Plaintiff Reports to her Supervisors

Rowan's unwanted sexual comments soon included sexual/racial comments and  lewd

text messages, and escalated to incessant demands for pictures of Plaintiff's breasts and

vagina in exchange for teaching her the job, texting Plaintiff  pictures of his genitals, flashing

pornographic images on his cell phone, and violently assaulting Plaintiff, grabbing her breast.

The following non-exhaustive list illustrates Plaintiff's illegal work environment under

Rowan, and Mahoney and Markavich's knowledge of same and refusal to take action to

stop it.

1.     Rowan, daily and repeatedly, asked to see Plaintiff's breasts ("show me those

black [or brown or chocolate] mounds"; "show me those black [or brown or chocolate]

mountains"; "show me them titties" (Ex A, FAC ¶10; Ex B, Johnson 211-212-213, 257, 382; Ex C, Johnson Decl. ¶19).

2.      Rowan's demands to see Plaintiff's breasts became a running "joke," with co-workers echoing that Rowan needed to see "those titties" (Ex C, Johnson Decl. ¶13).

3.      Rowan repeatedly told Plaintiff that he knew seeing pictures of Plaintiff's breasts would be "worth the wait" (Ex B, Johnson 386).

4.      Rowan referred to Plaintiff as a "chocolate jolly rancher" he wanted to lick, and made comments that she was "spicy chocolate" (Ex A, ¶11; Ex B, Johnson 212-213; Ex C, Johnson Decl. ¶20).

5.      Rowan told Plaintiff of his numerous sexual conquests at the plant, that he did not yet have a black woman in his "collection" and that he wanted to add her to his "collection" (Ex A, ¶20; Ex C, Johnson Decl. ¶20).

6.      Rowan constantly asked for pictures of Plaintiff's vagina (Ex C, Johnson Decl. ¶12; Ex B, Johnson, 196, 257) (*[He was] just constantly harassing me, asking me to 'Let me see those black mounds. Let me see those brown mountains. Send me a picture when you go to the bathroom. Where's my pic? Everything I do for you and look, I don't get anything in return*').

7.      Plaintiff generally responded to Rowan's nasty comments and texts by telling him to stop, or trying to change the subject; she never complied with his requests for pictures, and attempted to get help through her chain of command/supervisors (Ex B, Johnson 142-144, 147, 185, 385, 395, 423).

8.     Beginning in August 2018, Johnson told Mahoney about Rowan's demands for nude pictures in exchange for training (Ex B, Johnson 140).

9.     On many occasions Rowan stuck his cell phone in Plaintiffs face, flashing pornographic pictures of naked women, or videos of Rowan engaged in sex acts with various women – some of whom she recognized as their subordinates (Ex A, ¶19; Ex B, Johnson 424-426, 429-435; Ex C, Johnson Decl. ¶14).

10.    The same day that Rowan flashed Plaintiff a graphic video of him having sex with a subordinate (Frances), Plaintiff reported the incident to Mahoney, telling Mahoney to take Rowan, with his phone, to HR (Mahoney did not) (Ex B, Johnson 427-429).

11.    Not only did Plaintiff verbally tell Mahoney about Rowan's nasty texts, comments, pictures and videos – she physically showed him most of the texts/pictures Rowan had sent to her phone (Ex B, Johnson 49, 150-152; Ex C, Johnson Decl. ¶20).

12.    When the line went down and Rowan refused to assist Plaintiff in troubleshooting/fixing the issue because he had not received the naked pictures he sought, Mahoney texted Plaintiff that she needed to "kiss and make up" with Rowan (Ex B, Johnson 148-149; Ex C, Johnson Decl. ¶ 10; Ex K, PL-Mahoney texts at 2171).

13.    Early on, Mahoney or Markavich told Plaintiff that Nick Rowan told them she wasn't "getting it" (learning the job); Plaintiff responded that she *was* "getting it" but that Rowan was not teaching her everything she needed to learn (Ex C, Johnson Decl. ¶9).

14.    On September 13, 2018, Rowan texted Plaintiff a nude picture of his erect penis (Ex I, PL-Rowan texts Pt 1 at 3211).

15.     Plaintiff showed Mahoney the penis picture; Mahoney responded that Plaintiff should warn him before showing him "a wienie" (Ex C, Johnson Decl. ¶17).

16.     A few days after Rowan send the penis picture, Mahoney texted Plaintiff to "think about what you want to do and let me know" (Ex K, PL-Mahoney texts at 2173).

17.     Mahoney also told Plaintiff to "do us all a favor and f---k him [Rowan] and get it over with" and that she and Rowan should "just get married" (Ex B, Johnson 148-149).

18.     A week after Rowan sent the penis picture, Ms. Johnson experienced an emotional breakdown and medical emergency with soaring blood pressure while at work. She passed out, was taken to plant medical and then Beaumont Hospital, where she was kept overnight; she remained off work a few days (Ex B, Johnson 195-200, 347-348).

19.     After this incident, Rowan texted Plaintiff, "I knew I shouldn't have shown you that picture" (Ex I, PL-Rowan texts Pt 1 at 3215-3216; Ex B, Johnson 250-351).[4]

20.     Following Ms. Johnson's return to work, Markavich approached her and yelled repeatedly that he didn't give a f---k about her problems, and that she had better get in line. (Ex B, Johnson 145, 191-192, 238) (Billy [Markavich] came to me when I was hurting … and told me he didn't give a fuck about me. He didn't give a fuck about my back. He didn't give a fuck about my mother …. and that I'd better fall in line like Rich [Mahoney] told me….).

---

[4] Plaintiff does not claim, as Ford suggests, that she passed out because she saw a picture of Rowan's penis. She alleges that Rowan's constant lewd behavior, and her supervisors' callous indifference to it, caused her tremendous stress for which she required medical attention (Ex B, Johnson 195-198).

21.     Rowan also texted Plaintiff a picture of himself holding his penis (Ex B, Johnson 132-133).[5]

22.     In one of Plaintiff's discussions with Mahoney about Rowan's disgusting pictures, she told Mahoney she couldn't continue to work with Rowan and HR needed to be involved (Ex B, Johnson 152) (I *said 'I can't do it over here anymore. You guys got to move me…. We have to go to HR. Something has to be done'*). Mahoney then replied, "Oh my God, I'm telling" and walked over to Markavich, where the two talked for several minutes (*Id*).

23.     After speaking with Mahoney, Markavich walked back over to Ms. Johnson and asked, "Okay, I need to know this. On a scale of 1 to 10, how bad are things between you and Nick Rowan?" She replied, "l00" (Ex B, Johnson 152-153, 236-237).

24.     Markavich then said, "Oh God, I don't want to know." As he walked away, Johnson loudly called after him, "You have to hear this. He's sending me naked pictures of his [penis]" (Ex B, Johnson 153).

25.     Markavich subsequently texted Plaintiff "He was wrong. Just write everything down. We'll handle it tomorrow kid" (Ex L, PL-Markavich texts at 2791; Ex B, Johnson 154-155, 357-358;363-364).[6]

26.     Rowan also texted Plaintiff a picture of his crotch in bikini underwear, a bare-chested picture of himself, and a surreptitiously taken rear-view shot of Plaintiff (Ex I at 3211,

---

[5] Plaintiff received this lewd photo when looking at her phone with her 8 year old granddaughter; she quickly deleted it (Ex B, Johnson 132-133).

[6] Given Markavich's history of hostility towards Plaintiff, she did not believe Markavich and viewed his text as a worried reaction to her threats to go to HR (Ex B, Johnson 154-155).

3229; Ex J at 3139, 3185). His text messages included references to oral sex (Ex I at 3193); wanting to reach into Plaintiff's pocket (Ex I at 3194); erections (Ex I at 3194[7],3222); "getting off" (Ex J at 3183-3184); feeling Plaintiff's breasts and wanting to see her "black mounds" (Ex I at 3229; Ex J at 3142); and demanding but never receiving nude pictures (Ex I at 3203, 3217, 3218; Ex J at 3140, 3153, 3156, 3178). His texts also included vulgar misspellings (cum vs come) (Ex I, at 3205; Ex J at 3165); stated that he expected to be "handsomely rewarded" (Ex I at 3205); and referred to Plaintiff as "sugar britches" (Ex I at 3210); amid other sexually suggestive texts (Ex J at 3158-3159, 3166 -3167, 3180); see also Ex B, Johnson 336-337, 341-342, 345, 365-366)).

27.    Rowan made disgusting, false comments about Plaintiff having "nipple rings" and acted out a bizarre scenario in which he simulated having an erection (Ex C, Johnson Decl. ¶15-16).

28.    Mahoney told Plaintiff she and Rowan needed to "work their shit out" while admitting he knew Rowan was not teaching her the job (*You know he's f---king you right now*) (Ex C, Johnson Decl. ¶11).

29.    Johnson was often in tears when speaking with Mahoney about Rowan. Mahoney at times responded, "I hate to see you cry" or "we'll figure it out" (Ex C, Johnson Decl. ¶ 21).

30.    Mahoney asked Johnson if she wanted him to talk to Rowan or "take him

---

[7] Plaintiff's "you made me smile" text to Rowan (Ex I at 3194) came nine hours after his "erect" text, and was completely unrelated, despite Defendant's attempt to suggest otherwise (Ex B, Johnson 336-338).

outside." She told him no, fearful of Rowan's reaction, given his erratic and violent behavior. (Ex C, Johnson Decl. ¶18; Ex B, Johnson 246).[8]

31.     Mahoney told Plaintiff that he shared all her complaints about Rowan with Markavich, and they both promised her they would move her away from Rowan, as she repeatedly requested (Ex C, Johnson Decl. ¶22; Ex B, Johnson 101-102; 166-167, 376-377).

> [I told Mahoney] I cannot work with Nick Rowan. You've seen all of the pictures of his penis. He's still hounding me for sex…. He's still not teaching me – he's not going to teach me. I'm never going to learn if I stay over here with him because I'm never going to give him nude pictures of myself, and that's the only way I can learn is if I give him something. I have to give him something for him to give me something, and I was tired of that. Id 376-377.

32.     Plaintiff expected Mahoney and Markavich to do their jobs and get her out of the hostile work environment created by Rowan (Ex C, Johnson Decl. ¶18). Despite her repeated complaints to them, neither did anything (Ex B, Johnson 145).

Ms. Johnson testified at length as to the *quid prop quo* aspects of Rowan's harassment and having to follow Rowan around like a "puppy dog" trying to get him to train her; she estimates she was never taught 60% of the job (Ex B, Johnson 346, 353-355, 387-388, 401-409). At her deposition, Ms. Johnson physically demonstrated how Rowan would watch her from the sidelines when the line went down - refusing to help her as she struggled to input the proper code into a computer module as required to re-start the line, staring at her with his arms crossed and then grabbing his "breasts" (a clear reference to the fact that Johnson had

---

[8]The Court should not adopt Ford's depiction of Mahoney as a docile grandfather. He is in his 30s and threatened violence against employees who crossed him (Ex F, Mahoney 8; Ex B, Johnson 148, 421-422) (*I'm gonna take you outside and f—k you up*").

not sent him pictures of her breasts). Then, only after Production Manager Clemons called

out, asking Rowan where he was, Rowan would spring into action, run to the module, and

input the code (Ex B, Johnson 400-401) (*He's running… 'I'm here, I got it now, I saved you*

*again. Where's my picture?' This was a constant, constant thing*).

> The line never stops moving. There's problems all day. So you're getting your
> training as you can – unless you have a Nick Rowan, you know, and you have
> to be propositioned to get your training (Ex B, Johnson 354-355).

> [I was able to meet or exceed all expectations] every way 100% if I did not have
> someone constantly asking me to see pictures … When you have something
> hovering over your head… someone constantly saying to you they're not gonna
> teach you this unless you show me this…. How can I [list all the training I had,
> didn't have, what I could do, or couldn't do] when I didn't get the proper training?
> I don't even know what I'm supposed to know because… he did not tell me. I
> can't tell you that he didn't train me on this, this and this because he never told
> me…. all he wanted to see was my breast[s] (Ex B, Johnson 402-405).

As Rowan denied Plaintiff training because she had not sent him naked pictures,

Rowan reported to her supervisors that she wasn't "getting it" (*Id*; Ex C, Johnson Decl. ¶9).

According to Mahoney, he and Markavich also had discussions in which they criticized

Plaintiff's knowledge base and ability to handle the job (Ex F, Mahoney 92-93, 98-99).

### E.   Plaintiff's Supervisor Threatens Her When She Again Says that Rowan Needs to be Taken to HR ("You've Only Been Here a Hot F---king Minute")

By approximately late October 2018 (a month before Plaintiff left Ford), her hostile

work environment had become so "over the top" that she was speaking with Mahoney almost

daily about Rowan's disgusting, ongoing behavior (Ex B, Johnson 140-141, 149). She also

told Mahoney she intended to go to HR and report Rowan's sexual harassment (*Id* at 138).

Subsequently, Mahoney lashed out at and threatened Ms. Johnson during a crew meeting:

*You've only been here for a hot fucking minute. You better watch what you do and what you say. I have kids to take care of. I have a wife. And you're running around here saying shit. You better watch what you say* (*Id*).[9]

### F.    Plaintiff Meets with Crew Operations Manager LaDawn Clemons, a Point Person for Sexual Harassment Issues at the Plant; Mahoney and Markavich Burst In

On November 3, 2018, Ms. Johnson went to the office of Crew Operations Manager LaDawn Clemons, who agreed to meet with her (Clemons was a member of a [since disbanded] committee formed to discuss sexual harassment issues with female UAW workers) (**Ex D**, Clemons 10 -12, 14). In their meeting, Johnson became upset and began crying, telling Clemons that there was a lot of testosterone on the floor, that Rowan was inappropriate and said nasty things to women, and that she did not want to work with him (**Ex C**, Johnson Decl. ¶23-24; 26). Clemons said she knew about Rowan, that he should have been written up for his behavior (but had not), and that Rowan knew better than to come around her (*Id*). Clemons, who constantly listens in on all areas of the plant via radio, also told Johnson that she knew things were bad in Johnson's area and gave Johnson a bracelet inscribed with the words, "Nevertheless SHE PERSISTED" (*Id*; **Ex D**, Clemons 27-28; **Ex N**, picture of bracelet).

---

[9] Ms. Johnson testified that she was and is scared of Mahoney and Markavich (and Rowan) (**Ex B**, Johnson 137-138, 145, 420).

[I'm scared of Rich Mahoney] because I just told you that Rich Mahoney knows all of this. Rich Mahoney doesn't want to say that he knows everything. [He] doesn't want to say he's seen the pictures of a penis because if he did, that means he wasn't doing his job and that means he would probably get fired, so that means I put him in a position to be looked at, and it scares me (*Id* at 420).

As Plaintiff met with Clemons, Mahoney and Markavich began texting Plaintiff, and then burst through Clemons' door, appearing agitated. Clemons then excused Ms. Johnson from her office (Markavich and Mahoney remained) (Ex C, Johnson Decl. ¶25; Ex M, PL-Mahoney-Markavich texts).

### G. Plaintiff's Supervisors Move Her Away from Rowan, and then Shuttle her Back and Forth from Rowan's Area

Around early November 2018, Markavich moved Plaintiff off the frame/engine line (where Rowan worked) to the chassis lines because of her complaints about Rowan (Ex B, Johnson 98-100, 368, 372-373). Markavich acknowledges that chassis is a more desirable location, and was essentially a promotion (Ex G, Markavich 41-42). The move impacted and displaced (demoted) more senior employees, who let Johnson know they were unhappy about the changes (Ex B, Johnson 369-370).

A couple weeks later, Markavich and Mahoney moved Ms. Johnson back to frame/engine, at which time Rowan resumed his incessant sexual comments (Ex B, Johnson 103, 372-376) and assaulted her (see next section) (Ex C, Johnson Decl. ¶27).[10] A couple days later, after Plaintiff profusely complained about Rowan's behavior and said she would go to HR if she had to work with him, Mahoney and Markavich moved her back to chassis (Ex B, Johnson 376-377, 380-382) (*[I told Mahoney Rowan was] still hounding me for sex… he's still not teaching me… I'm never going to learn if I stay over here with him because I'm*

---

[10] Johnson protested moving back to frame/engine, but was told she had to fill in for "Mark" who had not come in; this proved to be untrue (she saw that Mark *was* there) (Ex B, Johnson 373-374; 380-381).

*never going to give him nude pictures of myself.... I have to give him something for him to give me something*).

### H. Rowan Assaults Plaintiff, Violently Grabbing her Breast

Plaintiff, and all supervisors, were assigned a cubicle in the plant management office; Plaintiff's cubicle was two spots down from Rowan's (Ex B, Johnson 222).

On November 16, 2018, as Plaintiff got up from her cubicle, Rowan ran at her, pinned her against a wall, thrust his hand down her shirt, and forcefully grabbed her breast, as though he was ripping it from her body. The event left Plaintiff distraught, crying and in physical pain, and was forceful enough that she developed bruising (Ex B, Johnson 143; 221-233, 390). She promptly reported the assault to Mahoney, who said he was "really telling Billy [Markavich]" (Ex B, Johnson 227-228, 231, 233-234).[11] The next day, Rowan texted Plaintiff apologizing for his "hand slippage" (Ex B, Johnson 216, 218-221, 390; Ex H, at 3178).

### I. Plaintiff Continues to Report Rowan's Sexual Harassment (to Higher Management and HR) Despite her Supervisor's Directive to "Lie, I did"

LaDawn Clemons  On November 25, 2018, after being told by Mahoney or Markavich that she was again being moved back to the frame/engine line (Rowan's area), Ms. Johnson again met with Crew Operations Manager LaDawn Clemons and provided her with detailed information about Rowan's harassment (Ex B, Johnson 128-131; 396-397).

> [I was prompted to go to LaDawn Clemons on November 25] [b]ecause I just kept replaying this stuff over and over in my mind. Billy [Markavich] didn't care. Rich [Mahoney] didn't care. None of the guys on the floor cared. Nobody cared.

---

[11] Another supervisor (Sean Closurdo) was close by when the assault occurred and later said to Plaintiff, "He grabbed those titties...he finally got you to show him those titties" (Ex B, Johnson 228-230, 238-239, 245).

I thought about my subordinates on his phone, the positions and the sex videos and them … it was just too much, him grabbing by breast and bruising my breast. It was too much. It was over the top. I had no one else to tell, and LaDawn had been nice to me once. She gave me a bracelet and told me to try to keep going. To persevere over everything because she could hear over the radio how everything had changed, now the guys had started treating me differently. And I just couldn't take it …anymore. I tried…. [N]o one should have to be subject to that (Ex B, Johnson 215, 396-397).

Johnson, crying profusely, told Clemons her complaints about Rowan to Mahoney and Markavich had not worked, and that the two of them made a mockery of her ordeal, threatened her, and put her in a horrible position (Ex B, Johnson 34, 125-131). Clemons confirms that Johnson told her Rowan had sent her lewd pictures of himself, was demanding nude pictures of Johnson  in exchange for training her, and that Rowan told Johnson  she was new, no one would believe her [complaints] and if Johnson wanted any more help she could not say "no" to his demands (Ex D, Clemons 38-39, 43, 69-70, 77, 92). Clemons believed Johnson was telling the truth (*Id*).[12]

During their meeting, Clemons handed Ms. Johnson a file of materials related to Ford sexual harassment cases, provided her with websites where she could find additional information, told Johnson she needed to be a "whistleblower" with respect to sexual harassment at Dearborn Truck, and gave her attorney information (Ex B, Johnson 31-23; Ex C, Johnson Decl. ¶27-28). Clemons also left the meeting to take pictures of Rowan's dented up cubicle furniture, and confirmed to Johnson that she had done so (*Id.;* Ex B, Johnson 392-

---

[12] Ford produced interview notes taken by HR (Les Harris) who interviewed Clemons about Plaintiff's complaints. The notes are incomplete (Ex B, Johnson 125-127; Defendant's Exhibit A at Pg ID 770).

396). Johnson told Clemons she was going to HR the next day (Ex C, Johnson Decl. ¶29; Ex B, Johnson 250, 261-262).[13]

    <u>Les Harris</u> On November 26, 2018, the day after meeting with Ms. Clemons, Ms. Johnson came to work at her normal time (5:00 pm), attended a team meeting, and then started walking toward the HR office. She saw Mahoney, told him she was on her way to HR and would be asked if she told her supervisors about Rowan's harassment, and that she was going to tell the truth. Mahoney responded, "Well you should just lie, I did" (Ex B, Johnson 115-121).

    When she arrived in HR, Les Harris (Salaried Personnel Supervisor) told her he had already spoken to some individuals, including Mahoney, about her complaints (Ex B, Johnson 115-116, 121-124; Ex G, Markavich 119).[14] Johnson shared with Harris some of the lewd images and text messages and forwarded them to him; she also handed Harris her phone, and he made photocopies and/or forwarded images to himself (Ex B, Johnson 182-183)(*I had no problem with [sharing my phone contents] whatsoever*).

    As Plaintiff detailed Rowan's sexual harassment, Harris appeared overwhelmed, stopped the interview, and directed Clemons to have Rowan come to his office. Clemons,

---

[13] Clemons also told Harris that she knew Rowan had relationships with hourly women, for which he had been moved around, and that this issue had been discussed in staff meetings going back many years (Ex D, Clemons, 71-74).

[14] Les Harris spoke with Mahoney 2-3 times. The first meeting was brief, and the follow-up(s) were more substantive (Ex F, Mahoney 55, 79-80; Ex E, Harris 100-101; Ex G, Markavich 119). Mahoney told Harris that Ms. Johnson had a poor attitude and he viewed *her* as the problem (Ex F, 117-118).

acknowledging that Johnson was rightfully fearful of Rowan, arranged to have Johnson escorted out of the plant and followed until she got on the highway (Ex D, Clemons 51; Ex B, Johnson 246-249, 255-256; 258; Ex C, Johnson Decl. ¶32).

     J.    Ford Demands to Search Plaintiff's Home

The following morning (November 27, 2018), Ms. Johnson had additional (phone, email) communications with Les Harris in which she provided Harris with more information -- including telling Harris (as she had already told Clemons) that she had been complaining to her supervisors about Rowan's behavior for months. *See* emails; and Harris' notes of his discussions with Plaintiff (attached to Ford's Brief at Pg ID 772-775) which are accurate in part, but incomplete (Ex B, Johnson 168-169, 176-177,186, 189-193) (Harris' notes leave out that Mahoney and Markavich moved Plaintiff to get away from Rowan, etc.).

Also, very early that morning, Harris began phoning and emailing Johnson, telling her she needed to bring her cell phones into Ford HQ and sign a Ford "Consent to Search" form. The consent form Harris demanded Ms. Johnson sign allowed Ford to search her home, and carry away "any and all property" located. The form also provided that such consent was given with "full knowledge of my constitutional rights" (Ex O, email with Ford Consent to Search Form; Ex B, Johnson 174-182; 184-185, 192; Ex E, Harris 63-65; 69-73; Ex C, Johnson Decl. ¶33). Plaintiff questioned Harris about the form; he told her to just sign it (I*d.*). She did not.

Ford's position is that Ford mistakenly sent Ms. Johnson the "wrong form" – which Harris, HR Manager Spadafora, and the two Ford investigators copied in on the email/consent form all failed to notice (Ex E, Harris 66-68).

K.      Plaintiff Goes on a Medical Leave

Plaintiff never returned to Ford. She commenced an (unpaid) medical leave in late
November 2018 due to her hostile work environment, and has since been terminated by Ford.

LAW AND ANALYSIS

Summary Judgment Standards

In assessing whether summary judgment is appropriate, "the court must view the
evidence in the light most favorable to the non-moving party and draw all reasonable
inferences in [her] favor." *Anderson v Liberty Lobby, Inc,* 477 US 242, 251-52 (1986).
Summary judgment is not appropriate when "the evidence presents a sufficient disagreement
to require submission to a jury." *Id* at 251-52. Indeed, "[c]redibility determinations, the
weighing of the evidence and the drawing of legitimate inferences from the facts are jury
functions, not those of a judge...." *Id* at 255. If a reasonable jury could return a verdict for the
plaintiff, then a genuine dispute of material fact exists and summary judgment may not be
granted. *Satterfield v State of Tenn*, 295 F3d 611, 615 (6th Cir 2002).

I.      COUNT I:   Hostile Work Environment Sexual Harassment in Violation of
        Michigan's Elliott-Larsen Civil Rights Act (ELCRA)

There are five elements necessary to establish a prima facie case of hostile work
environment sexual harassment under Michigan law: 1) the employee belongs to a protected
group; 2) was subject to communications or conduct on the basis of sex; 3) the sexual conduct
or communication was unwelcome; 4) the conduct was intended to or did in fact substantially
interfere with the employee's employment *or* created an intimidating, hostile or offensive work

environment; and 5) respondeat superior. MCL 37.2103 (i)(i-iii); *Radtke v Everett,* 442 Mich

368 (1993).

Given the record in this case, it is not surprising that Ford does not even address, let

alone challenge, the first four (4) above elements. Thus, they are uncontested. Instead, Ford's

only challenge to this claim is that Ford lacked sufficient notice of the sexual harassment, and

thus cannot be held responsible (element 5 – respondeat superior). Ford's position is that

neither the open and obvious nature of Mr. Rowan's sexual antics, or Plaintiff's many

complaints about his sexual harassment to her supervisors, count as notice. Instead, Ford

would like the Court to consider only Plaintiff's complaints to Ms. Clemons and HR at the end

of her employment, and the fact that Rowan was fired, to conclude as a matter of law that

Ford promptly addressed and remedied Plaintiff's hostile work environment. Ford's position

is contrary to the factual record, contrary to summary judgment standards, and contrary to

the law regarding what constitutes "notice" for purposes of a hostile work environment claim.

At a very minimum, a question of fact exists regarding Ford's notice of Plaintiff's sexually

hostile work environment.

When a hostile work environment is created by the actions of coworkers and other co-

employees, the plaintiff can establish respondeat superior, or vicarious liability, by showing

that her employer had adequate notice of the harassment, but failed to take appropriate

corrective action. *Elezovic v Bennett*, 274 Mich App 1, 7; 731 NW2d 452 (2007). Notice means

the employer knew or should have known of the sexual harassment. *Sheridan v Forest Hills

Pub Sch*, 247 Mich App 611, 621; 637 NW2d 536 (2001). Stated otherwise, "notice of sexual

harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Chambers v Trettco, Inc*, 463 Mich 297, 319; 614 NW2d 910 (2000). "An employer may avoid liability if it adequately investigated and took prompt and appropriate action upon notice of the alleged hostile work environment." *Radtke*, 442 Mich at 396. *See also Hawkins v Anheuser Busch*, 517 F3d 321, 347 (6th Cir 2008) (prompt and adequate remedial action is that which stops the abuse).

In addition, Courts may hold an employer directly liable for co-worker harassment if its response "manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *See Quanex Corp*, 191 F3d at 659 (6th Cir 1999), cited in *Sykes v Fed Ex Freight E*, 2019 WL 3530828, *4-5 (Mich App 2019).

The factual record convincingly establishes Ford's "notice." First, Rowan's sexual talk and antics were open and obvious (s*ee,* e.g., Ex C, Johnson Decl. ¶5-8; Facts, above, §C) (Rowan made sexual comments constantly and openly, including in front of Mahoney and Markavich, who laughed or shrugged them off with a "that's just Nick"; Plaintiff complained to Markavich that Rowan was talking about his genitals and should be written up). Moreover, Plaintiff <u>directly provided both Mahoney and Markavich with notice</u> – she told both of them about Rowan's disgusting behavior, showed Mahoney the offensive texts and pictures, yelled to Markavich that Rowan was sending her pictures of his [penis], told Mahoney that Rowan had violently grabbed her breast, etc. (see*, e.g.*, Ex C, Johnson Decl. ¶17, 20, 21, 22; Facts, above, §D ##8, 10-12, 15-17, 20, 22, 23. 24, 25, 28-29, 31-32; §G, §H). Notice is also evident

in Markavich's question to her about Rowan's behavior (*on a scale of 1 to 10, how bad are things …*) and the fact that both Plaintiff's supervisors repeatedly told her they would move her to get her away from Rowan (§D, ##23-24; 31).

Plaintiff has presented overwhelming evidence from which a reasonable trier of fact could conclude that Ford had notice of the harassment yet failed to take prompt and appropriate action. *See Woods v Dept of Corr*, 2018 WL 1611444, p *4-5 (Mich App)(court finding question of fact as to "notice" where there was evidence giving rise to an inference of knowledge or constructive knowledge before plaintiff even complained of the harassment, given harasser's reputation as a womanizer, history of lewd conduct, and failure to acknowledge boundaries; and question of fact as to prompt remedial action); *Jackson, supra*, 191 F3d 665 (reversing judgment for employer on hostile work environment claim, citing the employer's '"pattern of unresponsiveness" to the plaintiff's complaints); *Coley v Consolidated Rail Corp*, 561 F Supp 645 (ED MI 1982)(judgment for plaintiff given employer's failure to take prompt remedial action which permitted offensive work environment to continue); *MacMillan v Millennium Broadway Hotel*, 2011 WL 4357523 at *5 (SDNY 2011)(court noting that the promptness and adequacy of an employer's response to a hostile work environment claim is generally a question of fact for the jury; summary judgment denied).

Ford's argument that Plaintiff "waived" her right to have the sexual harassment addressed is lacking in candor. She testified that that she did not want Mahoney to confront Rowan by "talking to" and "taking [him] outside" as she thought doing so would set her up for a violent reaction by Rowan ("I did not want to look like one of his file cabinets"). She *did* want

Mahoney and Markavich to do their jobs and get her out of the hostile work environment crated by Rowan – she specifically asked that they get her away from Rowan, she specifically asked Mahoney to take Rowan to HR, and she literally called out to Markavich, "You have to hear this. He's sending me naked pictures of his [penis]" (Ex B, Johnson 138, 152-153, 376-377, 380-382 427-429); Ex C, Johnson Decl. ¶18, 22; Facts, §D #10). And, Ford's reliance on *Elezovic v Ford*, 472 Mich 408 (2005) is misplaced – in that case, the court found that plaintiff's complaint, in confidence, to two low level supervisors about one instance of her supervisor's improper conduct did not constitute notice to Ford.

Ford's mantra that Plaintiff's complaints to Mahoney and Markavich were legally insufficient because Mahoney was not "higher management," and Markavich knew nothing, does not make it so. At a minimum, questions of fact exist on both points. Ms. Clemons (two management levels higher than Markavich), as well as several others, admits that Mahoney was Plaintiff's (and Rowan's) supervisor. *See* Facts, §D. Harris (HR) also admits that under Ford policies, Mahoney had a duty to report to HR sexual harassment he became aware of (Ex E, Harris 95). There is also ample evidence that Markavich, who Ford admits was Plaintiff's supervisor, was well aware of Rowan's sexual harassment because it was open, reported to him by Plaintiff, and reported to him by Mahoney. (Exhibit B, Johnson, 166-167)(he [Markavich] knew the details… Rich [Mahoney] told me he told him everything….)

Ford's reliance on *Sheridan (*which involved a purported report of harassment to a head custodian) for the proposition that a report to "higher management" is required, does not help Defendant. First, Plaintiff did report to "higher management" (Mahoney, Markavich),

23

who failed to act, months before her reports to Clemons and HR. And, in *Sheridan* (where, unlike here, the plaintiff did not view either of the individuals she reported the harassment to as her supervisors) the Court specifically noted that its holding did not cover the situation where, like here, the employer's policies permit employees to notify non-higher management supervisors of sexual harassment. *Id*, 247 Mich App at 625, cited in *Robinson v Tendercare*, 2008 WL 11355460 at fn 11 (ED MI 2008); see Ex P, Ford Anti-Harassment Policy at a Glance, p 4)(policy specifically providing that one avenue of reporting harassment is 'to your supervisor or manager'). At a very minimum, a question of fact exists as to Defendant's notice of Plaintiff's hostile work environment, rendering summary judgment improper.

## II.     COUNT I: Quid Pro Quo Sexual Harassment in Violation of Michigan's ELCRA

To establish a claim of *quid pro quo* sexual harassment under Elliott-Larsen, an employee must show (1) she was subjected to any of the types of unwelcome sexual conduct or communication described in the statute; and (2) her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment. *Chambers v Trettco*, 463 Mich 297, 310 (2000) (emphasis added). Strict liability applies. *Id. See also Carrero v New York City Housing Authority*, 890 F2d 569, 579 (2d Cir 1989)(*Quid pro quo sexual harassment occurs when an employer (or one exercising authority delegated by the employer) expressly or impliedly makes a decision affecting an employee's job status based upon the employee's willingness or refusal to submit to sexually harassing conduct*).

A.   Ford Granted the Harasser (Rowan) De Facto Supervisory Authority Over Plaintiff

Ford argues that it is not liable for Rowan's *quid pro quo* sexual harassment of Plaintiff because Rowan was not her supervisor, and thus could not impact her employment in any tangible way. This argument fails to acknowledge that Mahoney and Markavich delegated Rowan with supervisory authority over Plaintiff, enabling Rowan to train or not train Plaintiff as he saw fit and report her progress or lack thereof back to them, thereby jeopardizing her employment. Ford also ignores the substantial body of law allowing *quid pro quo* harassment claims arising from the conduct of a *de facto* supervisor to proceed.

As a Ford Production Supervisor, Rowan supervised 66 hourly Ford employees, with oversight for quality issues, payroll and discipline (Ex H, Rowan 13-17, 20-21). He held that position for 13 years and was one of the most experienced Production Supervisors at the plant. *Id*. As such, Ford assigned him to train Plaintiff – a new Production Supervisor, who was also new to Ford (*Id*). Rowan testified that he trained Plaintiff with respect to handling day to day production issues, including the line going down; tracking attendance and handling payroll for the hourly reports, and more (Ex H, Rowan 15, 20-21, 33-35, 38). Rowan testified that Plaintiff was to shadow him in order to learn the job, and that his assignment to train Plaintiff included providing feedback to Markavich (Plaintiff's and Rowan's ultimate boss) about whether Plaintiff was catching on, and how well she was doing (Ex H, Rowan 17-19,40). He reported to Markavich that Plaintiff was struggling with payroll issues and had a "retention issue"; he also testified that hourly employees were complaining that their pay was not correct, that Plaintiff

required his (Rowan's) coaching and assistance, and that Plaintiff also had issues with "manning"/staffing (*Id*, 44-47, 54-56).[15]

As stated previously, Plaintiff's supervisors were clearly aware of the *quid pro quo* aspects of Rowan's harassment, yet allowed his "training" (and harassment) to continue. See Facts, pp 11-12, **Ex B**, Johnson 376-377, 380-382) (*[I told Mahoney Rowan was] still hounding me for sex… he's still not teaching me… I'm never going to learn if I stay over here with him because I'm never going to give him nude pictures of myself…. I have to give him something for him to give me something*); **Ex C**, Johnson Decl. ¶11 (*Mahoney also told me that Rowan and I needed to 'work [our] shit out.' I told him that Rowan was not teaching me, not helping me. Mahoney even acknowledged this, stating, 'You know he's f—king you right now'*).

Ample case law exists providing that a *quid pro quo* harassment claim is viable under the circumstances presented here, despite the fact that the harasser is not the plaintiff's nominal supervisor. *See Barhouma v Athenian Assisted Living,* 2015 WL 5437796 (ND OH 2015) (even where plaintiff did not believe the harasser had any express supervisory authority over her, a *quid pro quo* claim can rest on the harasser's authority to influence an adverse employment decision, if the influence is so significant that the harasser may be deemed the de facto decision maker); *Scarbary v Georgia Dept of Nat Res*, 2017 WL 1132726, at *8-9

---

[15] This Court previously agreed, in the context of ruling on Plaintiff's motion to amend, "[T]here are enough disputed issues of fact with respect to whether Mr. Rowan enjoyed sufficient supervisory authority over Plaintiff to support her *quid pro quo* claim." *Johnson v Ford Motor Company,* 2019 WL 6649245 (ED MI, 12/06/19).

(WD KY 2017)(denying summary judgment on co-worker *quid pro quo* claim, where harasser was part of a "core team" and was put in the position of providing direction and instruction to "non-core team" employees like plaintiff); *LaMarca v City of Niagara Falls,* 2016 WL 8674161 at*12 (WD NY 2016)(triable issue as to whether harasser, although not plaintiff's supervisor, but served as a resource for new cadets like plaintiff, had apparent authority to alter the terms of her employment); *Heskin v Insite Advertising In*c, 2005 WL 407646 at *17(SD NY 2005)( *quid pro quo harassment action can survive ... if an employee who is not plaintiff's actual supervisor acted as a de facto supervisor*) *Perks v Town of Huntington,* 251 F Supp 2d 1143, 1156 n 11 (ED NY 2003) (triable issue of fact existed as to whether harasser was plaintiff's *de facto* supervisor); *Hernandez v Jackson, Lewis, Schnitzler & Krupman*, 997 F Supp 412, 417 (SD NY, 1998) (whether alleged harasser was plaintiff's *de facto* supervisor presented a triable issue; harasser gave plaintiff work assignments and 'taught her how to do things' and his authority may have been enhanced by his relationship with higher management); *Gostanian v Bendel,* 1997 WL 214966, at *6 (SD NY Apr. 25, 1997) (worker who possesses the authority to affect the terms and conditions of plaintiff's employment is a *de facto* supervisor).

### B. Denying a Plaintiff Training to Learn her Job Duties (Adverse Decision) Can Support a Quid Pro Quo Claim

Denial of training can support a quid pro quo sexual harassment claim. In *Carrero, supra,* 890 F2d 569, following a bench trial, the appeals court upheld a finding that the denial to plaintiff of adequate training and an impartial and fair evaluation of her probationary period supported her *quid pro quo* claim. In *Cruz v New York State Dept of Corrections*, 2014 WL

2547541 at *5 (SD NY 2014), the court denied a 12(b)(6) motion, including the attempted dismissal of the plaintiff's *quid pro quo claim*, agreeing that plaintiff's allegations of denial of training stated a plausible *quid pro quo* claim). *See also Pitter v Community Imaging Partners*, *Inc*, 735 F Supp 2d 379, 393 (D MD 2010)(denying employer's motion for summary judgment as to *quid pro quo* claim, citing evidence that harasser agreed to train plaintiff in a new area if she would consent to a romantic relationship with him).

Here, Plaintiff alleges that Rowan conditioned his willingness to train her as to the duties of a Production Supervisor and allow her to learn her job, on her willingness to go along with his sexual antics. In turn, Rowan reported negative feedback to higher level Ford agents with respect to Plaintiff's performance as a new employee. Thus, Rowan (who Ford had selected to train Plaintiff) jeopardized Plaintiff's ability to remain employed at Ford and her very livelihood (and $7000 a month paycheck), conditioning her job success on her willingness to go along with his illegal demands.

Ford's discussion of the *Hartleip* and *Iceberg* cases for the proposition that "training is not a tangible job action" is lacking in candor. In *Hartleip*, the harasser was not a supervisor and was one of many people who assisted in training plaintiff during a three week training session, years before plaintiff gave notice that she was leaving to take a new job. Unlike this case, the harasser was neither in an ongoing position of training the plaintiff nor did he provide feedback on her performance to their superiors. 83 F3d at 771, 775. Her claim failed because the only alleged repercussions to her failure to go along with the harasser was the denial of an award that she admittedly failed to meet the objective criteria for receiving, and the

cancellation of a display she had created due to lack of funding. Ford also misrepresents *Iceberg,* where Judge Cleland dismissed the plaintiff's *quid pro quo* claim finding that there was no evidence that the conduct at issue was unwelcome (the parties had been in a consensual sexual relationship), among other serious deficiencies. Finally, the court also agreed that the plaintiff being denied "a few training sessions" – as opposed to basic, ongoing training needed to learn and succeed on the job – was a "mere inconvenience" rather than the basis for a lawsuit. 914 F Supp 2d 870 (ED MI 2012). In addition, the additional cases cited by Ford (*Lindsey, Douglas, Curtis)* none of which are even quid pro quo cases, involve denial of a course or training session – not basic training required to grasp the job duties (*Lindsey* – denial of "extra training" that was not needed and which plaintiff admits did not affect her ability to perform her job; *Douglas* – denial of one workshop; *Curtis* - does not address training).

Given the questions of fact with respect to Rowan's de facto supervisory authority over Plaintiff, bestowed upon him by Ford, Defendant is not entitled to summary judgment on this claim.

III.    COUNT II:  Racial Harassment/Racially Hostile Work Environment in Violation of 42 USC 1981

The same principles that govern sexual harassment claims also govern racial harassment claims, including those arising under 42 USC 1981. *See Jackson v Quanex Corp,* 191 F3d 647, 658 (6th Cir 1999), *citing Radtke.* Hostile work environment claims are to be evaluated given the "totality of the circumstances." *Harris v Forklift,* 510 US 17, 23 (1993). A court is to consider the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.; Pena v Ingham County Road Comm'n*, 255 Mich App 299 (2003), citing *Radkte.* A district court may not carve out the work environment into a series of discrete incidents and then measure the harm occurring in each one, as such an approach robs incidents of their cumulative impact, contrary to the "totality of the circumstances" requirement. *Jackson*, 191 F3d at 660.

The essence of a hostile work environment claim is that one or more supervisors or coworkers create an atmosphere so infused with hostility that they alter the conditions of employment for them. *Radtke,* 442 Mich at 385. A loss of a tangible job benefit is not a necessary element of this claim, since the harassment itself affects the terms or conditions of employment. *Id.* This is so because the employer "can thus implicitly and effectively make the employee's endurance of sexual harassment a 'condition' of her employment." *Id.*

In addition, to support a §1981 claim of a racially hostile work environment, the harassing conduct need not be overtly racist; instead harassment is based on race if the harassment would not have occurred but for the plaintiff's race. *Clay v United Parcel Service, Inc,* 501 F3d 695, 706 (6th Cir 2007). Here,  it is beyond any reasonable dispute that the sexual comments made by Rowan that were infused with references to her race would never have occurred but for Plaintiff's race (wanting to see her black (brown, chocolate) mounds and black (brown, chocolate) mountains; not yet having a black woman in his "collection" and needing a black woman in his collection; chocolate jolly rancher, spicy chocolate, etc.; *see*

*also* Ex C, Johnson Decl. ¶20)(confirming that Plaintiff told Mahoney about the nasty texts and comments, including those that were race related).

Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment under federal law is "quintessentially a question of fact." *Jordan v City of Cleveland*, 464 F3d 584, 597 (6th Cir 2006); *Smith v Rock-Tenn Services, Inc*, 813 F3d 298, 310 (6th Cir 2016). Plaintiff's hostile work environment (race) claim must therefore be submitted to a jury.

## IV.    COUNT III: Sexual Assault and Battery in Violation of Michigan Common Law

In addition to supporting Plaintiff's hostile work environment claim, Plaintiff's (sexual) assault and battery claim is independently viable. As noted above, Rowan's aggressive and violent attack on Plaintiff, which she reported to Mahoney, went unaddressed.

It is true that in general an employer is not responsible for an intentional tort in the workplace committed by its employee acting outside the scope of employment. *Martin v Jones*, 302 Mich 355 (1942). However, Michigan law has long recognized an exception to this rule, where the employer knew or should have known of the employee's propensities and criminal record before that employee committed an intentional tort. *Hamed v Wayne Co*, 490 Mich 1, 12 (2011).

Here, Rowan's inappropriate sexual conduct toward Plaintiff and others (including his disturbing obsession with Plaintiff's body and breasts), and erratic and violent workplace behavior (including punching and damaging Ford property) are well documented. Whether or not Ford "knew or should have known" of Rowen's propensities clearly creates an issue of

31

fact to be determined by a jury. See *Hersh v Kentfield Builders*, 385 Mich 410, 413 (1971)(whether defendant employer knew of should have known the vicious propensities of employee who attacked plaintiff should not be determined by any court as a matter of law, but by jury).

## RELIEF REQUESTED

For all the above reasons, Plaintiff requests an Order denying Defendant's motion in its entirety.

PROOF OF SERVICE

I certify that on February 25, 2020, I filed the foregoing paper with the Clerk of the Court using the ECF system, which will electronically send notification to all counsel of record.

/s/Carol A. Laughbaum_____
Sterling Attorneys at Law, P.C.
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500
claughbaum@sterlingattorneys.com

Respectfully submitted,

STERLING ATTORNEYS AT LAW, P.C.

By:   /s/Carol A. Laughbaum
        Carol A. Laughbaum (P41711)
        Attorneys for Plaintiff
        33 Bloomfield Hills Pkwy., Ste. 250
        Bloomfield Hills, MI 48304
        (248) 644-1500