**EXHIBIT B**

# In the Matter Of:

## JOHNSON vs FORD MOTOR COMPANY

## DEANNA RENAE JOHNSON

October 07, 2019

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

JOHNSON, DEANNA RENAE
10/07/2019



Pages 1–4

---

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF MICHIGAN
3                    SOUTHERN DIVISION
4
5   DeANNA JOHNSON,
6                    Plaintiff,
7
8   v.                    U.S. District Court
9                         No. 2:19-cv-10167 Case No.
10                        Honorable Gershwin A. Drain
11                        Magistrate Elizabeth A. Stafford
12
13  FORD MOTOR COMPANY,
14  a Delaware corporation,
15                   Defendant.
16  _____
17
18       The Video-recorded Deposition of
19       DeANNA RENAE JOHNSON,
20       Taken at 289 North Old Woodward Avenue, Suite 400,
21       Birmingham, Michigan,
22       Commencing at 9:38 a.m.,
23       Monday, October 7, 2019,
24       Before Melinda S. Moore, CSR-2258.
25
```

---

**Page 2**

```
1   APPEARANCES:
2
3   CAROL A. LAUGHBAUM (P41711)
4   Sterling Attorneys at Law, P.C.
5   33 Bloomfield Hills Parkway
6   Suite 250
7   Bloomfield Hills, Michigan 48304
8   248.644.1500
9   claughbaum@sterlingattorneys.com
10       Appearing on behalf of the Plaintiff.
11
12  ELIZABETH HARDY (P37426)
13  THOMAS J. DAVIS (P78626)
14  Kienbaum Hardy Viviano Pelton & Forrest, P.L.C.
15  280 North Old Woodward Avenue
16  Suite 400
17  Birmingham, Michigan 48009
18  248.645.0000
19  ehardy@khvpf.com
20  tdavis@khvpf.com
21       Appearing on behalf of the Defendant.
22
23  ALSO PRESENT:
24  Rob Girkin - Video Technician
25
```

---

**Page 3**

```
1                   TABLE OF CONTENTS
2
3   WITNESS                              PAGE
4   DeANNA RENAE JOHNSON
5       EXAMINATION BY MS. HARDY          4
6
7   EXHIBIT                              PAGE
8       (Exhibits attached to transcript.)
9
10  DEPOSITION EXHIBIT 1                  58
11  DEPOSITION EXHIBIT 2                 125
12  DEPOSITION EXHIBIT 3                 125
13  DEPOSITION EXHIBIT 4                 125
14  DEPOSITION EXHIBIT 5                 125
15  DEPOSITION EXHIBIT 6                 125
16  DEPOSITION EXHIBIT 7                 125
17  DEPOSITION EXHIBIT 8                 229
18  DEPOSITION EXHIBIT 9                 269
19  DEPOSITION EXHIBIT 10                271
20
21
22
23
24
25
```

---

**Page 4**

```
1   Birmingham, Michigan
2   Monday, October 7, 2019
3   9:38 a.m.
4          VIDEO TECHNICIAN:  We are now on the
5   record.  This is the video-recorded deposition of
6   DeAnna Johnson being taken on Monday, October 7,
7   2019.  The time is 9:38 a.m.  We are here in the
8   matter of DeAnna Johnson vs. Ford Motor Company.
9          Will the court reporter swear in the
10  witness and the attorneys identify themselves for
11  the record, please.
12          DeANNA RENAE JOHNSON,
13  was thereupon called as a witness herein, and
14  after having first been duly sworn to testify to
15  the truth, the whole truth and nothing but the
16  truth, was examined and testified as follows:
17          MS. LAUGHBAUM:  Carol Laughbaum on
18  behalf of the plaintiff.
19          MS. HARDY:  Elizabeth Hardy on behalf
20  of defendant Ford Motor Company.
21          MR. DAVIS:  Thomas Davis on behalf of
22  the defendant.
23               EXAMINATION
24  BY MS. HARDY:
25  Q.  Good morning, Ms. Johnson.
```

---

**MIdeps@uslegalsupport.com**
Ann Arbor | Detroit | Flint | Jackson

**U. S. LEGAL SUPPORT**
Bingham Farms/Southfield | Grand Rapids

**Phone: 888.644.8080**
Lansing | Mt. Clemens | Saginaw | Troy

JOHNSON, DEANNA RENAE
10/07/2019



EXHIBIT B

Pages 5–8

Page 5

1    A.    Good morning.
2    Q.    My name, again, is Elizabeth Hardy.  I introduced
3          myself when I walked into the room, and I will be
4          asking you questions today in this proceeding
5          about the facts that you have to support the
6          allegations that you've made in your lawsuit.
7                    Have you been in a deposition before?
8    A.    No.
9    Q.    Okay.  Have you given sworn testimony previously?
10   A.    No.
11   Q.    You've never testified in a hearing?  In court
12         or --
13   A.    Yes.
14   Q.    You have?
15   A.    Yes.
16   Q.    All right.  How many times have you testified in
17         court?
18   A.    One time.
19   Q.    Okay.  And what was the occasion?
20   A.    I'm sorry.  Excuse me.  Let me clarify that.  I've
21         never testified in court.
22   Q.    Where have you testified under oath?
23   A.    For a past job.  I don't know if I'm allowed to
24         speak in regards to that.
25   Q.    What kind of proceeding was it?

Page 6

1    A.    I don't know if I'm allowed to speak in regards to
2          that.
3    Q.    Why would that be?
4    A.    I've signed paperwork in regards of not speaking
5          of that.
6    Q.    A confidentiality agreement?
7    A.    Yes.
8    Q.    Is it an employer that you sued?
9    A.    Yes.
10   Q.    Okay.  And what's the name of the employer?
11   A.    Z Technologies.
12   Q.    Okay.  And were you required to give testimony
13         under oath in connection with the lawsuit against
14         Z Technologies?
15   A.    Yes.
16   Q.    Okay.  And where did that testimony occur?  Was
17         it in a courtroom?  An administrative proceeding?
18         An arbitration?  What kind of proceeding was it?
19   A.    Administrative proceeding.
20   Q.    And in front of the EEOC?
21   A.    No.
22   Q.    In front of the state Department of Civil Rights?
23   A.    No.
24   Q.    In front of a state agency concerning workers'
25         comp?

Page 7

1    A.    Yes.
2    Q.    When was that?
3    A.    I don't recall the exact date at this time.
4    Q.    Can you give me a general idea?  Was it within
5          the past year?
6    A.    No.
7    Q.    Past two years?
8    A.    I don't recall an exact time.
9    Q.    You can't even give me a year?
10   A.    I would say a few years back.  I don't want to be
11         wrong.  I don't want to give you a year and it's
12         wrong.
13   Q.    Have you testified under oath on any occasion
14         other than the workers' compensation proceeding
15         in connection with Z Technologies?
16   A.    Can you repeat that for me.
17               MS. HARDY:  Can you read it back.
18               (The requested portion of the
19               record was read by the reporter at
20               9:42 a.m.:
21               "Q.  Have you testified under oath
22               on any occasion other than the
23               workers' compensation proceeding in
24               connection with Z Technologies?")
25         THE WITNESS:  No.

Page 8

1    BY MS. HARDY:
2    Q.    Let me take a moment and go over the procedures
3          that will be applicable in today's proceeding.
4          I'm going to ask you questions about the factual
5          support that you have for the various allegations
6          you're making in this lawsuit.  It's important
7          that you understand my question before you
8          answer, and if you don't under my question, you
9          can ask me to clarify it, but if you don't ask me
10         to clarify it, it will be assumed that you
11         understood the question when you answered it.  Do
12         you understand that?
13   A.    Yes.
14   Q.    Okay.  And if at any point in time you think I'm
15         speaking too rapidly or you just need a break,
16         let me know.  I will be happy to accommodate you
17         so long as there's not a question pending on the
18         table.  Fair enough?
19   A.    Fair enough.
20   Q.    All right.  And there's restrooms out to the
21         right just outside of our lobby.  There's also
22         coffee and water over there on the credenza; all
23         right?  So you can help yourself.
24   A.    Thank you.
25   Q.    All right.  At some point in time during the

JOHNSON, DEANNA RENAE
10/07/2019



Page 9

```
1       course of every deposition the witnesses tend to
2       talk over the lawyers and sometimes the lawyers
3       tend to talk over the witnesses.  That makes it
4       very difficult for the court reporter to get a
5       clean transcript, so if you start to interrupt
6       me, I'm going to have to let you know that you're
7       interrupting me and ask you to please let me
8       finish.  I don't mean to be critical or rude but
9       it just makes it very difficult to get a clear
10      transcript.  Fair enough?
11  A.  Fair enough.
12  Q.  And if I interrupt you because I think you're
13      done and you're still in the middle of something,
14      let me know and I'll let you finish as long as
15      you're being responsive to the question that I
16      posed.  Fair enough?
17  A.  Fair enough.
18  Q.  Okay.  Let's go back and get your legal name for
19      the record.
20  A.  DeAnna Renea Johnson.
21  Q.  R-e-n-e-e?
22  A.  R-e-n-e-a.
23  Q.  E-a.  And what is your current home address?
24  A.  20284 Mansfield Street, Detroit, Michigan 48235.
25  Q.  When did that become your home address?
```

Page 10

```
1   A.  The end of June, I believe, of this year.
2   Q.  End of June 2019?
3   A.  Yes.
4   Q.  Do you still maintain any other residence?
5   A.  No, not at this time.
6   Q.  Okay.  Where did you move from when you moved to
7       20284 Mansfield Street?
8   A.  From 29752 Farmbrook Villa Lane, Southfield,
9       48034.
10  Q.  Is the residence on Mansfield Street a home or an
11      apartment?
12  A.  Home.
13  Q.  Are you an owner?
14  A.  No.
15  Q.  Or are you in the process of becoming an owner?
16  A.  No.
17  Q.  Do you have a lease?
18  A.  No.
19  Q.  Do you rent month-to-month?
20  A.  No.
21  Q.  How do you pay for -- or do you pay to live at
22      20284 Mansfield Street?
23  A.  I am residing with my mom.
24  Q.  So is she the owner of the house?
25  A.  Yes.
```

Page 11

```
1   Q.  All right.  And did you own 29752 Farmbrook Villa
2       Lane, that residence?
3   A.  No.
4   Q.  Was that an apartment?
5   A.  Condominium.
6   Q.  Condominium.  Did you lease it from someone?
7   A.  Yes.
8   Q.  Who did you lease it from?
9   A.  Jenny Peterovich.
10  Q.  Can you spell her name, please.
11  A.  That's a tough one.  F-e-t-e-r-v-o-i-c-h [sic].
12  Q.  Did you lease month-to-month?
13  A.  No.
14  Q.  No?
15  A.  No.
16  Q.  What was the term of your lease?
17  A.  One year.
18  Q.  And when did your lease expire?
19  A.  My lease actually does not expire until October of
20      this year.
21  Q.  Have you moved all your belongings out of 29752
22      Farmbrook Villa Lane?
23  A.  The home became -- I had a fire in May so I lost
24      all of my belongings.
25  Q.  You had a fire in the condo?
```

Page 12

```
1   A.  Yes.
2   Q.  Did you stay there after the fire?
3   A.  No.
4   Q.  What day was the fire?
5   A.  May 21st.
6   Q.  Did the Southfield police -- or Southfield Fire
7       Department come?
8   A.  Yes.
9   Q.  And was the property condemned following the
10      fire?
11  A.  Not at this time.
12  Q.  Do you still have -- still have access to that
13      property?
14  A.  No.
15  Q.  And why is that, if you have a lease until
16      October?
17  A.  Because the property -- everything in the property
18      was burned.  There's nothing left.  The roof is
19      caved in so it's not safe for me to enter the
20      property to look for anything that I had.
21  Q.  Were there any documents that relate to your
22      employment at Ford Motor Company in the condo at
23      the time of the fire?
24  A.  Previous paperwork that I've had since starting
25      there, yes.
```

JOHNSON, DEANNA RENAE
10/07/2019


Pages 13–16

| Page 13 |
|---|
| 1   Q.   What do you mean, "previous paperwork"? |
| 2   A.   Hire -- different things that you receive when |
| 3        you're hired, different various paperworks. |
| 4   Q.   Were there any documents in the condo at the time |
| 5        of the fire that are in any way connected to the |
| 6        allegations you're making in this lawsuit? |
| 7   A.   No. |
| 8   Q.   Were either of the phones that you were utilizing |
| 9        in the time period June 2018 through the end of |
| 10       the year in the condo at the time of the fire? |
| 11  A.   No. |
| 12  Q.   Did you have any computer-related devices that |
| 13       were in the condo at the time of the fire? |
| 14  A.   Yes. |
| 15  Q.   What was in -- what in that regard was in the |
| 16       condo at the time of the fire? |
| 17  A.   My laptop. |
| 18  Q.   Anything else? |
| 19  A.   No. |
| 20  Q.   Were the contents of the laptop backed up at the |
| 21       time of the fire? |
| 22  A.   No.  My laptop was fairly new. |
| 23  Q.   Did you have a backup function to preserve data? |
| 24  A.   No. |
| 25  Q.   How new was your laptop at the time of the fire? |

| Page 14 |
|---|
| 1   A.   A few months. |
| 2   Q.   So you bought the laptop in 2019, sometime |
| 3        between January and May 21, 2019? |
| 4   A.   No.  I bought the fire -- I bought the -- excuse |
| 5        me.  I bought the laptop before 2019. |
| 6   Q.   When did you buy the laptop? |
| 7   A.   I don't recall the exact day. |
| 8   Q.   What information, if any, was on the laptop that |
| 9        has a connection of any kind to the allegations |
| 10       you're making in this lawsuit? |
| 11  A.   None. |
| 12  Q.   With respect to your medical condition today, are |
| 13       you suffering from any kind of unrest that would |
| 14       interfere in any way with your ability to |
| 15       understand questions and answer truthfully? |
| 16  A.   No. |
| 17  Q.   Are you taking any medication today? |
| 18  A.   No. |
| 19  Q.   Do you take on a regular basis any kind of |
| 20       medication? |
| 21  A.   Yes. |
| 22  Q.   What do you take on a regular basis? |
| 23  A.   I take pro-- give me one second, please. |
| 24            MS. LAUGHBAUM:  Do you want your |
| 25       handbag? |

| Page 15 |
|---|
| 1            THE WITNESS:  Thank you.  I take |
| 2        Prosarin (phonetic). |
| 3   BY MS. HARDY: |
| 4   Q.   Can you spell it, please. |
| 5   A.   Prazosin.  I don't know how to pronounce it |
| 6        correctly.  P-r-a-z-o-s-i-n. |
| 7   Q.   Who prescribes that? |
| 8   A.   That's prescribed by my doctor, Dr. Davis. |
| 9   Q.   And what's that for? |
| 10  A.   I take that at bedtimes.  It helps with my |
| 11       nightmares. |
| 12  Q.   Do you take it every day?  Every evening? |
| 13  A.   Yes, I do. |
| 14  Q.   Okay.  And -- |
| 15  A.   Okay.  And I also take -- I'm going to spell this |
| 16       for you: H-y-d-r-o-x-y-z-i-n-e.  And I take that |
| 17       twice daily. |
| 18  Q.   What time of day do you normally take that? |
| 19  A.   I usually take that in the morning and in the |
| 20       afternoon. |
| 21  Q.   And what's -- what is the purpose of that |
| 22       particular medication? |
| 23  A.   That helps with my posttraumatic stress -- helps |
| 24       with my stress. |
| 25  Q.   And you did not take that this morning? |

| Page 16 |
|---|
| 1   A.   No, I did not.  My prescription -- my prescription |
| 2        was out on the 6th, which was yesterday, I |
| 3        believe, and I have a doctor's appointment |
| 4        tomorrow. |
| 5   Q.   And you have to have the doctor's appointment |
| 6        before you can get a refill? |
| 7   A.   Well, actually I'm going to call her today so she |
| 8        can refill them over the phone, but she'll -- |
| 9        probably would like to see me. |
| 10  Q.   What did you do to prepare for your deposition |
| 11       today? |
| 12  A.   I sat and I just went over a lot of things in my |
| 13       head about how many hours that it would take |
| 14       during the deposition, just preparing. |
| 15  Q.   I didn't understand your response.  You sat and |
| 16       went over a lot of things in your head? |
| 17  A.   Just a lot of things in my head. |
| 18  Q.   Like such as? |
| 19  A.   Such as how long it's going to take, this is going |
| 20       to take a lot of time today, and the things to |
| 21       expect in a deposition. |
| 22  Q.   Did you meet with counsel? |
| 23  A.   Yes. |
| 24  Q.   How long? |
| 25  A.   For a few hours. |

JOHNSON, DEANNA RENAE
10/07/2019



Page 17

1  Q.  All right.  On only one occasion or more than one
2      occasion?
3          MS. LAUGHBAUM:  You mean specifically
4      to prepare?
5          MS. HARDY:  Yes.
6          MS. LAUGHBAUM:  For the deposition?
7          THE WITNESS:  Thank you.  That's what I
8      wanted to know.  Yes, for -- to specifically
9      prepare for the deposition.
10 BY MS. HARDY:
11 Q.  When did you meet with counsel?
12 A.  I met with counsel on Friday -- this past Friday.
13 Q.  And for several hours?
14 A.  For a couple of hours.
15 Q.  And what does that mean?  A couple of hours could
16     be two; it could be four; it could be six.
17 A.  I would say between two and three hours.
18 Q.  Did you look at any documents?
19 A.  I looked at a couple of paperworks.
20 Q.  What did you look at?
21 A.  Just things on how to prepare for a deposition,
22     just things that -- just basic things on -- that
23     it was going to take several hours and I could
24     have bathroom breaks and I would be allowed to
25     take a break if I needed a break.

Page 18

1  Q.  Who prepared those instructions?
2  A.  My attorney.
3  Q.  And she had them written out for you or she
4      conveyed those through the course of the meeting?
5  A.  She conveyed those through the course of the
6      meeting.
7  Q.  So what did you look at to prepare for the
8      deposition today?
9  A.  I looked at my complaint.
10 Q.  Okay.  What else?
11 A.  That's it.
12 Q.  You didn't look at any text message?  Email?
13 A.  No.
14 Q.  Photo?
15 A.  No.
16 Q.  Nothing?  Absolutely nothing?  Just the
17     complaint?
18 A.  Just my complaint.
19 Q.  All right.  I'd like you to identify your legal
20     name at birth.
21 A.  DeAnna Renea Logan.
22 Q.  Your legal name obviously changed at some point
23     in time.  When did it first change?
24 A.  2002.
25 Q.  And what did it change to?

Page 19

1  A.  Johnson.
2  Q.  So it was DeAnna Renea Johnson?
3  A.  Yes.
4  Q.  Why did it change in 2002?
5  A.  I was married.
6  Q.  And who were you married to at that time?
7  A.  Rufus Johnson.
8  Q.  How long were you married to Rufus Johnson?
9  A.  17 years.  I think 17 years so far.
10 Q.  Rufus Johnson is known in the rapper world as
11     Bizarre?
12 A.  Yes, he is.
13 Q.  You were a rapper too at one point; correct?
14 A.  No.
15 Q.  Did you perform in any of the musical pieces that
16     were produced by Rufus Johnson?
17 A.  When you say "perform," I'm unsure.
18 Q.  Well, were you a vocalist on -- with respect to
19     any of the pieces that he has produced?
20 A.  Sometimes, yes.
21 Q.  Which songs were you a vocalist?
22 A.  I don't recall it's so long ago.
23 Q.  During what period of time did you sing as a
24     rapper/vocalist in Rufus Johnson productions?
25 A.  I was never a rapper and it wasn't Rufus Johnson

Page 20

1      productions.  Rufus Johnson was in a group and I
2      would do backup vocals.  I worked in the studio
3      for that particular group or whomever group would
4      come in.
5  Q.  What was the name of the group that you were a
6      backup in?
7  A.  D12 and also Eminem.
8  Q.  Any others?
9  A.  No.
10 Q.  What time period were you a backup vocalist in
11     D12?
12 A.  Before we were married.  Before 2002.  I can't
13     recall the exact dates.
14 Q.  Before 2002?
15 A.  Yes.
16 Q.  And what about Eminem?  When were you a backup
17     vocalist in his group?
18 A.  As well as before 2000 -- before we were married.
19 Q.  Were you divorced from Rufus Johnson?  Did you
20     get divorced from Rufus Johnson?
21 A.  Yes.
22 Q.  When was that?
23 A.  Oh, I'm sorry.  We're separated.  We are not
24     divorced.  Excuse me.
25 Q.  So you are currently married?

JOHNSON, DEANNA RENAE
10/07/2019



Page 21

1   A.   Yes.
2   Q.   Okay.  When did you separate from Rufus Johnson?
3   A.   15 years ago.
4   Q.   At any point have you been known legally, that
5        is, by a name other than DeAnna Renea Logan or
6        DeAnna Renea Johnson?
7   A.   Yes.
8   Q.   What other names have you legally been known by?
9   A.   Oh, I should have taken my time.  Legally, no.
10  Q.   All right.  What other names are you referring
11       to?
12  A.   Sindy Syringe, band name.
13  Q.   That was your stage name; correct?
14  A.   Yes.
15  Q.   Okay.  S-i-n-d-y and then --
16  A.   Syringe.
17  Q.   -- the word "Syringe"?
18  A.   Yes.
19  Q.   How did you acquire that name?
20  A.   Eminem gave me that name.  He gave my band that
21       name.
22  Q.   What was your band?
23  A.   Sindy Syringe.
24  Q.   Okay.  And when was your band operational?
25  A.   If I recall, we started our band in 2001 and went

Page 22

1        for a couple of years after that.
2   Q.   And when you say "we started our band," who were
3        the members of that band?
4   A.   I had a drummer, two guitar players and a base
5        player.
6   Q.   And you were the lead vocalist?
7   A.   Yes.
8   Q.   What was the name of the band?
9   A.   Sindy Syringe.
10  Q.   Okay.  And why was Eminem giving you a name for
11       your band?
12  A.   Because we were -- we were all close at that time.
13       I was married to his best friend, and he heard my
14       voice and he would say that my voice is something
15       that should be injected into the world, so that's
16       how he came up with the name Sindy Syringe.
17  Q.   How long did -- how long did that band stay
18       together?
19            MS. LAUGHBAUM:  It's been asked and
20       answered.
21            Go ahead, DeAnna.
22  BY MS. HARDY:
23  Q.   It started in 2001.  When did it disband?
24  A.   A few years after that.  I'm not quite sure of the
25       date.

Page 23

1   Q.   Did you write music for your band?
2   A.   Yes.
3   Q.   Okay.  And did you publish music?
4   A.   Yes.
5   Q.   All right.  So let's go back to my earlier
6        question to make sure I have a complete answer.
7        I've asked you to identify every legal name by
8        which you have been known since the time of
9        birth, and you have identified DeAnna Renea Logan
10       and DeAnna Renea Johnson.  Are those the only two
11       names -- legal names that you have had since time
12       -- since your time of birth?
13  A.   Yes.
14  Q.   Do you have any children with Rufus Johnson?
15  A.   No.
16  Q.   Have you been married to anyone other than Rufus
17       Johnson?
18  A.   No.
19  Q.   So you've never been divorced and you've only
20       been married once; correct?
21  A.   Correct.
22  Q.   Is there a reason you are still married to Rufus
23       Johnson, even though you've been separated for 15
24       years?
25  A.   I could not find him at a certain time.  I don't

Page 24

1        know if he moved out of state.  We lost contact
2        with each other.
3   Q.   When have you last had contact with him?
4   A.   Maybe a couple of months ago.  I just kind of
5        found him.
6   Q.   Where did you find him a couple months ago?
7   A.   I called his mom.
8   Q.   Do you have any children?
9   A.   Yes.
10  Q.   Who's the father of the children?
11  A.   Daniel Richardson.
12  Q.   How many children do you have?
13  A.   One.
14  Q.   What is the name and age of your child?
15  A.   Dominic Richardson, 34.
16  Q.   When did -- or where does Dominic Richardson
17       live?
18  A.   On Schoolcraft Avenue.  I think that's Redford,
19       Michigan.
20  Q.   Is he a dependent of yours?
21  A.   She's a girl.
22  Q.   Oh, she's a girl.  Danielle?
23  A.   No, Dominic.
24  Q.   Dominic.  I'm sorry.  It's Daniel Richardson;
25       right?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

JOHNSON, DEANNA RENAE
10/07/2019



Pages 25–28

Page 25

1   A.   Yes.
2   Q.   All right.  And Dominic, okay.  Is she a
3        dependent of yours?
4   A.   No, but I do help her a lot.
5   Q.   When did she last live with you?
6   A.   2014, maybe '13.  I'm not quite sure of the time.
7   Q.   When you say you help her a lot, what does that
8        mean?
9   A.   My daughter was diagnosed with a brain tumor when
10       she was younger, and she has an autistic daughter,
11       and I help her with her daughter, with my
12       granddaughter, and I help her with a lot of
13       ongoing issues that she has from having that brain
14       tumor and chemo.  She has also congestive heart
15       failure.  She doesn't get a lot of money, so she
16       -- they depend on me a lot.
17  Q.   Where does the granddaughter live?
18  A.   With her mom.
19  Q.   How old is the granddaughter?
20  A.   She's eight.
21  Q.   Do you have a driver's license?
22  A.   Yes.
23  Q.   Michigan driver's license?
24  A.   Yes.
25  Q.   Okay.  What is the address on your driver's

Page 26

1        license?
2   A.   Mansfield.
3   Q.   When did you make that change?
4   A.   I made that change just recently.
5   Q.   When is just recently?
6   A.   When I moved back to that address after my home
7        caught on fire.
8   Q.   So after May 21 you made the change?
9   A.   Yes.
10  Q.   Do you still receive mail at the 29752 Farmbrook
11       Villa Lane condo?
12  A.   Not that I'm aware of.  I don't go there anymore.
13  Q.   You don't even check for mail?
14  A.   I don't -- I don't have a way to check for mail
15       anymore.  Since the house it's burned, I would --
16       I can't say I assume, but I don't check.  All of
17       my mail comes to my new address.  I've notified
18       everyone.
19  Q.   Did you do a change of address at the post
20       office?
21  A.   No, I did not.
22  Q.   Well, how would mail that was addressed to 29752
23       Farmbrook Villa Lane find you if you didn't do a
24       change of address and you don't go to the
25       property to pick up mail that's delivered, if

Page 27

1        it's delivered?
2   A.   I didn't have a lot of mail coming to the
3        Farmbrook Villa Lane.  I only had mail from my job
4        coming there and a lot of junk mail, and so the
5        people like Ford Motor Company and the different
6        people that was of importance, if I had mail
7        coming from them, I notified them of my address
8        change.
9   Q.   All right.  Did you notify Ford Motor Company of
10       your address change after May 21?
11  A.   Yes.
12  Q.   How did you notify Ford Motor Company?
13  A.   I contacted the NESC.
14  Q.   How did you contact the NESC?
15  A.   I called them.
16  Q.   Who did you speak to?
17  A.   I don't recall their names.  I spoke with several
18       people on several occasions.
19  Q.   Who did you speak with to provide a change of
20       address?
21  A.   I don't recall their names.  I spoke with several
22       people.
23  Q.   What phone did you use when you called the NESC?
24  A.   My cellular.
25  Q.   Which cellular?

Page 28

1   A.   My cellular in my purse.
2   Q.   Okay.  Can you provide the phone number of that
3        -- for that phone, please.
4   A.   313.454.8825.
5   Q.   What number did you call at the NESC?
6   A.   They have an 800 number.
7   Q.   Do you know which one -- what the number is?
8   A.   Not off the top of my head.
9   Q.   All right.  And when did you make that call?
10  A.   I made that call the following day.
11  Q.   You made the call on May 22?
12  A.   Within the next couple of days I made the call.
13  Q.   So May 22 or 23, 2019 is when you claim you
14       called the NESC?
15  A.   Yes.
16  Q.   Did you attempt to effectuate a change of address
17       through any method other than making a phone call
18       to someone at the NESC who you can't identify?
19  A.   Could you repeat that.
20                (The requested portion of the
21                record was read by the reporter at
22                10:09 a.m.:
23                "Q.  Did you attempt to effectuate
24                a change of address through any
25                method other than making a phone

JOHNSON, DEANNA RENAE
10/07/2019



Pages 29–32

Page 29

1      call to someone at the NESC who you
2      can't identify?")
3           THE WITNESS:  No.
4  BY MS. HARDY:
5  Q.  Do you have any notes of who you spoke with at
6      the NESC about your change of address?
7  A.  No.
8  Q.  And do you have any way of recollecting with
9      specificity the time and date that you called the
10     NESC?
11 A.  I can't recall at this time.
12 Q.  You didn't jot down any notes with a date and
13     time of when you called the NESC?
14 A.  No.  I called the NESC frequently.
15 Q.  Or who you spoke to when you claim you called to
16     change your address?
17 A.  No.
18 Q.  And just so that the record is clear, you did not
19     go to the post office in Southfield or contact
20     the post office in Southfield to ensure that they
21     had on file a change of address form for you;
22     correct?
23 A.  No.  Correct.
24 Q.  When did you first seek legal counsel concerning
25     any aspect of your employment relationship with

Page 30

1      Ford?
2  A.  I cannot remember the exact date.
3  Q.  Well, let's start with a month and year.
4  A.  I would think it was November 2018.
5  Q.  When in November 2018?
6  A.  I cannot recall the exact day.
7  Q.  Can you correlate when you first called legal
8      counsel with any event that occurred in the
9      workplace?
10 A.  When Mr. Harris sent to me a form to search my
11     property.
12 Q.  That's the first time you sought legal counsel
13     about problems at Ford Motor Company?
14 A.  Yes.
15 Q.  So that was after your interview with Mr. Harris?
16 A.  Yes.
17 Q.  Okay.  And your interview with Mr. Harris was on
18     November 26, 2018; correct?
19 A.  Correct.
20 Q.  All right.  So it was -- you're referring to the
21     form that was sent to you by Mr. Harris that he
22     apologized for sending; correct?
23 A.  Correct.
24 Q.  Okay.  And that he sent on November 27 or
25     November 28; correct?

Page 31

1  A.  Correct.
2  Q.  So that's the first time you had ever had any
3      contact with Carol Laughbaum; correct?
4  A.  Correct.
5  Q.  November 27 or 28; correct?
6  A.  Correct.
7  Q.  All right.  And did you seek the legal counsel of
8      anyone other than Ms. Laughbaum in connection
9      with the problems you felt you were having at
10     Ford Motor Company?
11 A.  I don't recall.
12 Q.  Did you go see Ms. Bogas again?
13 A.  No.
14 Q.  It's possible that you did seek counsel from
15     someone other than Ms. Laughbaum prior to
16     engaging her?
17 A.  I don't recall at this time ever speaking to
18     anyone else.
19 Q.  How did you locate the name of Ms. Laughbaum?
20 A.  I was given information by LaDawn the day that I
21     expressed my concerns to her.
22 Q.  What information were you given by LaDawn?
23 A.  She gave me literature in regards to several other
24     cases that happened or something that happened at
25     Ford.

Page 32

1  Q.  Describe the literature she gave you.
2  A.  It was about women in Chicago.
3  Q.  Did you retain copies of the documents that
4      Ms. LaDawn gave you?
5  A.  No.
6  Q.  Did you give copies of those documents to
7      Ms. Laughbaum?
8  A.  I didn't receive any copies.
9  Q.  She just showed you something but didn't give you
10     a copy?
11 A.  She didn't give me a copy.
12 Q.  All right.  So what was the content of the
13     information that she showed you on November 25?
14 A.  It was in regards to a sexual harassment claim.
15 Q.  What did it have to say?
16 A.  It said that there had been sexual harassment in
17     the company of Ford before and she just wanted me
18     to read over those things.
19 Q.  How did you get Ms. Laughbaum's name from reading
20     information about sexual harassment issues in
21     Chicago?
22 A.  It was Chicago.  It was something that had
23     occurred at the Dearborn plant, at the plant that
24     I'm at.  It was different articles and different
25     things that she had written down, and

JOHNSON, DEANNA RENAE
10/07/2019



Pages 33–36

Page 33

1    Ms. Laughbaum's name was a part of that.  It was
2    on something that I seen of hers that she showed
3    to me.
4  Q.  What -- were these things that Ms. Clemons had
5    written down herself?
6  A.  Yes.
7  Q.  Was it in her handwriting?
8  A.  Yes.  They were in her handwriting as well as
9    typed-up papers that were laminated.
10  Q.  In what context did Ms. Laughbaum's name appear?
11  A.  I don't quite remember.  She just pointed to me
12    and showed me this is someone that has helped
13    other people.
14  Q.  What was mentioned about the Detroit Truck Plant
15    in the papers that Ms. Clemons showed you?
16  A.  I don't recall the exact wording.  I was really
17    upset that day.
18  Q.  What was the gist of what it was referring to
19    about the Detroit Truck Plant?  Did it have
20    anyone's name in it --
21  A.  No.
22  Q.  -- associated with the truck plant?
23  A.  No.
24  Q.  Did it reference any litigation against the truck
25    plant?

Page 34

1  A.  No, not litigation.  A lot of accusations.  I
2    didn't read the entire -- the entire form.
3  Q.  Had you known Ms. Clemons prior to meeting with
4    her on November 25?
5  A.  I known her as an employee at Ford Motor Company.
6  Q.  And had you worked with her before?
7  A.  No.
8  Q.  She was a higher level than you; correct?
9  A.  Yes.
10  Q.  Did you find her to be someone that you were
11    comfortable talking with?
12  A.  Yes.
13  Q.  Someone that you would consider honest?
14  A.  Yes.
15  Q.  And someone you presumed would be helpful?
16  A.  Yes.  And she told me she was the head of the
17    sexual harassment force at Dearborn.
18  Q.  Why did you go to Ms. Clemons on November 25 to
19    discuss the issues that you had with Nick Rowan?
20  A.  Because I previously went to my supervisors and
21    that didn't turn out well.
22  Q.  How many different mobile phones have you used
23    for personal or work phone calls since June 2018?
24    Let's take the beginning of June.
25  A.  The beginning of June, I'm not quite sure.  After

Page 35

1    I came on board at Ford Motor Company, two cell
2    phones.
3  Q.  All right.  So you started at Ford Motor Company
4    on June 25, 2018; correct?
5  A.  Correct.
6  Q.  All right.  From June 25, 2018, through today's
7    date, how many different cell phones have you
8    been the owner of?
9  A.  Two.
10  Q.  All right.  What are the phone numbers of those
11    two phones?
12  A.  They are the same number, 313.454.8825.
13  Q.  Let's take the first phone.  What type of phone
14    is it?
15  A.  It is a Samsung.  It's an LG.
16  Q.  How long have you had that particular phone or
17    did you have that particular phone?
18  A.  I've had -- I had that particular phone for maybe
19    two years.
20  Q.  Preceding June 25, 2018?
21  A.  Yes.
22  Q.  Through today's date?
23  A.  Yes.
24  Q.  So you still use that phone?
25  A.  No.

Page 36

1  Q.  Okay.  You still have possession of it but you
2    don't actively use it?
3  A.  Yes.
4  Q.  Does it have service?
5  A.  No.
6  Q.  When did you cease service on the Samsung device?
7  A.  I don't recall the exact date.  Because I had so
8    much storage in it, I had to get a new phone for
9    Ford.
10  Q.  Who was your carrier?
11  A.  MetroPCS.
12  Q.  And was the account in your name?
13  A.  Yes.  No, my mom's name.  Excuse me.
14  Q.  Did you use the Samsung LG phone for emails or
15    text messages while you were employed at Ford
16    Motor Company?
17  A.  Yes.
18  Q.  During what time period?
19  A.  The full-time that I was there.
20  Q.  So you stopped using it sometime after November
21    2018?
22  A.  I'm not sure.
23  Q.  Well, you stopped service on it at some point;
24    correct?
25  A.  I have two phones.  I stopped service on the first

JOHNSON, DEANNA RENAE
10/07/2019



Page 37

1       phone.
2  Q.  I thought you said the Samsung phone no longer
3       had service?
4  A.  No.  I have two phones, two Samsung phones.  One
5       has service; one does not.
6  Q.  Okay.  Well, I'm talking -- you started with the
7       Samsung LG phone.
8  A.  Yes.
9  Q.  What's the type of the second phone?
10  A.  It's a Samsung as well.
11  Q.  Samsung LG as well?
12  A.  Yes.
13  Q.  All right.  What year was the one with no service
14       issued by Samsung?
15  A.  I have no idea.  What year it was made?
16  Q.  Yes, you know, like you get a phone that's
17       released in 2010, 2011.
18  A.  I have no idea what's the year.
19  Q.  How would one distinguish between the two Samsung
20       phones that you have?
21  A.  One is bigger than the other.  One is black.
22  Q.  Okay.  Let's take the one with no service.
23       Describe that one.
24  A.  It's smaller than the other one.  It's a white
25       phone.

Page 38

1  Q.  Any other descriptors?  You can get emails on
2       that phone; correct?
3  A.  Yes.
4  Q.  Texts?
5  A.  There's no service.  When it was service, yes.
6  Q.  Okay.  All right.  So let's stay with that
7       particular phone.  Did you use that phone for
8       emails and texts during the entire time you were
9       employed at Ford?
10  A.  Not the entire time.
11  Q.  When did you stop using that phone during your
12       tenure at Ford?
13  A.  I can't remember the exact date.  Maybe in October
14       I got a new phone.
15  Q.  And when you got a new phone, you stopped the
16       service on the white Samsung and started it on
17       the black Samsung?
18  A.  That's correct.
19  Q.  Did you transfer the data from the white Samsung
20       to the black Samsung?
21  A.  No.
22  Q.  Have you kept the white Samsung -- do you still
23       have it in your possession?
24  A.  It is in -- yes, I do.
25  Q.  And is all the data still on that phone?

Page 39

1  A.  Yes.
2  Q.  Did you provide that phone to an outside service
3       for forensic exam?
4  A.  Yes, I did.
5  Q.  Did you sign an agreement to have your phones
6       forensically examined?
7  A.  Yes.
8  Q.  Did they -- did that agreement cover both your
9       white Samsung as well as your black?
10  A.  Yes.
11  Q.  So both of those phones were imaged in their
12       entirety by an outside vendor; correct?
13  A.  Correct.
14  Q.  Do you know the name of the vendor?
15  A.  No, I do not.
16  Q.  Does N1 Discovery sound familiar?
17  A.  Yes.
18  Q.  Okay.  And so that's the vendor with whom you
19       signed an agreement to have your phones imaged?
20  A.  Yes.
21  Q.  Correct?
22  A.  Correct.
23  Q.  And at the time you gave those phones to your
24       attorney to give to N1 -- is that how it
25       happened?

Page 40

1  A.  Yes.
2  Q.  Okay.  None of the data had been deleted from
3       either of those phones; correct?
4  A.  Correct.
5  Q.  So everything -- every text and email that you
6       sent while at Ford Motor Company is still on
7       either the white Samsung or the black Samsung as
8       of today; correct?
9  A.  I cannot say that I didn't maybe erase a picture
10       that my granddaughter put on or anything like
11       that, but as far as Ford Motor Company business,
12       correct.
13  Q.  And anything that relates to the events that
14       caused you to file this lawsuit?
15  A.  They are still there.
16  Q.  Everything is still there?
17  A.  Correct.
18  Q.  As well as photos that you have had on your phone
19       during the course of your tenure at Ford, they're
20       still there as well; correct?
21  A.  Correct.
22  Q.  So everything related to Nick Rowan that was ever
23       on either your white Samsung or your black
24       Samsung is still on one of those two phones to
25       this day; correct?

JOHNSON, DEANNA RENAE
10/07/2019



Page 41

```
1   A.   Correct.
2   Q.   And you have the phones back in your possession
3        at this time?
4   A.   Correct.
5   Q.   Were there any limitations on the instructions
6        given to N1 as to what it could image on your
7        phone or from your phone?
8             MS. LAUGHBAUM:  If you know.
9             THE WITNESS:  I don't recall.  I don't
10       know.
11  BY MS. HARDY:
12  Q.   Well, when you signed an agreement with them to
13       allow them to image your phone, was it to image
14       the entire phone and all contents on both phones?
15  A.   I'm not sure.  I believe so.
16  Q.   All right.  Let's go back to the black Samsung,
17       which is the larger of the two; correct?
18  A.   Correct.
19  Q.   Who do you have service through on that phone?
20  A.   MetroPCS.
21  Q.   And is that in your name or your mother's?
22  A.   My mom.
23  Q.   What's your mother's name?
24  A.   Carrie Logan.
25  Q.   C-a-r-r-i-e?
```

Page 42

```
1   A.   Yes.
2   Q.   What email addresses have you used in the past?
3        Let's take two years.
4   A.   djok123@hotmail.com.
5   Q.   Any others?
6   A.   singsomthin.
7   Q.   Sink or sing?
8   A.   Sing.
9   Q.   Can you spell it?
10  A.   S-i-n-g, somethin, s-o-m-t-h-i-n@gmail.com.
11  Q.   @gmail.com?
12  A.   Yes.
13  Q.   Any others?
14  A.   No.
15  Q.   Did you have, during the time you were employed
16       at Ford, any other devices on which electronic
17       data could be stored other than a cell phone?
18  A.   No.
19  Q.   Have you made a search for documents that relate
20       to the allegations in this complaint since the
21       time this litigation was filed?
22  A.   A search?
23  Q.   Have you looked for documents in your possession
24       that pertain in any way to the allegations that
25       you're making in this lawsuit?
```

Page 43

```
1   A.   Yes.
2   Q.   What did you do in that regard?
3   A.   I went through my phone and I found the pictures,
4        text messages from various people at my job.
5   Q.   Did you do anything else?
6   A.   No.
7   Q.   You didn't search for hard copy documents?
8   A.   No.
9   Q.   Why not?
10  A.   When you say "hard copy documents," what are you
11       referring to?
12  Q.   Hard copy documents.
13  A.   No.  I didn't have any at that time, no.
14  Q.   So you never retained copies of anything as
15       opposed to just an electronic -- a document in
16       electronic form?
17  A.   Are you referring to copies of my complaint to
18       Ford?
19  Q.   No, that's created by your lawyer.
20  A.   I'm sorry.
21  Q.   I'm talking about documents that existed during
22       the time of your employment --
23  A.   No.
24  Q.   -- at Ford.  Well, you did produce some Ford
25       manual to your lawyer; correct?
```

Page 44

```
1   A.   Yes.  Sorry.
2   Q.   Okay.  So where did you find that?
3   A.   That was given to me when I began at Ford.
4   Q.   All right.  But where was that stored?  Where did
5        you retrieve that from to give to your attorney?
6   A.   I retrieved that from my briefcase.  It was just a
7        paper manual.
8   Q.   So you kept that manual in your briefcase?
9   A.   Certain manuals, certain things, when you're first
10       hired, your new hire form, things like that.
11  Q.   All right.  So what else did you have in your
12       briefcase that pertained to Ford?
13  A.   Just my new hire forms.
14  Q.   So in your briefcase you had the manual and new
15       hire forms?
16  A.   Yes.
17  Q.   And when did you take those out of the briefcase
18       and give them to your attorney?
19  A.   I don't recall the exact date but it was when we
20       met.
21  Q.   In November 2018 or at some earlier or later
22       point?
23  A.   It could have been at a later point.  Not too far
24       from that.
25  Q.   And the only thing in the briefcase was the new
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

JOHNSON, DEANNA RENAE
10/07/2019



EXHIBIT B
Pages 45–48

---

Page 45

1    hire form and the manual?
2  A.  **New hire form, manual, my work badge, things like**
3     **that of that nature.**
4  Q.  What other things like that?
5  A.  **Just my new hire forms, my badge.**
6  Q.  Did you have any photos in your briefcase?
7  A.  **In folders on my phone, yes, in folders.**
8  Q.  Were the photos only on your phone or did you
9     have hard copies of photos?
10 A.  **I had hard copies of photos.**
11 Q.  Okay.  We're getting there.  What other hard copy
12    documents did you retain from Ford Motor Company
13    or that relate to Ford Motor Company?
14 A.  **I think that was it.  I can't recall any more at**
15    **this time.**
16 Q.  Why don't you take a moment and think about it
17    since, as we've been discussing this, the list
18    has grown.
19         Are there any other hard copy documents
20    that you retained copies of that concern events
21    that occurred at Ford Motor Company or your
22    employment at Ford Motor Company?
23 A.  **Only my new hire packet, text messages, and**
24    **pictures.**
25 Q.  Did you make hard copies of text messages?

---

Page 46

1  A.  **I don't recall.  I don't recall.**
2  Q.  Did you ever print off a text message or a photo
3     so you would have a copy in a non-electronic
4     format?
5  A.  **Yes.**
6  Q.  Of what?  Of text messages?
7  A.  **Of photos, if I'm not mistaken.**
8  Q.  What about text messages?
9  A.  **I can't recall if I copied the text messages.**
10 Q.  When did you copy the photos?
11 A.  **Early on, when I -- when I first met with my**
12    **attorney, but I don't know the exact date but it**
13    **was early on.**
14 Q.  Early on, meaning --
15 A.  **I don't -- can't --**
16 Q.  I don't have to have an exact date.  I'd prefer
17    an exact date but I'll take something less than
18    an exact date.  I want to get as close to the
19    exact date or accurate date as you can possibly
20    get.
21 A.  **I don't know.  Between December -- maybe between**
22    **December and February.  I'm so unsure of the date.**
23 Q.  So with respect to your briefcase, the contents
24    were your new hire manual, new hire forms, work
25    badge and hard copy photos?

---

Page 47

1  A.  **Yes.**
2  Q.  Is that -- is that everything that was in the
3     briefcase?
4  A.  **I believe so.**
5  Q.  Is there any place other than the briefcase that
6     you stored hard copies of documents that
7     pertained to this lawsuit or Ford Motor Company?
8  A.  **When I was sick and went to the doctor, I took**
9     **pictures of my doctor's excuses, things like that**
10    **so I can send them to my supervisors.  I have**
11    **things like that.**
12 Q.  Are those still on your phone?
13 A.  **Yes.**
14 Q.  Okay.  And you made hard copies of some or all of
15    those?
16 A.  **Some of those.**
17 Q.  Okay.  And they were in your briefcase?
18 A.  **Well, actually I made copies and I gave them to my**
19    **supervisors.**
20 Q.  All right.  Did you keep copies for your own
21    records?
22 A.  **No, but they're in my briefcase -- but they're --**
23    **I'm sorry.  They're in my phone.**
24 Q.  All right.  Is there any place you stored hard
25    copy documents that relate in any way to Ford

---

Page 48

1     other than in your briefcase?
2  A.  **There could be something on my phone, but I'm not**
3     **sure.**
4  Q.  All right.  We know about your two phones.
5  A.  **Yes.**
6  Q.  And we know about the briefcase.  I want to know
7     if there's any other place that you need to look
8     for documents.
9  A.  **No.**
10 Q.  So the only places they could possibly be would
11    be in the briefcase or on one of the two phones?
12 A.  **Exactly.**
13 Q.  All right.  So tell me what you did to search for
14    your text messages on your two cell phones.  What
15    was the process that you followed?
16 A.  **The process?**
17 Q.  How did you go about conducting your search for
18    text -- for relevant text messages?
19 A.  **When I was asked by Mr. Harris, I scrolled through**
20    **my phone and found them.  They were there.**
21 Q.  All right.  Is that the only time you did a
22    search of your phone for text messages that
23    relate to the allegations you're making in this
24    lawsuit?
25 A.  **No.**

---

JOHNSON, DEANNA RENAE
10/07/2019



Page 49

1   Q.   All right.  When did you -- what other time did
2        you do a search for text messages?
3   A.   When I spoke with Rich Mahoney.
4   Q.   All right.  And when was that?
5   A.   That was during maybe my two months into my
6        employment.
7   Q.   All right.  And what did you do at that time in
8        the way of a search for text messages?
9   A.   I got my phone and I told Rich Mahoney about the
10       incident, and I said I need to show you something,
11       and I scrolled through my phone and I found the --
12       one of the horrible pictures that he sent me.
13  Q.   That was two months into your employment, so that
14       would have been by the end of August?
15  A.   Maybe in the fall, beginning of September.
16  Q.   Since you have retained legal counsel, have you
17       done a search of text messages on your phone to
18       identify all messages that relate in any way to
19       the allegations you are making in this lawsuit?
20  A.   Yes.
21  Q.   All right.  When did you do that?
22  A.   Searched through my phone and found all messages?
23  Q.   When did you do a search of the text messages on
24       your phone since retaining counsel to identify
25       all text messages that in any way relate to your

Page 50

1        allegations in this lawsuit?
2   A.   I don't remember when I did that, but sitting with
3        my counsel, sitting with my attorney, before the
4        whole process, I scrolled through and went through
5        a lot of text messages.
6             I don't think I'm understanding the
7        question.
8   Q.   All right.  I want to understand two things and
9        it's pretty simple.  All right.  Since you
10       retained legal counsel, you have done a search
11       for text messages on your two phones; correct?
12  A.   Correct.
13  Q.   And you've been searching for everything that
14       relates to the allegations in this lawsuit;
15       correct?
16  A.   Correct.
17  Q.   All right.  Do you know when you conducted that
18       search or searches, if it was on more than one
19       occasion?
20  A.   I don't recall the dates.
21  Q.   You have no idea?
22  A.   I have no idea.
23  Q.   All right.  What process did you follow to locate
24       relevant text messages on your two phones?  How
25       did you conduct that search?

Page 51

1   A.   I don't quite think I'm following you.  I just
2        have my phone.  When I was asked, if Ford Motor
3        Company needed that information or if my attorney
4        needed that information, before my phone was went
5        through from N1 or that company, I would scroll
6        through my phone.
7   Q.   All right.  So all you would do or all you did in
8        connection with the search that you performed is
9        to just keep scrolling through every text message
10       that was on your phone?
11  A.   Yes.
12  Q.   You didn't fill in search terms and conduct a
13       search through that method?
14  A.   No.
15            MS. LAUGHBAUM:  I need a short break.
16       Is now a good time?
17            MS. HARDY:  Yeah, that's fine.
18            VIDEO TECHNICIAN:  Off the record at
19       10:42 a.m.
20            (Off the record at 10:42 a.m.)
21            (Back on the record at 10:51 a.m.)
22            VIDEO TECHNICIAN:  We're back on the
23       record at 10:51 a.m.
24  BY MS. HARDY:
25  Q.   Outside of emails and texts, did you keep any

Page 52

1        notes, either handwritten or electronic, for the
2        purpose of memorializing events that occurred in
3        the workplace that you found offensive?
4   A.   No.
5   Q.   Did you keep any electronic or handwritten notes
6        of significant dates that relate to the events in
7        this lawsuit?
8   A.   My cell phones.
9   Q.   What do you mean, "your cell phones"?
10  A.   Could you repeat the question.
11            MS. HARDY:  Can you read it back.
12            (The requested portion of the
13            record was read by the reporter at
14            10:52 a.m.:
15            "Q.  Did you keep any electronic or
16            handwritten notes of significant
17            dates that relate to the events in
18            this lawsuit?")
19       THE WITNESS:  Electronic, my text
20       messages that are on my phone.  I never erased
21       them.
22  BY MS. HARDY:
23  Q.   All right.  So what you're referring to, is that
24       -- to the extent text messages are dated, those
25       would be dates you could refer to for the purpose

JOHNSON, DEANNA RENAE
10/07/2019



Page 53

```
 1         of attaching a date to an event?
 2    A.   Yes.
 3    Q.   Okay.  Other than text messages and emails, both
 4         of which contain dates, did you keep any notes,
 5         either handwritten or through electronic means,
 6         to record significant dates?
 7    A.   No.
 8    Q.   Do you have any audio recordings that relate to
 9         any of the allegations you're making in this
10         lawsuit?
11    A.   No.
12    Q.   Do you have any video recordings of any
13         allegations that you are making -- that relate to
14         any allegations you are making in this lawsuit?
15    A.   No.
16    Q.   Do you have any photos that you took of anybody
17         or anything at Ford Motor Company that relate to
18         the allegations in this lawsuit?
19    A.   No.
20    Q.   All right.  So I want to return to your search
21         for texts.  Before -- just before your counsel
22         initiated a break, you had said that all you did
23         to search for texts was to look at your phone and
24         look through the text messages on your phone;
25         correct?
```

Page 54

```
 1    A.   Yes.
 2    Q.   Okay.  Did you do that in the presence of your
 3         counsel?
 4    A.   Yes.
 5    Q.   Did you do it on your own as well or just in the
 6         presence of your counsel?
 7    A.   To look through text messages?
 8    Q.   To identify text messages that have any
 9         connection to the allegations you're making in
10         this lawsuit.
11    A.   With counsel.
12    Q.   All right.  So when you went through and
13         identified a text message that you thought
14         related to the events that you're complaining
15         about, how did you get a copy of that text
16         message from your phone to your counsel?  What
17         process did you follow?
18    A.   When the team N1, is that -- I'm sorry.
19    Q.   N1 Discovery.
20    A.   When N1 Discovery, they took all that information
21         from my phone.
22    Q.   When N1 Discovery took your phone, did it return
23         to you a hard copy printout of everything on your
24         phone?
25    A.   Not to myself.
```

Page 55

```
 1    Q.   To your counsel?
 2    A.   I'm not aware of that.
 3    Q.   All right.  Well, then we need to continue here.
 4         How did you -- did you participate in the
 5         identification of text messages from your phone
 6         that were responsive to Ford's request for all
 7         messages that relate to the allegations in this
 8         lawsuit?
 9    A.   Yes.
10    Q.   How did you participate?  What did you do?
11    A.   I signed a consent form for N1 to search my phone.
12    Q.   All right.  And then did you leave it up to your
13         lawyer after that to figure out what was
14         responsive or did you participate?
15    A.   I participated.
16    Q.   What did you do in terms of your participation?
17    A.   I explained to her what dates that these were,
18         what happened surrounding those dates.
19    Q.   Did you look at all the text messages that were
20         retrieved from your phone?
21    A.   Yes.
22    Q.   All right.  In what form were they when you
23         looked at them?
24    A.   Paper form.
25    Q.   All right.  So your counsel showed you a stack of
```

Page 56

```
 1         paper text messages; correct?
 2    A.   I wouldn't say a stack.  I'd say she showed me
 3         text messages, paper.
 4    Q.   Did you -- and so that's how you identified the
 5         text messages that you feel support your claims
 6         in this lawsuit?
 7    A.   Yes.
 8    Q.   All right.  And so you looked at what
 9         Ms. Laughbaum showed you, and from that grouping
10         of text messages, you picked the ones that you
11         thought were responsive; correct?
12    A.   Can you repeat that?  I picked the ones --
13              MS. HARDY:  Can you read that back,
14         please.
15              (The requested portion of the
16              record was read by the reporter at
17              10:57 a.m.:
18              "Q.  And so you looked at what
19              Ms. Laughbaum showed you, and from
20              that grouping of text messages, you
21              picked the ones you thought were
22              responsive; correct?")
23              THE WITNESS:  No.
24    BY MS. HARDY:
25    Q.   You identified the ones you thought were
```

JOHNSON, DEANNA RENAE
10/07/2019


**EXHIBIT B**
Pages 57–60

Page 57

1  responsive?
2  **A.  I identified all of them.**
3  Q.  Every one she showed you you told her was
4      responsive to the request for documents that
5      relate to the allegations in your lawsuit?
6  **A.  I'm unsure how to answer that because I don't**
7      **remember how -- what every text message was.  If**
8      **they were pertaining to this lawsuit, yes.**
9  Q.  Did you provide to either your counsel or N1 any
10     search terms to be used in identifying responsive
11     text messages?
12 **A.  No.**
13 Q.  Okay.  I have the same questions with respect to
14     emails.  Did you provide any search terms for
15     emails that would help N1 or your counsel
16     identify responsive text messages?
17 **A.  No.**
18 Q.  Did you conduct on your phone any search of
19     either text messages or emails by using search
20     terms?
21 **A.  No.**
22 Q.  So I'm going to show you what was marked as
23     Plaintiff's Exhibit No. 2 in the Nick Rowan
24     deposition.  It's 71 pages of text messages, and
25     I'm marking this as Exhibit 1 in this deposition.

Page 58

1                MARKED FOR IDENTIFICATION:
2                DEPOSITION EXHIBIT 1
3                    10:58 a.m.
4  BY MS. HARDY:
5  Q.  Please, take whatever time you need to look
6      through this stack of text messages, and then I'm
7      going to ask some questions for you.  You don't
8      need any more time?
9  **A.  It's just that when I look at the text messages of**
10     **erection and things like that, it just brings**
11     **horrible memories to me.**
12 Q.  Well, we need to have you look through the
13     documents so that you can identify those as all
14     of the text messages that you identified through
15     your counsel as responsive to Ford's document
16     requests.
17 **A.  Let me be clear on this.  You're asking me to pick**
18     **out certain documents --**
19 Q.  No, I'm not.  I'm asking you to look at the
20     totality of Exhibit No. 1 in this deposition, and
21     to confirm for me that those are the text
22     messages that you identified for your counsel as
23     supportive of the allegations you're making in
24     this lawsuit and responsive to the document
25     requests that Ford made.

Page 59

1  **A.  Okay.**
2                MS. LAUGHBAUM:  Would you like me to
3      weigh in on this?  Because we're kind of getting a
4      little convoluted.
5                MS. HARDY:  I'll allow that with
6      limitations.
7                MS. LAUGHBAUM:  So recently, within the
8      last couple of days, I've e-mailed Mr. Davis, and
9      this is subsequent to the Rowan deposition, and
10     this was also on the record at the Rowan
11     deposition, that these 71 pages I was not
12     representing were a complete set of text messages
13     between my client and Rowan, but they were odds
14     and ends of what I had received from my client and
15     there were other texts that were part of the N1,
16     you know, analysis, that I've always made
17     available to Ford.  So I think you're assuming
18     these are something my client gave to me and these
19     are the be all and end all of text messages.  I've
20     never taken that position.
21                MS. HARDY:  Well, those are the only
22     documents that you have produced to date, and you
23     haven't even formally produced them because they
24     came through the Rowan dep as an exhibit to the
25     Rowan dep, and we didn't even have them in advance

Page 60

1  of the Rowan dep, which we should have because
2  they were responsive to document requests that
3  have been outstanding for quite some time.
4                MS. LAUGHBAUM:  Okay.  I made the
5  phones available about six months ago and your
6  office didn't follow up at all.  It was always
7  available to you to do whatever you wanted, and,
8  in fact, I got correspondence from your office
9  saying we'll make arrangements to get those phones
10 picked up and imaged, and that never occurred.
11                MS. HARDY:  I am not aware of what
12 you're referring to, so I'm not conceding that is
13 accurate, but I will let Mr. Davis speak to
14 anything that occurred in the Rowan dep that
15 relates to this topic because he was present and I
16 was not.
17                MR. DAVIS:  Yeah, and I'll just go on
18 the record you represented that you don't have
19 anything more to produce other than these and I
20 believe that's in writing, Ms. Laughbaum, and
21 we've had discussions at the Rowan deposition
22 otherwise that the request for production asked
23 for documents within your possession, custody and
24 control, which these are, and you have an
25 obligation to produce them regardless of whether

JOHNSON, DEANNA RENAE
10/07/2019



Pages 61–64

Page 61

1  we might ask for a forensic inspection, so that's
2  all I have to add.
3          MS. LAUGHBAUM:  Okay.  Just to clarify,
4  these are the paper copies in addition to Rowan
5  Exhibit 1 or whatever the most vile picture is.
6  Those are the paper copies that I have.  The
7  imaging did not result in some stack of, you know,
8  pictures of texts and photos.  As I indicated
9  previously, I have an Excel spreadsheet from N1
10  that lists the text communications and the photos.
11  That's what I have and I've agreed to produce it.
12  I have not withheld anything.  It's all there.
13  It's all available to you.
14          MS. HARDY:  Why hasn't it been produced
15  to date?
16          MS. LAUGHBAUM:  Because it's an Excel
17  spreadsheet.  I will produce it.  I've told
18  Mr. Davis I'll produce it.  It's an Excel
19  spread --
20          MS. HARDY:  But you have --
21          MS. LAUGHBAUM:  It's hundreds of pages
22  of an Excel spreadsheet.
23          MS. HARDY:  It doesn't matter.  You've
24  produced hundreds and hundreds of pages of some
25  manual she had from Ford and you didn't produce

Page 62

1  the text messages.  Of course the manual --
2  procedural manual at Ford is of no consequence in
3  this lawsuit whatsoever.
4          MS. LAUGHBAUM:  And do you know what,
5  Ms. Harding --
6          MS. HARDY:  But the text message Excel
7  spreadsheet is of absolute critical importance,
8  and you haven't given it to us.
9          MS. LAUGHBAUM:  I'd be happy to respond
10  to that.  If you go back and look at the
11  communications between me and Ms. Baumhart, she
12  insisted -- I told her, you don't really want --
13  you don't really want copies of all these training
14  manuals, do you?  And she very emphatically said I
15  was not being cooperative, and yes, I need them,
16  so my office spent hours, you know, copying and
17  producing double-sided training manuals, which
18  have nothing to do with anything in the case, and
19  that was at your, you know, co-counsel's
20  insistence.
21          And with respect to the phone imaging,
22  I said at my initial requests they're available.
23  You can come and get them.  Ms. Baumhart's
24  correspondence made it crystal clear that you
25  wanted to do your own inspection of the phone.

Page 63

1  She didn't ask for any other follow-up.  She said
2  we'll get the phones.  She said I need the
3  training manuals, et cetera, and we'll make
4  arrangements to get the phones, and that was about
5  six months ago and I hadn't heard anything
6  subsequent.
7          MR. DAVIS:  I just want to clarify for
8  the record here.  So you're saying that there are
9  no other physical copies that you have either
10  taken off the phone in paper form, screen shots,
11  downloaded emails, anything else that's an actual
12  source document to be produced other than what is
13  marked as Exhibit 2 in the Rowan deposition?  Is
14  that the representation, just so we're clear?
15          MS. LAUGHBAUM:  And the penis picture
16  that we've all seen way too many times.
17          MR. DAVIS:  So that was Exhibit 3 to
18  the Rowan.  So besides Exhibit 2 and Exhibit 3 to
19  the Rowan deposition, there are no other paper
20  copies, electronic screen shots, downloaded
21  emails, any other source documents?  That's the
22  representation?
23          MS. LAUGHBAUM:  I believe that's true.
24          MR. DAVIS:  Okay.
25  BY MS. HARDY:

Page 64

1  Q.  Let's go back to Exhibit No. 1 to today's
2     deposition.  Do you know how that particular
3     collection of text messages became gathered
4     together and used in the Rowan deposition?
5  A.  No.
6  Q.  Did you collect those 71 pages and identify them
7     for your lawyer and give them to her as
8     responsive text messages?
9  A.  I did not collect the 71 pages.
10  Q.  All right.  So you don't have any idea how those
11     particular 71 pages became part of this lawsuit?
12  A.  When N1 took my phone.
13  Q.  No.  But I'm asking about why those 71 pages in
14     particular.
15          MS. LAUGHBAUM:  Objection.  There's a
16     lack of foundation.
17  BY MS. HARDY:
18  Q.  Do you know how it is that those 71 pages had
19     been identified as responsive text messages?
20  A.  No.
21  Q.  All right.  Having taken the time to look through
22     the 71 pages, do you know of any other text
23     message that is on your phone that relates to the
24     allegations in this lawsuit that doesn't appear
25     in those 71 pages?

JOHNSON, DEANNA RENAE
10/07/2019



Pages 65–68

---

Page 65

1   **A.   No.**
2   Q.   How was the photo of Mr. Rowan's penis that you
3        claim he sent to you conveyed to you?  How did he
4        send that to you?
5   **A.   He sent that to me from his cell phone.**
6   Q.   Via text or email?
7   **A.   Via text.**
8   Q.   Okay.  Where is the text message that would
9        document that he sent you a photo of his penis?
10  **A.   I assume it would be in the 71 pages.**
11  Q.   Do you see it in those 71 pages?  Your counsel
12       stipulated that it's not there.
13            MS. LAUGHBAUM:  I'll stipulate it's not
14       in there.  This is not a complete set of all the
15       text messages.  I've made that crystal clear.
16            MS. HARDY:  All right.  So you have a
17       text message in which Mr. Rowan conveyed a photo
18       of his penis and you haven't produced that?
19            MS. LAUGHBAUM:  I have this.  I --
20            MS. HARDY:  "This" being the 71 pages
21       that doesn't contain that.
22            MS. LAUGHBAUM:  Yes, because this is
23       not complete.  If you look at the Excel
24       spreadsheet produced by N1, it will tell you that
25       that penis picture was texted to my client on

---

Page 66

1   September 13, 2018.
2            MS. HARDY:  Where is that text message?
3            MS. LAUGHBAUM:  What text message?
4            MS. HARDY:  The September 13 text.
5            MS. LAUGHBAUM:  It's a photo of his
6   penis.
7            MS. HARDY:  Where is the text copy of
8   the text conveyance on September 13?  We don't
9   have that.
10            MS. LAUGHBAUM:  Well, we could look at
11  someone's phone and do a screen shot.
12            MS. HARDY:  Why haven't you produced
13  that?
14            MS. LAUGHBAUM:  I have told -- how many
15  times do we have to pass this penis picture back
16  and forth?
17            MS. HARDY:  Well --
18            MS. LAUGHBAUM:  You have it.  We have
19  it.
20            MS. HARDY:  No, no, we want
21  verification that it was sent from Mr. Rowan's
22  phone to your client.
23            MS. LAUGHBAUM:  You will have that.
24  It's on the N1.
25            MS. HARDY:  Why don't we have that

---

Page 67

1   today?
2            MS. LAUGHBAUM:  It's on the N1 Excel
3   spreadsheet.
4            MS. HARDY:  Why haven't you provided
5   that before this deposition today?
6            MS. LAUGHBAUM:  I didn't really think
7   we needed --
8            MS. HARDY:  You didn't think that was
9   important?
10            MS. LAUGHBAUM:  The penis picture has
11  been produced.  It's been back and forth.
12            MS. HARDY:  No, that is not --
13            MS. LAUGHBAUM:  You've got it.  You've
14  got it.  You produced it to us.  We produced it to
15  you.  Now you're claiming somehow I've not been
16  forthcoming?
17            MS. HARDY:  Yes.
18            MS. LAUGHBAUM:  Trust me.  I'm very
19  happy to show you all the vile images that your
20  former employee sent my client.  Why would I
21  withhold anything?
22            MS. HARDY:  If there's any further
23  evidence that Mr. Rowan sent vile images, the
24  penis picture or other images through his phone,
25  we need evidence that they were sent from his

---

Page 68

1   phone.
2            MS. LAUGHBAUM:  As I said, it's on the
3   Excel.
4            MS. HARDY:  That is independent --
5   well, it will be an issue in our motion to compel.
6   They should have been produced prior to today --
7   long prior to today.
8            MS. LAUGHBAUM:  All right.  Well, I
9   don't understand your point, but that's fine.
10            MS. HARDY:  Well, I don't know how you
11  couldn't understand the point.  That evidence that
12  the photos actually came from his phone and were
13  sent by him --
14            MS. LAUGHBAUM:  Okay.  I'm representing
15  as an officer of the court that the Excel
16  spreadsheet says that at a certain time on
17  September 13, 2018, that penis picture was sent
18  from Mr. Rowan's phone to my client's phone, and
19  in fact he admitted the other day that, yes, he
20  did send that -- that picture was from his phone
21  to my client.
22            MS. HARDY:  He didn't admit to sending
23  it -- to him sending it.
24            MS. LAUGHBAUM:  No.  In fact, of
25  course, we all know that my client, according to

---


Page 69

1       Mr. Rowan, just grabbed his phone and couldn't
2       wait to get her hands on the dirty pictures and
3       texted them to herself. That was his testimony.
4            MS. HARDY: Well, September -- this is
5       the first time I've heard that September 13 was
6       the date that that photo was allegedly conveyed,
7       so...
8   BY MS. HARDY:
9   Q.   All right. Let's continue. Did you search your
10      hotmail account for responsive data, text
11      messages and/or emails related to this lawsuit?
12   A.   **No.**
13   Q.   Why not?
14   A.   **There was -- I've never had anything sent to my**
15      **hotmail account that was related other than things**
16      **between my lawyer and myself, but nothing --**
17      **nothing from Ford Motor Company, nothing from Nick**
18      **Rowan goes to my hotmail account.**
19   Q.   And you didn't send anything to your hotmail
20      account that would have -- that related in any
21      way to events that occurred at Ford Motor
22      Company?
23   A.   **Yes, possibility I did.**
24   Q.   Okay.
25   A.   **I don't recall the dates.**

Page 70

1   Q.   Okay.
2   A.   **For myself.**
3   Q.   All right. You sent to yourself as a reminder of
4      things that had happened, to keep a record of
5      things that had happened?
6   A.   **I'm not quite sure what the reason was.**
7   Q.   All right. Over what course of time, from
8      June 25 through the last day worked?
9   A.   **I don't really recall the dates or the times.**
10   Q.   Okay. But you haven't searched your hotmail
11      account for those messages that you sent to
12      yourself about events that occurred at Ford?
13   A.   **Well, I wouldn't have to search my hotmail**
14      **account. Those are events that are in my text**
15      **messages. It's not anything new.**
16   Q.   Well, you have to search all places where
17      information is stored that's responsive to the
18      document requests that's outstanding by Ford, and
19      if the hotmail account is an independent source
20      of information, that has to be searched in
21      addition to the phones.
22   A.   **My hotmail account, no one sent me anything to my**
23      **hotmail account.**
24   Q.   But if you sent things to yourself that concern
25      the allegations in this lawsuit, we are entitled

Page 71

1      to copies of that information and you need to
2      search and provide it to your counsel so that it
3      can be produced in this case. Do you understand?
4   A.   **Yes.**
5   Q.   Okay. And you are not to delete or tamper with
6      in any way anything contained in your hotmail
7      account. Do you understand?
8   A.   **Yes.**
9   Q.   Have you searched your Google drive for photos or
10      any other data that relates to allegations made
11      in this lawsuit?
12   A.   **No.**
13   Q.   You still have access to your Google drive?
14   A.   **I'm not sure.**
15   Q.   When did you last access your Google drive?
16   A.   **I don't recall the last day.**
17   Q.   Have you accessed your Google drive since you
18      have retained counsel?
19   A.   **I don't recall at this time.**
20   Q.   Have you accessed your Google drive in 2018?
21   A.   **I'm sorry. I don't recall. I'm not really big on**
22      **that sort of thing.**
23   Q.   Did you at any point in time delete anything from
24      your Google drive?
25   A.   **I don't recall.**

Page 72

1   Q.   How do you access your Google drive?
2   A.   **I do not remember. That's how much I use it.**
3   Q.   So you place things in your Google drive but you
4      don't know how you did that?
5   A.   **I don't place things on my Google drive.**
6   Q.   How does data get on your Google drive?
7   A.   **I don't know. I guess if you save something to**
8      **your phone, does it automatically go to your**
9      **Google drive?**
10   Q.   Well, I'm not here to answer questions.
11   A.   **I'm sorry. I don't know.**
12   Q.   Have you ever looked at your Google drive?
13   A.   **Probably years ago.**
14   Q.   Have you ever pulled any information off of your
15      Google drive?
16   A.   **I don't recall.**
17   Q.   Have you ever shared any information from your
18      Google drive with anyone at Ford Motor Company?
19   A.   **No.**
20   Q.   Have you ever shared any information from your
21      Google drive with your counsel?
22   A.   **No.**
23   Q.   Have you ever transferred any information from
24      your Google drive to anyone at Ford or your
25      counsel?

JOHNSON, DEANNA RENAE
10/07/2019



EXHIBIT B
Pages 73–76

Page 73

1  A.  No.
2  Q.  What social media accounts do you use?
3  A.  I've used Facebook in the past and Instagram.
4  Q.  What's your username on Facebook?
5  A.  DeAnna Logan.
6  Q.  Do you still use Facebook?
7  A.  No.
8  Q.  When did you last use Facebook?
9  A.  It's been well over a year, if I can -- I don't
10     recall.  I want to say it's been at least over a
11     year, but I don't actually recall any dates.  I'm
12     not really big on posting a lot of things on
13     Facebook.
14  Q.  Okay.  Did you ever post anything on Facebook
15     that concerned anyone at Ford Motor Company?
16  A.  No.
17  Q.  Did you ever post anything at Facebook that
18     concerned any events you claim occurred at Ford
19     Motor Company?
20  A.  No.
21  Q.  So there would be nothing on Facebook that
22     relates to Ford or anyone employed by Ford?
23  A.  No.
24  Q.  Or anything concerning this lawsuit?
25  A.  No.  That's correct.

Page 74

1  Q.  That's correct, all right.
2  A.  That's correct.
3  Q.  And what's your user name on Instagram?
4  A.  That, I do not remember.  I haven't used Instagram
5     in years.
6  Q.  Have you at any point in time posted anything on
7     Instagram that relates in any way to a Ford
8     employee or events at Ford Motor Company?
9  A.  No.
10  Q.  Did you have a Facebook account in which your
11     username is Sindy Syringe?
12  A.  Yes.  Yes.
13  Q.  So when was that?
14  A.  Years ago.  I don't recall the exact date because
15     I haven't been Sindy Syringe in years.
16  Q.  When did you stop being known as Sindy Syringe?
17  A.  Well, I'm sure with having a band, I'll always be
18     known as Sindy Syringe, but when did I stop music?
19     I don't know -- what are you --
20  Q.  Well, when did you stop using the name Sindy
21     Syringe?
22  A.  I only use that name when I'm on stage.  It's not
23     a personal thing.
24  Q.  When did you stop using the Facebook username
25     Sindy Syringe?

Page 75

1  A.  I don't -- I don't recall.  It's -- once you open
2     something, a page or something, it's probably
3     still there but I don't post it.  I don't use it.
4     I'm not a band anymore.
5  Q.  All right.  Are there any other social media
6     accounts that you use?
7  A.  No.
8  Q.  When you were shown the hard copy of text
9     messages that were obtained from your phone by N1
10     Discovery, did the copy of the text message
11     appear as they appear in Exhibit 1 to this
12     deposition?
13        MS. LAUGHBAUM:  Objection.  That
14     assumes facts not in evidence.
15  BY MS. HARDY:
16  Q.  Is that the format -- Exhibit No. 1 to your
17     deposition here today, is that the same format as
18     the documents you were shown from N1 Discovery?
19        MS. LAUGHBAUM:  Same objection.
20  BY MS. HARDY:
21  Q.  Go ahead and answer.
22  A.  I don't recall.
23  Q.  Why did you transfer photos to a Google drive?
24  A.  I never said I transferred photos to a Google
25     drive.

Page 76

1  Q.  Well, how did they get to -- on a Google drive?
2  A.  I didn't know that they were on Google drive.
3  Q.  Have you ever transferred a photo from your
4     Google drive to a third party?
5  A.  Not that I recall.
6  Q.  You wouldn't even know how to do that?
7  A.  I'm sure I could figure it out, but it's not
8     something that I often do.
9  Q.  And it's not anything that you did while you were
10     employed at Ford Motor Company?
11  A.  No.
12  Q.  All right.  So you have a Microsoft Outlook
13     account?
14  A.  Yes.
15  Q.  Okay.  And what do you use that for?
16  A.  Microsoft Outlook is for business, for typing or
17     whatever I may need it for.  I can't recall the
18     last time I used that.
19  Q.  Did you -- when did you first start using
20     Microsoft Outlook?
21  A.  Oh, my gosh, years ago.  Probably whenever they
22     first started.
23  Q.  Al.  Right.  So prior to Ford --
24  A.  Yes.
25  Q.  -- right?  And so you had an Outlook account at

JOHNSON, DEANNA RENAE
10/07/2019



Page 77

1    the time that you were hired into Ford?
2  A. Yes.
3  Q. And what email address is associated with your
4    Outlook account?
5  A. I can't remember.
6  Q. Is it one of the two emails you gave me --
7  A. It should be --
8  Q. -- before or is it yet another one?
9  A. I'm not sure.  I want to say my djok, the hotmail
10   account, but I'm not quite sure because I don't
11   use it often.
12 Q. And the only two emails you have are the djok
13   email that you previously provided and the
14   singingsomthin email?
15 A. And the singsomthin.
16 Q. The singsomthing@gmail.com?
17 A. Yes.
18 Q. So it's got to be one of those two?
19 A. Possibly, yes.
20 Q. What do you mean, "possibly"?
21 A. I assume so.  I haven't used that in so long.
22 Q. When did you last use your Microsoft Outlook
23   account?
24 A. I don't recall the last time I used it.
25 Q. Did you use it while you were at Ford?

Page 78

1  A. No, because Ford gives us our own accounts.  We
2    have your own email addresses with Ford and we use
3    everything @Ford with their computers.
4  Q. Did you use the Microsoft Outlook account that's
5    in your name for personal reasons during the time
6    that you were employed at Ford?
7  A. For emailing?
8  Q. Correct.
9  A. Of course I used my email.  Yes, I did.  Not for
10   Ford.
11          COURT REPORTER:  I'm sorry.
12 BY MS. HARDY:
13 Q. I'm asking for personal reasons.  Did you use the
14   Microsoft Outlook account between January 25,
15   2018, and your last day of work for personal
16   reasons?
17 A. My Microsoft Outlook account --
18 Q. Yes.
19 A. -- under djok, yes.
20 Q. You used it during that time frame?
21 A. For emails, I'm sure I did.
22 Q. All right.  Did you search your Microsoft Outlook
23   account for emails that are responsive to Ford's
24   document request?
25 A. No.

Page 79

1  Q. Have you provided your attorney access to your
2    Microsoft Outlook account?
3  A. I don't remember.  I don't recall.  I'm sorry.
4  Q. Have you provided to your attorney all emails
5    that you exchanged with Les Harris at Ford Motor
6    Company?
7  A. Yes.
8  Q. Have you provided to your attorney all emails
9    that you've exchanged with William Markavich?
10 A. Yes.
11 Q. Have you provided to your attorney all emails
12   that you exchanged with Rich Mahoney?
13 A. Excuse me.  I'd like to go back with the Billy
14   Markavich.  I can't remember if you said emails or
15   text messages.
16 Q. I'm going through emails at the moment.
17 A. Emails from Bill Markavich?
18 Q. Any emails that you've exchanged, he sent to you
19   or you sent to him.
20 A. I don't remember receiving at this time any emails
21   from Billy Markavich.
22 Q. All right.  But you did receive emails from Les
23   Harris?
24 A. Yes.
25 Q. And you sent emails to Les Harris?

Page 80

1  A. Yes.
2  Q. And you have provided every one of those emails
3    to your counsel?
4  A. Yes.
5  Q. And how did you search for those emails to make
6    sure that you provided your counsel with all
7    responsive emails from Mr. Harris or to Mr.
8    Harris?
9  A. I went on my phone and went to emails and I went
10   through my emails from Les Harris.
11 Q. What email addresses did you search?  Did you
12   search them both?
13 A. For Les Harris only.  Reframe that.
14 Q. What email addresses did you search?
15 A. My email addresses?
16 Q. Yes.
17 A. He only has one email address, the djok.
18 Q. That's the only email address that Mr. Harris
19   communicated with you through or on?
20 A. Yes.
21 Q. Okay.  So that's the only one you searched?
22 A. Yes.
23 Q. All right.  And how did you go about searching
24   for all responsive emails related to Les Harris?
25 A. I typed in Les Harris's name and they all came up.

JOHNSON, DEANNA RENAE
10/07/2019



Page 81

```
1   Q.   All right.  And you provided every one of those
2        to your counsel?
3   A.   Yes.
4   Q.   And did you review them to make sure that
5        everything you recalled that had been received or
6        sent to Mr. Harris was identified and then turned
7        over to your counsel?
8   A.   Yes.
9   Q.   And you were comfortable that you had given her
10       all responsive emails related to Mr. Harris?
11  A.   Yes.
12  Q.   Okay.  All right.  So with respect to text
13       messages exchanged with Mr. Harris, did you
14       search for those?
15  A.   I'm sorry.  When you say "search," it just -- when
16       you have your phone, you don't really have to
17       search.
18  Q.   Did you look through your phone to identify all
19       text message exchanges with Mr. Harris?
20  A.   Yes.
21  Q.   And I'm referring to both your white phone and
22       your black phone.  You looked at both of them?
23  A.   I didn't have to look at the white phone.
24  Q.   Why did you not look at the white phone?
25  A.   Because I had stopped using the white phone before
```

Page 82

```
1        I had contacted Mr. Harris.
2   Q.   Okay.  So you only looked through the black phone
3        for text messages that were exchanged with Mr.
4        Harris; correct?
5   A.   They would only be on the black phone.
6   Q.   Okay.  And you -- the method you used to identify
7        those was just to look through for Les Harris,
8        for his name?
9   A.   Yes.
10  Q.   Okay.  And you identified every text message that
11       you had exchanged with Mr. Harris and turned
12       those over to your counsel?
13  A.   Yes.
14  Q.   Okay.  How did you turn them over, text messages?
15       What process did you use?
16  A.   I don't remember.  I don't recall at this time.
17  Q.   Well, do you know how to transfer a text message
18       on your phone to forward?
19  A.   I know how to forward.
20  Q.   A text message?
21  A.   Yes, I do know how to forward but --
22  Q.   How do you do that?
23  A.   To forward a text message?  I have to think about
24       it because it's not something I do on an everyday
25       basis.  I don't know.  Maybe make a copy and then
```

Page 83

```
1        resend it or something.
2   Q.   Is that what you did?
3   A.   No.  I'm not saying that's what I did.  I don't
4        recall how I -- how I sent the messages.
5   Q.   All right.  So you testified you never exchanged
6        any emails with Mr. Markavich; correct?
7   A.   Not from my phone.
8   Q.   From what computer device did you exchange email
9        messages with Mr. Markavich?
10  A.   Ford Motor Company.
11  Q.   Through a Ford Motor Company computer?
12  A.   Yes.
13  Q.   Okay.  Were all of those messages related to job
14       duties?
15  A.   No.
16  Q.   Okay.  Did some of them relate to the allegations
17       you've made in this lawsuit?
18  A.   I don't recall.
19  Q.   Was the email used in those text messages the
20       djok?
21  A.   No.
22  Q.   Which email was that?
23  A.   My Ford Motor Company email.
24  Q.   What was your Ford Motor Company email?
25  A.   Oh, my goodness.  I don't remember my Ford Motor
```

Page 84

```
1        Company email.  It could have been --
2        djohn825@Ford.
3   Q.   djohn?
4   A.   Yes.
5   Q.   J-o-h-n?
6   A.   825.
7   Q.   825.  Did you search your djohn825@Ford email for
8        emails that in any way relate to the allegations
9        you're making in this lawsuit?
10  A.   No.
11  Q.   Why not?
12  A.   Well, Ford computers, you cannot search their
13       computers, only if you're on their property.  You
14       cannot retrieve anything unless you're on the
15       property.
16  Q.   All right.  At any point in time did you forward
17       or copy any emails on djohn825@ford.com that are
18       in any way supportive of the allegations you're
19       making in this lawsuit?
20  A.   No, I didn't make copies.
21  Q.   All right.  You didn't make copies and you didn't
22       forward to another email address --
23  A.   No.
24  Q.   -- any such emails?
25            Were there ever any emails on
```

JOHNSON, DEANNA RENAE
10/07/2019



**EXHIBIT B**
Pages 85–88

Page 85

1    djohn825@ford.com that in any way support the
2    allegations in this lawsuit?
3  A. **Well, there are emails of Mr. Markavich**
4     **apologizing for cursing me out on several**
5     **occasions --**
6  Q. And they were on that --
7  A. **-- and also from Rich Mahoney.**
8  Q. -- email?
9  A. **Yes.**
10 Q. The djohn825@ford.com?
11 A. **Yes.**
12 Q. Are there any other emails on that particular
13    email account that in any way relate to or
14    support the allegations in this lawsuit?
15 A. **No.**
16 Q. And the ones that are from Mr. Markavich
17    apologizing for cursing you out, is that related
18    to the time in which you had an issue with your
19    back and he made a comment about not caring about
20    the problems with your back?  Is that what you're
21    referring to?
22 A. **No.**
23 Q. What are you referring to?
24 A. **Mr. Markavich cursed me out on several occasions.**
25    **This was just another form of an apology letter**

Page 86

1     that he would always send.
2  Q. He always sent you an apology letter or apology
3     email?
4  A. **Not always.**
5  Q. And all documentation concerning such incidents
6     are on the email djohn825@ford?
7  A. **Repeat that for me.  I'm sorry.**
8           MS. HARDY:  Can you read it back,
9     please.
10                (The requested portion of the
11                record was read by the reporter at
12                11:33 a.m.:
13                "Q.  And all documentation
14                concerning such incidents are on
15                the email djohn825@ford?")
16        **THE WITNESS:  Concerning --**
17 BY MS. HARDY:
18 Q. About Mr. Markavich cursing you out and later
19    apologizing.
20 A. **Yes.**
21 Q. All right.  So are there any other email accounts
22    that were used to exchange messages with
23    Mr. Markavich?
24 A. **No.**
25 Q. Let's go to text messages.  Did you have text

Page 87

1     messages with Mr. Markavich?
2  A. **Yes.**
3  Q. On your cell phone number that you provided?
4  A. **Yes.**
5  Q. And did you search your phone to identify all
6     text messages with Mr. Markavich that in any way
7     relate to the allegations you're making in this
8     lawsuit?
9  A. **I have looked over those text messages before.**
10 Q. Well, have you done a thorough search of your
11    phone to identify all responsive text messages?
12 A. **Yes.**
13 Q. All right.  And you used the same method that you
14    previously described where you just looked at
15    your phone and scrolled through?
16 A. **Yes.**
17 Q. All right.  And are you certain that you
18    identified all responsive text messages when
19    conducting that search?
20 A. **Yes.**
21 Q. How can you be certain if you're just simply
22    scrolling through and looking at the phone?
23 A. **Because they are under his name, Billy Markavich,**
24    **or "My Boss."  There are no other text messages in**
25    **my phone under "My Boss" or Billy Markavich.**

Page 88

1  Q. All right.  So they would be identified as "My
2     Boss" or --
3  A. **Some is identified as "My Boss" and some says**
4     **"Billy Markavich," because I don't -- I'm unsure**
5     **but I think at one time he may have had two**
6     **phones, so I have it under Billy Markavich and**
7     **then I have some under "Boss."  I'm not quite**
8     **sure.**
9  Q. Mr. Markavich was your boss; correct?
10 A. **Yes.**
11 Q. Okay.  And did you provide to your counsel all
12    text messages with Billy Markavich which in any
13    way relate to the allegations you're making in
14    this lawsuit?
15 A. **I don't recall if I provided her with all of them,**
16    **seeing that N1 took my phone and I'm sure that**
17    **they may have done something similar to that.  I'm**
18    **not sure.**
19 Q. Well, have you looked through the Excel
20    spreadsheet that came from N1 that identifies the
21    text messages and emails on your phone?  Phones,
22    that is.
23 A. **I don't recall at this time if I have or not.**
24 Q. So how would -- if you're not providing from your
25    phone text messages from Mr. Markavich that

JOHNSON, DEANNA RENAE
10/07/2019



Pages 89–92

Page 89

1     relate to this lawsuit and you haven't looked at
2     N1's production, how have you been able to assure
3     that all such documents have been identified for
4     production to Ford?
5 A.  I didn't say that I did not look at N1.  I just
6     said I didn't recall at this time if I had looked
7     at it or not.  A lot of things has happened with
8     me personally since that time so it's a little
9     fuzzy.  I don't really recall a lot of the dates
10    and things like that, of that nature.
11 Q.  Well, do you or do you not recall looking at
12    materials from N1?
13 A.  I don't recall at this time.  I don't want to give
14    you a wrong answer.  I want to be totally
15    truthful.  I don't recall.
16 Q.  Do you know when the N1 production, imaging of
17    your phone was complete and the materials
18    produced by N1 were provided to your counsel?
19 A.  I have no idea when they were provided to my
20    counsel.  That's between my counsel an N1.  I
21    believe the date that I turned my phone in was
22    sometime maybe December.  I'm not quite sure of an
23    exact date.
24 Q.  December of '18?
25 A.  Yes.

Page 90

1 Q.  Did you exchange email messages with Mr. Mahoney?
2 A.  Yes.
3 Q.  Through what email addresses?
4 A.  Ford.
5 Q.  Only Ford?
6 A.  Only Ford for emails.
7 Q.  Okay.  Have you searched the Ford email for all
8    emails exchanged with Mr. Mahoney that in any way
9    relate to this lawsuit?
10 A.  Once again, you cannot search for emails if you're
11    not on the property.
12 Q.  When you were on the property, did you search
13    those emails?
14 A.  No, I did not.
15 Q.  At any point in time did you make copies of any
16    emails on the Ford system that were exchanged
17    with Mr. Mahoney that in any way relate to the
18    allegations in this lawsuit?
19 A.  No, I did not.
20 Q.  At any point in time did you forward email
21    exchanges with Mr. Mahoney to another email
22    address if they related in any way to the
23    allegations you're making in this lawsuit?
24 A.  I don't recall at this time.  I want to say no,
25    but I don't want to be incorrect.

Page 91

1 Q.  Is there anyone other than Les Harris -- strike
2    that.
3        Let's take Mr. Rowan.  Did you have
4    email exchanges with Mr. Rowan on the Ford email
5    address that in any way relate to the allegations
6    you're making about him in this lawsuit?
7 A.  No.
8 Q.  Did you have any email exchanges on your other
9    email addresses with Mr. Rowan that in any way
10    relate to the allegations you're making in this
11    lawsuit?
12 A.  No.
13 Q.  Did you exchange text messages with Mr. Rowan on
14    any phone other than your two Samsung phones?
15 A.  No.
16 Q.  You retained all text messages that you had with
17    Mr. Rowan; correct?
18 A.  Yes.
19 Q.  They were all on your -- one of your two phones;
20    correct?
21 A.  Yes.
22 Q.  All right.  And did you use any particular
23    process to search for Nick Rowan text exchanges?
24 A.  No.  I don't believe so.
25 Q.  All right.  The black phone is the one that

Page 92

1    you're using now?
2 A.  Yes.
3 Q.  Is it here?
4 A.  Yes.
5 Q.  If you were to -- strike that.
6        Is the photo of the penis on your black
7    phone?
8 A.  I'm not sure.
9 Q.  I would like you to get your phone out and search
10    for the photo of the penis and see if it's there.
11        MS. LAUGHBAUM:  That's fine with me,
12    but for the record, it's on the other phone.
13        THE WITNESS:  I have to turn it on.  I
14    turned it off for silence.
15        MS. HARDY:  Why don't we go off the
16    record.
17        VIDEO TECHNICIAN:  Going off the record
18    at 11:41 a.m.
19        (Off the record at 11:41 a.m.)
20        (Back on the record at 11:43 a.m.)
21        VIDEO TECHNICIAN:  Back on the record
22    at 11:43 a.m.
23 BY MS. HARDY:
24 Q.  You did not locate the photo of the penis that
25    you claim Mr. Rowan sent you --

JOHNSON, DEANNA RENAE
10/07/2019



Page 93

```
1    A.   It --
2    Q.   -- on your black phone?
3    A.   I'm sorry for interrupting you.  It is on my other
4         phone.
5    Q.   It's on your white phone?
6    A.   Yes.
7    Q.   What is the earliest text with Rowan on your
8         black phone?  Please open it up and -- no, look
9         at your phone again, please.
10             MS. HARDY:  We'll go off the record
11        again.
12             VIDEO TECHNICIAN:  Going off the record
13        at 11:44 a.m.
14                  (Off the record at 11:44 a.m.)
15                  (Back on the record at 11:45 a.m.)
16             VIDEO TECHNICIAN:  Back on the record
17        at 11:45 a.m.
18             MS. HARDY:  The question pending on the
19        table is what is the earliest text with Rowan on
20        Ms. Johnson's black phone, and she has been taking
21        the time to scroll through to identify the
22        earliest text.
23   BY MS. HARDY:
24   Q.   And what is your response?
25   A.   Friday, October the 19th, 2018.
```

Page 94

```
1    Q.   What is the earliest text on your black phone
2         with Mr. Mahoney?
3    A.   October 21st.
4    Q.   And how are you identifying these dates?  It's
5         clear from the video that you're sitting there
6         scrolling through emails, but are you searching
7         for Mr. Mahoney's name and Mr. Rowan's name, or
8         are you just looking through text messages?
9    A.   No.  I'm searching for Mr. Mahoney's name and
10        Mr. Rowan's name.
11   Q.   Okay.  Are you filling their name into the search
12        function on the phone?
13   A.   No.  When you go to your messages, you just scroll
14        of your different contacts.
15   Q.   All right.  And so you're certain, after having
16        searched your phone and knowing how to search
17        your phone, that the earliest text message on the
18        black phone with Mr. Rowan is October 19 and the
19        earliest text message with Mr. Mahoney is October
20        21?
21   A.   Yes.
22   Q.   Did you search your white phone as well for text
23        messages related to Mr. Mahoney, Mr. Markavich,
24        Mr. Harris and Mr. Rowan?
25   A.   Did I search for --
```

Page 95

```
1    Q.   Did you -- in providing your counsel with
2         documents that relate to the allegations in this
3         lawsuit, did you search your white phone for text
4         messages that you exchanged with Mr. Rowan,
5         Mr. Mahoney, Mr. Markavich, and Mr. Harris?
6    A.   Yes.
7    Q.   And you provided all text exchanges with those
8         individuals to your counsel --
9    A.   The --
10   Q.   -- from your white phone?
11   A.   The white phone was also taken in by N1 and they
12        took all the information off of that phone.
13   Q.   Independent of what N1 did, which you don't even
14        know whether you've looked at, did you go through
15        your white phone and provide your counsel with
16        text messages that I've covered in my question?
17   A.   I don't recall if I provided her with paper text
18        messages, but I'm sure that I spoke with her in
19        regards to those text messages.
20   Q.   Well, even if you didn't provide her with the
21        paper copy, did you electronically convey all
22        text messages that in any way relate to this
23        lawsuit to your counsel from your white phone?
24   A.   No.
25   Q.   So with respect to the data on your white phone,
```

Page 96

```
1         you've done nothing more than talk to your
2         counsel about what is there and then let N1
3         Discovery and your counsel determine what's
4         responsive?
5    A.   Can you repeat that for me.
6              MS. HARDY:  Can you read it back,
7         please.
8                  (The requested portion of the
9                  record was read by the reporter at
10                 11:49 a.m.:
11                 "Q.  So with respect to the data on
12                 your white phone, you've done
13                 nothing more than talk to your
14                 counsel about what is there and
15                 then let N1 Discovery and your
16                 counsel determine what's
17                 responsive?")
18             THE WITNESS:  I didn't let N1 or my
19        attorney determine what was responsive, I don't
20        think.
21   BY MS. HARDY:
22   Q.   Well, you don't recall having looked at the N1
23        materials; right?
24   A.   Exactly.
25   Q.   So how would -- how would your counsel know it's
```

JOHNSON, DEANNA RENAE
10/07/2019



Page 97

| | |
|---|---|
| 1 | responsive from the N1 if you haven't looked at |
| 2 | it to identify responsive? |
| 3 | MS. LAUGHBAUM:  Objection.  That's form |
| 4 | and foundation. |
| 5 | BY MS. HARDY: |
| 6 | Q.  Go ahead and answer. |
| 7 | A.  Responsive meaning -- you just lose me on the word |
| 8 | "response," meaning -- |
| 9 | Q.  Responsive to the document requests that have |
| 10 | been served by Ford that seek everything that |
| 11 | relates to the allegations in this lawsuit that |
| 12 | you have in the way of documentation, hard copy |
| 13 | or electronic. |
| 14 | A.  And you're asking me, again? |
| 15 | Q.  How would your counsel be able to produce that |
| 16 | documentation if you haven't looked at it to help |
| 17 | her identify what you consider to be supportive |
| 18 | of your allegations? |
| 19 | A.  Through my phone.  I don't remember exactly about |
| 20 | the paperwork.  I am not sure of, once again, |
| 21 | about the Excel sheet or anything like that.  I |
| 22 | don't recall that at this time.  I know we have |
| 23 | sat down and we've spoken, but it's been months |
| 24 | ago.  I've been on several medications and I just |
| 25 | don't recall.  I don't recall any too much of that |

Page 98

| | |
|---|---|
| 1 | at this time. |
| 2 | Q.  Okay. |
| 3 | MS. HARDY:  We need to go off the |
| 4 | record because our realtime is about to die. |
| 5 | VIDEO TECHNICIAN:  Off the record at |
| 6 | 11:51 a.m. |
| 7 | (Off the record at 11:51 a.m.) |
| 8 | (Back on the record at 11:54 a.m.) |
| 9 | VIDEO TECHNICIAN:  We're back on the |
| 10 | record at 11:54 a.m. |
| 11 | BY MS. HARDY: |
| 12 | Q.  You started at Ford Motor Company as a new |
| 13 | employee on June 25, 2018; correct? |
| 14 | A.  Yes. |
| 15 | Q.  And you started in the position of process coach; |
| 16 | correct? |
| 17 | A.  Yes. |
| 18 | Q.  And you were assigned to the Detroit Truck Plant; |
| 19 | correct? |
| 20 | A.  Yes. |
| 21 | Q.  And to work on the frame and engine line; |
| 22 | correct? |
| 23 | A.  Yes. |
| 24 | Q.  And you were moved at a later point in time |
| 25 | before your last day of work to a different line; |

Page 99

| | |
|---|---|
| 1 | correct? |
| 2 | A.  Yes. |
| 3 | Q.  Okay.  Which line did you move to? |
| 4 | A.  4 and 5. |
| 5 | Q.  4 and 5 of the engine line? |
| 6 | A.  No, 4 and 5 totally away from the engine line. |
| 7 | Q.  When did you move to 4 and 5? |
| 8 | A.  I moved to 4 and 5 at the beginning of November. |
| 9 | I'm not quite sure of the day. |
| 10 | Q.  Did you move from being supervised by |
| 11 | Mr. Markavich to somebody else? |
| 12 | A.  No. |
| 13 | Q.  He continued to be your supervisor? |
| 14 | A.  Yes. |
| 15 | Q.  What did Lines 4 and 5 do?  What part of the |
| 16 | production process was involved on 4 and 5? |
| 17 | A.  Bumpers, hinges, several different aspects of the |
| 18 | job. |
| 19 | Q.  You were still a process coach; correct? |
| 20 | A.  Yes. |
| 21 | Q.  How far from the frame and engine line where you |
| 22 | had previously worked was 4 and 5?  What was the |
| 23 | rough distance between the two? |
| 24 | A.  The rough distance between the two, about a half a |
| 25 | mile. |

Page 100

| | |
|---|---|
| 1 | Q.  All right.  Once you moved to Lines 4 and 5, did |
| 2 | you ever have an occasion to go back to the area |
| 3 | of the frame and engine line where you had |
| 4 | previously worked or did you stay in this new |
| 5 | area and not return? |
| 6 | A.  Well, as a process coach, you don't just literally |
| 7 | stay in your area.  You are often moved around. |
| 8 | You often have to go to different lines to talk to |
| 9 | the team leaders or interact with the other |
| 10 | process coach if you receive something that is not |
| 11 | satisfactory. |
| 12 | Q.  When you say the beginning of November, do you |
| 13 | have a specific date? |
| 14 | A.  No, I don't. |
| 15 | Q.  Okay.  And why did you move to 4 and 5 at the |
| 16 | beginning of November? |
| 17 | A.  Because of the complaints that I had against Nick |
| 18 | Rowan. |
| 19 | Q.  Who made the decision to move you to 4 and 5? |
| 20 | A.  Billy Markavich. |
| 21 | Q.  Do you have anything in writing that documents |
| 22 | that you moved to 4 and 5 at the beginning of |
| 23 | November because of complaints you had made about |
| 24 | Nick Rowan? |
| 25 | A.  No. |

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

JOHNSON, DEANNA RENAE
10/07/2019



Page 101

```
1    Q.   So you don't have a single email exchange in the
2         Ford email, on your personal email, or any text
3         message that addresses why you were moving to
4         Line 4 and 5 in the beginning of November?
5    A.   No.
6    Q.   When did you allegedly request a move to 4 and 5
7         or to another area of the plant?
8    A.   I don't recall an exact date but I would have to
9         say maybe in October -- early October, end of
10        September.
11   Q.   How did you make that request?  How did you
12        convey it?
13   A.   I conveyed it to my supervisors, to Rich Mahoney
14        and also to Billy Markavich.
15   Q.   What did you say to Mr. Markavich, who was your
16        boss?
17   A.   I told Mr. Markavich that I am having a rough time
18        with Nick because he's very inappropriate.
19   Q.   Did you do that verbally?
20   A.   Yes.
21   Q.   Were there any witnesses?
22   A.   I can't recall their names.
23   Q.   Do you know the date when you talked to
24        Mr. Markavich?
25   A.   I don't recall the date.  It was on several
```

Page 102

```
1         occasions.
2    Q.   And you can't recall the dates of any occasion
3         when you made that request of Mr. Markavich or
4         any witnesses to you having made that request to
5         Mr. Markavich; correct?
6    A.   The -- correct -- to be moved?
7    Q.   Yes, because you were having problems with
8         Mr. Rowan.
9    A.   I don't remember any witnesses, but as I stated,
10        sometime September/October.  I don't -- I don't
11        remember the dates of --
12   Q.   That's pretty general.  You can't give any
13        specific dates of when those requests were made?
14   A.   From the first -- maybe from the first explicit
15        scene, I can give you an idea, but I can't give
16        you an exact date.
17   Q.   Let's go back to my earlier question concerning
18        where you worked in the plant once you moved to 4
19        and 5.  That's Lines 4 and 5; correct?
20   A.   Yes.
21   Q.   Okay.  You moved a half a mile away from where
22        you'd previously worked in frame and the engine
23        line; correct?
24   A.   Yes.
25   Q.   All right.  Did you ever return to the frame and
```

Page 103

```
1         engine line during -- during your tenure at Ford
2         after you made the move to Lines 4 and 5?
3    A.   Yes.
4    Q.   Why and when?
5    A.   I don't know what the reason for -- the reason
6         that I was told, I was told because a supervisor
7         did not come in that day or they were going home
8         early and they needed me to go back over there.
9    Q.   Do you know when that was?
10   A.   Maybe two weeks prior to me leaving.
11   Q.   Was your last day of work November 25, 2018?
12   A.   Yes, I believe so.
13   Q.   So two weeks prior to November 25?
14   A.   Yes.
15   Q.   Did anything occur that was problematic when you
16        returned to the frame and engine line?
17   A.   Other than Nick Rowan constantly asking me for
18        pictures again.
19   Q.   When you worked at Ford, you worked on what's
20        known as the C-crew; correct?
21   A.   Well, I worked all three crews.  We rotate,
22        A-crew, B-crew, C-crew.  The last crew that I was
23        on was C.
24   Q.   When did you work the A-crew?
25   A.   When I first started.
```

Page 104

```
1    Q.   For how long?
2    A.   Maybe month or less.  I was training with another
3         individual at that time.
4    Q.   Who were you training with?
5    A.   A gentleman by the name of Darnell.  I can't
6         recall his last name.
7    Q.   How long did you train with Darnell?
8    A.   Less than a month.
9    Q.   Training typically takes two to three weeks for a
10        new process coach; correct?
11   A.   Yes.
12   Q.   And you trained with Darnell for at least three
13        weeks; correct?
14   A.   No, I can't say if that was correct, if it's -- if
15        it was that long.
16   Q.   He was a process coach; correct?
17   A.   Yes.
18   Q.   And what line were you on at that point in time?
19   A.   Engine and frame.
20   Q.   And what are the hours of the A-crew?
21   A.   A-crew -- if I can remember correctly, A-crew is
22        all of our seniority people, so they are 5:30 in
23        the morning until whatever the time the line shuts
24        down.
25   Q.   What days of the week?
```

JOHNSON, DEANNA RENAE
10/07/2019


Pages 105–108

---

Page 105

1  A.  Monday through Thursday.
2  Q.  And were you assigned to the A-crew strictly for
3      the purpose of being trained?
4  A.  I don't know.
5  Q.  You didn't have seniority; correct?
6  A.  No.
7  Q.  You didn't otherwise qualify for the A-crew;
8      correct?
9  A.  Well, no, A-crew people, the line workers, those
10     are the seniority people, not the actual process
11     coaches.
12 Q.  All right.  In your position as a process coach,
13     you supervised hourly personnel; correct?
14 A.  Correct.
15 Q.  And you don't recall how long -- a month or less
16     you were on the A-crew training with Darnell;
17     correct?
18 A.  Correct.
19 Q.  Did he train you appropriately?
20 A.  Yeah, he gave me appropriate training, yes.
21 Q.  Okay.  So if you had a month or a little less
22     being trained by Darnell, did you learn what you
23     needed to learn to adequately perform your job
24     following your training with Darnell?
25 A.  No.

Page 106

1  Q.  What had you failed to learn under Darnell's
2      tutorship?
3  A.  There's a lot to learn when you're a supervisor on
4      the line.  It's more than just running the line.
5      From Darnell, I learned how actually to run the
6      line.  Certain things on the line, that's a
7      different aspect.  Paperwork that we have to do
8      before the line starts and after the line stops,
9      that's another aspect of the job.
10 Q.  What did you still need to learn so you could
11     adequately perform the job of the process coach
12     once you'd finished training with Darnell?
13 A.  I needed to learn payroll as well as different
14     other various paperwork, and also when problems
15     arise on the job, it didn't necessarily mean that
16     they would come when I was training with Darnell.
17     It could have been problems that came -- problems
18     come all the time and you have to know how to take
19     care of those.
20 Q.  All right.  And despite having been with him for
21     a month or a little less, and despite the fact
22     that training usually takes two to three weeks,
23     you still had not mastered or at least learned
24     sufficient portions of the job to adequately
25     perform it?

Page 107

1  A.  Well, there's no handbooks that says training
2      lasts two to three weeks for anyone.  Training
3      lasts until you learn how to do your job.
4  Q.  Was it taking you unusually long to learn the
5      job?
6  A.  Not at all.
7  Q.  When did you go to the B-crew?
8  A.  B-crew, I think I went to B-crew maybe two months
9      later because you stay on a crew shift for three
10     months, so I can't quite remember the dates.  I
11     don't recall the exact dates of when I went to
12     B-crew.  And then you go to C-crew.  B-crew you
13     stay on for three months; C-crew is three months;
14     A-crew is three months.
15 Q.  So you were on the A-crew for three months?
16 A.  No.
17 Q.  How long were you on the A-crew?
18 A.  I don't recall the exact time that I was there.
19     It was during the beginning when I started.
20 Q.  I think you said a month or less but I'm not sure
21     if that applied to the A-crew itself or to
22     training with Darnell.
23 A.  That was training with Darnell.
24 Q.  Okay.  You have -- do you have any idea of when
25     you left the A-crew for the B-crew?

Page 108

1  A.  Not the exact date, no.
2  Q.  Well, let's take a month.  You started on
3      June 25.  Did you go to the -- were you in the
4      B-crew as of August?
5  A.  As of August?  I think I was with B-crew.  I'm not
6      quite sure.
7  Q.  And what were the hours of the B -- what was the
8      schedule of the B-crew?
9  A.  B-crew is afternoon shift.
10 Q.  What days of the week?
11 A.  Tuesday to Friday.
12 Q.  What time does the afternoon shift start?
13 A.  5:30.
14 Q.  And you stayed on the B-crew three months?
15 A.  Yes.
16 Q.  All right.  And who did you train with on the
17     B-crew?
18 A.  Nick follows me for every crew.
19 Q.  Was Nick also working on the A-crew when you were
20     there?
21 A.  No.
22 Q.  All right.  So he doesn't come into the picture
23     until you go to the B-crew?
24 A.  Right.
25 Q.  Okay.  And who else did you train with on the

JOHNSON, DEANNA RENAE
10/07/2019



Pages 109-112

Page 109

1  B-crew other than Nick?
2  **A.  No one.**
3  Q.  Well, Mr. Mahoney helped you as well; correct?
4  **A.  No, Mr. Mahoney didn't help me with my job at all.**
5  Q.  Did you have any contact with Mr. Mahoney?
6  **A.  Constant, every day.**
7  Q.  But not related to your job?
8  **A.  Of course related to the job but not for him**
9  **training me.  He doesn't do that.**
10 Q.  Well, did he ever assist you when there was a
11    problem on your line?
12 **A.  He assisted me with getting a parking pass once**
13   **but he doesn't --**
14 Q.  Okay.
15 **A.  He comes over -- when Mahoney comes into the**
16   **picture, it is because something is terribly**
17   **wrong, something is not right.**
18 Q.  Like the line's down?
19 **A.  Like the line's down or inappropriateness or for**
20   **anything.**
21 Q.  Okay.  So your contact with Mahoney on the job
22    was limited to him getting you a parking pass and
23    coming over to the line when something was
24    seriously wrong?
25 **A.  Yes.**

Page 110

1  Q.  Did you train with anyone other than Nick on the
2     B-crew?
3  **A.  No.**
4  Q.  When did you move to the C-crew?
5  **A.  Three months after B-crew.  I don't quite remember**
6     **that date as well.**
7  Q.  You were on the C-crew on your last day of work?
8  **A.  Yes.**
9  Q.  And the hours of the C-crew and the days of the
10    week?
11 **A.  C-crew is Friday and Saturday mornings, Sunday,**
12   **Monday nights.**
13 Q.  What time does the Friday, Saturday morning
14    schedule start, or shift?
15 **A.  5:00, 5:30.**
16 Q.  5:30 -- 5:00 or 5:30 a.m.?
17 **A.  Yes, depending on the time the line starts.**
18 Q.  And then Sunday, Monday nights starts at 5:00,
19    5:30 p.m.?
20 **A.  Yes.**
21 Q.  And is it your testimony that Nick Rowan worked
22    the same schedule as you when you were on the
23    C-crew and B-crew?
24 **A.  Yes.**
25 Q.  You know an individual named Leslie or Les

Page 111

1  Harris; correct?
2  **A.  Yes.**
3  Q.  And you met Mr. Harris very early in your tenure
4     at Ford; correct?
5  **A.  Yes.**
6  Q.  Okay.  He is a supervisor and salaried personnel
7     at the Detroit Truck Plant; correct?
8  **A.  Correct.**
9  Q.  And he's an African American gentleman; correct?
10 **A.  Correct.**
11 Q.  All right.  And you first met him in connection
12    with a complaint you had about an interview in
13    the paint department; correct?
14 **A.  Correct.**
15 Q.  Did you go to Mr. Harris to register a complaint?
16 **A.  Yes, I did.**
17 Q.  Okay.  When did you go to Mr. Harris to register
18    your complaint?
19 **A.  Immediately following the interview.**
20 Q.  And that was in July 2018; correct?
21 **A.  Correct.**
22 Q.  All right.  So you knew that Mr. Harris was the
23    person to go to if you had a complaint about a
24    violation of the zero tolerance policy; correct?
25 **A.  At that point -- I didn't have a supervisor at**

Page 112

1  **that point.  I didn't have a team.  I worked out**
2  **of human resources department.  The plant actually**
3  **was shut down when I was hired.**
4  Q.  But you knew that Mr. Harris was one of the
5     people you could go to to register a complaint
6     about violations of zero tolerance; correct?
7  **A.  Correct.**
8  Q.  And Mr. Harris immediately started an
9     investigation into your complaint; correct?
10 **A.  I can't answer that.  I don't know what -- from**
11   **the first time that I spoke with him?  From the**
12   **paint?  Yes, he did.**
13 Q.  Okay.  And he completed an investigation and
14    concluded that there should be discipline of the
15    two people that you complained about; correct?
16 **A.  I don't know what the end -- the outcome of the**
17   **investigation was at all.**
18 Q.  Nobody shared any outcome with you?
19 **A.  No.**
20 Q.  All right.  Do you have any complaints about how
21    Mr. Harris interacted with you during the course
22    of that investigation about the paint department
23    interview?
24 **A.  No.**
25 Q.  He was appropriate in all respects; correct?

JOHNSON, DEANNA RENAE
10/07/2019



Pages 113–116

Page 113

1  A.  Correct.
2  Q.  All right.  He was receptive to your complaint;
3      correct?
4  A.  Correct.
5  Q.  He didn't engage in any conduct that would make
6      you fearful of him; correct?
7  A.  Correct.
8  Q.  Or any conduct that suggested you'd be retaliated
9      against in any way because you complained;
10     correct?
11  A.  Correct.
12  Q.  Did you have any contact with Mr. Harris between
13     the complaint that you lodged with him in
14     July 2018 about the paint department interview
15     and the time you talked to him in the end of
16     November about Nick Rowan?
17  A.  Sorry.  It's kind of a double question.  Can you
18     give me the first part first.
19          MS. HARDY:  Can you read it back,
20     please.
21          (The requested portion of the
22          record was read by the reporter at
23          12:13 p.m.:
24          "Q.  Did you have any contact with
25          Mr. Harris between the complaint

Page 114

1          that you lodged with him in
2          July 2018 about the paint
3          department interview and the time
4          you talked to him in the end of
5          November about Nick Rowan?")
6          THE WITNESS:  I had no contact with him
7      from that time until the Nick Rowan time.
8  BY MS. HARDY:
9  Q.  So no contact with him between July 2018 and
10     November 26, 2018?
11  A.  Well, other than me going to HR regarding Nick
12     Rowan.
13  Q.  Well --
14  A.  Oh, I'm sorry.
15  Q.  You had an interview with Mr. Harris on
16     November 26, 2018, about your Nick Rowan
17     complaints; correct?
18  A.  Yes.
19  Q.  And Mr. -- Mr. Harris contacted you to initiate
20     that interview; correct?
21  A.  No.  I went to Mr. Harris.
22  Q.  How did you contact Mr. Harris and when about
23     Nick Rowan?
24  A.  After I -- after I spoke with LaDawn the next day
25     when I came in, I went to -- I went to my meeting

Page 115

1      and I was going to tell Billy that I was going to
2      go to HR, and then I just got up out of the
3      meeting and I left and I started walking to HR on
4      my own.  I was not contacted to go to -- no one
5      contacted me to go to HR.
6  Q.  And when you arrived at HR, you asked to see
7      Mr. Harris?
8  A.  Yeah.  When I got there, it was like he was
9      expecting me anyway.
10  Q.  And you claim that no one conveyed to you that
11     Mr. Harris had asked you to come to HR to meet
12     with him?
13  A.  Not that I recall.
14  Q.  All right.  And when you arrived at HR, he was
15     ready to interview you; correct?
16  A.  Yes.
17  Q.  He had obviously been prepared and waiting for
18     you; correct?
19  A.  I have no idea.  I know he had been interviewing
20     several other people before he interviewed me at
21     all.  He had interviewed Rich Mahoney, Bill
22     Markavich as well as anyone else before he asked
23     me anything.
24  Q.  And how do you know that?
25  A.  He told me.  And Mahoney -- Rich Mahoney told me.

Page 116

1  Q.  What did Rich Mahoney tell you?
2  A.  I went to Rich Mahoney as I was walking to HR, and
3      I said, "Hey, Rich, I'm on my way to HR.  They're
4      going to ask me did I tell my supervisors, and you
5      know I'm going to tell them."
6          So I was about to say I would like you
7      to accompany me to HR, and he turns to me and
8      said, "Well, you should lie; I did."
9  Q.  And when do you claim that conversation occurred?
10  A.  The day that I seen Les Harris.
11  Q.  On November 26, 2018?
12  A.  Yes.
13  Q.  At what time?
14  A.  Ten minutes prior to whatever time I walked into
15     Les Harris's office.
16  Q.  Were there any witnesses to that conversation or
17     that verbal exchange?
18  A.  I didn't pay attention to anyone standing around
19     us.
20  Q.  So you can't identify any witnesses?
21  A.  No.
22  Q.  What meeting did you leave?
23  A.  Our morning meeting.
24  Q.  What time of the day was it?
25  A.  Actually it was in the afternoon.  It had to have


1    been at 5:00 or -- in between 5:00 and 5:30.
2 Q. A.m.?
3 A. No.
4 Q. P.m.?
5 A. P.m.
6 Q. Why do you call it the morning meeting?
7 A. I don't know because it's just -- just a habit.
8    I'm sorry.
9 Q. All right.  So you're in a meeting around 5:00 to
10    5:30 on November 26 on the floor, and you just
11    get up and walk to labor relations or salaried
12    personnel office without anyone suggesting that
13    you go there or asking for you to come.  Is that
14    your story?
15 A. No.  I was not on the floor.  The meeting is held
16    upstairs, a mile away from my area.
17 Q. Where upstairs?
18 A. It's held upstairs in the conference room, in the
19    managers cubicle section, in our particular
20    section.
21 Q. Was there a chair of the meeting?
22 A. I don't recall whom.
23 Q. Was there someone presiding?
24 A. I don't recall whom.  Everyone was there but I
25    don't recall who was the chairman, so to speak.

1 Q. Who was there?  Identify the participants.
2 A. The -- the crew before us as well as my own crew.
3 Q. When you say "crew," what are you referring to?
4    Hourly or salaried?
5 A. This is all salary because you can't get into the
6    office unless you're salary.
7 Q. Was Mr. Mahoney there?
8 A. Yes.
9 Q. Mr. Markavich?
10 A. Yes.
11 Q. Can you identify anyone else who was there?
12 A. I don't know everyone's name but all of the other
13    teams that works B-crew.  I don't know if C-crew
14    was there.  But when we're going into a meeting,
15    one crew is leaving and the other one is coming in
16    unless we have our meetings together.
17 Q. And this was a meeting of B- and C-crew?
18 A. B- and C-crew was there.
19 Q. Okay.  So all the process coaches from B- and
20    C-crew were in this meeting?
21 A. Correct.
22 Q. All right.  And you just got up and left the
23    meeting without notice to anybody?
24 A. Well, I got to the meeting a little late because I
25    was going to go to Les's office but I wanted to

1    tell Billy, my boss, where I was going.
2 Q. So you went to the meeting.  Did you sit down?
3 A. Yes, I did.
4 Q. Okay.  Did you participate in the meeting at all?
5 A. No, I did not.
6 Q. How long did you stay in the meeting?
7 A. The meeting was about 15 minutes.
8 Q. Did you stay for the whole meeting?
9 A. Yes.
10 Q. All right.  So you didn't leave during the
11    meeting?
12 A. No.  Well, I stayed for the last part of the
13    meeting.  I didn't get there for the whole entire
14    meeting.
15 Q. How long were you at the meeting?
16 A. Maybe 15 minutes.
17 Q. All right.
18 A. I'm not quite sure.
19 Q. But when you left, was the meeting over?
20 A. We still had people talking and they were still
21    kind of going on, but I thought that our part of
22    the meeting was over because we have two crews in
23    there.
24 Q. And when -- were you the first to leave the room?
25 A. No.  Rich Mahoney was.

1 Q. All right.  Was Mr. Markavich in the room when
2    you left?
3 A. I didn't see him when I was about to leave.
4 Q. Did you talk to Mr. Markavich during the meeting?
5 A. No.  I went to -- during the meeting, no, because
6    they were all at one end of the table and I was at
7    the other end of the table.
8 Q. All right.  So you didn't talk to him either
9    during the meeting or as you were departing the
10    room; correct?
11 A. As I was departing the room, I didn't see him
12    anymore.
13 Q. Okay.  Where was Mr. Mahoney when you saw him?
14 A. He -- he actually came into the meeting after I
15    did, and I sat, let's say, here and he walked past
16    me and sat at that end.
17 Q. Okay.  And as you left the meeting, did you talk
18    to Mr. Mahoney in the room?
19 A. No.  I talked to Mr. Mahoney outside of the room.
20 Q. Why was Mr. Mahoney outside of the room?  Do you
21    know?
22 A. He left out of the room before me.  He passed by
23    me.
24 Q. All right.  And tell me again what you said to
25    Mr. Mahoney at that point.

JOHNSON, DEANNA RENAE
10/07/2019


EXHIBIT B

Pages 121–124

Page 121

1  A.  I said, "Hey, Rich.  I'm going to go to HR about
2      Nick Rowan and they're going to ask me did I ask
3      my supervisors, did I tell my supervisors what's
4      going on, and I'm going to tell them that you know
5      about this."
6          And I went to proceed to ask him has he
7      already spoken with Les about this or not, and he
8      turns around and goes, "Well, you should lie; I
9      did."
10 Q.  Is that all you claim Mr. Mahoney said?
11 A.  That's all he said.
12 Q.  All right.  Why do you -- so based upon that
13     one comment is the reason you believe Mr. Mahoney
14     had been interviewed by Les Harris prior to you?
15 A.  And the fact that Les Harris told me that he
16     interviewed him.  At that moment, yes.
17 Q.  What did Les Harris tell you about when he
18     interviewed Mr. Mahoney?
19 A.  He told me -- he didn't tell me about the
20     interview.  He told me that he had already
21     interviewed several people.
22 Q.  Did he tell you who?
23 A.  He told me -- he told me "I've already" -- when I
24     went to speak with him about -- I was going to
25     tell him about different people or maybe someone

Page 122

1      he should call or, I don't know, you know, the
2      rest of the whole case, the whole thing and he
3      goes, "Well, I've spoken with several people."  I
4      said, "So you've already spoken with Rich?"  He
5      says, "I've already spoken with Rich."
6  Q.  Did you ask him who else he'd spoken with?
7  A.  No.  I just wanted to let him know what was going
8      on at that time.
9  Q.  Just answer my question.  So you didn't ask him
10     who else he had spoken with?
11 A.  No.
12 Q.  Did he tell you who else he allegedly had spoken
13     with as of that time?
14 A.  He just said he spoke with several people.
15 Q.  And you don't know who they are other than your
16     client that he identified Mr. Mahoney?
17 A.  Yes.
18 Q.  So what's your basis for claiming that Mr. Harris
19     had spoken to Mr. Markavich before he interviewed
20     you?
21 A.  I didn't tell you that he spoke to Mr. Markavich
22     before he interviewed me.
23 Q.  I believe you said that earlier.
24 A.  I said he spoke with other people.
25 Q.  All right.  So you don't know whether or not

Page 123

1      Mr. Harris had spoken to Mr. Markavich before he
2      spoke to you; correct?
3  A.  Well --
4  Q.  Answer my question.  Correct?
5  A.  Repeat your question again so I can answer --
6          MS. HARDY:  Read it back, please.
7          THE WITNESS:  -- it carefully.
8          MS. LAUGHBAUM:  Will you please stop
9      stepping over the witness.
10         MS. HARDY:  I've asked the witness to
11     let me know if I am accidentally stepping on any
12     of her testimony and she has not so indicated.
13         MS. LAUGHBAUM:  Well, she's more polite
14     than I am, I guess.
15         (The requested portion of the
16         record was read by the reporter at
17         12:24 p.m.:
18         "Q.  So you don't know whether or
19         not Mr. Harris had spoken to
20         Mr. Markavich before he spoke to
21         you; correct?")
22         THE WITNESS:  Mr. Harris told me that
23     he had spoken with my supervisors.
24 BY MS. HARDY:
25 Q.  A moment ago you said he said he had spoken with

Page 124

1      other people.  Now you're saying he told you he
2      had spoken with your supervisors?
3  A.  No, I think I believe what I said is a moment ago
4      he spoke with several people and I asked him about
5      Rich.  I can't quite remember just a second ago,
6      but he said he spoke with my supervisors.  I was
7      going to talk to him about that.
8  Q.  The only name Mr. Harris provided to you was
9      Mr. Mahoney?  That's your testimony; correct?
10 A.  Probably because I could have brought
11     Mr. Mahoney's name up first.
12 Q.  I don't want to know why.  I just want
13     confirmation that the only specific name
14     Mr. Harris identified as someone that he had
15     spoken to prior to you is Mr. Mahoney; correct?
16 A.  I don't recall actually how many names or what
17     names.  I just knew it was several names and I do
18     know Rich was one of the names.
19 Q.  That's the only name you can recall that
20     Mr. Harris identified; correct?
21 A.  Yes.
22         MS. HARDY:  This is a good time for a
23     lunch break.  It's 12:25, and we can reconvene
24     within 45 minutes.
25         VIDEO TECHNICIAN:  Going off the record

JOHNSON, DEANNA RENAE
10/07/2019



Pages 125–128

Page 125

```
1           at 12:26 p.m.
2                       (Off the record at 12:26 p.m.)
3                       MARKED FOR IDENTIFICATION:
4                       DEPOSITION EXHIBITS 2-7
5                       1:12 p.m.
6                       (Back on the record at 1:14 p.m.)
7                       VIDEO TECHNICIAN:  We are back on the
8           record at 1:14 p.m.
9                       MS. HARDY:  Let the record reflect that
10          I'm showing the witness Exhibit No. 2, which is an
11          investigatory interview dated 11/26/18 and the
12          person being interviewed is LaDawn Clemons.
13  BY MS. HARDY:
14  Q.  Can you take a minute and look at that, please.
15                      MS. LAUGHBAUM:  Can I get a copy?
16                      MS. HARDY:  Yep.
17                      MS. LAUGHBAUM:  Thank you.
18  BY MS. HARDY:
19  Q.  Have you seen Exhibit 2 prior to today's
20      deposition?
21  A.  I don't recall.  I don't recall.  I've read so
22      many things.
23  Q.  What things have you read?
24  A.  That I've read?  Just regular material things.
25  Q.  Well, I'm talking about --
```

Page 126

```
1   A.  Oh, I'm sorry.
2   Q.  -- things related to this case.
3   A.  I'm sorry.
4   Q.  What have you read?  What are the many things
5       that you have read?
6   A.  Just the things that we've had going back and
7       forth here today.  I'm sorry.  I just have to look
8       at that.
9   Q.  The only thing we have had in today's deposition
10      that has gone back and forth are the text
11      messages that were marked as Exhibit No. 1.  So
12      what other things have you read about this case?
13  A.  Just the things that we have here, that you just
14      had here.  I'm sorry.  I didn't mean other things
15      as far as far back and different things that you
16      haven't seen.  If I recall, I think I have read
17      this before.
18  Q.  All right.  So you have read LaDawn's statement
19      to Mr. Harris?
20  A.  Yes.
21  Q.  Okay.  And you recall meeting with LaDawn Clemons
22      on November 25, 2018; correct?
23  A.  Yes.  Yes.
24  Q.  All right.  Did you approach her?
25  A.  Yes, I did.
```

Page 127

```
1   Q.  Okay.  And after having taken another opportunity
2       today to read LaDawn's statement, is it an
3       accurate reflection of your conversation with her
4       on November 25 of what you said to her and of
5       what she said to you?
6   A.  It was some things left out also that I said to
7       her that's not in here.
8   Q.  All right.  So let's just take what is in Exhibit
9       No. 2.  Is it all accurate?
10  A.  Yes.
11  Q.  Okay.  What are you claiming is not contained in
12      Exhibit No. 2 that you said to LaDawn on
13      November 25 or she said to you?
14  A.  I said to LaDawn.
15  Q.  Okay.  What did you say to LaDawn that's not
16      reflected in Exhibit No. 2 on November 25?
17  A.  I explained to her the reason why I was coming to
18      her.
19  Q.  What did you tell her in that regard?
20  A.  Because I had went to my previous -- to Rich and
21      Billy and they just made a mockery out of it.
22      They scared me to death.  They put me in a
23      horrible position with threats.
24  Q.  Did you tell LaDawn what you told Rich and Billy?
25  A.  Yes, I did.
```

Page 128

```
1   Q.  What did you tell her about your reports to Rich
2       and Billy?
3   A.  I told her that Rich Mahoney knows of the whole
4       situation.  I told her that Rich Mahoney seen the
5       pictures.  I told her that I expressed my concerns
6       to Rich and to Billy but Billy more so cursed me
7       out several times.  It made the whole situation
8       very unapproachable.
9   Q.  Did you tell her what specifically you had told
10      Rich Mahoney?
11  A.  Yes.
12  Q.  What did you tell her you had told Rich Mahoney?
13  A.  What I just previously stated, that Rich Mahoney
14      had seen the text.  He knew about the pictures.
15      He knew about the inappropriateness.  He knew
16      about everything.
17  Q.  Well, what specifically did you tell her you had
18      told Rich Mahoney?
19  A.  That he knew about the pictures and he knew about
20      the texts.
21  Q.  Did you tell her anything else?
22  A.  I can't recall everything I told her at that time.
23      I was crying pretty profusely.
24  Q.  When you were speaking to LaDawn Clemons, you
25      were crying profusely?
```

JOHNSON, DEANNA RENAE
10/07/2019



Pages 129–132

Page 129

1  A.  Yes, I was.
2  Q.  What texts did you tell LaDawn that Rich Mahoney
3      had seen?  Did you identify the topics of texts
4      or the dates or any way of giving her an idea
5      what the content was of the texts that you claim
6      you showed Rich Mahoney?
7  A.  I told LaDawn that I had showed Rich Mahoney
8      pictures of Rick Rowan's penis.
9  Q.  No, stay with the texts.  Did you identify for
10     LaDawn Clemons the content of any of the texts
11     that you showed to Rich Mahoney?
12 A.  Yes.
13 Q.  What did you tell LaDawn Clemons about the texts
14     that you had showed Rich Mahoney?
15 A.  I told LaDawn that I showed Rich Mahoney the text
16     message -- the texts and the pictures of Nick
17     Rowan's penis.
18 Q.  All right.  So you specifically told her you had
19     shown her a text with Nick Rowan's penis in it.
20     Is there any other text that you identified for
21     LaDawn that you claimed you had shown to Rich
22     Mahoney?
23 A.  I show -- I told LaDawn that I showed Rich Mahoney
24     pictures and texts.
25 Q.  I know but I'm asking you if --

Page 130

1  A.  No.
2  Q.  -- you described what was in those pictures and
3      texts for LaDawn.
4  A.  Yes, I did.
5  Q.  What did you describe other than telling her
6      about the picture of the penis?
7  A.  I told her that he was constantly sending me
8      pictures -- constantly sending me pictures and
9      asking me for pictures of my breasts and my
10     vagina.
11 Q.  All right.  Stay with the texts.  Other than the
12     text you claim that Nick Rowan sent you of his
13     penis, is there any other text message that you
14     described the content of when talking to LaDawn
15     Clemons?
16 A.  I don't recall everything that I said to her.
17 Q.  I want to know if there's any text that you
18     described to her other than the one that I just
19     identified.
20 A.  I don't recall remembering everything I said to
21     LaDawn because I was crying a lot.
22 Q.  Do you recall anything beyond describing that one
23     text when talking to LaDawn?
24 A.  I described -- I told you I described that he was
25     sending me pictures of his other -- still sending

Page 131

1      me those pictures as well as asking me in text
2      messages for pictures of my breasts and my vagina.
3  Q.  Those are the only two things you recall
4      describing for LaDawn Clemons about Nick Rowan's
5      behavior?
6  A.  And telling her that if I didn't, he was holding
7      that over my head.  He wouldn't help me unless I
8      sent him those pictures.
9  Q.  Did you ever send Nick Rowan any pictures of
10     yourself?
11 A.  No.
12 Q.  All right.  So have you told me every description
13     of the offensive conduct that you were
14     attributing to Nick Rowan that you shared with
15     LaDawn Clemons on November 25?
16 A.  No.
17 Q.  What else did you share with LaDawn Clemons that
18     concerns offensive conduct by Nick Rowan?
19 A.  I'm sorry.  I should have asked you to reframe the
20     question.  I thought that you were saying did I
21     tell you everything.  LaDawn -- that's all I told
22     LaDawn.
23 Q.  Okay.
24 A.  I do need to say one other thing.
25 Q.  All right.  What is that?

Page 132

1  A.  I'm sorry.  Earlier you asked me a question about
2      deletion on my phone of pictures.  I did delete
3      one picture off my phone because my daughter and
4      my -- my granddaughter and I were looking through
5      my phone, and a picture pops up of him holding it
6      so I immediately deleted that because my
7      granddaughter sometimes gets my phone and she's
8      eight, so I just kind of --
9  Q.  When was that?
10 A.  -- I had forgotten about that.  I can't remember
11     that exact date, but it was during the same time
12     when he sent me the pictures.  It was all around
13     the same time.
14 Q.  Well, but when was that?  Was that over the
15     course of weeks and months or was that at a
16     particular point in time?
17 A.  It was at a particular point in time when I was
18     working for the company.  I don't remember the
19     exact date.
20 Q.  Well, beyond even giving me an exact date, can
21     you give me any idea when it was between June 25
22     and November 25?
23 A.  I would say between September and the end of
24     October.
25 Q.  And that -- you can't be any more specific than

JOHNSON, DEANNA RENAE
10/07/2019



Pages 133-136

Page 133

1    that?
2  A. I can't because I don't really remember the dates.
3  Q. And there's only one picture that you deleted,
4    correct, and that's what you recall after having
5    been on a lunch break; correct?
6  A. I didn't say anything about a lunch break. Excuse
7    me.
8  Q. Well, we've been here all morning.
9  A. Oh, that. Oh, I'm sorry. I thought you meant
10    lunch break at work.
11  Q. No. All right. So you're here all morning long.
12    I asked you repeated questions about deletions on
13    your phone. You didn't recall deleting anything.
14    You assured me you had not deleted anything. You
15    came back from the lunch break and now you recall
16    the deletion of a photo of him holding his penis.
17    Is that what you claim it was?
18  A. Yes, it was.
19  Q. Okay. And you just all of a sudden recalled that
20    over lunch?
21  A. It just happened to come to me. I was just
22    thinking back at lunch of all the questions that
23    you asked me and I wanted to be thorough in my
24    answers.
25  Q. Have you ever told anybody about that particular

Page 134

1    photo before?
2  A. I don't recall about that particular photo. I
3    just told -- when I told HR and when I told Billy
4    and when I told Nick, I said several pictures.
5    That was included in the several pictures. I
6    don't think no one but you has asked me like what
7    type of picture.
8  Q. What phone was that photo on?
9  A. That was on my white phone.
10  Q. And how was that photo conveyed to you? By text
11    or by email?
12  A. It was by text.
13  Q. From the same phone number that you claim Nick
14    Rowan had used for every other photo?
15  A. From the same phone number that Nick Rowan has
16    used from every other photo.
17  Q. All right. So over what period of time did you
18    receive the photos that you're claiming were
19    offensive photos from Nick Rowan? When did they
20    start? When did you start receiving them?
21  A. I started receiving the photos sometime in
22    September -- could have been the end of August.
23    -- until the time that I left.
24  Q. When did you last receive an offensive photo from
25    Nick Rowan?

Page 135

1  A. I think the last offensive photo I received was --
2    I can't remember. I'm sorry. I don't recall the
3    date. I don't recall the date of the last
4    offensive photo.
5  Q. What month was it?
6  A. I'm sorry. I can't recall it, because he sent
7    several photos and that's not something I tried to
8    keep looking at as far as the date.
9  Q. But your phone would have the dates of all the
10    photos he sent to you; correct?
11  A. Correct, next to the photo that I don't pick to
12    look at all the time.
13  Q. Well, did you get any photos after you were moved
14    to Lines 4 and 5 from Nick Rowan?
15  A. I don't recall. I would have to look at my photos
16    to check the dates -- the pictures to check the
17    dates. It's not something that --
18  Q. It's making it pretty difficult to move through
19    this line of questioning because we don't have
20    your text messages with the photos and the dates.
21    So I'll have to return to that at a later
22    deposition, because it's just taking up too much
23    time to keep pursuing it when you can't recall
24    any of the dates; nor do we have the documents
25    which would have the dates.

Page 136

1    So let's go back to LaDawn Clemons.
2    You've identified that Exhibit No. 2 does not
3    reference what you told Rich Mahoney about text
4    messages and photos and you've indicated what it
5    is you claim you told LaDawn on that topic. Is
6    there anything else you told her about
7    conversations with Rich Mahoney concerning Nick
8    Rowan? And I'm referring specifically to your
9    conversation on November 25.
10  A. I can't remember. I don't think -- I think I told
11    her just -- I can't recall every aspect of the
12    conversation.
13  Q. Do you have any notes of the conversation you had
14    with LaDawn?
15  A. No, I didn't keep any notes from that.
16  Q. And you don't have an audio recording?
17  A. Oh, definitely not.
18  Q. All right. So all you can rely on for the
19    substance of that conversation is your memory;
20    correct?
21  A. Correct.
22  Q. All right. What did you tell LaDawn about your
23    conversations with Mr. Markavich about Nick
24    Rowan? Did you give her any details?
25  A. I told her that I was scared of Billy because I

JOHNSON, DEANNA RENAE
10/07/2019



Pages 137-140

Page 137

1    tried to approach him about the whole Nick Rowan
2    thing.
3  Q.  But were too scared to talk to him?
4  A.  No, I talked to him but I was scared.
5  Q.  Okay.  And did you tell her what you had told
6       Billy Markavich about Nick Rowan?  Did you get
7       into the detail or did you just tell her you were
8       scared and you talked to him about inappropriate
9       conduct?
10 A.  We didn't get into details.
11 Q.  Did you tell her why you were scared and
12      threatened to death with respect to talking to
13      Mr. Mahoney and Mr. Markavich about Nick Rowan?
14 A.  Repeat that, please.
15 Q.  Let me rephrase that.  That wasn't the best
16      question.
17          You testified earlier that Mr. Mahoney
18      and Mr. Markavich scared you to death.  Do you
19      recall that testimony?
20 A.  That is correct.
21 Q.  Okay.  What did they do that scared you to death?
22 A.  Several -- several things.
23 Q.  What?
24 A.  When I -- after I showed Mahoney pictures several
25      times and told him instances of Nick Rowan,

Page 138

1    Mahoney, in one of our meetings, he looks over the
2    table and he goes, "You've only been here for a
3    hot fucking minute.  You better watch what you do
4    and watch what you say.  I have kids to take care
5    of.  I have a wife.  And you're running around
6    here saying shit.  You better watch what you say."
7  Q.  What had you said to him prior to Mr. Mahoney
8       allegedly making that comment?
9  A.  That I need to go to HR and report everything
10      that's going on inside this entire plant.
11 Q.  What were you referring to?
12 A.  I was referring to just sexual things going on,
13      just inappropriateness that I didn't want to be a
14      part of.
15 Q.  Are you referring to something other than Nick
16      Rowan or just Nick Rowan?
17 A.  I'm referring to Nick Rowan.
18 Q.  Okay.  Nick Rowan's the only person you have a
19      complaint about at Ford Motor Company engaging in
20      inappropriate sexual behaviors; correct?
21 A.  Correct.
22 Q.  When did you have that conversation with
23      Mr. Mahoney?
24 A.  The conversation of him cursing at me?  That we
25      just said?

Page 139

1  Q.  The conversation where he used the expression "a
2       hot fucking minute."
3  A.  That was at one of our meetings.  I don't know the
4       exact date of that meeting but that was at one of
5       our meetings in front of the entire team.
6  Q.  All right.  So you made that comment in front of
7       the entire team?  You told Mr. Mahoney in front
8       of the entire team that you needed to go to HR
9       and report everything that was happening, and he
10      responded with a comment about the "hot fucking
11      minute"?
12 A.  I did not say that I told Mahoney that in the
13      meeting.  I said in the meeting he told me that I
14      had just spoken with Rich before the meeting.  I
15      had spoken with him the day before and several
16      days before, and when we got to the meeting, it
17      just came out -- because we were all sitting there
18      and it just came out, and that's what he told me
19      because he knew how I was feeling.
20 Q.  All right.  I'm not tracking you at all.  So you
21      talked to Mr. Mahoney a couple days before this
22      meeting that you're referring to?
23 A.  Uh-huh.
24 Q.  Yes?
25 A.  I spoke with -- say that one more time.  I'm

Page 140

1    sorry.
2  Q.  You talked to Mr. Mahoney a couple days before
3       there was a crew meeting?
4  A.  Well, we have a crew meeting every day.  I talked
5       to Mahoney every day and I started speaking with
6       him every day in regards to this problem.  On that
7       particular day, yes, I spoke with him again before
8       that meeting.
9  Q.  You talked to Mr. Mahoney every single day about
10      your problems with Nick Rowan?
11 A.  Just about as -- before I left, yes.
12 Q.  Okay.  Starting when?
13 A.  The first time I ever spoke with him, is that what
14      you're asking me?
15 Q.  The first time you talked to Mr. Mahoney about
16      problems with Nick Rowan, when was the first
17      time?
18 A.  It would have probably been in August.
19 Q.  And every day until your last day of work on
20      November 25, you claim you talked to Mr. Mahoney
21      about your problems with Nick Rowan?
22 A.  Well, let me rephrase that.  I would not say every
23      single day because we want to be truthful here
24      now.
25 Q.  Yes.

JOHNSON, DEANNA RENAE
10/07/2019



Pages 141–144

Page 141

1   A.   I talked to him at least three times a week, four
2        times a week, at least three times a day, at
3        least.
4   Q.   At least three to four times a day?
5   A.   At least.
6   Q.   Three to four times a day?
7   A.   During the end -- during the end -- I'm sorry.
8        During the end of my employment, because it had
9        gotten so over the top.
10  Q.   All right.  So tell me the pattern.  You started
11       in August and you talked with him three to four
12       times a week, and then at some point in time
13       you're talking to him three to four times a day?
14       Is that what you're saying?
15  A.   Maybe not roughly as much, but a lot.  A lot.
16       Yes.
17  Q.   All right.  So let's go back to the conversation
18       in which you claim you told him you want to go to
19       HR or you need to go to HR to report everything
20       that's happening and he responded with an
21       expression, "hot fucking minute."  When was that
22       conversation?
23  A.   That conversation was during one of our meetings.
24       I want to say maybe three weeks prior to
25       everything getting to HR, maybe a month prior.

Page 142

1        I'm not quite sure.  I don't really recall the
2        exact date and time.
3   Q.   Why didn't you go to HR and see Les Harris prior
4        to November 25 -- November 26?  I'm sorry.
5   A.   In the beginning -- in the beginning, it started
6        off with telling my superiors, my supervisors, and
7        seeing if there was a way that this could be
8        handled because it first started with
9        inappropriate talking.  It didn't reach sexual
10       harassment and sexual assault until later on in
11       the -- in my time of working there.
12  Q.   When do you claim it reached the level of sexual
13       harassment and sexual assault?
14  A.   Well, it started off with inappropriate talking to
15       me and as well as other ladies in the beginning,
16       and then it escalated from there to sexual
17       harassment, asking me for a pic -- every single
18       second -- of my vagina and my breasts, and it went
19       from sexual harassment to sexual assault when he
20       pinned me in a corner and grabbed my breast, and
21       that's how I come to that.
22  Q.   All right.  When do you claim it reached the
23       point of sexual harassment?
24  A.   The first time when he started asking me for
25       pictures constantly, three pictures in one day,

Page 143

1        "Please, send me a pic.  Send me a pic."
2   Q.   When was that?
3   A.   That started, I think, sometime in August,
4        sometime around the end of August.
5   Q.   And when do you claim he grabbed your breast?
6   A.   When did he actually grab my breast?  He actually
7        grabbed my breast -- I think that was in November.
8        That was like the last -- that was it.  That was
9        the last straw.
10  Q.   When in November?
11  A.   I can't recall the exact day.
12  Q.   Do you have any idea when in November?
13  A.   No, but --
14  Q.   Between November 1 and November 25?
15  A.   It would probably be here in your documents you
16       gave me, when he apologized for the hand slippage,
17       so I'm sure it's right here in the documents that
18       you've given me.
19  Q.   All right.  So the day he grabbed -- you claim he
20       grabbed your breast is the same day as the
21       comment about hand slippage in the text message?
22  A.   I don't know if it was the same day.  I'm sure --
23       or if it was not the same day, it was the day
24       after the day that he grabbed my breast.
25  Q.   So going back to my earlier question, you had

Page 144

1        gone to Les Harris and he treated you with full
2        respect in a non-retaliatory way in July when you
3        had a complaint about the way two men had
4        conducted themselves at an interview in the paint
5        department.  You claim you were being sexually
6        harassed as of the end of August.  Why didn't you
7        go back to HR to Les Harris and ask him to deal
8        with the situation prior to November 25?
9   A.   Because in August -- first, I was a new hire
10       there.  When I came into the company, I didn't
11       expect Ford Motor Company to have such people like
12       that working there, so by the time all this came
13       around, I wanted to get into my job.  I didn't
14       want to run to HR for something that wasn't --
15       that wasn't as bad to me yet, just inappropriately
16       talking to other women and speaking with myself,
17       so I actually went the chain of command route.  I
18       went to my boss, to his boss.
19  Q.   And you claim that when you went to your boss,
20       Mr. Markavich, that nothing happened; correct?
21  A.   When I went to Billy first -- when I went to --
22       excuse me.  -- Rich Mahoney first because Billy is
23       not around a lot.
24  Q.   Okay.  Well, whether you went to Rich Mahoney or
25       to Billy Markavich, you claim that whenever you

JOHNSON, DEANNA RENAE
10/07/2019



Pages 145–148

Page 145

1    talked to them about problems with Nick Rowan,
2    that they didn't do anything; correct?
3  **A.  Correct.**
4  Q.  Okay.  So why didn't you go to see Mr. Harris,
5    who had helped you in July, to have him address
6    the Nick Rowan situation?
7  **A.  Because I was very, very scared.  The situation**
8    **that Mr. Harris helped me with was a gentleman**
9    **that was not in that building and nowhere around**
10   **us.  This particular situation, we have**
11   **supervisors -- two supervisors involved as well as**
12   **a lot of female employees that I'm going to have**
13   **to reveal of what they did, and I was just scared.**
14   **I was scared of Rich.  I was scared of Billy.**
15   **Prior to that, Billy came to me when I was hurting**
16   **-- and I'm sure you know this statement.  -- and**
17   **told me he didn't give a fuck about me.  He didn't**
18   **give a fuck about my back.  He didn't give a fuck**
19   **about my mother.  He has a fat grandmother he has**
20   **to carry the entire weekend, and I better fall in**
21   **line like Rich told me, so it made it kind of**
22   **hard.  It, you know, made me scared.**
23  Q.  You were comfortable making a complaint to Les
24    Harris in salaried personnel relations in
25    July 2018 within a couple weeks of when you

Page 146

1    started at Ford.  You got good reception, one
2    that made you comfortable.  Why didn't you go
3    back to him prior to November 25?
4  **A.  I didn't have supervisors then.  I looked at Les**
5    **Harris at that time as my supervisor.**
6  Q.  But you're claiming your supervisors knew about
7    the problems yet didn't do anything, so why
8    didn't you go to Les Harris?
9  **A.  For one, I was scared; and, for two, I worked**
10   **different shifts.  HR was not open at certain**
11   **times.  During that time, also, HR has just put a**
12   **lock on their door.  I had never seen it before.**
13   **HR was always an open building.  They have a card**
14   **slide now that you have to go in.  If you notice**
15   **the hours in the crew that I was working on, HR is**
16   **closed after 5:00 p.m.**
17  Q.  You could always email Les Harris; correct?
18  **A.  Correct.**
19  Q.  And you didn't do that, did you?
20  **A.  No, I didn't email Les --**
21  Q.  And you could have called him too; correct?  And
22    you didn't do that either, did you?
23  **A.  I don't know if I could have called him.  I know I**
24    **called my boss.  Les Harris is not right with me**
25    **at the side of me every moment.**

Page 147

1  Q.  All right.  So why are you scared to go talk to
2    Les Harris if you're willing to go talk to your
3    colleague, who's a fellow process coach,
4    Mr. Mahoney, and to your boss, Mr. Markavich?
5  **A.  Because in the beginning, I figured that**
6    **Mr. Markavich and Mr. Mahoney could handle them --**
7    **could handle him better.  I wasn't -- when you're**
8    **a new employee, you just kind of don't want to**
9    **make waves until it gets really horrible and then**
10   **you do.**
11  Q.  My question is why would you be scared to go to
12    Les Harris, if you were willing and able to go
13    approach Mr. Markavich, your boss, and then your
14    co-worker, Mr. Mahoney?
15  **A.  Because when you approach Les Harris, sometimes**
16   **Ford Motor Company does things out of the ordinary**
17   **like interview other people before they tell you**
18   **that they're going to interview you, so it makes**
19   **you kind of scared.**
20  Q.  But if that had happened, you didn't even know
21    about that until November 25.
22  **A.  If --**
23  Q.  If Mr. Harris had indeed interviewed someone
24    before you, such as Mr. Mahoney and Mr. Markavich
25    before November 25, you weren't even aware of

Page 148

1    that until November 25, so how does that explain
2    why you were scared to talk to Mr. Harris prior
3    to November 25?
4  **A.  Because I knew when I talked to Mr. Harris that I**
5    **was going to have to implicate everyone.**
6    **Implicating everyone would make me -- then I'd**
7    **have to go back to work down in the pit over in**
8    **the back corner where no one is protected at.  I**
9    **was just scared.  I was scared to talk to Les.**
10  Q.  Who -- who were you implicating when you talked
11    to Mr. Harris that you had not already implicated
12    when you talked to Mr. Markavich and Mr. Mahoney?
13  **A.  Well, when I talked to Mr. Markavich and Mahoney,**
14    **I didn't implicate them to themselves.**
15  Q.  All right.  So what did -- when you talked to
16    Mr. Mahoney and you claim he scared you to death,
17    what did he do that, quote, scared you to death?
18  **A.  Mr. Mahoney is a big guy and I've watched him**
19    **scare other people to death.  And what did he do**
20    **to me?**
21  Q.  Yes.
22  **A.  He talked to me in a horrible, foul manner.  He**
23    **told me -- and then sent me text messages, things**
24    **like "Kiss and make up" and "You should get**
25    **married," and just -- "Why don't you just do us**

JOHNSON, DEANNA RENAE
10/07/2019



Page 149

1  all a favor and fuck him and get it over with."
2  Q.  He put all that in text messages?
3  A.  He put all that in text messages except the "fuck
4      him and get it over with."
5  Q.  Okay.  So tell me what he put in text messages to
6      you that concerns Mr. Rowan.
7  A.  "I wish you guys would kiss and make up."
8  Q.  What else?
9  A.  What did I just say?  "Kiss and make up," and -- I
10     can't -- I don't recall.
11 Q.  Get married, you said.
12 A.  Yeah, "Why don't you guys just get married," and
13     just different -- just different inappropriate,
14     very inappropriate things, that's coming from my
15     boss.  Told me to kiss and make up with a person.
16 Q.  What is the horrible, foul manner that
17     Mr. Mahoney used when he talked to you?
18 A.  Rephrase that, please.
19 Q.  What is the horrible, foul manner that
20     Mr. Mahoney used when he talked to you?
21 A.  The "you've been here a hot fucking minute."
22 Q.  Did he say anything else that you're considering
23     horrible and foul?
24 A.  Yes, "kiss and make up," "fuck him and get it over
25     with."

Page 150

1  Q.  Anything else?
2  A.  I can't recall any more at this time.
3  Q.  All right.  Did you -- strike that.
4          What -- when did Mr. Mahoney allegedly
5      say "fuck him and get it over with"?
6  A.  This is after the first -- after the first penis
7      pic, during that time.  I can't remember but the
8      dates are on the pictures.
9  Q.  Were there any witnesses to that comment?
10 A.  I don't recall.  I don't recall anyone standing
11     around us for that.
12 Q.  Is there anything else that Mr. Mahoney did or
13     said that made you scared to death to talk to him
14     about Nick Rowan?
15 A.  I can't remember everything at this time.
16 Q.  What -- what photos do you claim that you showed
17     to Mr. Mahoney that you received from Mr. Rowan?
18 A.  Full erect penis, picture of him in some sort of
19     animal print, scale underwear.
20          COURT REPORTER:  I'm sorry, "print..."
21          THE WITNESS:  Animal print underwear.
22     I can't remember all of the pictures.  I told him
23     about the videos that I seen of our -- our
24     subsidize [sic] with Nick Rowan in various
25     positions, videos of him having sexual intercourse

Page 151

1  with women that worked there.
2  BY MS. HARDY:
3  Q.  Did you show Mr. Mahoney any photos that you
4      claim you received from Mr. Rowan?
5  A.  Yes, I did.
6  Q.  What ones did you show him as opposed to
7      describe?
8          MS. LAUGHBAUM:  It's been asked and
9      answered.
10         Go ahead, DeAnna.
11         THE WITNESS:  The picture of his erect
12     penis, the picture of him in his leopard or snake,
13     whatever, underwear.  I can't remember what are
14     the other ones.
15 BY MS. HARDY:
16 Q.  Did you show him the photos contemporaneous with
17     having received the photos?  Did you show him the
18     photos at the same time they were received?
19 A.  Yes.
20 Q.  The same day, for instance?
21 A.  Yes.
22 Q.  So then you would have shown him photos on the
23     dates that they correlate with your text
24     messages?
25 A.  They should but not every picture.  I don't know

Page 152

1  if he was around at that time.  Rich doesn't work
2  with me.  He works above me.  So I would show
3  him -- show him whenever he would come around.
4  Q.  Let's go to Mr. Markavich.  What do you claim you
5  told Mr. Markavich about Mr. Rowan?  I understand
6  you said you were scared of him and felt
7  uncomfortable talking to him.  Did you provide
8  him with any description of your issues with
9  Mr. Rowan, other than the fact that you're upset
10 and it was inappropriate?
11 A.  Yeah, when he was cursing me out that day and he
12     came -- let me go back.  On one day -- I do not
13     recall the date.  It was one of the days that I
14     told Rich about the picture, the full erect penis,
15     and I said, "I can't do it over here anymore.  You
16     guys got to move me."  I said, "We have to go to
17     HR.  Something has to be done."
18         Rich walked away from me, and he walked
19     to Bill.  They conversated for about five minutes
20     or so.
21 Q.  Did you hear what they were talking about?
22 A.  No, I did not hear what they were talking about.
23     He told me he was on his way to talk to Billy.  I
24     don't know what their conversation was, but when
25     Rich walked away from Billy, Billy came back to me

JOHNSON, DEANNA RENAE
10/07/2019



Page 153

1   and he goes, "Okay.  I need to know this.  On a
2   scale from 1 to 10, how bad is it between you and
3   Nick Rowan?"  I said -- my reply was "100."  And
4   he goes, "Oh, God, I don't want to hear anything,"
5   and he turns away and I go, "You have to hear" --
6   at this point I'm kind of getting loud.  "You have
7   to hear this.  He's sending me naked pictures of
8   his weddle (phonetic)."  That's the word that I
9   use.  And he kept walking.
10  Q.   You said he's sending naked pictures of his --
11  A.   Weddle.
12  Q.   How do you spell that?
13  A.   I don't know.  W-e-d-d-l-e.
14  Q.   Does weddle have a meaning?  I'm not familiar
15       with that word.
16  A.   No.  It's just -- I didn't want to say -- I don't
17       know why I didn't want to yell out "penis" or yell
18       out, you know, the D word.  I just yelled -- you
19       know, said that.  And, actually, let me take that
20       back.  I'm sorry.  Not weddle.  Weenie.  I'm so
21       sorry.  Just -- it just -- just makes me upset
22       when I kind of think back on it.  It just gets me
23       upset.
24  Q.   Is that the only exchange you had with
25       Mr. Markavich about Nick Rowan?

Page 154

1   A.   No.
2   Q.   What other exchanges did you have?
3   A.   I received a text message from Billy.  On the text
4        message it says he was wrong.  "You write down
5        everything he did and we'll handle it tomorrow."
6   Q.   How did you receive that message?  Via text?
7   A.   Via text.
8   Q.   Did you respond to that text?
9   A.   I can't recall if I did.
10  Q.   Why would you not respond if he's asking you for
11       the details of everything?
12  A.   Because I want to be thorough with you.  I don't
13       want to say I responded and I didn't respond.  I'm
14       sure I responded with a "Tank you, boss," or
15       "That's great."  I don't know my exact words, but
16       I'm sure I probably did, but at that time, I
17       didn't -- I didn't believe anything that Billy was
18       saying, his thank-yous or apologies or anything at
19       that point.
20  Q.   Well, did you -- if he asked you specifically in
21       a text to write down every problem you were
22       having with Nick Rowan, did you take advantage of
23       that opportunity and convey that information to
24       him?
25  A.   Definitely I would wanted to -- I wanted to take

Page 155

1   -- you know, I wanted to write all that down, but
2   I did not.  I chose then, I'm going to just go
3   upstairs, because after the cursing out, the
4   talking to me, the belittling me, I'm not -- now
5   you want to help because you see that I'm going to
6   HR.  You see that this is getting really big.
7   That's how I took it.
8   Q.   All right.  So you did not provide a substantive
9        response with the details of your problems with
10       Nick Rowan in response to Mr. Markavich's text;
11       correct?
12  A.   Correct.
13  Q.   When did you receive that text?
14  A.   I am unsure of the day.  I don't recall the date.
15  Q.   Did you have any other exchanges with
16       Mr. Markavich about the problems you claim you
17       had with Mr. Rowan?
18  A.   I don't recall.
19  Q.   What was the date of the conversation you had
20       with him in which you claimed that, on a scale of
21       1 to 10, your issues with Mr. Rowan were 100?
22  A.   It had to have been during the time that I passed
23       out in the plant because he scolded me on that.
24  Q.   What does that mean, during the time in which you
25       passed out in the plant?  On the day you passed

Page 156

1   out in the plant?
2   A.   It had to be on the day that I came back, maybe
3        probably two days later.  That's when he
4        approached me with the --
5   Q.   All right.  And what's the date that you claim
6        you passed out in the plant?
7   A.   You're cutting me off again, but that's fine.  Say
8        that -- say that one more time.  Can you repeat
9        that.
10                 (The requested portion of the
11                 record was read by the reporter at
12                 1:55 p.m.
13                 "Q:  What does that mean, during
14                 the time in which you passed out in
15                 the plant?  On the day you passed
16                 out in the plant?
17                 A.  It had to be on the day that I
18                 came back, maybe probably two days
19                 later.  That's when he approached
20                 me with the --
21                 Q.  And what's the date that you
22                 claim you passed out in the
23                 plant?")
24  BY MS. HARDY:
25  Q.   All right.  Let's take it one at a time.  What's

JOHNSON, DEANNA RENAE
10/07/2019



Page 157

1    the date that you claim you passed out in the
2    plant?
3  A.  **The day that I did pass out in the plant was in --**
4       **I think it was in November.  I don't know the**
5       **exact date of that, but you would have records of**
6       **that because they took me to Beaumont Hospital as**
7       **a result of that.**
8  Q.  And wasn't it September 16?
9  A.  **I can't remember.  I don't recall the date.  I**
10      **know it was after he sent me the picture.**
11 Q.  September 19, does that sound right?
12 A.  **It could be.**
13 Q.  All right.
14 A.  **I'm not sure.**
15 Q.  All right.  So you can't identify when you passed
16      out in the plant, but three days later you told
17      Mr. Markavich that the problem was 100 on a scale
18      of 1 to 10?
19 A.  **I don't know if that was the exact date but I did**
20      **tell that to Mr. -- to -- Billy.**
21 Q.  And it was very soon after you returned to work
22      after having passed out?
23 A.  **I believe so.  I'm not quite sure of my dates.**
24      **I'm really fuzzy.**
25 Q.  Well, a moment ago you said it was within three

Page 158

1    days of returning.
2  A.  **I said it was within maybe two days.  I'm just**
3       **really fuzzy about my dates.  I'm not really sure.**
4  Q.  So two or three days is better than giving me no
5       idea.
6  A.  **Right.  I understand.**
7  Q.  All right.  And is that accurate, two or three
8       days after returning from work following having
9       been at Beaumont Hospital?
10 A.  **I believe so.**
11 Q.  All right.  And that's when you made the comment
12      of, on a scale of 1 to 10, it's 100?
13 A.  **I'm not quite sure if that was on that date.  I'm**
14      **trying to remember.  I know on that date is when**
15      **he came to me.  He approached me and I thought he**
16      **was approaching me about asking me how I was**
17      **feeling, and that's when he approached me with all**
18      **of that.  I don't know if that was at that exact**
19      **same moment.  I'm just -- I'm fuzzy with the dates**
20      **on there.**
21 Q.  Do you have any way of refreshing your memory as
22      to these dates?
23 A.  **Yeah, when I look at them on paper, when I look at**
24      **them maybe in my cell phone, if I have a text**
25      **message or something to reference them to, but I**

Page 159

1    **have been taking a lot of heavy kind of medication**
2    **from this --**
3  Q.  Yeah.
4  A.  **-- so it has my dates kind of fuzzy.**
5  Q.  So why don't you -- we'll go off the record and I
6       want you to take a moment to look through the
7       text messages that your counsel has produced and
8       I want you to identify that text message from
9       Mr. Markavich in which he asks you to write down
10      everything that was going on with Mr. Rowan.
11          VIDEO TECHNICIAN:  Off the record at
12      1:58 p.m.
13              (Off the record at 1:58 p.m.
14              (Back on the record at 1:59 p.m.)
15          VIDEO TECHNICIAN:  Back on the record
16      at 1:59 p.m.
17          MS. HARDY:  All right.  So you have not
18      produced any text messages between your client and
19      Mr. Markavich or anyone else at the plant?
20          MS. LAUGHBAUM:  I don't have any paper
21      copies of text messages.  I have the Excel sheet
22      that I will be producing where N1 has compiled all
23      that information.  And if you want Ms. Johnson to
24      look at her phone now, current phone, and see if
25      she has any messages with Markavich, I'm happy to

Page 160

1    accommodate that.
2          MS. HARDY:  Well, that's a very
3    inefficient way to go about a dep, to have her sit
4    and look at the phone now when we should have had
5    these before.  Plus she only has her black phone
6    with her, not her white phone.
7          MS. LAUGHBAUM:  Well, guess what --
8          MS. HARDY:  And the messages are in two
9    different phones.
10         MS. LAUGHBAUM:  -- Ms. Hardy, I asked
11   you for these text messages about six months ago
12   and I didn't receive them.  They're equally
13   available to you.  You have them all.
14   Mr. Markavich is your employee.  You could easily
15   have gotten the text messages from him, and six
16   months ago I said please -- you know, here's the
17   phones, as I said before -- I don't need to rehash
18   this again, but you've had this available to you
19   for months.  And I don't have paper copies of
20   Markavich-Johnson texts.  I have an N1 report that
21   is just an Excel sheet which lists the different
22   text messages.
23         MS. HARDY:  Well, you have paper copies
24   of the Rowan messages.
25         MS. LAUGHBAUM:  I told you repeatedly.

JOHNSON, DEANNA RENAE
10/07/2019



Pages 161–164

Page 161

```
1    I have dribs and drabs of paper copies.  Nobody
2    sat down and did screen shots of hundreds and
3    hundreds of text messages and printed them out.  I
4    have odds and ends.  I've communicated that to
5    your firm repeatedly.
6            Mr. Davis, throughout this whole
7    deposition, you have been nodding your head and
8    sighing and rolling your eyes.  It's very
9    distracting.  It's not professional.
10           MR. DAVIS:  That's not true.  You know
11   what?  Carol, that's not true.
12           MS. LAUGHBAUM:  It's not necessary.
13           MR. DAVIS:  It's not necessary for you
14   to make false representations.
15           MS. LAUGHBAUM:  I've noticed it; my
16   client has noticed it.  And she'd been distracted
17   by it, and I'm asking you to please stop.
18           MR. DAVIS:  I don't -- you know what?
19   I'm asking you do not, first, say false things.
20   Don't misrepresent conversations that we had or in
21   text messages.  You know that that is not a proper
22   -- that's not proper for you to withhold documents
23   because you think we have them.
24           MS. LAUGHBAUM:  I didn't withhold --
25           MR. DAVIS:  It's not proper for you to
```

Page 162

```
1    say that we have to ask you twice for documents,
2    and this will be part of the motion to compel, so
3    you don't need to say anything more about that.
4            MS. LAUGHBAUM:  I have --
5            MS. HARDY:  We have on the record that
6    you have not complied with your discovery
7    obligations.
8            MS. LAUGHBAUM:  I have withheld
9    nothing.  I've made everything available.  You'll
10   have the Excel spreadsheet --
11           MR. DAVIS:  Where are the text messages
12   that you're talking about, Carol?
13           COURT REPORTER:  I can only write one.
14   Sorry.
15           MR. DAVIS:  Where are the text messages
16   that you're talking about?
17           MS. LAUGHBAUM:  I'm working on getting
18   those to you.  There's been a lot of activity -- a
19   flurry of activity in this case.  On Thursday we
20   were in Toledo all day for the Rowan dep.  My
21   assistant was out half a day Friday.  I told you I
22   would get them and I told you I couldn't promise
23   them by Friday, so that's where we are.  You will
24   have them shortly.
25   BY MS. HARDY:
```

Page 163

```
1    Q.   I'd like to sum up the communications you had
2         with Mr. Markavich about Mr. Rowan.  There were
3         two communications.  One started with you talking
4         to Mr. Mahoney.  Mr. Mahoney went aside and had a
5         private conversation with Mr. Markavich.
6         Mr. Markavich came to you afterwards and asked
7         you how bad your problems were on a scale of 1 to
8         10 and you said a hundred; correct?
9    A.   Correct.
10   Q.   Okay.  Then there is the text message you claim
11        he sent within roughly two to three days after
12        you came back from Beaumont Hospital to work and
13        he asked you in that text message to list all the
14        problems you were having with Nick Rowan, and you
15        did not respond by providing such a list;
16        correct?
17   A.   I want to say I don't recall my dates because when
18        he came to me and asked me between 1 and 100, he
19        could have sent me the text after that
20        conversation to tell me the list and I could have
21        went to -- and I fell out after that.  I'm not
22        sure of those dates.  That's what -- what I'm
23        telling you, I don't recall the dates.
24   Q.   Well, you testified earlier that the text message
25        he sent you that you didn't respond to asking for
```

Page 164

```
1         a list of your problems with Nick Rowan was
2         approximately two to three days after you came
3         back to work from your stay at Beaumont.  Is that
4         accurate?
5    A.   I think so.  I'm just so fuzzy on the dates.  I
6         said that before, when you asked me.
7    Q.   And that text message followed your conversation
8         with him about the scale of 1 to 10, or that text
9         communication followed the conversation you had
10        with him when he asked on a scale of 1 to 10 how
11        bad your problems were?
12   A.   I think so.  I'm not quite sure because I don't
13        know the dates.  I want to be sure.
14   Q.   And you don't have any way to refresh your memory
15        as to the dates?
16   A.   Only if I look at it.
17   Q.   Okay.  But the conversation that you had with
18        Mr. Markavich in which you claim he made the 1 to
19        10 comment is not in a text message; correct?
20        That was a one-on-one verbal conversation?
21   A.   That was a one-on-one verbal conversation.
22   Q.   Okay.  Do you have any record anywhere in writing
23        of what the date was of that alleged
24        conversation?
25   A.   I don't believe so.
```

JOHNSON, DEANNA RENAE
10/07/2019



1  Q.  Were there any witnesses to that conversation
2      with Mr. Markavich?
3  A.  Yes.
4  Q.  Who?
5  A.  It's an employee that works on the line, an hourly
6      employee.
7  Q.  What's that person's name?
8  A.  I don't know her last name but her first name is
9      Carrie (phonetic).
10 Q.  How close was Carrie to you and Mr. Markavich
11     when you were talking to Mr. Markavich?
12 A.  My desk is here and Carrie's podium maybe is about
13     here.  She works on the axles, and she -- caught
14     her attention because she heard me really crying
15     as he was going in on me.
16 Q.  What do you mean, "going in on you"?  How was he
17     going in on you?
18 A.  With the -- you know, with the "I don't give a
19     'f'" and the whole thing of that nature, but the 1
20     to 10 conversation.  She works right there at that
21     station.  She's close by us.  I don't -- I don't
22     know if she heard word for word or anything like
23     that.  I'm just thinking of the only person that
24     was around us that was close by.
25 Q.  So you don't know if Carrie overheard anything

1      that was involved in the conversation in which
2      she asked about the scale of 1 to 10?
3  A.  No, I can't answer that for sure.
4  Q.  Were there any communications with Mr. Markavich
5      about Nick Rowan other than the conversation that
6      you've testified to in which the 1 to 10 comment
7      was made and the text in which he asked you to
8      provide a list of your problems?
9  A.  Conversations or texts?
10 Q.  Any communication --
11 A.  Yes.
12 Q.  -- whether it's verbal, text, email or --
13 A.  Yes.
14 Q.  -- writing.
15 A.  Yes.
16 Q.  Okay.  What other communications did you have
17     with Mr. Markavich about Mr. Rowan?
18 A.  We would just generally just talk in -- at the
19     board meetings, meaning that we would walk to this
20     big board in the middle.  When we get there
21     sometimes, I would just say, you know, "You've got
22     to get me away from him."  He goes, "That guy's
23     really weird.  I know he's weird.  He's eccentric.
24     He's just Nick.  You know, he's just Nick.  We're
25     going to get you away from him.  We're going to

1      get you away from him."
2  Q.  Did you get into any more detail than what you
3      just testified to in those conversations?
4  A.  No, because he knew the details after that.  Rich
5      told me he told him everything, so then he says
6      he's got to get me away from him, and they moved
7      me.
8  Q.  You don't know what Rich told Mr. Markavich, do
9      you?
10 A.  No, I do not.
11 Q.  Okay.  Did you have any other communications with
12     Mr. Markavich about Mr. Rowan?
13 A.  I can't recall at this time.
14         MS. HARDY:  Let the record reflect I'm
15     showing the witness Exhibit No. 3, which is an
16     investigatory interview dated 11/26/18 of DeAnna
17     Johnson conducted by Leslie Harris.
18 BY MS. HARDY:
19 Q.  Have you seen this document before?
20 A.  Yes.
21 Q.  Okay.  Take a moment and read through it.
22         Have you had adequate time to read
23     through Exhibit No. 3?
24 A.  Yes.
25 Q.  All right.  Is Exhibit No. 3 an accurate

1      reflection of what you told Mr. Harris during
2      your interview on November 26, 2018, concerning
3      your complaints about Mr. Rowan?
4  A.  Somewhat.
5  Q.  Is there anything contained in Exhibit No. 3 that
6      is not accurate?
7  A.  It's a part in here where I told him that he can't
8      some of those -- say some of those things to the
9      ladies because someone was going to get -- you
10     know, they was going to report him, and he was
11     standing there dripping in sweat.  I told Les --
12     and I'm like -- I told Les, "I think that guy's on
13     something.  He looks like he's going to have a
14     heart attack."
15 Q.  Who were you referring to?
16 A.  I was referring to Nick Rowan.
17 Q.  Okay.  So what's inaccurate with respect to that
18     testimony and Exhibit No. 3?
19 A.  That's really, I think, about it.
20 Q.  All right.  So is there anything missing from
21     Exhibit No. 3 that you told Mr. Harris on
22     November 26, 2018?
23 A.  I was really scared that day, and I was trying to
24     remember everything that I could.  I'm sorry.
25     Just reading this, it just -- I -- I remember

JOHNSON, DEANNA RENAE
10/07/2019



---

Page 169

1  calling him back and telling him that I was scared
2  and I had to tell him more things.
3  Q.  We'll get to that next.  Stay with Exhibit No. 3
4     because it's a reflection of what Mr. Harris
5     recalls you telling him on November 26, 2018.  Is
6     it an accurate reflection of your conversation
7     but for you making a reference to Mr. Rowan
8     looking like he was going to have a heart attack
9     because he was dripping with sweat?
10 A.  I would say so but -- a word a two.
11        COURT REPORTER:  I'm sorry?
12        THE WITNESS:  I would say somewhat
13     given a word or two.
14 BY MS. HARDY:
15 Q.  Is there any word or two of significance that's
16     missing or not fully accurate?
17 A.  I don't -- I think that -- I don't know if that's
18     all of it.  I can't remember.  I wasn't -- I can't
19     remember back on that day what everything I said.
20     Reading on this paper, this looks accurate but I
21     know I was in his office for a very long time,
22     longer than just these semi questions here.
23        I need tissue.  I'm sorry.
24 Q.  Do you want to take a break?
25 A.  Just maybe a second.

---

Page 170

1        MS. HARDY:  Okay.  Let's go off the
2     record.
3        VIDEO TECHNICIAN:  Off the record at
4     2:15 p.m.
5        (Off the record at 2:15 p.m.)
6        (Back on the record at 2:22 p.m.)
7        VIDEO TECHNICIAN:  We're back on the
8     record at 2:22 p.m.
9  BY MS. HARDY:
10 Q.  Can you tell me how much time passed from the
11     comment that you claim Mr. Markavich made about
12     the scale of 1 to 10 and the text message that he
13     sent you asking you to detail all your complaints
14     about Nick Rowan?  How close -- how close in time
15     were those two communications?
16 A.  I can't recall.
17 Q.  All right.  We're going to go off the record so
18     that you can get on your black phone and locate
19     the Markavich text message that you've testified
20     to where he asked you to detail all your
21     complaints about Nick Rowan.
22 A.  Okay.
23        VIDEO TECHNICIAN:  Off the record at
24     2:23 p.m.
25        (Off the record at 2:23 p.m.)

---

Page 171

1        (Back on the record at 2:26 p.m.)
2        VIDEO TECHNICIAN:  Back on the record
3     at 2:26 p.m.
4  BY MS. HARDY:
5  Q.  Have you searched your black cell phone for the
6     Markavich message in which he asks you to detail
7     all your complaints about Nick Rowan?
8  A.  I searched my phone but he didn't ask me to detail
9     all of my complaints.  That wasn't the text
10     message.
11 Q.  Well, you've described what it was previously.
12     We'll stay with that.  Has that email that you
13     referred to in your testimony here today, is it
14     on your black cell phone?
15 A.  No.
16        MS. LAUGHBAUM:  There was no -- you
17     misstated.
18        THE WITNESS:  You said email.
19 BY MS. HARDY:
20 Q.  All right.  Or text.  I'm sorry.  What is the
21     first date of text -- a text message on that
22     phone and what is the first email date on that
23     phone?
24 A.  Email?
25 Q.  Yes.  Do you -- you have emails on that phone?

---

Page 172

1  A.  None from Billy.
2  Q.  Well, just any email.  I'm trying to identify
3     when that phone went into effect, when you
4     started using it.  So when did you receive your
5     first email and your first text on the black cell
6     phone that you have in your hand?
7  A.  Well, showing you my first email on this phone
8     doesn't validate the day that I received the
9     phone.  I could have gotten emails previous to
10     that and erased them.  That doesn't validate the
11     day that I received the phone, my first email.
12 Q.  Well, just tell me what the first email is.
13 A.  So you want me to leave out of this?  You don't
14     want to know --
15 Q.  Well, just answer my question.  We'll take them
16     one at a time.  What's the first email on the
17     black phone?  What's the date of it?
18 A.  I don't -- emails come from particular people.  It
19     doesn't just say this is the first email you've
20     ever sent from your phone.
21 Q.  I'm not -- maybe you have deleted some.  We'll
22     determine that at a later date, but what shows up
23     on the phone as it currently exists in your hand
24     as the first email?  What's the oldest email on
25     that phone?

---

JOHNSON, DEANNA RENAE
10/07/2019



Pages 173-176

Page 173

1    A.   October the 4th.
2    Q.   All right.  October 4th.  What is the oldest text
3         on that phone?
4              MS. LAUGHBAUM:  I'm going to object.  I
5         don't think there's a way to determine that within
6         less than a couple of hours.
7    BY MS. HARDY:
8    Q.   You can put in your search function -- put in
9         October 4th and see what comes up.
10   A.   In my inbox for email?
11   Q.   No, for your text.  I'm asking about text right
12        now.
13   A.   Okay.  Because you switched it.  You were asking
14        about emails.
15   Q.   I know, but I switched to texts.  Because you
16        answered the emails --
17             MS. LAUGHBAUM:  You know, object.
18        That's not going to tell you anything unless
19        somebody typed the word "October" to her at some
20        point.  That's not the way email works -- or text
21        messages, rather.
22   BY MS. HARDY:
23   Q.   What is the oldest Markavich text on your black
24        cell phone that you have in your hand?
25   A.   I have several messages from Billy, group texts

Page 174

1         and texts just from him.
2    Q.   What is the oldest text that Markavich is a party
3         to on your black cell phone?
4    A.   That Markavich is --
5    Q.   A party to.
6    A.   That's a party to?
7    Q.   Yes.
8    A.   November the 12th.
9    Q.   All right.
10             MS. HARDY:  Let me -- let the record
11        reflect I'm showing the witness Exhibit No. 4.  It
12        is an email from Mr. Harris to DeAnna Johnson
13        dated November 27, 2008, at 10:16 a.m.  And it has
14        been Bates stamped by Ford Motor Company 340.
15   BY MS. HARDY:
16   Q.   Did you receive this email from Mr. Harris at
17        10:16 a.m. on November 27?
18   A.   On November 27th?
19   Q.   Yes.
20   A.   This is to my Ford account.  I'm sorry.  Where did
21        he email this to?
22   Q.   Well, that has nothing to do with it.  It says to
23        DeAnna Johnson.  It does not have an email
24        address on the face of Exhibit No. 4.
25   A.   But on the 27th, I think I was not there.  What

Page 175

1         was my last day at Ford?  Sorry.  Oh, okay.  Okay.
2         I see it.  I'm sorry.
3    Q.   At the bottom it indicates -- I just see your
4         counsel pointed to it.
5    A.   Yes, I was at home.
6    Q.   djok123123@hotmail.com.  So you received this
7         email on November 27 on your personal email
8         account from Mr. Harris; correct?
9    A.   Yes.
10   Q.   10:16 a.m.; correct?
11   A.   Yes.
12   Q.   Now, you hadn't spoken to him earlier that
13        morning, had you?
14   A.   If I recall, yes.
15   Q.   Did you talk to him by phone?
16   A.   Yes.
17   Q.   And what brought that about?
18   A.   He -- if I recall, if this is the day after I left
19        the plant, he called me starting at about 7:00
20        a.m., maybe earlier than that, asking me for
21        request to bring my phone in.  He started at about
22        7:00 a.m. with that and sending me -- and also
23        calling me asking me for -- to sign the paperwork
24        so they can do a search and seize of my home --
25        things in my home.  He called it -- he called me

Page 176

1         before he sent me this.
2    Q.   Did you ask him after you received this email
3         why, if he had these questions, he didn't ask
4         those of you in the phone call he allegedly made
5         prior to sending the email?
6    A.   Can you just repeat that again.
7              MS. HARDY:  Can you read it back.
8              (The requested portion of the
9         record was read by the reporter at
10        2:34 p.m.
11             "Q:  Did you ask him after you
12        received this email why, if he had
13        these questions, he didn't ask
14        those of you in the phone call he
15        allegedly made prior to sending the
16        email?")
17             THE WITNESS:  No, I didn't.  I just
18        complied with whatever he sent me.  I didn't ask
19        him, why didn't you -- it's like a confrontational
20        ask.  No.  I don't remember that.
21             MS. HARDY:  Let the record reflect I'm
22        showing the witness Exhibit No. 5, which is an
23        email that was sent by Ms. Johnson on her personal
24        hotmail account --
25             MS. LAUGHBAUM:  Can I have a copy,

JOHNSON, DEANNA RENAE
10/07/2019



Page 177

1     please.
2                 MS. HARDY:  Yes.  Here's one for you.
3                 -- to Mr. Harris on November 27 at
4     10:20 a.m.
5     BY MS. HARDY:
6     Q.  Did you send this email?
7     A.  Yes, I did.
8     Q.  Okay.  And it says, "Good morning.  I need to
9         speak with you.  Again, I was very scared and
10        nervous yesterday and did not say everything.
11        Could you give me a call at 313.454.8825";
12        correct?
13    A.  Correct.
14    Q.  Okay.  Well, if you had things to say to
15        Mr. Harris that you hadn't told him the prior day
16        of November 26, why didn't you discuss those with
17        him when he allegedly called you at 7:00 a.m.
18        that morning?
19    A.  Because when he called me at 7:00 a.m. that
20        morning, he wasn't trying to hear that.  His whole
21        main objective was to get me to sign, to come in
22        to have my phones brought in and then we would
23        discuss everything else after that.  His whole
24        objective was to sign the paper.
25    Q.  I'm not asking what his objective was.  You had

Page 178

1         him on the phone, allegedly.  So why didn't you
2         say, "I didn't tell you everything yesterday.
3         I've got more to tell you?"  Why didn't you tell
4         him when you had him on the phone that morning?
5     A.  Give me one moment.  Les Harris, the first day
6         that I went in his office and I complained, I sent
7         him this email.  When I sent this email, he called
8         me right back.  I explained everything to him.
9         But that morning -- let me see.
10    Q.  You went in his office on November 26.  This
11        email is dated November 27, the following day;
12        correct?
13    A.  Correct.
14    Q.  Okay.  So you went in his office.  You spent a
15        long time with him and he produced Exhibit -- the
16        interview investigation summary, which is Exhibit
17        No. 3 in this case.
18    A.  No.
19    Q.  We've already covered Exhibit No. 3.
20    A.  Oh, okay.
21    Q.  All right?  And then the following morning, you
22        had numerous email exchanges with him, including
23        this document which is Exhibit No. 5.  So my
24        question is, if he had supposedly called you
25        prior to 10:20 a.m., which is the time of the

Page 179

1         November 27 email, why didn't you bring up that
2         you had more to tell him about your complaint
3         that you made on November 26, if that was the
4         case?
5     A.  When he called me that morning, he called me about
6         the cell phones.  I don't recall if I did not
7         bring that up to him, actually.  His whole motive,
8         what he called me -- I'm telling you, the whole
9         conversation -- when he contacted me, he contacted
10        me and started telling me about the cell phones
11        and bringing the cell phones in.  I didn't just
12        rudely interrupt him and say, "Hey, wait a
13        minute," but I did tell him after we talked about
14        that.  I don't quite remember how everything that
15        we spoke about on that day, but I did tell him.  I
16        did tell him.
17    Q.  You told him in the phone conversation at 7:00
18        a.m. the very thing you tell him in Exhibit 5 at
19        10:20 a.m.?
20    A.  Well, you know what -- Ms. Hardy; right?
21    Q.  Yes.
22    A.  Okay.  Well, Ms. Hardy, when he contacted me
23        first, the day prior to that, I had told him
24        everything.  This was a very hard thing that I
25        went through.  The next morning, regardless --

Page 180

1         yes, he was nice, but the next morning, he didn't
2         call to ask me about was there anything else.  I
3         knew I had something else.  He contacted me about
4         the cell phones.  During that time about the cell
5         phones, that's what he was badgering me about.  I
6         didn't -- maybe I didn't get a chance to tell him
7         or maybe I did tell him.  I'm not sure of what
8         else went on in that conversation.  If I didn't
9         tell him, maybe I told him some things and maybe I
10        add -- had more things to add at this point.  I'm
11        not quite sure because I don't really recall the
12        entire situation.  I recall this.  Maybe this was
13        more that I had to add on.  I'm not quite sure.
14    Q.  And when you refer to "this," you mean Exhibit
15        No. 5?
16    A.  Yes, I do.
17    Q.  What did Mr. Harris do or say that warrants you
18        referring to him as badgering you?
19    A.  When you call me at 7:00 a.m. in the morning,
20        you're not asking me how I'm feeling or my ordeal.
21        You're calling me saying "I really need you to
22        hurry up, come back, bring those phones.  I need
23        you to bring both of your phones in.  I need you to
24        bring your phones in now."  Conversation after --
25        phone call after phone call and then email,

JOHNSON, DEANNA RENAE
10/07/2019



Page 181

```
1    sending me emails to sign waivers, email to sign a
2    waiver to search my home, having other people to
3    call me to schedule appointments for me to come in
4    to Dearborn main office and all of that, and then
5    another gentleman calling me.  It was
6    overwhelming.  You weren't asking me about my
7    feelings.
8  Q.  You knew as of November 28 that the waiver
9        concerning a search of your home had been
10       accidentally sent to you, and Mr. Harris had
11       already apologized for that; correct?
12  A.  In your words.  I know he claimed that it was an
13       accident.
14  Q.  You -- you know he said it was an accident and
15       that he apologized in writing; correct?
16  A.  I know he claimed that it was an accident and he
17       apologized in writing.
18  Q.  And what basis do you have for contesting that
19       that's the absolute truth?
20  A.  He sent me -- because he sent me an email
21       apologizing?  I'm sorry.  What were you saying?
22  Q.  If Mr. Harris says, "It was truly an accident,
23       and that's why I told her it was an accident and
24       I apologized," what basis do you have for
25       challenging that as an accurate and truthful
```

Page 182

```
1        statement on his part?
2  A.  The same basis I would suggest that you would have
3        to challenge me in this of what we're doing here.
4        This is what we're doing here; right?  This is how
5        I felt.  He -- I don't think that he was -- he was
6        badgering me and that's how I felt.  "You didn't
7        call to ask me about anything else or if I had
8        anything else to say.  You called me about getting
9        my cell phones in and having my house searched."
10  Q.  Why should he call you after a long interview on
11       November 26 to ask you if you have anything else
12       to say?  Why would you expect that of him?
13  A.  I don't know.  Maybe it's because he called me to
14       tell me that I needed my phone searched.  Maybe he
15       could have told me that when I was there when I
16       gave up my phones the first time.
17  Q.  Do you think there's anything wrong with Ford
18       Motor Company asking you to make your phones
19       available so they can find the evidence that
20       you're referring to with the dates that you can't
21       remember from your text messages on your phone?
22  A.  Not at all.  I provided my phone calls.  That's
23       how you should have all the pictures that Les
24       Harris took off of my phones of Nick Rowan's penis
25       and different things.  I sent those pictures to
```

Page 183

```
1        Les Harris' cell phone as well as emailed them to
2        Les Harris' account, so I had no problem with
3        getting -- with my phone whatsoever.
4  Q.  And you had no problem with having your phone
5        searched?
6  A.  None whatsoever.
7  Q.  Okay.
8  A.  I agreed to that.
9  Q.  Okay.  And you thought that was fully appropriate
10       as a way for Ford to make sure that it had all
11       the evidence?
12  A.  Of course.
13  Q.  Okay.
14           MS. HARDY:  Let the record reflect I'm
15       showing the witness Exhibit No. 6, which is a
16       series of email exchanges between Ms. Johnson and
17       Mr. Harris.
18  BY MS. HARDY:
19  Q.  Take a moment and review the content of
20       Exhibit 6, please.
21           MS. HARDY:  For the record, Exhibit 6
22       has been Bates stamped by Ford Motor Company 344
23       and 345.
24  BY MS. HARDY:
25  Q.  Are you okay to continue or do you want to take a
```

Page 184

```
1        break?
2  A.  Reliving it --
3  Q.  You can take a break if you'd like.
4  A.  I'm sorry.  Please just give me a moment.
5           MS. HARDY:  Why don't we take a break.
6           VIDEO TECHNICIAN:  Going off the record
7        at 2:45 p.m.
8               (Off the record at 2:45 p.m.)
9               (Back on the record at 2:54 p.m.)
10          VIDEO TECHNICIAN:  We're back on the
11       record at 2:54 p.m.
12  BY MS. HARDY:
13  Q.  All right.  Ms. Johnson, please take a moment and
14       review Exhibit No. 6, which is a series of emails
15       between you and Mr. Harris that occurred starting
16       at 10:40 a.m. on November 27 and concluding with
17       an email that you sent him at 11:00 a.m. on
18       November 27.
19           Have you reviewed it?
20  A.  Yes.
21  Q.  Okay.  So let's go over the sequence of
22       communications via email between you and
23       Mr. Harris on November 27.  At 10:20 a.m., you
24       sent him an email, and that's Exhibit 5, saying
25       "I need to speak with you again.  I was very
```

JOHNSON, DEANNA RENAE
10/07/2019



Pages 185–188

Page 185

1    scared and nervous yesterday and did not say
2    everything.  Could you give me a call..."
3            And you provide your phone number;
4    correct?
5  **A.**  **Correct.**
6  Q.  Okay.  And he called you immediately; correct?
7  **A.**  **No, he didn't call me immediately.  It took a**
8      **little time.  He was just a little busy.**
9  Q.  How much time did it take for him to call you?
10  **A.**  **I'm not quite sure but it wasn't immediately.**
11  Q.  Well, give me an estimate.
12  **A.**  **I'm sorry.  I can't give you an estimate.  I don't**
13      **recall how long but I know it wasn't --**
14  Q.  Was it -- was it -- I'm sorry.  It was my fault.
15  **A.**  **I'm sorry.  Maybe could have been an hour later or**
16      **something.  It wasn't -- I know it wasn't**
17      **immediately.  He didn't immediately call me back.**
18  Q.  It was at least an hour?
19  **A.**  **It could have been.  I don't recall the time but I**
20      **know it wasn't immediately at that point.**
21  Q.  Well, I don't mean immediate as within
22    30 seconds, but he called you very shortly
23    thereafter; correct?
24  **A.**  **Correct.**
25  Q.  Correct?

Page 186

1  **A.**  **Correct.**
2  Q.  Yes.  Okay.  And you told him what you didn't
3    tell him on November 26; correct?
4  **A.**  **Yes, of what I thought I didn't tell him.**
5  Q.  Okay.  And then he put in an email to you a
6    summary of what you told him in the morning of
7    November 27, and sent that to you to review and
8    asked you if you could please respond that these
9    are the things you told me on the phone this
10    morning; correct?
11  **A.**  **Yes.**
12  Q.  Okay.  All right.  So look at Exhibit No. 6.  The
13    email at 10:40 a.m. on November 27 reflects the
14    email that Les Harris sent to you after hearing
15    the additional points you wanted to make, and he
16    summarized them in an email and sent them back to
17    you at 10:40 a.m.; correct?
18  **A.**  **Correct.**
19  Q.  Okay.  And then you read what he wrote from your
20    phone interview and sent him an email at 11:00
21    a.m. on November 27, and in responding to his
22    question about whether these are the things that
23    you told me on the phone, you indicated, "That is
24    exactly right," and then you went on to tell him,
25    "I told Billy also he hurt my feelings very bad

Page 187

1    when he said that he apologized for being so mean
2    but it didn't make me comfortable enough to
3    explain the situation I'm sure he knew about."
4            That's what you wrote; correct?
5  **A.**  **Correct.**
6  Q.  Okay.  So in sending your 11:00 a.m. email,
7    you're agreeing that Mr. Harris accurately
8    described your second investigatory interview
9    with him, the one that occurred over the phone on
10    the morning of November 27; correct?
11  **A.**  **When I spoke with Mr. Harris again when he contact**
12      **me back and I told him everything, Mr. Harris --**
13      **and before -- looking over my notes, when I went**
14      **to Les Harris, Les Harris -- first of all, let me**
15      **say this.  I didn't see a copy of my complaint at**
16      **all from Les Harris.  I never had seen a copy of**
17      **my full complaint.  Mr. Harris was very nice, but**
18      **he didn't type this out.  This was afterwards.**
19      **Mr. Harris took notes.  He took pictures.  He took**
20      **texts from my phone.  He took my phone and helped**
21      **me send messages to his self because I couldn't --**
22      **I didn't quite know how to do it and I was just**
23      **blubbering all over the place.  So all of the**
24      **things that I told Mr. Harris, different notes,**
25      **things that I know that he took down that was**

Page 188

1    **fresh in my memory at that time, I don't know if**
2    **he just kind of -- what's the words I'm looking**
3    **for?  He just put everything together.  He kind of**
4    **sort of like he kind of Ziploc'd it up maybe, but**
5    **I don't know where is -- it's a lot of things that**
6    **we discussed that kind of don't kind of go a**
7    **little bit.  There are words in there --**
8  Q.  Let's stay focused, okay, on Exhibit No. 6.  Look
9    at the email at 10:40 a.m. and look at the last
10    line on page 1, page 1 of the email, the very
11    last line.
12  **A.**  **Exhibit 6, the very last line.**
13  Q.  Of page 1 of Exhibit No. 6.
14  **A.**  **I'm sorry.**
15  Q.  Okay.  The very last line says "Can you please
16    respond that these are the things you told me on
17    the phone this morning?"
18            And above that question is his
19    recitation of what you told him on the phone the
20    morning of November 27; correct?
21  **A.**  **Correct.**
22  Q.  Okay.  And when he asked you to confirm in
23    writing that he accurately described everything
24    you told him on the phone on the morning of
25    November 27, you responded at 11:00 a.m., "That

JOHNSON, DEANNA RENAE
10/07/2019



---

Page 189

1   is exactly right"; isn't that correct?  Look at
2   the top of Exhibit No. 6, the first line.  See
3   the words "That is exactly right"?
4   A.   Yes, I see those words.
5   Q.   Those are your words; correct?
6   A.   Those are my words.
7   Q.   And you're referring to his description of your
8        phone conversation with him on November 27, and
9        the recitation that he provided at 10:40 a.m.;
10       correct?
11   A.   Here's the thing.  We also had conversations on
12        that day.  So it wasn't that this was all exactly
13        right.  I could have been telling him everything
14        is exactly right from us talking about the whole
15        thing.  We talked -- we talked over the phone and
16        about certain things that, I guess, was going to
17        go on my statement.  I want to say, yes, all of
18        this is right but it's more things that is just
19        this.
20   Q.   All right.  Everything -- let's take it this way.
21   A.   Okay.
22   Q.   When Mr. Harris sent you the email at 10:40 a.m.
23        and described what you had said to him in your
24        phone conversation with him that morning, he
25        accurately described what you reported on the

Page 190

1        morning of November 27; correct?
2   A.   I don't think he accurately reported it all.
3   Q.   All right.  Tell me what's inaccurate about what
4        he wrote on Exhibit No. 6 on the email that's
5        dated November 27 at 10:40 a.m.  What is
6        inaccurate, if anything?
7   A.   I don't see in here where he -- where I told him
8        that -- how they had to get me away from him.  I
9        don't see in here where they switched me to
10        another line.  I don't see all these things Les
11       wrote down.  I don't see where they -- when I told
12        him they moved me, you know, away from the
13        problem, I don't see in here -- with me telling
14        him -- they said, "Oh, that's just Nick.  Don't
15        worry about him."  I don't see that.  I don't see
16        anything in here about Billy saying how eccentric
17        Nick was and he's just weird, just eccentric.  I
18        don't see that.  I told Les that.
19             So I don't understand -- I know --
20        maybe he tried to sum it up but I know he took
21        several notes as well, so maybe he tried to sum it
22        up but I'm just saying these things are correct.
23        They are correct here.
24   Q.   All right.  So --
25   A.   It was just not everything.

Page 191

1   Q.   -- everything is correct.  Is there anything else
2        that's missing other than what you just
3        identified?
4   A.   I can't recall everything at this time but I know
5        those things I remember.
6   Q.   Well, take your time and tell me anything that
7        you can recall that you told Les Harris on the
8        morning of November 27 that's not reflected in
9        his 10:40 a.m. email.  And if the list is
10        complete, then we can move on.
11   A.   I can't say the list is complete.  I can only say
12        that we discussed a lot of things that are not in
13        here.
14   Q.   Is there anything more you can recall that --
15   A.   Not at this time.
16   Q.   -- that's not in there that you have identified?
17   A.   I'm sorry.  I can't recall any more at this time.
18   Q.   What did you mean when you said "I told Billy he
19        hurt my feelings very bad" and "when he said that
20        he apologized for being so mean"?
21   A.   I meant that when I tried to tell Billy about the
22        things about -- things about Nick Rowan or
23        anything that I would come to him within that, he
24        was not forthcoming.  This is when he hurt my
25        feelings really bad probably because of the

Page 192

1        situation where he says, "Look at my face.  I
2        don't give a fuck about you or your back.  I don't
3        give a fuck about your problems, your grandmother,
4        whatever you're going through."
5             That would make any person not feel
6        comfortable talking to their superior after being
7        talked to like that, so that is what I could have
8        meant.  I'm not sure.  Les, like I said, once
9        again, he took a lot of notes so maybe it could be
10        more there.
11   Q.   How do you know Les was taking notes when you
12        were on the phone with him?
13   A.   Because he says, "Hold on.  I have to write this
14        down.  You're going too fast."
15   Q.   If there was something that was important that
16        was missing from his summary email that he sent
17        you at 10:40 a.m., why didn't you point that out
18        in your response to him?
19   A.   Probably because this was such a horrific act
20        towards me.  Crying so hard constantly, you don't
21        remember everything the same that moment.  You
22        just might not remember every single thing that
23        should be in here, you know.  It's like you look
24        at it later and you go, "Oh, my gosh.  Why didn't
25        he put that in there?  We talked about that."  I

JOHNSON, DEANNA RENAE
10/07/2019


Page 193

1    just didn't recall.  I just didn't -- at that
2    time, I was just very upset.
3    Q.  But at 11:00 a.m., when you responded to him, you
4        did make several comments in the email.  Why
5        didn't you include the things that you claim he
6        left out of his summary if they were important
7        items for the record?
8    A.  Because I knew that he was taking notes and I
9        figure if he was the head of HR, he has all the
10       notes and he has the responsibility to show them,
11       so you would know this, so you wouldn't be sitting
12       here having to ask me this.  He's HR.  I figured
13       he would know how to do that.
14   Q.  That's the best -- that's the best response you
15       have?
16   A.  That's the response that I have.
17               MS. HARDY:  Let the record reflect I'm
18       showing the witness Exhibit No. 7, which is a
19       series of text messages that have been Bates
20       stamped 127 through 131.
21   BY MS. HARDY:
22   Q.  Take a moment and review these, Ms. Johnson.
23   A.  They're all the same.  There are only two text
24       messages on four pages.
25   Q.  Okay.  Who are these text messages between?

Page 194

1    A.  They're between me and Mr. Markavich.
2    Q.  And what is the time period when these text
3        messages occurred?
4    A.  I seen that it was screen shot on 11/29, but that
5        wasn't the date that they occurred.
6    Q.  When did they occur?
7    A.  I'm not sure.  I don't recall.
8    Q.  Okay.
9    A.  I have them -- I have them as well.
10   Q.  All right.  And Mr. Markavich is apologizing for
11       getting upset with you and telling you he didn't
12       care about you; correct?
13   A.  Again.
14   Q.  Okay.  And he apologizes in writing to you;
15       correct?
16   A.  Uh-huh.
17   Q.  Yes?
18   A.  Yes.
19   Q.  Okay.  And he apologized other times verbally;
20       correct?
21   A.  Correct.
22   Q.  Okay.  Is this the last time you communicated
23       with Mr. Markavich about him saying "I'm sorry"?
24   A.  I don't recall.  He said "I'm sorry" so many
25       times, and they got more and more -- "I'm sorry,"

Page 195

1    he says.  I started to tell more and more and as
2    he knew I was going to go to HR, so the apologies
3    came rather frequently after that.  I don't think
4    no one should have to have that from their
5    supervisor, constant apologies, so they came a
6    lot.
7    Q.  All right.  When did you first seek medical
8        attention related to what you claim occurred with
9        Nick Rowan?
10   A.  I would have to say it was the day that I was
11       carried out of Ford Motor Company.
12   Q.  All right.  And what happened on that day?
13   A.  On that day I can't quite recall everything that
14       happened on that day.  I just remember getting
15       lewd pictures again.  I don't know if it was that
16       day or the day before or week before, but I know
17       Billy had just recently again cursed me out; Rich
18       Mahoney had recently cursed me out.  I was crying
19       really hard from the cursing out from Billy.  I
20       went in the back -- outside in the back where I go
21       every lunch hour and break.  I went out there and
22       I sat down because my head started hurting me
23       terribly, and the next thing I know, one of the
24       employees picked me up.  I don't remember them
25       picking me up.  They put me on a cart and I was on

Page 196

1    my way to medical.
2    Q.  All right.  So let's take the week before you
3        went to Beaumont.  What had happened in the week
4        prior?  Do you have any recall whatsoever?
5    A.  Constant asking for the -- for pics.  I don't
6        recall everything that happened that week.  I
7        don't recall everything that happened the week
8        before that.
9    Q.  Well, do you recall anything of significance that
10       happened in the prior week that related to Nick
11       Rowan and offensive conduct?
12   A.  Yes.  Sending me -- just constantly harassing me,
13       asking me to "Let me see those black mounds.  Let
14       me see those brown mountains.  Send me a picture
15       when you go to the bathroom.  Where's my pic?
16       Everything I do for you and, look, I don't get
17       anything in return."
18   Q.  When you went to the hospital, what were you
19       treated for?
20   A.  High blood pressure.
21   Q.  Anything else?
22   A.  No.
23   Q.  Did you have any medical conditions at that time?
24   A.  No.
25   Q.  Did you have any encounters with Mr. Rowan on the

JOHNSON, DEANNA RENAE
10/07/2019



Page 197

1    day that you went to the hospital, that you
2    passed out and went to the hospital?
3 A.  He sent me a text and said he shouldn't have sent
4    me that picture of his erect penis.  That's
5    probably what made me fall out.
6 Q.  So the same day you went to Beaumont you got a
7    text from Nick Rowan saying he should not have
8    sent you a picture of his erect penis?
9 A.  I won't say it was the same day.  It could have
10   been the next day but I'm not sure.  It was in
11   that frame, but that's what the text said, "I
12   shouldn't have never sent you that picture."
13 Q.  Well, it couldn't have been the day after you
14   went to the hospital.  It had to be before;
15   right?
16 A.  Yeah.  I'm sorry.  Yeah, it had to be, because he
17   sent the picture.
18 Q.  All right.  So when did he send the picture to
19   you in connection with when you went to the
20   hospital?
21 A.  I'm not sure.  I don't recall.  It could have been
22   that day or the day before.  It was within the
23   three-day time frame or some days time frame.  No.
24   Excuse me.  Not three days.  I don't quite
25   remember what days it was.  But the picture was

Page 198

1    the over-the-top picture, and right after that,
2    everything just -- the blood pressure, the stress,
3    it just all went from there.
4 Q.  Okay.  So right before you passed out and went to
5    Beaumont, he sent you, one, the picture of his
6    penis, and then he also sent you a text saying "I
7    should not have sent you a picture of my erect
8    penis"?
9 A.  He sent me the text saying he shouldn't have sent
10   it after I went to the hospital.  The picture came
11   before I went to the hospital; the text came
12   after.
13 Q.  The text saying "I should not have sent you a
14   picture of my erect penis" came after you went to
15   the hospital?
16 A.  Yes, insinuating that's why I passed out, because
17   of his penis.
18 Q.  All right.  And did he send you an email -- I'm
19   sorry.  -- a text saying "I should not have sent
20   you a picture of my erect penis while you were
21   still in the hospital"?
22 A.  I don't know when that text came through.
23 Q.  Was it while you were on leave -- on medical
24   leave?
25 A.  No.  That was right after I went to the hospital

Page 199

1    for my blood pressure.  I'm not quite sure of the
2    exact day.  I'm not -- excuse me.  I'm not quite
3    sure of the exact date like --
4 Q.  Well, I'm not -- because you can't remember dates
5    per se, I'm trying to relate events to other
6    events.  So were you back at work when you got an
7    email from him saying "I should not have sent you
8    a picture of my erect penis" or were you still
9    off of work?
10         MS. LAUGHBAUM:  Objection.  It's a text
11   and you're mischaracterizing the content of the
12   text, but go ahead.
13 BY MS. HARDY:
14 Q.  When did you receive that text?  While you were
15   off on medical leave or after you returned?
16 A.  I'm not quite sure.  I don't recall.
17 Q.  When you were being treated at Beaumont, did you
18   describe the events that had happened that had
19   caused you so much stress that you passed out?
20 A.  I didn't so much as describe the events.  I said,
21   "I have a guy on my job that's harassing me.  It's
22   horrible."  And she -- and the doctor there goes
23   you have one of the most stressful jobs in
24   America.  Don't let him get to you.  They had gave
25   me medication.  I was near what -- what Ford --

Page 200

1    nurses/medical were saying I was near stroking
2    out.  My blood pressure was in the hundreds over
3    the hundreds.  You have it in your paperwork.  So
4    I don't quite remember a lot during that moment
5    from the medication to my head feeling like it's
6    going to explode.
7 Q.  Who was the -- was it a physician at Beaumont
8    that you explained that you had been subjected to
9    harassment by a guy at work?
10 A.  I don't quite remember if it was the doctor or the
11   nurse or the triage nurse but it was someone in
12   there taking care of me.  I didn't pull anyone to
13   the side.
14 Q.  Okay.  And did you tell them anything else about
15   your situation that would shed light on what was
16   causing you to have medical problems at that
17   time?
18 A.  I don't recall.
19 Q.  Was there anything else going on with your
20   physical being or emotional being that was
21   causing or could have been causing medical
22   problems at that time?
23 A.  Oh, no.  Nothing at all.
24 Q.  Have you received any kind of professional
25   counseling or care for emotional or mental health

JOHNSON, DEANNA RENAE
10/07/2019



Pages 201–204

Page 201

| 1 | | problems prior to your work at Ford Motor |
| 2 | | Company? |
| 3 | A. | I've been to therapy before, before Ford Motor |
| 4 | | Company, yes. |
| 5 | Q. | Okay. Over what period of time? |
| 6 | A. | I don't recall the exact dates. |
| 7 | Q. | Who have you treated with for emotional or mental |
| 8 | | health problems prior to becoming employed at |
| 9 | | Ford? |
| 10 | A. | It's a while back. I can't quite remember at this |
| 11 | | time. |
| 12 | Q. | You can't recall anyone that you treated with? |
| 13 | A. | Not at this time. It's been a while. |
| 14 | Q. | Well, prior to becoming employed in June 2018 at |
| 15 | | Ford Motor Company, when had you last received |
| 16 | | any kind of professional counseling or care for |
| 17 | | emotional or mental health problems? |
| 18 | A. | Years before I started working at Ford. |
| 19 | Q. | Like five years? Ten years? |
| 20 | A. | I'm not quite sure. |
| 21 | Q. | Or more than that? |
| 22 | A. | I'm not quite sure. Not ten years, but I'm not -- |
| 23 | | I'm not quite sure. |
| 24 | Q. | More than five years prior to starting at Ford |
| 25 | | Motor Company? |

Page 202

| 1 | A. | I can't recall that time and I want to be |
| 2 | | accurate. I don't want to say five years and you |
| 3 | | say, "Hey, look, I see it's two years." So I want |
| 4 | | to be accurate with you; so I don't recall really |
| 5 | | at this time. |
| 6 | Q. | What did you receive treatment for that relates |
| 7 | | to my question? |
| 8 | A. | I don't think that I can answer that. |
| 9 | Q. | Why not? |
| 10 | A. | I think that's a private concern. |
| 11 | Q. | Pardon me? |
| 12 | A. | I don't think that that's -- what I was treated |
| 13 | | for then has any bearing on what's going on. |
| 14 | Q. | Well, it does have a bearing and you are required |
| 15 | | to answer the question. |
| 16 | A. | I didn't know. |
| 17 | Q. | Yeah. |
| 18 | A. | I didn't know. |
| 19 | Q. | Okay. |
| 20 | A. | I was -- I was treated for an injury. |
| 21 | Q. | What was the injury? |
| 22 | A. | I don't know that I'm allowed to say. |
| 23 | | MS. LAUGHBAUM: Is it related to the |
| 24 | | confidential matter -- |
| 25 | | THE WITNESS: Yes. |

Page 203

| 1 | | MS. LAUGHBAUM: -- that you raised |
| 2 | | earlier? |
| 3 | | THE WITNESS: Yes. So how would I -- |
| 4 | | MS. LAUGHBAUM: Do you know what? Let |
| 5 | | me step out for a minute. |
| 6 | | MS. HARDY: All right. I don't think |
| 7 | | that's necessary, but I'm also not going to create |
| 8 | | an incident over it. |
| 9 | | VIDEO TECHNICIAN: Off the record at |
| 10 | | 3:19 p.m. |
| 11 | | (Off the record at 3:19 p.m.) |
| 12 | | (Back on the record at 3:25 p.m.) |
| 13 | | VIDEO TECHNICIAN: We're back on the |
| 14 | | record at 3:25 p.m. |
| 15 | BY MS. HARDY: |
| 16 | Q. | I asked you what the injury was that you |
| 17 | | testified to that you received emotional or |
| 18 | | mental health counseling in connection with. |
| 19 | | What is the injury? |
| 20 | A. | I was sexually assaulted. |
| 21 | Q. | Okay. And when was that? |
| 22 | A. | I think 2012 or '15. I'm not quite sure. I don't |
| 23 | | recall the date. And why don't I recall it? |
| 24 | | Because I put it in the back of my mind. |
| 25 | Q. | I'm sorry. I didn't hear what you said. 2000 -- |

Page 204

| 1 | A. | '15 or '12. 2012 or '15. I can't quite -- I |
| 2 | | can't quite remember. |
| 3 | Q. | Was that during the course of your employment at |
| 4 | | Z Technologies? |
| 5 | A. | Yes, it was. |
| 6 | Q. | Is that the basis of the sexual harassment |
| 7 | | lawsuit you filed in March 2017? |
| 8 | A. | For Z Technologies? |
| 9 | Q. | Yes. |
| 10 | A. | Yes, it is. |
| 11 | Q. | Okay. All right. And that's the case in which |
| 12 | | Ms. Bogas represented you? |
| 13 | A. | Yes. |
| 14 | Q. | Okay. And did you proceed with discovery in that |
| 15 | | case? Were you deposed in that case? |
| 16 | A. | No. |
| 17 | Q. | All right. Did you settle that case almost |
| 18 | | immediately after it was filed? |
| 19 | A. | No. |
| 20 | Q. | Okay. How long did that case proceed before it |
| 21 | | was settled? |
| 22 | A. | Maybe a year. I'm not quite sure. I don't quite |
| 23 | | recall. |
| 24 | Q. | All right. And what do you claim occurred in the |
| 25 | | workplace that was the basis of your sexual |


Page 205

1      harassment claim?
2  **A.**  **I don't think I can speak on that.**
3  Q.  You can speak on that. It's a public pleading.
4  **A.**  **Tell me -- tell me again your question.**
5  Q.  I want to know what you alleged in that lawsuit
6      had been done to you that constituted sexual
7      harassment.
8  **A.**  **I didn't allege anything. He bent me over a desk**
9      **and tried to have sex with me when no one was in**
10     **the office. The bigger boss locked me in the**
11     **office so I could have sex with him -- so he could**
12     **do that to me. I wrote out an affidavit. They**
13     **both swore to it and signed it and apologized**
14     **profusely. And I walked away.**
15  Q.  All right. They wrote out an affidavit agreeing
16     with the facts that you just described on the
17     record?
18  **A.**  **Yes.**
19  Q.  And who's "they"?
20  **A.**  **The big boss, the plant manager.**
21  Q.  What was his name?
22  **A.**  **Wayne Hall.**
23  Q.  And did anyone else sign an affidavit attesting
24     to the facts that you've just described?
25  **A.**  **Yes, the gentleman who assaulted me.**

Page 206

1  Q.  And who was that?
2  **A.**  **Don -- I'm trying to think of Don's last name. I**
3     **can't think of his last name.**
4  Q.  So it is Don who allegedly bent over -- you over
5     the desk and tried to have sex with you in the
6     office?
7  **A.**  **He didn't allegedly. He admitted it.**
8  Q.  He admitted it in writing?
9  **A.**  **Yes.**
10  Q.  And it was an affidavit in the case of DeAnna
11     Johnson v. Z Technologies Corporation?
12  **A.**  **That is correct.**
13  Q.  All right. And it was filed with the court?
14  **A.**  **Yes, it was.**
15  Q.  Okay. And --
16         MS. LAUGHBAUM: I'm sorry. The case
17     was filed in court --
18         MS. HARDY: No, the affidavit.
19         MS. LAUGHBAUM: -- or the affidavit?
20         MS. HARDY: The affidavit.
21         MS. LAUGHBAUM: Do you know if the
22     affidavit was filed in court?
23         **THE WITNESS: I'm sorry. I don't know.**
24     **I don't know if the affidavit was filed in court.**
25         MS. LAUGHBAUM: Yeah, and let me just

Page 207

1     say for the record, I don't know what of this is
2     public record and what isn't, and I think you've
3     got enough on the record to know what the
4     situation was and can we please move on.
5         MS. HARDY: No. I have further
6     follow-up questions that relates to damages,
7     certainly, and credibility.
8  BY MS. HARDY:
9  Q.  Okay. So it's -- Don is the person who allegedly
10     tried to have sex with you; correct?
11  **A.**  **Don is the person who tried to have sex with me.**
12  Q.  All right. And --
13  **A.**  **It wasn't allegedly.**
14  Q.  -- was Wayne Hall allegedly there at the time?
15  **A.**  **No, he left.**
16  Q.  What did he observe or what did he know?
17         MS. LAUGHBAUM: I'm going to -- I'm
18     going to object. First of all, this is irrelevant
19     insofar as you've already established that she's
20     had some counseling over this incident. I don't
21     know why we need to get into the nitty-gritty of
22     exactly how she was assaulted. It just seems to
23     be a weird path.
24         MS. HARDY: I'm not getting into the
25     nitty-gritty. I'm trying to get the basic outline

Page 208

1     of the facts that she claims happened.
2         MS. LAUGHBAUM: All right. Well, she's
3     already told you that some of this is subject to a
4     -- an agreement -- a confidentiality agreement,
5     and we're not going to, you know, testify ad
6     nauseam about matters that might be protected.
7         MS. HARDY: I'm not going on ad
8     nauseam; I'm not.
9         MS. LAUGHBAUM: Well, you kind of
10     suggested that you would be beginning to.
11         MS. HARDY: No, I want the basic facts.
12  BY MS. HARDY:
13  Q.  So what did Wayne Harris allegedly observe?
14  **A.**  **Wayne Hall?**
15  Q.  Or Wayne Hall. I'm sorry.
16  **A.**  **He didn't observe anything. He locked me in the**
17     **room.**
18  Q.  Did he know Don was in the room with you?
19  **A.**  **We was the only two people in the entire building.**
20  Q.  Did -- did he observe Don do anything
21     inappropriate to you before he locked you in the
22     room?
23  **A.**  **I can't recall at that time. I believe so. I**
24     **can't recall details at that time. It's not**
25     **something I try to remember.**

JOHNSON, DEANNA RENAE
10/07/2019



Page 209

1   Q.   All right.  And that's what he attested to in the
2        affidavit, that he locked you in the room with
3        Don?
4   A.   **Yes.**
5   Q.   And did he acknowledge in the affidavit that he'd
6        seen Don sexually assault you?
7   A.   **I don't recall that.**
8   Q.   All right.  But Don admitted to sexually
9        assaulting you in his affidavit?
10  A.   **Yes, he did.**
11  Q.   Okay.  And you received counseling about the
12       emotional impact of this event?
13  A.   **Yes, I did.**
14  Q.   Okay.  And who did you get counseling with?
15  A.   **I got counseling with Sinai.**
16  Q.   Sinai-Grace?
17  A.   **Yes.**
18  Q.   Who at Sinai-Grace?
19  A.   **I don't recall at this time.**
20  Q.   At the crisis center at Sinai-Grace?
21  A.   **I went to the crisis center before.**
22  Q.   That's the same place you went in connection with
23       -- or following leaving Ford Motor Company?
24  A.   **Yes.**
25  Q.   Okay.  And how long did you get counseling in

Page 210

1        connection with what you claim happened at Z
2        Technologies?
3   A.   **Probably a year.  I'm not quite sure.  I don't**
4        **recall the exact amount of counseling.**
5   Q.   What was -- what were you diagnosed with at that
6        time?
7   A.   **I don't recall.**
8   Q.   When did you obtain counseling?  What year was
9        it?
10  A.   **I don't recall.**
11  Q.   Was it the same year you had pending litigation?
12  A.   **If I had pending litigation?  Are you asking me**
13       **did I have counsel?**
14  Q.   Well, your complaint was filed in March 2017.
15       Were you in counseling at that time?
16  A.   **Yes.**
17  Q.   Okay.  And you were in counseling for a year;
18       correct?
19  A.   **I'm not sure how long it was but I know I was in**
20       **counseling.  I don't recall the length of time.**
21  Q.   All right.  And was it inpatient or outpatient
22       counseling or a mixture of both?
23  A.   **It was -- it was outpatient.**
24  Q.   At all times it was outpatient?
25  A.   **I believe so.**

Page 211

1   Q.   I'm sorry.  I don't recall hearing what you said
2        the diagnosis was.
3   A.   **I don't think I did.**
4   Q.   You didn't receive a diagnosis?
5   A.   **I did receive a diagnosis.  I think -- I can't**
6        **recall.  I can't recall.**
7   Q.   All right.  Had you ever received any kind of
8        professional care or counseling for emotional or
9        mental health problems prior to going to
10       Sinai-Grace in connection with what you've
11       described as a sexual assault at Z Technologies?
12  A.   **No.**
13  Q.   When did you complete your counseling in
14       connection with the events you've described at Z
15       Technologies?
16  A.   **I don't recall.  I think I just told you I may**
17       **have went through counseling for about a year or**
18       **something.  I'm not quite sure.  I don't recall.**
19  Q.   Well, you -- I'm now asking when did you complete
20       it?
21  A.   **And I'm not quite sure.  I don't recall the time I**
22       **completed it, nor did I recall how long I had did.**
23       **I think it was maybe for a year or so.**
24  Q.   Did you assume that when Mr. Rowan allegedly made
25       reference to your black mounds, that that -- that

Page 212

1        that was referring to something racial in nature?
2   A.   **Of course I did.**
3   Q.   Why is that?
4   A.   **My black mounds?  You're asking me why I would**
5        **think that he would -- that would be a racial**
6        **comment?**
7   Q.   Yeah, what --
8   A.   **I'm sorry.  I had to make sure that's what you're**
9        **asking me.**
10  Q.   Yes, that is what I'm asking.
11  A.   **Because what else -- what would he be referring**
12       **to?  That's kind of a common sense.  There's no**
13       **black mountains at Ford Motor Company unless**
14       **there's some there that I hadn't seen before.**
15  Q.   Okay.  Did you ask him if it was racial or did
16       you just conclude it was because he had used the
17       word "black"?
18  A.   **I asked him and he says because I don't have any**
19       **of those in my collection, no black ones, no**
20       **chocolate ones in my collection of women.**
21  Q.   Okay.  All right.  Is there anything else that he
22       ever said or did that was racial in nature?
23  A.   **Other than call me a chocolate Jolly Rancher.  And**
24       **I asked him what was that and he goes, "That's**
25       **something walking -- you know, I'd like --**

JOHNSON, DEANNA RENAE
10/07/2019


EXHIBIT B

Pages 213—216

Page 213

1      something that's walking that I'd like to like
2      on." So he gave me that -- said that to me on
3      several occasions and I kept walking.
4  Q.  Okay. So he's called you on several occasions a
5      chocolate Jolly Rancher and he made reference to
6      black mounds and black mountains?
7  A.  Yes.
8  Q.  Okay. Is there anything else that he said that
9      you interpreted as being racial in nature?
10  A.  I can't recall at this time because it was always
11      black mounds constantly or -- it was always
12      something to the effect of "You're spicy,
13      chocolate," just always a comment -- constant
14      comment.
15  Q.  Well, if there's any other comment other than
16      what you've testified to, I want you to tell me
17      what it is.
18  A.  I can't remember everything. Those are what stick
19      out the most so far.
20  Q.  Is there anybody else at Ford Motor Company that
21      made any comments or engaged in any conduct that
22      you considered racially offensive?
23  A.  Racially offensive?
24  Q.  Yes.
25  A.  Not that I can recall at this time.

Page 214

1  Q.  Okay. Let's talk about your medical condition
2      since you began your -- strike that.
3            Let's talk about your medical condition
4      since your last day of work on November 25, 2018.
5            When you did not return to work
6      following November 25, did you seek medical
7      attention?
8  A.  I don't recall exact date that I sought medical
9      attention. I think -- I think on that first day
10      or two I probably just stayed at home. I think
11      it -- I think it took me a couple of days, I
12      think. My daughter had to -- to push me to go.
13  Q.  Do you know when you first went to get medical
14      attention?
15  A.  It maybe could have been less than a week later
16      because -- because I didn't want to leave out the
17      house. I was scared and hurt and I think my
18      daughter, maybe in December, maybe the 1st,
19      between the 1st and the 5th. I'm not quite sure.
20  Q.  Where did you go to get medical attention?
21  A.  I went to Sinai -- to urgent --
22  Q.  Do you need to stop?
23  A.  No. I'm fine, because this is going to make me
24      cry regardless. It just brings back -- it just
25      brings it all back, so I want to get through this.

Page 215

1  Q.  What prompted you on November 25, that specific
2      date, to go to Les Harris? Is there anything in
3      particular? Or -- I'm sorry. Strike that.
4            What prompted you on November 25 to go
5      to LaDawn Clemons?
6  A.  Because I kept -- I just kept replaying this stuff
7      over and over again in my mind, and Billy didn't
8      care; Rich didn't care; none of the guys on the
9      floor cared. Nobody cared. I thought about my
10      subordinates on his phone, the positions and the
11      sex videos, and them, and this was -- it just was
12      too much, him grabbing my breast and bruising my
13      breast. It was too much. It was over the top. I
14      had no one else to tell, and LaDawn had been nice
15      to me once. She gave me a bracelet and tell me to
16      try to keep going, to persevere over everything
17      because she could hear over the radio how
18      everything had changed, how the guys had started
19      treating me differently, and I just couldn't take
20      it any -- anymore. I tried. I just -- no one
21      should have to be subject to that, and Ford Motor
22      Company is not the only place I can work, and I
23      just decided on that day to go tell LaDawn.
24      That's what I did.
25  Q.  When are you claiming Nick Rowan grabbed your

Page 216

1      breast and bruised your breast?
2  A.  Whatever day you have that he says that that's --
3      I'm sorry. -- about my hand slippage. He texted
4      me and apologized about grabbing my breast.
5  Q.  Look at page 68 of the text messages which are
6      Exhibit 1.
7            Ms. Johnson, I think we should adjourn
8      this deposition. You do not appear to be in a
9      condition to be listening to and responding to
10      questions and it's important that you be able to
11      do so, and I don't want to have you be crying and
12      nor do I want my client to be in a position where
13      later on there's going to be a question about
14      whether or not we were asking you questions at a
15      time when you were not able to focus and respond
16      to the questions.
17  A.  Ms. Hardy, I'm sorry for my emotions, but it
18      doesn't matter if you adjourn today or we do this
19      tomorrow. It's not going to change how I feel.
20      It's not going make me cry any less tomorrow or
21      next week or whenever we do this. My feelings are
22      my feelings and this is something that I cannot
23      help. We can do it today. We can adjourn it for
24      3:00 in the morning and I'm going to be the same
25      way. I don't know what to tell -- to tell you.

JOHNSON, DEANNA RENAE
10/07/2019



Pages 217–220

Page 217

1  This is how I feel.  So it's up to you, but you're
2  going to get the same thing whether you do it
3  today or do it tomorrow.  It doesn't -- it doesn't
4  matter.  It doesn't matter.  It's up to you.
5              MS. LAUGHBAUM:  Well, it's actually up
6  to you.  So why don't we take a couple of minutes
7  and talk.
8              THE WITNESS:  Okay.
9              VIDEO TECHNICIAN:  Off the record 3:43
10  p.m.
11              (Off the record at 3:43 p.m.)
12              (Back on the record at 3:47 p.m.)
13              VIDEO TECHNICIAN:  We're back on the
14  record at 3:47 p.m.
15  BY MS. HARDY:
16  Q.  Are you able to proceed for a bit more?
17  A.  Yes, I am.
18  Q.  Okay.  I want you to understand that I am not
19      going to be able to complete your deposition
20      today, and if your counsel doesn't agree to have
21      you come back voluntarily, we'll ask the court to
22      require that you come back, and while I can't
23      speak for the court, I think the likelihood
24      you'll be coming back is pretty high, so bear
25      that in mind if you're feeling uncomfortable or

Page 218

1      too upset to testify with a clear head, and if at
2      any point you are in such condition, you are
3      compelled to tell me, because I will immediately
4      stop the questioning in fairness to you and in
5      fairness to my client.  Understood?
6  A.  Yes.  I am -- I am in perfectly good shape to do
7      this deposition, but I have to tell you, this has
8      been a traumatic experience for me, and I'm going
9      to cry because this has hurt me a lot.  I've lost
10      a lot.  I've been through a lot.  And crying
11      doesn't mean that I cannot comprehend what you're
12      asking me.  It just means what you're asking me, I
13      have to relive it, and reliving it hurts.  That's
14      all.
15  Q.  Okay.  All right.  So if you look at page 66 of
16      Exhibit No. 1, you'll see at the top the date
17      November 17, 2018.  Do you see that?
18  A.  Yes.
19  Q.  Okay.  And then if you go to page 68, you see the
20      text that reads, "Sorry for my hand slippage
21      yesterday"; correct?
22  A.  Yes.
23  Q.  And that is from Mr. Rowan?
24  A.  Yes.
25  Q.  Okay.  Does this refresh your memory that the

Page 219

1      incident that you describe as a sexual assault
2      occurred on or about November 17, 2018?
3  A.  Well, first I have to look at this because this
4      right here, this is not from -- this -- I'm sorry.
5      Did you -- were you asking me something as well
6      about the medical?
7  Q.  No, I wasn't.  I was just --
8  A.  Oh, okay.
9  Q.  You testified earlier that if we looked at your
10      text messages, we'd know the date --
11  A.  Right.
12  Q.  -- of the event that you describe as a sexual
13      assault, and so I have gone to the text messages,
14      at your suggestion, and I'm trying to figure out
15      what the date is of the reference to "hand
16      slippage."
17  A.  Okay.
18  Q.  All right.  Can you tell me what the date is now
19      that you're looking at your text messages?
20  A.  It says, whatever the date is on here, for hand
21      slippage, the 17th?  I'm sorry.  I can't quite
22      see.
23  Q.  The "hand slippage" comment is on page 68.  Can
24      you tell -- and then it appears again on 69.  Can
25      you tell me what the date is?

Page 220

1  A.  The date on page 69 has no date.  The other page
2      is the 17th of November.
3  Q.  Well, is the date at the top of page 66 -- does
4      that correlate with the "hand slippage" comment
5      or don't you know?
6  A.  I'm not sure because I don't see a date for the
7      "hand slippage" comment on that day.  I don't see
8      a date pertaining to that.  This could have been a
9      couple days beforehand.  I'm not quite sure.
10  Q.  All right.  So your text messages don't help us
11      date the "hand slippage" comment or what you
12      describe as a sexual assault; correct?
13  A.  Well, no, actually they do.  Yours don't.  Maybe
14      they --
15  Q.  Yours do and mine don't?
16  A.  Maybe they do in my phone but you have pages here
17      where yours is cut off at the top.
18  Q.  Well, excuse me.  That's how your counsel gave
19      them to us.
20  A.  I don't know.  I'm just wondering.  I'm trying to
21      figure out the date.
22  Q.  It's certainly not our doing.
23  A.  I'm not quite -- I'm not quite sure so I can't say
24      the hand slippage was on this date if I don't see
25      the date up there.  I'm not quite sure.

JOHNSON, DEANNA RENAE
10/07/2019



Pages 221–224

Page 221

1  Q.  All right.  Well, describe to me, putting the
2      date aside, which we'll try to verify once we get
3      your phones, what occurred that you are calling a
4      sexual assault.  Describe in as much detail as
5      you can the events that you are labeling sexual
6      assault.
7  A.  **In my words, inappropriate is when you're talking**
8      **and you're just saying something that's**
9      **inappropriate.  Sexual harassment is when you text**
10     **me constantly all day and ask me to send you**
11     **pictures of my vagina and my breasts.  Sexual**
12     **assault is when I'm walking from my cubicle and**
13     **you push me up against the door or the other side**
14     **of the cubicle and take your hand and forces it**
15     **down my shirt and grab my breast and try to**
16     **literally rip it off my body to where you left it**
17     **totally bruised.  That's what I call a sexual**
18     **assault.**
19 Q.  So where is your cubicle?
20 A.  **Two cubicles from Nick Rowan's.**
21 Q.  All right.  And is your cubicle open?
22 A.  **Yes.**
23 Q.  An open space?
24 A.  **Yes.**
25 Q.  Okay.  And it's out on the plant floor; correct?

Page 222

1  A.  **No.**
2  Q.  Where is it located in the building?
3  A.  **In the managers office; only supervisors and**
4      **management that are allowed to get in.**
5  Q.  How many different people have cubicles in that
6      office?
7  A.  **Probably 30.**
8  Q.  So you're claiming that this event that you
9      describe as a sexual assault occurred actually in
10     your cubicle area?
11 A.  **Yes.**
12 Q.  All right.  And who was in the office at the
13     time?
14 A.  **A couple of other supervisors.  Not a full party**
15     **of people because we have different shifts.**
16 Q.  Do you know the names of any other supervisor who
17     was in the office at the time you claim that Nick
18     Rowan sexually assaulted you?
19 A.  **Sean (phonetic) was the only other person that I**
20     **remember being in there at that time.**
21 Q.  Sean.  That's a male, Sean?
22 A.  **Yes.**
23 Q.  Okay.  And where was Sean located within the
24     managers office at the time you claim this event
25     occurred?

Page 223

1  A.  **His cubicle is on the other side of ours.**
2  Q.  Okay.  And he was at the cubicle?
3  A.  **Yes.**
4  Q.  So he would have been within direct eyesight;
5      correct?
6  A.  **No.  He had to stand up and look over the cubicle**
7      **desk to see that but he heard me -- he stood up**
8      **and he heard me when I yelled out, "You've done it**
9      **now.  You went too far."**
10 Q.  He heard you yell out, "You've done it now.
11     You've gone too far"?
12 A.  **He jumped up and he looked and then I took off**
13     **running to the restroom.**
14 Q.  Okay.  But you said that loud enough for him to
15     hear that; correct?
16 A.  **Yes, I did.**
17 Q.  Okay.  Did you confirm with him that he'd heard
18     it?
19 A.  **No, I didn't.  I ran off to the restroom because**
20     **my breast was hurting.  I was embarrassed, and**
21     **that scared the crap out of me.**
22 Q.  All right.  So tell me how this came about.  Were
23     you first in there and Mr. Rowan came in or what
24     was the sequence?
25 A.  **I don't know when Mr. Rowan came in.  I will give**

Page 224

1      **you a description of how we sit.  Cubicle, my**
2      **cubicle, someone else's cubicle, Nick Rowan's**
3      **cubicle, copy machine.**
4          **I walk out of my cubicle on the way to**
5      **the copy machine.  He comes flying out of his**
6      **cubicle and attacks me.  That's it.**
7  Q.  Okay.  So he came flying out of his cubicle and
8      put his hand down your blouse and squeezed your
9      breast?
10 A.  **He put his hand down my blouse and grabbed my**
11     **breast.  He tried to rip my breast off my chest.**
12 Q.  Okay.  He left bruises on your breast?
13 A.  **Yes, he did.**
14 Q.  Okay.  Did you get medical attention?
15 A.  **No, I didn't.**
16 Q.  Did you take any photos of the bruises on your
17     breast?
18 A.  **I don't take pictures of my nude body --**
19 Q.  Well --
20 A.  **-- so I didn't take them of that.  I just -- I**
21     **didn't.**
22 Q.  You did not take any -- you didn't do anything to
23     document that he had bruised your breast?
24 A.  **No, I didn't.  I didn't have -- I told who I was**
25     **supposed to tell.  I told my superiors, and I told**

JOHNSON, DEANNA RENAE
10/07/2019



Pages 225—228

Page 225

1      him that that was wrong, and that was like the end
2      of the straw, and then after he sent me the
3      message, saying that he apologized for it.
4  Q. What -- what did you have on that day?  What
5      clothing were you wearing?
6  A. I wear crewneck shirts like the boys' shirts that
7      buttons up to like here.  They button about to
8      about right here, the collar shirts.  I also wear
9      a security vest, a safety vest, and --
10 Q. And how --
11 A. -- that's what I had on that day.
12 Q. How do you secure your vest?
13 A. My safety vest?  It's just a zipper.
14 Q. Up the front?
15 A. Up the front --
16 Q. Okay.
17 A. -- but it comes up to the front to maybe here --
18 Q. Uh-huh.
19 A. -- but my shirt comes here.
20 Q. Okay.  And it's got buttons from --
21 A. All the way up.
22 Q. -- breast level up to your --
23 A. Yes, it like about four buttons up --
24 Q. Neckline, okay.
25 A. Yes, with a little collar.

Page 226

1  Q. So did he rip the buttons off your shirt?
2  A. No, he didn't rip the buttons off my shirt.  It's
3      only -- excuse me.  It's only like, I think, two
4      or three buttons on that shirt, but they're here.
5  Q. But he could get his hand down and grab so hard
6      you thought he was trying to rip your breast off
7      your body without breaking the buttons or tearing
8      your shirt?
9  A. Absolutely.
10 Q. Okay.  Did you show anybody your -- the bruises
11     on your breast?
12 A. Did I show my supervisors my breast?
13 Q. No, anybody.
14 A. I showed my daughter.  That's the only person I
15     ever showed.  Well, actually, I didn't -- she
16     didn't know that that's what that came from, but
17     she noticed my breast when I was changing my
18     clothes.
19 Q. And you didn't tell her what it was?
20 A. Of course not.
21 Q. Okay.  All right.  So who did you tell about this
22     incident and when?
23 A. I told Rich Mahoney.  Billy knows about this
24     incident.  Sean knows.  I told Antoine.  I told
25     Les Harris.

Page 227

1  Q. All right.  So let's start with Rich Mahoney.
2      When did you tell Rich Mahoney that Nick Rowan
3      tried to rip your breast off?
4  A. During the time that I was employed there, right
5      after he did it.  I don't have an exact day for
6      that.  I can't say, "Oh, I told him on the 12th at
7      6:00 p.m., at 3:15, at 2 seconds."  I don't have
8      that exact time.
9  Q. Well, when did you tell him in connection with
10     when it happened?
11 A. The very next day, if not that day.
12 Q. You don't recall?
13 A. No.
14 Q. Where were you when you told Rich Mahoney?
15 A. On the floor.
16 Q. Okay.  Was anyone a witness to you telling Rich
17     Mahoney?
18 A. I don't recall at this time.
19 Q. What did you tell Rich Mahoney?
20 A. I told Rich that he had went too far.  He stuck
21     his hand down my shirt and pinned me up and
22     grabbed my breast and tried to rip it off my body.
23 Q. He picked you up?
24 A. No.  I said he pushed me.  He came out of his
25     cubicle and he pinned me up against the wall.

Page 228

1  Q. Pinned you up?
2  A. Pinned me up --
3  Q. Okay.
4  A. -- against the wall.
5  Q. All right.  I think we better get a drawing here.
6      Draw the cubicles, please.  And we'll make this
7      Exhibit No. 8.  I can give you a fresh sheet of
8      paper.
9  A. This is fine.  You want a little more clearer --
10 Q. Yes.  Take your time.
11 A. Okay.
12 Q. Okay.  Can I please see what you've sketched out.
13 A. I'm not artist.
14 Q. All right.  Can you indicate where Sean, where
15     his cubicle was and -- or actually where Sean was
16     at the time of this incident.  All right.  So
17     Sean was on the other -- exactly on the other
18     side of Nick Rowan --
19 A. Yes.
20 Q. -- right?
21     And the star, is that where you claim
22     he pinned you up against the wall and then stuck
23     his hand down your blouse and tried to rip your
24     breast off?
25 A. Yes.

JOHNSON, DEANNA RENAE
10/07/2019



Page 229

```
1    Q.   Okay.  And where is the wall?  Is this the wall
2         here?
3    A.   This is -- yeah, that's the wall.  It has windows
4         there as well.
5    Q.   All right.  So with a blue pen mark where you
6         were pinned up against the wall.  Okay.  So where
7         you put the squiggly within blue --
8    A.   Yes.
9    Q.   -- is where you were pinned up against the wall?
10   A.   Yes.  I'm trying to remember.  Yes.  I'm trying to
11        remember, to recall it correctly.
12   Q.   Is this correct?
13   A.   Yes.
14   Q.   Okay.
15             MS. HARDY:  So I'm going to mark this
16        as Exhibit No. 8.
17             MARKED FOR IDENTIFICATION:
18             DEPOSITION EXHIBIT 8
19             4:04 p.m.
20   BY MS. HARDY:
21   Q.   So when you were pinned up against the wall,
22        that's when you noticed that Sean had stood up
23        and was observing what was going on?
24   A.   No.
25   Q.   When did you notice Sean standing up?
```

Page 230

```
1    A.   I have to play this back in my head.  I'm going to
2         the copier.  He comes flying out, brushes right on
3         me.  Hand goes straight down my -- like lightning,
4         pushing me back, pinning me back, push towards the
5         little wall or whatever over there, little in
6         section that's there.  I scream, "Get off me."
7         What the hell are you doing?"  And I knock him
8         back.  And he goes that's -- he says something
9         sarcastic, and I look up and Sean is standing.
10   Q.   Okay.  And so you don't how long Sean's --
11   A.   I don't know how --
12   Q.   -- been standing?
13   A.   -- long he was standing but I know he heard and he
14        seen something.  He seen me definitely walk -- run
15        off.
16   Q.   And he was standing at the time you're
17        yelling at --
18   A.   Yes.
19   Q.   -- Nick Rowan?
20             And you're -- you say to him words to
21        the effect, you know, "You've gone too far".
22   A.   Yeah, like "You've gone too far.  I'm telling HR
23        on you.  You did it."  I mean, I'm just screaming.
24        I'm crying.  I'm screaming.  I'm embarrassed.  I'm
25        just -- I'm mad.  He's laughing.  He's walking
```

Page 231

```
1         off.
2    Q.   Okay.  What's Sean's last name?
3    A.   I don't know at this time.  Sean -- oh, geez.
4         Caruso?  Is it Caruso?  I can't quite remember.
5    Q.   So he's a process coach?
6    A.   Yes, he is a process coach.
7    Q.   All right.  So don't worry about the last name.
8             Could you please hand me back my pen,
9         please.
10   A.   Oh, I'm so sorry.
11   Q.   All right.  So you tell Rich Mahoney about this
12        event either that very day or the following day;
13        correct?
14   A.   Yes.
15   Q.   All right.  What time of day does this occur?
16   A.   We were on the evening shift, and I -- I want to
17        say it was -- we were on the evening shift.  I
18        don't know if we were on the days or in the
19        evenings that day.  I want to say it was in our
20        evening shift, one of the evening shifts.  It
21        could have been at 5:00; it could have been at
22        3:00 in the morning after shift -- it was after
23        shift was over.  Definitely didn't go back to work
24        after anything like that.  It was at the end of
25        our shift.
```

Page 232

```
1    Q.   Did you leave early?
2    A.   No.
3    Q.   So he waited until the end of the shift and did
4         this?
5    A.   Yes.
6    Q.   Okay.  Did you see anybody on your way from the
7         office area to the bathroom?
8    A.   No.  It's in between shifts, and when I got in the
9         bathroom, I was crying and it was some ladies in
10        the bathroom.  I heard someone asking me was I
11        okay, and I didn't say anything, and they were
12        like, "Are you okay?"  I didn't know if she was --
13        it was a couple of women in there, and I just
14        remembered them leaving or saying, "We got to go
15        because the line is about to start."  These were
16        hourly employees, but I don't remember whose faces
17        they were because I was in a stall.
18   Q.   All right.  But on the way from the office to the
19        bathroom, you didn't encounter anybody who saw
20        you crying and running to the bathroom?
21   A.   I don't remember.
22   Q.   How far is the bathroom from the office area
23        where you claim this occurred?
24   A.   From the actual current spot or that office?
25   Q.   Well, you were standing right next to the
```

JOHNSON, DEANNA RENAE
10/07/2019



Pages 233—236

Page 233

1    entrance door when you claim this -- where this
2    allegedly occurred; right?
3  A.  Yes.
4  Q.  Okay.  So from that spot to the bathroom, how far
5    is it?
6  A.  About 50 feet.
7  Q.  Okay.
8  A.  Maybe 60.  I'm not quite sure.  It's not that far.
9    It's right there.
10  Q.  All right.  So what exactly did you tell Rich
11    Mahoney about this incident?
12  A.  I said, "He grabbed my breast.  He tried to rip my
13    breast off."
14  Q.  Where were you when you talked to Rich Mahoney?
15  A.  I can't recall if I was in the cubicle or on the
16    floor.  I think -- I want to say I was on the
17    floor, if I remember correctly.  We were on the
18    floor when I -- did I tell him that on the floor?
19    I can't quite remember.  I can't quite remember if
20    we were on the floor or we were at Rich's cubicle.
21    I don't recall.
22  Q.  What was Rich Mahoney's response?
23  A.  I'm really telling Billy.  He said that before.
24  Q.  Did he say anything else?
25  A.  He had told me once before that, "I'm going to go

Page 234

1    and talk to him," and that's what he told me, he
2    was going to talk to him.
3  Q.  Okay.  That's all you recall about Rich Mahoney's
4    response?
5  A.  Yes, that he was going to talk to him about what
6    he was doing.
7  Q.  Okay.  You've already said that.  Is there
8    anything else?
9  A.  Not that I can recall at this time.
10  Q.  All right.  So when did you tell Mr. Markavich
11    and what did you tell him?
12  A.  I don't remember telling Billy about my breast.  I
13    remember telling him other things, but that was
14    sort of the last thing.  I don't think I was
15    trying to tell Billy anything at the end because
16    of his nastiness towards me.
17  Q.  What do you mean, "at the end"?  What time
18    period?
19  A.  Just meaning -- I mean before I left the company,
20    not at a certain time period.  Before I left the
21    company, I didn't feel confident, like I said in
22    the other text -- in the -- what I just told you.
23    I didn't feel confident in telling Billy anything
24    because the apologies and the cursing out over and
25    over again, so he was not my go-to person anymore.

Page 235

1  Q.  Well, when did he start being, quote, nasty to
2    you?
3  A.  I think when I started complaining a lot about
4    Nick, that's when -- that's when I got the
5    nastiness.
6  Q.  When was that?
7  A.  When I first started complaining about Nick was
8    right after the inappropriateness.  That was --
9    well, I first started complaining about Nick right
10    after I got there.
11  Q.  I'm talking about with respect to Mr. Markavich.
12  A.  When I started complaining to Billy, I can't
13    recall.  I can't recall on what exact day that I
14    started complaining, but it was very early.
15  Q.  All right.  And what were you complaining about
16    at that point?
17  A.  His inappropriate talking just to the other women,
18    before he had even started talking to me like
19    that.
20  Q.  Did you share any details with Mr. Markavich or
21    did you just kind of describe it as, you know,
22    it's a problem -- it's a problem, it's
23    inappropriate?
24  A.  No.  I said, "This guy, Nick" -- I said, "If no
25    one's going to write him up, he's going to get in

Page 236

1    trouble.  He's over there talking about his
2    genitals and saying really nasty things," I said,
3    "to a lot of these girls, and they're laughing
4    about it from day one."
5  Q.  When did you tell that -- make that comment to
6    Mr. Markavich?
7  A.  I made that comment to Mr. Markavich a few times,
8    and it was just brushed off that Billy was -- that
9    Nick was just --
10  Q.  Eccentric?
11  A.  Yes, very, or weird.  It was either eccentric or
12    weird, one or the other.  It's always, you know,
13    "He's just different," or "That's just -- that's
14    just Nick."
15  Q.  Okay.  Did you share any other issues with
16    Mr. Markavich about Nick Rowan before he started
17    getting, quote, nasty with you?
18  A.  None other than how he was being nasty with the
19    other ladies in the beginning.  That's how it
20    started.
21  Q.  And that's when Mr. Markavich then started
22    getting nasty with you and then you stopped
23    sharing things with him?
24  A.  No, he started getting nasty with me after I --
25    after Rich told him about the -- the pictures, and

JOHNSON, DEANNA RENAE
10/07/2019



---

Page 237

1   he came to me and says, "Okay.  On a scale of 1 to
2   10..."  That's when the nastiness really started
3   after that.
4   Q.   Okay.  But you don't -- you don't -- you didn't
5        hear what Mark -- what Mahoney told Markavich;
6        right?
7   A.   I didn't hear what he told him, but after Mahoney
8        talked to me.  He says, "Hey, Billy's right there.
9        I'm going to go over and talk to Billy."  He walks
10       over and talks to Billy, and in a few moments
11       Billy comes back to me and asks me, "Okay.  So
12       what's the situation between you and Nick?  How
13       bad is it?  On a scale from 1 to 10, how bad is
14       the situation between you and Nick Rowan?"  And I
15       said, "A hundred."
16             Now, if he walks up to me telling me,
17       well, how bad is this situation between you and
18       Nick Rowan, he apparently knows something.  And
19       then tell me, "Oh, God, that's -- I don't want to
20       hear it.  I don't want to hear it."  And I go,
21       "But, wait, he's sending me pictures of his weenie
22       and he's..."
23             You know.  You know it.  You know.
24   Q.   And that's when he stopped -- you stopped sharing
25        information with him at that point?

---

Page 238

1   A.   I can't remember if I actually stopped sharing
2        information, because he is my boss and I did try
3        to, I'm sure, talk to him again sometime, but
4        Billy was mean.  Billy's mean.  After then, then
5        he comes back to me and tells me -- after I fall
6        out in the plant, and then he comes back and tells
7        me he don't give a fuck about me and all that,
8        makes it a little hard to kind of talk to your
9        superior when they tell you they don't give a fuck
10       about you.
11   Q.   All right.  So you didn't tell him that Nick
12        Rowan had grabbed your breast?
13   A.   Excuse me?
14   Q.   You did not tell Mr. Markavich that Mr. Rowan had
15        allegedly grabbed your breast?
16   A.   I don't recall.  I don't think I did.  I can't
17        quite recall at this time.
18   Q.   All right.  So who else did you tell other than
19        Mr. Mahoney?
20   A.   I told Sean.
21   Q.   Okay.  And what did you say to Sean and when?
22   A.   I told Sean he grabbed my breast, and Sean goes,
23        "He grabbed those titties."  Because that was like
24        a running joke about me, that someone, that
25        Nick -- not a joke but just a running comment of

---

Page 239

1   some sort, "Show me those titties."
2   Q.   When did you tell Sean that he grabbed your
3        breast?
4   A.   I probably told Sean that day.  I'm not quite sure
5        at the time.  And I probably told Sean that day
6        because we parked -- we parked at the salaried
7        parking lot in the back, and we walked back -- not
8        -- we wouldn't walk in together.  We didn't park
9        nowhere near Nick Rowan.  We parked on this end of
10       the plant and he went on that end.  He never
11       parked nowhere near us.  So leaving out, sometimes
12       we would all leave out together, meaning me, Nick,
13       Antoine or Rich Mahoney, or something, not as a
14       team, but we can see one ahead of the other, one
15       ahead of the other, but we're all parked next to
16       each other.  So I mentioned it to Sean.  I did
17       tell Sean.  On that day?  Could have been.  Could
18       have been the day after that, but I remember what
19       his response was.
20   Q.   What was his response?
21   A.   "Oh, he finally got you to show him those
22        titties."
23   Q.   Okay.
24   A.   "He showed you those titties," so that's kind of
25        what it was.

---

Page 240

1   Q.   Now, Sean's a fellow process coach?
2   A.   Yes.
3   Q.   Just like you, Mr. Mahoney, and Mr. Rowan;
4        correct?
5   A.   Mr. Mahoney is not a process coach.  He's above
6        us.
7   Q.   His title is process coach.  Are you aware of
8        that?
9   A.   His title -- then they -- when did they change his
10       title from process coach?  Because that's not his
11       title.  A process coach runs different lines.
12       That's not the title that Mr. Mahoney had, not
13       while I was there.  I'm sorry.
14   Q.   Did you ever see a different title?
15   A.   Yes, I did see a different title.  He was --
16   Q.   What title did you see?
17   A.   Mr. Mahoney is a -- oh, my gosh.  He works in the
18       bay area and he had just got a promotion.  He's
19       not a process coach.
20   Q.   Well, what do you claim his title was when you
21       and he were both working at Ford?
22   A.   I would think his title would not be a process
23       coach if I had to answer to him.  If he was just a
24       process coach, then he just would be my peer and
25       not one of my supervisors.

JOHNSON, DEANNA RENAE
10/07/2019



Pages 241–244

Page 241

1  Q.  Well, what leads you to believe or claim he was a
2      supervisor?
3  A.  Because he gave me duties.  When it was time for
4      -- when Billy Markavich told me that I had to move
5      to Line 4 and 5, Rich came and got me and moved me
6      over there.  Rich did not work on any line around
7      me.  In the meetings, like we're sitting here now,
8      Billy Markavich sat there; Rich Mahoney sat next
9      to him.  If he was a process coach, he would have
10     sat with us.  He gave us orders.  He gave us
11     things to do.  He gave us orders as a supervisor
12     would, not as my fellow process coaches would.
13 Q.  He passed on the orders of Mr. Markavich;
14     correct?
15 A.  I don't believe he passed on -- no, he had his own
16     orders.  He did things on his own.  He didn't just
17     pass on.  He didn't get orders just from
18     Mr. Markavich.  He had things of his own to do.
19 Q.  Orders related to how to fix critical problems on
20     the line; correct?
21 A.  No.  Orders to who I could pay and who I could not
22     pay and how much I can pay them, and who we wanted
23     there, who we didn't want there, who he could get
24     rid of, who he could throw out of the plant,
25     things like that.

Page 242

1  Q.  Who did he talk about throwing out of the plant?
2  A.  No.  What I mean is that if someone -- he had
3      that -- he had that responsibility.  Anyone could
4      throw anyone out of the plant, process coach or
5      not --
6  Q.  Okay.
7  A.  -- but he had that ability -- he had the ability
8      to have orders -- to give orders.
9  Q.  All right.  So you never saw any job title that
10     was carried by Mr. Markavich other than process
11     coach; correct?
12 A.  Mr. Markavich or Mahoney?
13 Q.  Or, I'm sorry.  Mr. Mahoney.
14 A.  I never seen Mr. Mahoney listed as a process coach
15     ever.
16 Q.  Well, have you even seen him listed as anything
17     else --
18 A.  Yes.
19 Q.  -- and if so, where and what?
20 A.  I've seen it on paperwork but it's never listed as
21     process coach.  I can't quite recall what the
22     title was, but when I was there, he was never
23     referred to as a process coach --
24 Q.  What --
25 A.  -- ever.

Page 243

1  Q.  -- was he referred to as?
2  A.  I don't quite remember but I know he was referred
3      to as one of my bosses, someone that I had to
4      listen to.
5  Q.  All right.  So you don't know what his job title
6      was and you can't recall what paperwork you
7      allegedly saw that listed a job title other than
8      process coach; correct?
9  A.  Correct.
10 Q.  So when did you tell Sean that your breast had
11     allegedly been grabbed by Mr. Rowan?
12         MS. LAUGHBAUM:  This has been asked and
13     answered a couple of times.
14         MS. HARDY:  I don't recall the when.
15         THE WITNESS:  I don't recall at this
16     time.
17 BY MS. HARDY:
18 Q.  Well, was it that day or --
19 A.  I don't recall at this time.
20 Q.  Well, you can't give me any frame?  Was it a
21     month or week later or --
22 A.  I'm sorry.  I can't recall at this time.  I really
23     can't.
24 Q.  Are you too tired to recall?
25 A.  Excuse me?

Page 244

1  Q.  Are you too tired to be able to recall?
2  A.  Not at all.  Not at all.
3  Q.  All right.
4  A.  I would like to just be accurate.  I would just
5      like to be accurate when I'm --
6  Q.  Well, do you have --
7  A.  -- speaking --
8         COURT REPORTER:  One at a time, please.
9         MS. HARDY:  Sorry.
10 BY MS. HARDY:
11 Q.  Do you have any way of refreshing your memory?
12 A.  Let me think.  Rephrase the question again.
13         THE WITNESS:  Can you repeat what she
14     said for me.
15 BY MS. HARDY:
16 Q.  I asked when you told Sean that Mr. Rowan had
17     grabbed your breast.
18 A.  I can't quite remember.  It could have been that
19     day, the day he grabbed it, on the way out, but I
20     don't recall at this time.  I'm not sure.
21 Q.  Well, where were you when you informed Mr. --
22     Sean, whatever his last name is, of this incident
23     that you've described?
24 A.  On Ford Motor Company's property.
25 Q.  Where on Ford Motor Company's property?

JOHNSON, DEANNA RENAE
10/07/2019



Page 245

1  A.  We were -- we could have been in the plant or we
2      could have been outside getting ready to go home.
3      I'm not quite sure.
4  Q.  All right.  Were there any witnesses to your
5      conversation with Sean about this topic?
6  A.  I'm not sure.  I know when we were leaving -- I
7      can't remember if this was the exact same day when
8      Sean said, "So he got -- so you showed him those
9      titties" or "He grabbed those titties."  And Nick
10     Huff was in front of us, and he goes, "I don't
11     want to hear that."  So I don't want to say that
12     was that exact day but I'm not quite sure if
13     Nicholas Huff was around at that time.
14 Q.  Did you tell Nicholas Huff --
15 A.  No.
16 Q.  -- about this incident?
17 A.  No.
18 Q.  Okay.  Is there anyone that you told other than
19     Mahoney and Sean?
20 A.  I don't recall.
21 Q.  You didn't go to plant medical?
22 A.  During the time when -- I've been to plant medical
23     before.  You're saying --
24 Q.  No, about the fact that your breast had been
25     bruised due to an assault --

Page 246

1  A.  I went home.
2  Q.  -- by a co-worker.
3  A.  I went home.
4  Q.  And you didn't report this to Mr. Harris
5      immediately?
6  A.  No.
7  Q.  All right.  Did you tell him during your
8      interview with him?
9  A.  Yes.
10 Q.  Okay.  Why did you wait until then to report a
11     sexual assault?
12 A.  Because I was scared.
13 Q.  What were you scared of?
14 A.  Nick Rowan.  I have seen this guy get so angry.
15     His inside of his cubicles are all busted.  He
16     goes in there and he socks the crap out of
17     everything inside of his cubicle.  Everything in
18     there is punch -- hole punches and everything in
19     his cubicle.  I told -- I told that to Les Harris.
20     I told him I was scared to death of him.  The day
21     that I finally went and I talked to Les Harris, I
22     was so scared.  LaDawn hide me in her office.  They
23     took me out the back door of the plant, put me in
24     another car, and then drove me to my car, and then
25     they followed me to the expressway because they

Page 247

1      knew how crazy this guy was.
2  Q.  Who followed you on the expressway?
3  A.  I don't know.  You'd have to get that information
4      from LaDawn.  They had someone -- I waited in
5      LaDawn's office.  She had someone to come and get
6      me.  They took me out the back -- out of one of
7      the back doors so no one could see me.  They put
8      me in a company F-150, drove me to my car, and
9      then that person followed me to the expressway.
10 Q.  Okay.  Let me go back and sort through this.
11         So when did LaDawn hide you in her
12     office?
13 A.  I don't remember the exact day but we had -- but
14     it's the text messages there.  It says on the text
15     messages, "I'm getting -- I need to get my coat
16     from my cubicle."  And she goes, "You can stay in
17     my office until" -- I can't remember how the text
18     is, but stay in her office until, you know, she
19     gets there because she was kind of hiding me from
20     him.  Not kind of; she was --
21 Q.  And you don't recall --
22 A.  -- hiding me.
23 Q.  -- when that was?
24 A.  That was probably my last day at Ford.
25 Q.  And that's on November 25, 2018?

Page 248

1  A.  Yes.
2  Q.  Why was she hiding you in her office?  What had
3      you told her that would cause her to hide you in
4      your [sic] office?
5  A.  I didn't have to tell her anything that caused me
6      [sic] to hide her [sic].  Everyone knows Nick
7      Rowan's behavior.  She hid me on her own because
8      she knew.
9  Q.  What did she do that you consider hiding you?
10 A.  She told me, "Stay here in my office.  Don't come
11     out."  I said, "Okay, because I'm scared of him."
12     She says, "I know you are."  I said, "He's crazy."
13     She says, "I know he is.  You stay right here in
14     the office.  I'll go downstairs."
15         LaDawn never goes downstairs.  She went
16     downstairs, went to my workstation, went in my
17     locker, and got all of my belongings for me
18     because she knew I didn't want to see Billy, Rich,
19     whomever.  I didn't want to see any of them
20     because Les, I think, had interviewed everyone
21     beforehand, and I just -- I was terrified after
22     that.
23 Q.  All right.  So at what point in time did LaDawn
24     hide you in the office?  Was that like right away
25     or when you walked in?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

JOHNSON, DEANNA RENAE
10/07/2019



Page 249

1   A.   That was right away.
2   Q.   Okay.  So what did you say that led to her hiding
3        you in the office?  How did you alert her that
4        you were so scared of him that she would need to
5        hide you in her office?
6   A.   I'm not sure, Ms. Hardy, if you're asking me did I
7        make her scared so I -- did I make her feel
8        scared so she could be scared?  I didn't give
9        her --
10  Q.   No, no, no, no.  I'm not -- I'm not suggesting
11       that.
12  A.   Okay.
13  Q.   I want to know what you said that alerted her
14       that you were so scared that she needed to hide
15       you from Nick Rowan in her office.
16  A.   I didn't say anything to her.  She overheard it
17       over her -- on the microphone.  Les Harris
18       contacted her and said, "Bring Nick Rowan to my
19       office right now."  And I said, "I don't want to
20       be in there."  And then she says, "I'm sure you
21       don't.  I know you don't."  Because we had
22       previously talked about this incident, and she
23       said, "You wait.  You hide here.  You stay here.
24       Don't come out."  Because LaDawn knows his office.
25       She knows the punchings all in his file cabinet.

Page 250

1        He's punched his file cabinet on every single
2        corner, so we all know that.  Should have pictures
3        of that.
4   Q.   Okay.  Let me get the sequence straight.  So when
5        you go in LaDawn's office on November 25, she had
6        heard just before you went into the office Les
7        Harris called for Nick Rowan to come to his
8        office.  Do I have that right?
9   A.   Yes.
10  Q.   Okay.  And so when you walked into LaDawn's
11       office on November 29 [sic], she knew that or
12       assumed that you would be scared of Nick Rowan
13       and instinctively tried to hide you from him in
14       her office; correct?
15  A.   I can't say what LaDawn knows.  I can't -- I can't
16       vouch for LaDawn's feelings or how she would feel,
17       but from our previous conversation that we had, I
18       was quite upset, and she was quite upset from it.
19  Q.   All right.  I want to make sure the record is
20       correct that I said November 25.  If it says 29,
21       perhaps I misspoke, but your meeting with LaDawn
22       was on November 25; correct?
23  A.   I think so.
24  Q.   Okay.  And that -- and right before you walked
25       into her office to meet with her, that's when Les

Page 251

1        Harris called for Nick Rowan to come to his
2        office?
3   A.   Yes, I believe so.
4   Q.   Okay.  Now, you just mentioned that, from your
5        prior meeting with LaDawn, she knew that you were
6        scared of Nick Rowan.  What are you referring to?
7   A.   When we had a talk -- when we had our talk about
8        him, she explained to me how she believed that --
9        that he was not a great person, and that --
10  Q.   Okay.  Go on.
11  A.   She believed that how he was not a great person
12       and indicated that he is someone that I should be
13       scared of.  And I think she was just doing her job
14       to hide me from this person whom she believed had
15       already did things around the plant and everyone
16       knew that, quote/unquote, he was eccentric.
17  Q.   When did that conversation occur with LaDawn
18       Clemons?
19  A.   Probably my last day there.
20  Q.   But we were just referring a moment ago to your
21       last day as the day that you went into her office
22       and she hid you because she had heard that Les
23       Harris had called Nick Rowan to his office.
24       That's your last day; correct?
25  A.   Yes.

Page 252

1   Q.   Okay.  Now, was there a conversation with LaDawn
2        about Nick Rowan and your issues with him that
3        preceded November 25?
4   A.   No.
5   Q.   Okay.  Was there more than one conversation with
6        LaDawn Clemons on November 25?
7   A.   Not that I recall.
8   Q.   Had you ever talked to LaDawn Clemons about Nick
9        Rowan prior to November 25?
10  A.   I can't recall at this time.
11  Q.   All right.  So how would LaDawn Clemons know when
12       you walk in her door, before you say anything,
13       that you were scared of Nick Rowan and that she
14       needed to hide you to keep you safe?
15  A.   Because of our conversation that I had with her
16       explaining how scared I was and what he did to me,
17       and I was crying profusely, so I guess maybe she
18       figured when she heard that they were pulling him
19       up and I was coming to my office, to my cubicle.
20       I asked her -- I went to her cubicle.  I went to
21       my cubicle, and she told me, "You can hide in my
22       office."  I says, "I don't want to go out there
23       where he's at."  She says, "Well, you stay in my
24       office and don't go anywhere."
25  Q.   All right.  I'm not understanding the answer to

JOHNSON, DEANNA RENAE
10/07/2019



Pages 253—256

Page 253

1     the question that I posed, so I'm going to read
2     back the question I posed.
3             I said how would LaDawn Clemons know
4     when you walked in her door on November 25 how
5     scared you were of Nick Rowan and that she needed
6     to hide you from him?"
7             At the moment you walk in the door, how
8     did she know that?
9  A.  Let me make sure I have this correctly.  My last
10    date of employment --
11  Q.  Last day worked was November 25.
12  A.  25.  The reason how she knew that is because
13    prior, before that, when I went to her office --
14    what's the testimony that you just gave me, the
15    conversation that me and LaDawn had?
16  Q.  Was on November 25.
17  A.  Well, when we had that conversation, maybe when I
18    got to her office it was that evening.  It had to
19    have been that evening because I was in her
20    office.  I went back to get my things, and when I
21    went back to my cubicle to get my things, she knew
22    I was scared because of our previous conversation
23    from that day or the day before, whenever we had
24    that previous conversation.  That's how she knew I
25    was scared.

Page 254

1  Q.  All right.  So I didn't realize that you had two
2    encounters with LaDawn Clemons on November 25.
3    So you had a meeting with her in her office where
4    you explained your issues with Nick Rowan, and
5    that meeting and the content of that meeting is
6    reflected in Exhibit No. 2; correct?
7  A.  Correct.
8  Q.  Okay.  And then after that meeting, you went to
9    your cubicle to get your stuff?
10  A.  After the meeting with LaDawn?
11  Q.  Yes.
12  A.  No, after that meeting with LaDawn -- no, after
13    that meeting with LaDawn, I went home because HR
14    was closed, once again.  That's why I ended up
15    having to go to LaDawn.  HR was closed.
16  Q.  All right.  So --
17  A.  There was no Les Harris.
18  Q.  -- what time did you meet with LaDawn on
19    November 25?
20  A.  On the 25th?
21  Q.  Yes.
22  A.  I don't recall the time.
23  Q.  All right.  And you immediately went home after
24    that?
25  A.  After that meeting with her?  Yes.

Page 255

1  Q.  All right.  And then what were you referring to a
2    moment ago when you said you -- "When I got to
3    her office, it was that evening.  It had to have
4    been that evening because I was in her office.  I
5    went back to get my things, and when I went back
6    to my cubicle to get my things, she knew I was
7    scared because of our previous conversation from
8    that day or the day before, whenever we had that
9    previous conversation."
10          What day are you referring to in that
11    testimony?
12  A.  It had to be that day.  We had two encounters the
13    day that I told her everything that happened, and
14    I -- on that day that I told her everything that
15    happened, I went home.  That next day, I came in.
16    I told her that I was going to HR that morning
17    because they were closed.  I came in that next
18    following day.  That's when I told you about the
19    meeting or whatever and I turned around, went,
20    told Rich I'm going to the meeting, blah, blah.  I
21    came back -- I'm sorry for saying "blah, blah."
22  Q.  It's okay.
23  A.  I came -- I came back from speaking with Les
24    Harris, and he was calling Nick to his office, and
25    when he says, "I'm going to bring -- I'm calling

Page 256

1    Nick up here," and he says, "I don't know if you
2    want to be around him."  I says, I don't."  And I
3    left out of his office and I didn't want to pass
4    him or anything.  And I went straight back to my
5    cubicle, and I seen LaDawn, and I says, "They're
6    calling Nick now."  I says, "I'm scared of him."
7    And she goes, "I know."  She says, "You go and
8    hide in my office until we get him out of here."
9    And I -- she says, "I'll get your things."  She
10    text-messaged me and says -- asked me where was my
11    things at.  I told her where my things was.  She
12    said in a text message to stay in her office.  I
13    stayed inside of her office.  She went downstairs,
14    got my things, came back up, put me in a car.
15    They sent me home.
16  Q.  Okay.  So those text messages are on your black
17    phone; correct?
18  A.  Yes.
19  Q.  All right.  And are the text messages when Nick
20    Rowan was asking repeatedly for pictures of your
21    breasts and vagina on your black phone or your
22    white phone, or both?
23  A.  Both.
24  Q.  Okay.  And did he -- how often did he send you
25    texts asking for pictures of your vagina?  Can

JOHNSON, DEANNA RENAE
10/07/2019


**EXHIBIT B**

Pages 257–260

---

Page 257

1   you estimate?
2   A.   Probably twice, three times of every day of my
3        employment there.
4   Q.   I don't understand.  Three times of every day of
5        your employment?
6   A.   I can't -- I don't want to put an exact number on
7        it because -- I don't want to put an exact number
8        on it.  So I will say several times -- I will say
9        several times a week, every day just about, every
10       single day.
11  Q.   Asking -- texts asking for pictures of your
12       vagina?
13  A.   Exactly.
14  Q.   Okay.  And how often did he send you texts asking
15       for pictures of your breasts?
16  A.   The texts were -- the texts actually stated, "Send
17       me a pic.  Send me a pic.  Not the pic I was
18       expecting for.  Let me see those mounds.  Send me
19       a picture of those mounds.  Send me a picture of
20       your breasts."
21            It was no -- he already discussed and
22       told me what he wanted, you know, so kind of
23       pretty obvious to see, to know what it was.
24  Q.   All right.  So have you had any contact with
25       LaDawn Clemons since November 26, 2018?

---

Page 258

1   A.   No.
2   Q.   And did -- you said she arranged for someone to
3        drive you home?
4   A.   No, I didn't say that.  I said that she hid me in
5        her office and she called someone.  I don't know
6        if it's plant security.  She called them to come
7        and get me out of her office, hide me, take me
8        down the backstairs, and put me in a company car
9        and drive me to my car.
10  Q.   Okay.
11  A.   Then they followed me to the expressway to make
12       sure that he was not following me.
13  Q.   Okay.  And who from security did you deal with
14       that day?
15  A.   I don't know his name.
16  Q.   Was it one person or more than one person?
17  A.   It was one person.
18  Q.   Did you hear LaDawn tell security that they
19       needed to come and get you and hide you and take
20       you down the backstairs and drive you in a car to
21       protect you from Nick Rowan?
22  A.   Absolutely.
23  Q.   You actually heard her use words to that effect
24       in talking to security?
25  A.   Exactly.

---

Page 259

1   Q.   All right.  So tell me about his cubicle and all
2        the things that he punched up.  This is the
3        cubicle in the office that's on Exhibit 8;
4        correct?
5   A.   Yes.
6   Q.   It's the one with the NR --
7   A.   Yes.
8   Q.   -- that stands for Nick Rowan?
9   A.   Yes.
10  Q.   And these are open cubicles that everybody could
11       see?
12  A.   Yes.
13  Q.   Okay.  So did you ever see him punching up his
14       cubicle?
15  A.   I've seen him punching his cubicle as well as
16       other things in the plant.  Everyone sees that.
17  Q.   All right.  So tell me what he punched in his
18       cubicle.
19  A.   File cabinets.
20  Q.   Okay.  Anything else?
21  A.   Just the file cabinets.  Maybe the chair every now
22       and again, but the file cabinets was a target
23       because I guess he needed to really make that, you
24       know, extra dent.
25  Q.   Who else saw him punching things in his cubicle

---

Page 260

1   or in the plant?  Who other than you?
2   A.   Every process coach on my team.
3   Q.   Were you present when a process coach saw him
4        punching things in the plant?
5   A.   Yes.
6   Q.   Who?
7   A.   Him and also Rich Mahoney, which I still don't see
8        as a process coach, but I -- we've all seen him
9        punch various things in the plant.
10  Q.   Well, describe incidents where you and somebody
11       else were observing Rich -- or Nick Rowan
12       punching things in the plant.
13  A.   We were all in a meeting one day and LaDawn came
14       into this meeting, and she told him something that
15       he didn't totally agree with, and he was furious.
16       Immediately following the meeting, he went
17       straight to his cubicle and punched it out a
18       whammer.  No one said anything because no one says
19       anything to this guy.  He just went on a punching
20       rampage.
21  Q.   Well, what did he do to his cubicle that day?
22  A.   Just punched his -- constantly -- dented it up
23       more than what it is, the cabinets.
24  Q.   Did he punch anything other than the cabinets
25       that day?

---

JOHNSON, DEANNA RENAE
10/07/2019

**EXHIBIT B** 
Pages 261–264

Page 261

1  A.  Just the cabinets.
2  Q.  Who, if anyone, observed it?
3  A.  We all observed it, my whole team, me, Sean,
4     Antoine, Rich Mahoney.
5  Q.  All observed him punching his -- -
6  A.  Yes.
7  Q.  -- cabinet.
8        When was that?
9        COURT REPORTER:  Please wait for the
10    question to be completed.
11 BY MS. HARDY:
12 Q.  When was that?
13 A.  I don't recall the exact day.
14 Q.  Well, can you give me a month?
15 A.  If I were to guess, I would guess October, if I
16    had to guess, but I'm not quite sure.
17 Q.  And that was a morning meeting that you're
18    referring to?
19 A.  I don't know if -- well, for LaDawn -- well, no,
20    it could have been the evening or afternoon
21    because LaDawn will rotate sometimes when we
22    rotated.
23 Q.  Did LaDawn ever, to your knowledge, observe
24    Mr. Rowan punching things in the plant or in his
25    cubicle?

Page 262

1  A.  No, but I did tell LaDawn that he does that and I
2     had her to go and look at his cubicle.
3  Q.  And did she go up and look at the cubicle, to
4     your knowledge?
5  A.  Yes.
6  Q.  When was that?
7  A.  That was the day that -- the 25th -- I'm sorry.  I
8     don't want to get my dates mixed up.  -- that I
9     had the conver- -- the full conversation with her
10    about what's going on in the plant.
11 Q.  What did he punch in the plant?
12 A.  Whatever was there, a pole, whatever was next to
13    him that he felt like he could punch.
14 Q.  Well, what do you recall him punching?
15 A.  Poles, file cabinets.
16 Q.  He just walked around and started punching
17    people's file cabinets?
18 A.  If he's pissed, yes, he did.  Yes, he does.
19 Q.  Did anyone ever make a security report about him
20    destroying company property as he was going on
21    what you'd call a punching rampage?
22 A.  I'm unaware of that, and I wouldn't call it so
23    much as a punching rampage.  It's just that I
24    noticed him over five times punching -- punching
25    things.

Page 263

1  Q.  "Punching rampage," those were your words, not
2     mine.
3  A.  Okay.  Good words, then.  Okay.
4  Q.  Did you ever take any photos of things in the
5     plant or in his cubicle that he punched up so
6     you'd have some evidence of damage that he'd done
7     to company property?
8  A.  No.  I wish I would have, and I actually was going
9     to go and take the pictures and Les Harris stopped
10    me.  Ah, good job, Les.  I wish I would have
11    actually just went ahead and did it anyway because
12    Les told me he was going around there and take the
13    pictures his self.  That's another thing he left
14    out of his report.  Sorry.
15 Q.  What do you mean, he stopped you?
16 A.  He told me, "Don't -- don't do that.  I'll take
17    care of it.  I'm going to go around there and I'll
18    get the pictures and I'm going to look at his file
19    cabinets."
20 Q.  All right.  But why didn't you take photos right
21    after it happened rather than waiting until
22    November 25, if you thought that it was evidence
23    of him having violent tendencies that created a
24    safety risk for employees?
25 A.  I'm not so much as the type to go off and try to

Page 264

1     take pictures.  That seems like someone that's
2     trying to prepare for a case.  It wasn't that -- I
3     didn't think to go and just, "I'm going to take
4     pictures of his file cabinets."  No, I'm going to
5     tell HR that his file cabinets have punches in
6     them so HR can go and take pictures of his file
7     cabinets.  I'd rather the --
8  Q.  But you didn't do that until November 25;
9     correct?
10 A.  This is true.
11 Q.  All right.  And how long had the punching been
12    going on?
13 A.  Since before I got to the plant --
14 Q.  Okay.
15 A.  -- so I figured that they should already know
16    about it since they were majority punched up
17    before I got there and punched even more after I
18    left.
19 Q.  Did you ever hear anyone say to him, "You've got
20    to stop punching up company property"?
21 A.  Yes.  Sean used to yell all the time on the other
22    side, "Nick, control yourself."
23 Q.  Anyone other than Sean who was a peer of Nick's?
24 A.  Antoine, several people.
25 Q.  And what position did Antoine hold?

JOHNSON, DEANNA RENAE
10/07/2019



Page 265

1  A.  They're all process coaches.
2  Q.  They're all peers; correct?
3  A.  Yes.
4  Q.  Did you ever hear anyone in management
5      acknowledge that he was punching property?
6  A.  Acknowledge it or see him?
7  Q.  Well, let's take see him.
8  A.  Rich Mahoney.  I cannot say if Billy -- if -- I
9      don't recall if Billy ever seen him punching
10     anything or not.
11 Q.  All right.  So you can't recall any manager who's
12     seen him punch things?
13 A.  I can recall Rich Mahoney.
14 Q.  Well, Rich Mahoney is not a manager.
15         MS. LAUGHBAUM:  Objection.  You're just
16     arguing now.
17 BY MS. HARDY:
18 Q.  Well, what basis do you have for saying someone's
19     -- he's a manager?
20         MS. LAUGHBAUM:  Okay.  Objection.  This
21     has been asked and answered.
22         MS. HARDY:  No, it's not.
23         MS. LAUGHBAUM:  We're just rehashing.
24         MS. HARDY:  No --
25         MS. LAUGHBAUM:  It has been.

Page 266

1          MS. HARDY:  -- it's not.  She used a
2      different word before and you know as an
3      employment lawyer there's a difference between
4      what is called supervising somebody and
5      management.  They are very different.
6          MS. LAUGHBAUM:  She's given you her
7      answer as to her understanding --
8          MS. HARDY:  No, well --
9          MS. LAUGHBAUM:  -- of his role and
10     you're just repeating.  This has been asked and
11     answered.
12         MS. HARDY:  No.  Well, okay.  Objection
13     noted.
14 BY MS. HARDY:
15 Q.  Why -- strike that.
16         On what basis do you call Rick Mahoney
17     a manager?
18         MS. LAUGHBAUM:  Same objection.
19     Go ahead, DeAnna.
20         THE WITNESS:  Because he told me what
21     to do.
22 BY MS. HARDY:
23 Q.  So you're using the term "manager" synonymous
24     with somebody who gives you direction on the
25     plant floor?

Page 267

1  A.  They give me direct orders and helps with my pay
2      to pay me and different things like that.  Yeah, I
3      would call that, because none of the other process
4      coaches, like Sean or Antoine, they couldn't tell
5      me what to do.  They're my peers.
6  Q.  Do you know what salary grade level in the Ford
7      system is considered management?
8  A.  Is it 7 or 8?
9  Q.  Where did you obtain the understanding that
10     someone who is Grade 7 or 8 is a manager?
11 A.  I asked you was it 7 or 8.  I didn't say it was 7
12     or 8.  I said "Is it."
13 Q.  I know.  I'm asking you the questions.
14 A.  I don't know.  I know -- I think I was a 6, and
15     that's a supervisor, so I'm not quite -- quite
16     sure.  I'm sure it wouldn't be a 2 or 1 or 5.  I
17     don't think it goes lower, or that's something new
18     that I don't know.
19 Q.  Did you submit medical documentation to Ford
20     Motor Company to substantiate grounds for your
21     leave of absence following November 25, 2018?
22 A.  Can you repeat that for me just so I can get it
23     clear.
24         (The requested portion of the
25         record was read by the reporter at

Page 268

1          4:50 p.m.:
2          "Q.  Did you submit medical
3          documentation to Ford Motor Company
4          to substantiate grounds for your
5          leave of absence following
6          November 25, 2018?")
7          THE WITNESS:  Yes.
8  BY MS. HARDY:
9  Q.  Who did you submit that documentation to?
10 A.  To Les Harris.
11 Q.  Anyone else?
12 A.  I don't recall if it was anyone else.
13 Q.  All right.  And did you -- when did you submit
14     medical documentation to Les Harris?
15 A.  I don't recall the exact date.
16 Q.  Well, I understand you're not recalling exact
17     dates in the course of this deposition, but can
18     you give me any idea of when you claim you made
19     such a submission to Les Harris?
20 A.  I'm sure it would have been maybe a few days after
21     I left work.  Less than a week.
22 Q.  Okay.  And on any other occasion than that --
23     than the one you've just identified?
24 A.  I don't recall.
25 Q.  All right.  Did you submit on the occasion you

JOHNSON, DEANNA RENAE
10/07/2019



Page 269

```
 1        just identified the medical documentation from
 2        Sinai-Grace or from what physician, or was it not
 3        even from a physician?
 4   A.   Les Harris was given paperwork from all my
 5        physicians, from any physician that I went to from
 6        Sinai-Grace as well as St. John's Hospital where I
 7        had to be admitted in the day program as a result
 8        of this, which I believe was the beginning of
 9        December --
10   Q.   Okay.
11   A.   -- I think.  I'm so unsure of -- with the dates.
12        I'm on different medications they gave me.  I
13        don't know.
14                  MARKED FOR IDENTIFICATION:
15                  DEPOSITION EXHIBIT 9
16                  4:51 p.m.
17                  MS. HARDY:  Let the record reflect I'm
18        showing the witness Exhibit 9, which is a Ford
19        form entitled 5166 Medical Certification Form for
20        Hourly and Salaried Employees.
21   BY MS. HARDY:
22   Q.   Did you fill out this form?
23   A.   No.  My doctor filled this form out, not I.
24   Q.   Is the handwriting on page 1 -- is any of it your
25        handwriting?
```

Page 270

```
 1   A.   Yes.
 2   Q.   Yes?
 3   A.   Yes.
 4   Q.   Is all of the handwriting on page 1 your
 5        handwriting?
 6   A.   Yes.
 7   Q.   All right.  Turn to page 2.  Is that your
 8        physician's handwriting on page 2?
 9   A.   Yes.
10   Q.   And on page 3, is that your physician's
11        handwriting?
12   A.   Yes.
13   Q.   Okay.  And is this the last documentation that
14        you submitted to Ford in connection with your
15        medical leave of absence?
16   A.   No.
17   Q.   All right.  And what other documentation did you
18        submit to Ford?
19   A.   I can't recall all of the documentation but they
20        had my diagnosis.  They have every time that I've
21        been to the doctor and whatever paperwork of this.
22        What they would send me, I would send to them.
23        Well, actually not to them.  Les Harris was the
24        only one that I could communicate with at that
25        time.
```

Page 271

```
 1                  MARKED FOR IDENTIFICATION:
 2                  DEPOSITION EXHIBIT 10
 3                  4:53 p.m.
 4                  MS. HARDY:  Let the record reflect that
 5        I'm showing the witness Exhibit No. 10, a letter
 6        dated August 6, 2019, addressed to DeAnna Johnson
 7        at 29752 Farmbrook Villa Lane, Southfield,
 8        Michigan 48034.
 9   BY MS. HARDY:
10   Q.   You received this letter; correct?
11   A.   I sure did.  I wasn't living at this address.  You
12        sent this by FedEx, and I wasn't living -- this
13        was months after my house burned down, and I still
14        don't understand why you sent it to that address
15        when you had my new address.
16   Q.   How did you receive it if your house had burned
17        down?
18   A.   You sent it by FedEx and my neighbor told me that
19        the FedEx guy came to the burned-up house with
20        caution tape all around it and stuck a sticker on
21        the door.  I figured it had to be from you all.
22   Q.   And who is your neighbor next door?
23   A.   Her name is Dominic.
24   Q.   What's her last name?
25   A.   I have no idea of her last name.
```

Page 272

```
 1   Q.   When did you receive a copy of Exhibit 10?
 2   A.   This is August the 6th.  I received this -- matter
 3        of fact, I think I received this after the August
 4        the 13th.  When I finally received it, I think it
 5        was after the date that you had, because I hadn't
 6        been back over to that house.  Someone had to call
 7        me and tell me that the slip was stuck to the
 8        door.
 9   Q.   Well, that's not a response to my question.  Do
10        you know when you received this document?
11   A.   I'm not sure, but you have record of me signing
12        it.  I'm not sure.  I know it was after -- on
13        August the 13th.  I think it was after August 13th
14        when I finally received this.
15   Q.   Why do you recall that it was after August 13?
16        Why that particular date?
17   A.   Because I had to go and pick it up from FedEx.  I
18        just remember -- I think I remember reading it and
19        I go, "Well, August the 13th is past."
20   Q.   Why is August 13 sticking in your head?
21                  MS. LAUGHBAUM:  She just answered that.
22        Go ahead, DeAnna.
23   BY MS. HARDY:
24   Q.   I didn't hear what connection you're making to
25        August 13.
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**JOHNSON, DEANNA RENAE**
10/07/2019



Pages 273–276

Page 273

1   A.   My neighbor contacted me and told me that I had
2        that on my door -- a sticker on my door.
3   Q.   You've told me that.
4   A.   And --
5   Q.   That doesn't help with the date, though, unless
6        you --
7   A.   And I was -- I think I was unable to get over to
8        that house at that time.  And I remember when I
9        read the letter, when I finally got it, I said,
10       "Well, August the 13th has passed."  Because the
11       driver made several attempts to -- I guess, for me
12       and it had been a week prior after that.
13  Q.   All right.  So what you're referring to is the
14       fact that in the body of the letter, it refers to
15       August 13, and that's what -- why you're thinking
16       it was after August 13?
17  A.   No, actually the date really sticks out.  It's
18       because it says "Return to work on August the
19       13th."  It says -- let me see.  "This letter is to
20       advise you that company medical has received
21       clearance from..."
22            COURT REPORTER:  I'm sorry.  I can't --
23            THE WITNESS:  Oh, I'm so sorry.
24            MS. LAUGHBAUM:  Either read it slowly
25       or just read it to yourself.

Page 274

1            THE WITNESS:  Okay.  You said that I
2        need to return to work on the 13th said my
3        physician.  That's why the 13th sticks out,
4        because my physician sent you no such letter for
5        me to return to work.  That's why it sticks out to
6        me.
7   BY MS. HARDY:
8   Q.   All right.  But you don't know when you received
9        it?  You're just assuming it was after August 13?
10  A.   Oh, I know it was after August 13.
11  Q.   But you don't know when after August 13?
12  A.   No.
13  Q.   Okay.
14  A.   Not at this time.
15            MS. HARDY:  All right.  So we're going
16       to adjourn for the evening.  It's 5:00, and I need
17       to know if you will concur in another deposition
18       or whether we need to file a motion.
19            MS. LAUGHBAUM:  You'll need to get an
20       order.
21            MS. HARDY:  Okay.  So we will be filing
22       a motion.
23            VIDEO TECHNICIAN:  Going off the record
24       at 4:58 p.m.
25            (Off the video record at 4:58 p.m.)

Page 275

1            MS. HARDY:  I asked Ms. Baumhart just
2        as we were going off the record why it is she will
3        not concur in a second date --
4            MS. LAUGHBAUM:  Ms. Baumhart?
5            MS. HARDY:  I'm sorry.  I asked
6        Ms. Laughbaum why it was she would not concur in a
7        second day of deposition, given the status of all
8        the documents that we're missing.  And she wanted
9        to go back on the record to explain her rationale.
10            MS. LAUGHBAUM:  So the rationale would
11       be that under the court rules, you're entitled to
12       one day, maximum of seven hours, deposition.  I
13       believe we're close to that.  If we -- we haven't
14       gotten all the way to seven hours, my client and I
15       are happy to stay here until the seven hours is
16       up, but there's no reason to bring her back a
17       second day when we're here and available now, and
18       it's not -- you know, if your side didn't follow
19       up on medical releases and whatever else you
20       wanted to prepare for today, that's, you know,
21       your lookout, not ours, and we're just complying
22       with the court rules.
23            MS. HARDY:  And my rationale for asking
24       for another deposition is that we are missing many
25       documents that should have been produced prior to

Page 276

1   today's date, and we have run into one roadblock
2   after another with the witness not being able to
3   put together a basic time frame of when these
4   events occurred and constantly referring to the
5   need to look at her text messages that we do not
6   have.  She has referenced many text messages in
7   the course of this deposition that we have never
8   laid eyes on.
9            MS. LAUGHBAUM:  Let me just follow up.
10  If there was really an issue with our discovery
11  being deficient, I'm presuming Ford would have
12  filed a motion to compel, which they have never
13  done, but -- nor have they fully responded to my
14  pending motion to compel, so that's where we are.
15            MS. HARDY:  Very well.  Thank you.
16       (The deposition was concluded at 5:00 p.m.
17  Signature of the witness was not requested by
18  counsel for the respective parties hereto.)
19
20
21
22
23
24
25

JOHNSON, DEANNA RENAE
10/07/2019



Pages 277

```
                                                Page 277
 1                     CERTIFICATE OF NOTARY
 2    STATE OF MICHIGAN      )
 3                           ) SS
 4    COUNTY OF MACOMB       )
 5
 6             I, MELINDA S. MOORE, certify that this
 7    deposition was taken before me on the date
 8    hereinbefore set forth; that the foregoing
 9    questions and answers were recorded by me
10    stenographically and reduced to computer
11    transcription; that this is a true, full and
12    correct transcript of my stenographic notes so
13    taken; and that I am not related to, nor of
14    counsel to, either party nor interested in the
15    event of this cause.
16
17
18
19
20
21
22             MELINDA S. MOORE, CSR-2258
23             Notary Public,
24             Macomb County, Michigan
25         My Commission expires:   September 6, 2022
```

**EXHIBIT B**

# In the Matter Of:

## JOHNSON vs FORD MOTOR COMPANY

## DEANNA JOHNSON

### December 19, 2019

*Prepared for you by*



**Bingham Farms/Southfield_ • Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

JOHNSON, DEANNA
12/19/2019



Pages 278–281

---

Page 278

```
1                  UNITED STATES DISTRICT COURT
2                  EASTERN DISTRICT OF MICHIGAN
3                       SOUTHERN DIVISION
4
5    DEANNA JOHNSON,
6              Plaintiff,
7         vs.                 Case No. 19-cv-10167
8                             Hon. Gershwin A. Drain
9    FORD MOTOR COMPANY,      Magistrate Elizabeth A. Stafford
10   A Delaware corporation,
11             Defendant.
12   _____/
13
14
15        The Videotaped Deposition of DEANNA JOHNSON - Volume 2
16        Taken at 33 Bloomfield Hills Parkway, Suite 250,
17        Bloomfield Hills, Michigan,
18        Commencing at 1:07 p.m.,
19        Thursday, December 19, 2019,
20        Before Cheri L. Poplin, CSR-5132, RPR, CRR.
21
22
23
24
25
```

Page 279

```
1    APPEARANCES:
2
3    CAROL A. LAUGHBAUM
4    Sterling Attorneys at Law, P.C.
5    33 Bloomfield Hills Parkway
6    Suite 250
7    Bloomfield Hills, Michigan 48304
8    248.644.1500
9    claughbaum@sterlingattorneys.com
10       Appearing on behalf of the Plaintiff.
11
12   ELIZABETH P. HARDY
13   THOMAS J. DAVIS
14   Kienbaum, Hardy, Viviano, Pelton & Forrest, P.L.C.
15   280 North Old Woodward Avenue
16   Suite 400
17   Birmingham, Michigan 48009
18   248.645.0000
19   ehardy@khvpf.com
20   tdavis@khvpf.com
21       Appearing on behalf of the Defendant.
22
23   ALSO PRESENT:
24   Shawn Capron - Video Technician
25
```

Page 280

```
1                      TABLE OF CONTENTS
2
3    WITNESS                                          PAGE
4    DEANNA JOHNSON
5    EXAMINATION BY MS. HARDY                          324
6
7                       EXHIBITS
8    (Exhibits attached to transcript.)
9    MARKED          DESCRIPTION                      PAGE
10   EXHIBIT 11    Job application                    327
11   EXHIBIT 12    Records from Z Technologies        358
12   EXHIBIT 13    Records from Cadillac Plastics
                   Manufacturing                      369
13
     EXHIBIT 14    Texts between Ms. Johnson and
14                 Mr. Rowan, Bates PLTF003194        377
15   EXHIBIT 15    Texts between Ms. Johnson and
                   Mr. Rowan, Bates PLTF003205        382
16
     EXHIBIT 16    Texts between Ms. Johnson and
17                 Mr. Rowan, Bates PLTF003209 to
                   PLTF003210                         383
18
     EXHIBIT 17    Texts between Ms. Johnson and
19                 Mr. Rowan, Bates PLTF003215 to
                   PLTF003216                         392
20
     EXHIBIT 18    Texts between Ms. Johnson and
21                 Mr. Rowan, Bates PLTF003223        393
22   EXHIBIT 19    Texts between Ms. Johnson and
                   Mr. Markavich, Bates PLTF002783 to
23                 PLTF002791                         399
24   EXHIBIT 20    Texts between Ms. Johnson and
                   Mr. Rowan, Bates PLTF003138 to
25                 PLTF003139                         406
```

Page 281

```
1    EXHIBIT 21    Texts between Ms. Johnson and
                   Mr. Rowan, Bates PLTF003149        407
2
     EXHIBIT 22    Texts between Ms. Johnson and
3                  Mr. Rowan, Bates PLTF003153        424
4    EXHIBIT 23    Texts between Ms. Johnson and
                   Mr. Rowan, Bates PLTF003072 to
5                  PLTF003074                         426
6    EXHIBIT 24    Texts between Ms. Johnson and
                   Mr. Rowan, Bates PLTF003183        431
7
     EXHIBIT 25    Emails dated 11/9/18 re: Process
8                  Coaches Training Session           454
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

JOHNSON, DEANNA
12/19/2019



EXHIBIT B

Pages 282–285

---

Page 282

1  Bloomfield Hills, Michigan
2  Thursday, December 19, 2019
3  1:07 p.m.
4
5            VIDEO TECHNICIAN:  We are now on record.
6  This is the video recorded deposition of Deanna
7  Johnson, Volume 2, being taken on Thursday,
8  December 19th, 2019.  The time is now 1:07 p.m.  We
9  are located at 33 Bloomfield Hills Parkway, Bloomfield
10 Hills, Michigan.  We are here in the matter of Deanna
11 Johnson versus Ford Motor Company.  The case is -- the
12 case number 219-cv-10167.
13            My name is Shawn Capron, video technician.
14 Will the court reporter swear in the witness and the
15 attorneys briefly identify themselves for the record.
16            DEANNA JOHNSON,
17 was thereupon called as a witness herein, and after
18 having first been duly sworn to testify to the truth,
19 the whole truth and nothing but the truth, was
20 examined and testified as follows:
21            MS. LAUGHBAUM:  Carol Laughbaum on behalf
22 of the plaintiff, Deanna Johnson.
23            MS. HARDY:  Elizabeth Hardy on behalf of
24 Ford Motor Company.
25            MR. DAVIS:  Thomas Davis on behalf of Ford

---

Page 283

1  Motor Company.
2                  EXAMINATION
3  BY MS. HARDY:
4  Q.  Good afternoon, Ms. Johnson.
5  A.  Good afternoon.
6  Q.  Did you review any documents to prepare for today's
7      deposition?
8  A.  My own deposition.
9  Q.  Did you read through your entire deposition?
10 A.  Briefly, yes.
11 Q.  Okay.  But you read it from the beginning to the end;
12     correct?
13 A.  Yes.
14 Q.  All right.  Have you looked at any other documents in
15     preparation for your deposition today?
16 A.  No.
17 Q.  Even briefly?
18 A.  No.
19 Q.  Even glancing?
20 A.  No.
21 Q.  Okay.  So the only physical thing you've looked at is
22     your first day of deposition?
23 A.  Yes.
24 Q.  All right.  Have you communicated with anyone who you
25     used to work with at Ford Motor Company at any point

---

Page 284

1      in time since leaving about the allegations you're
2      making in this lawsuit?
3  A.  No.
4  Q.  Have you attempted to reach out to anyone with whom
5      you formerly worked about your allegations in this
6      lawsuit?
7  A.  No.
8  Q.  For the purpose of finding out what their recall is,
9      to see if they have any information that would be
10     consistent with your recall, for any purpose?
11 A.  No.
12 Q.  All right.  Let's talk about your job history.  You
13     applied for a job at Ford in June 2018; correct?
14 A.  Yes.
15 Q.  And you filled out a job application; correct?
16 A.  Yes.
17 Q.  Okay.  And you submitted a resume that you'd prepared
18     in advance of filling out your job application to Ford
19     at the time you applied; correct?
20 A.  I didn't do the resume, but . . .
21 Q.  Who did the resume?
22 A.  A friend of mine did the resume.
23 Q.  And what -- who's that friend?
24 A.  She's moved now.  Her name is Melinda.  She lives in
25     Georgia.

---

Page 285

1  Q.  What's Melinda's last name?
2  A.  I have no idea.  She just got married, so I don't
3      know.  I just -- we really called her Mel.
4  Q.  How had you become friends with Melinda?
5  A.  Through another friend, through a mutual friend.
6  Q.  How long had you known Melinda?
7  A.  Couple of years maybe.
8  Q.  Were you personal friends?
9  A.  No.
10 Q.  Did you work with her?
11 A.  No.
12 Q.  How did you -- what kind of relationship did you have
13     with her?
14 A.  She did resumes, and a friend of mine told me that she
15     did really good resumes.
16 Q.  Okay.  And did you give her information so that she
17     would know the content to put in your resume?
18 A.  My birth date, things like that.  Just gradual
19     content.
20 Q.  How did you convey to her where you'd worked and what
21     you'd done and your dates of employment, et cetera,
22     that you included in your resume?
23 A.  I gave her gradual contents, maybe the places that
24     I've worked previously so they could have my work
25     history, but that's about it.  She put the resume

---

JOHNSON, DEANNA
12/19/2019



Pages 286–289

Page 286

1      together for me because I didn't know how.
2   Q.   All right.  So let's mark as Deposition Exhibit
3        Number 11 your job application.  Here's a copy.
4              MS. HARDY:  Copy for counsel.  Copy for the
5        court reporter.
6              (Marked EXHIBIT 11 at 1:12 p.m.)
7   BY MS. HARDY:
8   Q.   Deposition Number 11 is Bates stamped Ford/D. Johnson
9        1 through 13, and if you turn to Pages 12 and 13 you
10       will see what purports to be a resume.  Can you please
11       briefly review 12 and 13?
12             The resume which has been Bates stamped
13       Pages 12 and 13 and is part of Exhibit Number 11 is
14       the resume you submitted to Ford; correct?
15  A.   Correct.
16  Q.   All right.  And is this the resume that you claim
17       Melinda prepared for you?
18  A.   Yes.
19  Q.   All right.  And did you provide to her the information
20       contained in this resume?
21  A.   I provided some information.
22  Q.   What information did you provide to her?
23  A.   The places of where I previously worked.
24  Q.   Did you provide the dates of your employment?
25  A.   I can't recall.  I could have.  I can't recall if I

Page 287

1        gave her the dates or not.
2   Q.   Well, how would she know what dates to put down if you
3        didn't provide them to her?
4   A.   I can't recall.  I could have given her the dates, but
5        I can't recall if I did or not.
6   Q.   Did you tell her what your job was at the various
7        places of employment?
8   A.   Yes, I did.
9   Q.   Okay.  So you see underneath, for instance, Triton
10       Force Manufacturing, a whole bunch of items listed,
11       quality management for 26 employees, root cause
12       analysis specialist, and I won't read them all but
13       there's several -- several more listed.  Did you
14       provide that information to her?
15  A.   I provided some of this information but not the name
16       of the company.  She could have gotten that mixed up
17       with some other resumes.  But this -- this seems like
18       what it -- what I did at a previous job.
19  Q.   What do you mean she could have gotten the name of the
20       company mixed up?
21  A.   I don't know because I didn't work for Triton Force.
22  Q.   Did you review this resume when she completed it for
23       accuracy?
24  A.   Actually not at the time because I sent it straight
25       in.

Page 288

1   Q.   You sent it straight to Ford?
2   A.   Yes.
3   Q.   So you had somebody prepare a resume for you
4        purporting to quantify where you'd worked, when, and
5        what job duties you had had and you did not bother to
6        review it before you submitted it to Ford?
7   A.   No, I didn't.  I should have, though.
8   Q.   So let's go on.  So you claim you never worked at
9        Triton Force Manufacturing?
10  A.   No.
11  Q.   Okay.  Did you work anywhere from February 2017 to
12       present, to the time you -- to the time you applied
13       for a job with Ford?
14  A.   Yes, I did.  I can't quite remember the dates.  I
15       can't quite remember the dates, but yes, I did.
16  Q.   Where did you work?
17  A.   Peter-Lacke.
18  Q.   Spell that, please.
19  A.   P-E-T-E-R, L-A-C-K-E or L-A-K-E.
20  Q.   Where is that business located?
21  A.   Troy, Michigan.
22  Q.   What do you do for them?
23  A.   I was a root cause analyst specialist.  I inspected a
24       lot of the metal and the steel coatings, a lot of the
25       materials.  I did a lot of analyzing.

Page 289

1   Q.   So all of the -- the bullet points that are listed
2        under the Triton Force Manufacturing position, were
3        those all job duties that you performed for
4        Peter-Lacke in Troy, Michigan?
5   A.   I wouldn't say all of them, but the majority, yes.
6   Q.   And you have no idea where she got the name Triton
7        Force Manufacturing?
8   A.   No.
9   Q.   All right.  And you have no contact information for
10       Melinda?
11  A.   No, I don't.  Not anymore.
12  Q.   And you don't know her last name?
13  A.   No.  I never knew her last name.
14  Q.   Who are your friends that you have in common with
15       Melinda?
16  A.   Just various -- various friends that I know.
17  Q.   Who?  I need names.
18  A.   I can't recall at this time what friends' names.
19  Q.   Can you recall a single friend that knows Melinda?
20  A.   I have a friend named Kathy.  I don't know her last
21       name, though, either.  I call her Kat.  I don't . . .
22       Melinda was just -- she wasn't a friend.  She was
23       someone who did resumes.  That's all we knew.  That's
24       all I knew her from.  I didn't know her last name,
25       anything else about her.

JOHNSON, DEANNA
12/19/2019



Pages 290–293

Page 290

1   Q.   Who introduced you to her?
2   A.   I can't recall how I even met her.  I know I met her
3        through a mutual friend.
4   Q.   When did you meet her?
5   A.   Couple years back.  That's it.
6   Q.   How long had you known her before you entrusted
7        doing -- having her prepare a resume that you were
8        going to submit to Ford Motor Company without even
9        reviewing?
10  A.   Probably two weeks.  I didn't know her that well at
11       all.  But I knew -- I had got great reviews, you know,
12       at that time.
13  Q.   Did you ever look at the resume that you submitted to
14       Ford Motor Company after the fact to determine whether
15       or not it was accurate?
16  A.   No.  Why would I look at it after the fact?
17  Q.   Just answer my question.  You did not bother; correct?
18  A.   No, I did not.
19  Q.   So is the first time you looked at the resume during
20       the course of this litigation?
21  A.   Actually yeah.  I think so.  I can't remember.  I
22       can't recall.  But I think so.
23  Q.   You haven't --
24  A.   Possibly.
25  Q.   -- looked at the resume in the course of -- have you

Page 291

1        looked at your resume that you submitted to Ford Motor
2        Company prior to today's deposition?
3   A.   No.  Why would I look at it when I was working?
4   Q.   You're not here to ask me questions.
5   A.   Oh, I'm sorry --
6   Q.   Just answer the question.
7   A.   -- but no, I did not.
8   Q.   Okay.  So you're seeing this resume for the very first
9        time; correct?
10  A.   I think so.  I'm not quite sure.  But I think so.
11  Q.   Okay.  Let's go to the rest of the application.  So
12       you filled out this application for Ford; correct?
13  A.   Correct.
14  Q.   Pages 1 through 11; correct?
15  A.   Correct.
16  Q.   All right.  And you submitted or input into the Ford
17       system the information that's on Pages 1 through 11;
18       correct?
19  A.   Correct.
20  Q.   Okay.  And you provided an electronic signature on
21       this application which appears on Page 11; correct?
22  A.   Correct.
23  Q.   All right.  Did you review the submission that you
24       made before sending it to Ford?
25  A.   I don't remember.

Page 292

1   Q.   When you filled out the application and typed in the
2        various answers to the questions, were you working
3        from memory or from any -- anything before you?
4   A.   Working from memory.
5   Q.   Okay.  All right.  So let's go to Page 3.  Let's look
6        at the bottom where it asks employer names.  If you'd
7        never worked for Tri Force or Triton Force
8        Manufacturing, why did you answer that you worked for
9        Tri Force Manufacturing on your job application with
10       Ford Motor Company?
11  A.   I'm not quite sure of that.
12  Q.   You can't think of any reason why you'd put that down
13       if you'd never worked for them?  Is that your answer?
14  A.   That's my answer, because I'm not quite sure.
15  Q.   Okay.  So why'd you put down you were quality
16       inspection specialist with Tri Force Manufacturing if
17       you'd never even worked for that company?
18  A.   You know, I'm not quite sure.  Maybe after that I --
19       I'm not quite sure.  I'm not quite sure.  Maybe I
20       looked at it and just let it go.  I don't know.
21  Q.   What do you mean you looked at it and let it go?  How
22       did you even think to put the name of a company down
23       on an application if you'd never worked for the
24       company?
25  A.   I don't quite remember.  This was -- during the

Page 293

1        application is this -- did this come from off of the
2        resume or is this something that you have to type in?
3   Q.   I'm here to ask you questions.
4   A.   Well, I'm not sure about that because I don't know if
5        it came off my resume and was automatically filled
6        in or did I actually have to type it in, because I
7        can't quite remember.
8   Q.   All right.  So let's -- let's stay for a moment with
9        the company you claimed you worked for.  I need a
10       little more information on that.  Peter-Lacke in Troy,
11       what were your dates of employment?
12  A.   I can't remember.
13  Q.   Who did you report to?  Well, do you have any idea how
14       long you worked there?
15  A.   Approximately seven months maybe.  I can't quite
16       remember.
17  Q.   What year or years?
18  A.   Right before Ford.
19  Q.   Did you work there right up until the time you applied
20       at Ford?
21  A.   No.
22  Q.   Did you leave Peter-Lacke to work for Ford?
23  A.   No.
24  Q.   All right.  How soon before starting with Ford on
25       June 25, 2018, did you leave Peter-Lacke?

JOHNSON, DEANNA
12/19/2019



EXHIBIT B
Pages 294-297

Page 294

1   A.   Maybe just a few months.
2   Q.   What kind of business was Peter-Lacke?
3   A.   It was paint.
4   Q.   What kind of paint business?
5   A.   Paint for -- for the automotive industry.  It was all
6        automotive.
7   Q.   Well, did they manufacture paint or did they apply?
8        What -- what did they do in the paint business?
9   A.   They manufactured paint for Ford, GM, and Chrysler.
10  Q.   Are they still in business, to your knowledge?
11  A.   Yes.
12  Q.   What was your job at Peter-Lacke?
13  A.   I was a quality inspection specialist.
14  Q.   Who did you report to at the time you left?
15  A.   Phil Kim.
16  Q.   Spell his last name.
17  A.   K-I-M.
18  Q.   Did you report to anyone other than Phil Kim?
19  A.   No.
20  Q.   At any point during the course of your employment with
21       Peter-Lacke, were there any criticisms of the quality
22       of your performance?
23  A.   None at all.
24  Q.   At any point in time during your employment with
25       Peter-Lacke, was there ever any suggestion that you

Page 295

1        had an attendance problem or a tardiness problem?
2   A.   None at all.
3   Q.   During the course of your employment with Peter-Lacke
4        was there ever a question raised about your ability to
5        get along with people?
6   A.   Not at all.
7   Q.   During the course of your employment with Peter-Lacke
8        was there ever a question raised about your ethics?
9   A.   My work ethics?
10  Q.   Your ethics, your integrity, your honesty.
11  A.   No.
12  Q.   Anything of that sort.
13  A.   None at all.
14  Q.   Was your departure from Peter-Lacke completely
15       voluntary on your part?
16  A.   Somewhat.  It was 50/50.
17  Q.   Describe, please.  What was the 50/50?
18  A.   There was a dispute.
19  Q.   About what?
20  A.   Between me and another gentleman.  And I felt like --
21  Q.   What kind of dispute?
22  A.   He called me a nigger.
23  Q.   Who was this other gentleman?
24  A.   Another employee.
25  Q.   What's his name?

Page 296

1   A.   Nicholas Calabet (ph).  I can't recall his last name.
2        Calabat (ph) or something like that.
3   Q.   Did you file a complaint internally?
4   A.   Yes, I did.
5   Q.   Did you file an external complaint?
6   A.   Yes, I did.
7   Q.   Did you file a complaint with the EEOC or the --
8   A.   No, I did not.
9   Q.   -- Michigan Department of Civil Rights?
10  A.   No, I did not.
11  Q.   Did you file a lawsuit?
12  A.   No, I did not.
13  Q.   What kind of complaint did you file externally?
14  A.   I -- I'm sorry.  When you say externally, I --
15  Q.   Outside the company.
16  A.   Oh.  I did not.
17  Q.   All right.  Who did you complain to within the
18       company?
19  A.   HR.
20  Q.   And what was the content of the complaint or the
21       substance of it?
22  A.   I went to HR and I was 100 percent honest and I wrote
23       out a complaint and I told them that this gentleman
24       continues to call me -- we had a color of a black
25       paint called -- I can't quite remember.  It was A87 or

Page 297

1        something like that.  And he would call me a nigger
2        and then he would call me A87.  That's how he would
3        direct his comments.
4   Q.   Was he a coworker or a supervisor?
5   A.   He was a coworker.
6   Q.   What was the resolution of the complaint?
7   A.   Well, when I went to HR I was fed up.  They did
8        nothing at the time.  I went back to HR.  They -- they
9        actually -- they talked to him.  They suspended him.
10       And he continued to do so.  And when he did it for the
11       last time, I was so upset, I went into HR and I said,
12       "I told him if he calls me a nigger again, I'm going
13       to kick his ass."  And then the next day I sat at a
14       table with HR and with him.  They dismissed him, and
15       they told me that we do not condone violence here, so
16       you have a choice, and they wanted to offer me a
17       severance package, and I didn't take the severance
18       package nor did I file a lawsuit.  I walked away.
19  Q.   Did you consult a lawyer?
20  A.   No.
21  Q.   Why did you not disclose on your Ford application that
22       you'd worked for Peter-Lacke for seven months?
23  A.   I have no idea.  I thought maybe was the
24       mix-up with the Triton thing, so I don't under -- I
25       didn't understand that.

JOHNSON, DEANNA
12/19/2019



Page 298

1   Q.   You have no idea why the name Peter-Lacke does not
2        show up on your Ford application?
3   A.   I have no idea.
4   Q.   Even though you'd worked there just months before you
5        filled out that application?
6   A.   I had --
7   Q.   And you're the one who filled out the application and
8        you --
9   A.   Maybe because I was upset with them. I don't know. I
10       just didn't feel the need to put them down.
11  Q.   Oh, so you're saying --
12  A.   Which I thought I did. I'm not quite sure.
13  Q.   Is it that you didn't feel the need or you just didn't
14       remember or you have no idea why you didn't put it
15       down?
16  A.   I have no idea why I didn't put it down. I don't
17       remember. I could have given that information to Mel
18       when she did my resume. I don't know. I don't kind
19       of quite remember because it was a little while back.
20  Q.   Did you file for unemployment comp with Peter-Lacke?
21  A.   No, I did not.
22  Q.   Why not?
23  A.   To be honest, I didn't want to have anything to do
24       with them. I was disgusted. I could have called a
25       lawyer. I could have called the EEOC. I had every

Page 299

1        right to. But I didn't. I just wanted to work.
2   Q.   Did you talk to Phil Kim about your complaint and the
3        reason -- your complaint about your coworker and the
4        reason why you were resigning from the company?
5   A.   Yes, I did.
6   Q.   What did you tell him?
7   A.   I told him everything that was going on, which he
8        already knew of everything that was going on, and he
9        was crying and begging them not to do this.
10  Q.   All right. So let's look at Page 4 of Exhibit
11       Number 11, which makes a reference to your employment
12       with Z Tech Manufacturing. That's Z Technologies;
13       correct?
14  A.   Correct.
15  Q.   Okay. And you indicate you were a quality -- you just
16       indicate position title is quality, but your resume
17       indicates that your job there was quality inspection
18       specialist. Is quality inspection specialist the job
19       you claimed you had at Z Technology?
20  A.   Yes, I do.
21  Q.   Okay. So -- so the woman Melinda who created your
22       resume got that detail right?
23  A.   Yes. I guess so.
24  Q.   Okay. And your dates of employment as you inputted
25       into the Ford system with Z Technology was February 2,

Page 300

1        2015, through February 2, 2017. Do you see that on
2        Page 4?
3   A.   Yes, I do.
4   Q.   Okay. And those dates are correct?
5   A.   I'm not sure if those are correct or not.
6   Q.   What's causing you to question whether the dates that
7        you inputted into the Ford application are correct or
8        not correct?
9             MS. LAUGHBAUM: Let me just object that the
10       witness already testified she wasn't sure who inputted
11       the data.
12            MS. HARDY: You know, this is -- this is an
13       inappropriate coaching objection and you know it and
14       I'm asking you to please stop.
15            MS. LAUGHBAUM: I will finish my objection.
16       My objection is --
17            MS. HARDY: No. You are inappropriately
18       coaching the witness and I'm asking you to stop.
19            MS. LAUGHBAUM: You are assuming facts not
20       in evidence and you're mischaracterizing the record.
21            MS. HARDY: All right. Let's move on.
22  BY MS. HARDY:
23  Q.   So you have no idea whether the dates on your Ford
24       application, February 2, 2015, to February 2, 2017,
25       are correct or not? Is that your testimony?

Page 301

1   A.   Right. Yes.
2   Q.   Do you know sitting here today when you worked at
3        Z Technology?
4   A.   I worked for Z Technologies for a year. I cannot
5        remember what year. Right now I can't remember the
6        year.
7   Q.   So if you remember sitting here today you only worked
8        there for one year --
9   A.   I think it was a year.
10  Q.   -- why did you put two years on your employment
11       application with Ford?
12  A.   I'm not quite sure. I could have -- I'm not quite
13       sure.
14  Q.   Do you think it's important to be accurate when you're
15       filling out an employment application and representing
16       your employment history to a prospective employer?
17  A.   Yes, I do.
18  Q.   All right. And do you take the time and pay
19       appropriate attention to be sure you're not misleading
20       the employer with inaccurate information?
21  A.   Yes, I do.
22  Q.   All right. But you can't explain why you indicated to
23       Ford that you worked for Z Technology for two years
24       when, in fact, you only worked there one year?
25  A.   Was that a question? I'm sorry.

JOHNSON, DEANNA
12/19/2019



Pages 302–305

Page 302

1  Q.  It was a question.
2  A.  I'm sorry.  Can you repeat?
3          MS. HARDY:  Can you read it back, please?
4          COURT REPORTER:  But you can't explain why
5  you indicated to Ford that you'd worked for
6  Z Technology for two years when, in fact, you only
7  worked there one year?
8  A.  No.
9  BY MS. HARDY:
10  Q.  What do you claim you did for Z Technology as a
11  quality inspection specialist?
12  A.  Z Technology also deals with paint for the automotive
13  company, Bargeliners, things like that.  Ford's blue
14  comes from Z Technologies.  When the batch makers
15  would make the paint up, they would bring it for me
16  for inspection and I would have to put it through
17  various tests to see the elasticity, the weather, just
18  different things, so many different tests.  That was
19  my job to make sure that that paint was sustainable
20  for Ford, Chrysler, GM, or whomever that we had
21  contracts for.
22  Q.  Were you a supervisor?
23  A.  No.
24  Q.  Did you hold -- were you ever a supervisor at
25  Z Technology?

Page 303

1  A.  No.
2  Q.  Were you always a quality inspection specialist?
3  A.  Yes.
4  Q.  So that's the only job you held there?
5  A.  Yes.
6  Q.  All right.  And did you ever have any criticisms of
7  your job performance while at Z Technology?
8  A.  Never.
9  Q.  Were there ever any criticisms of your attendance or
10  suggestions that you had a tardiness problem?
11  A.  No.  I was employee of the month several times at
12  Z Technology.
13  Q.  Was there ever any questions or concerns conveyed
14  about your ethics or integrity?
15  A.  No.
16  Q.  Was your departure from Z Technology voluntary on your
17  part?
18  A.  Yes.
19  Q.  Completely?
20  A.  Yes.
21  Q.  Okay.  And why do -- why did you leave?
22  A.  Because my -- because one of the supervisors there
23  bent me over a desk and wanted to have sex with me.
24  Q.  All right.  So you're claiming you left due to that
25  incident?

Page 304

1  A.  Yes.
2  Q.  And otherwise your employment was -- was going just
3  fine?
4  A.  Yes.
5  Q.  And there were never any negative issues that you were
6  aware of from your employer's perspective?
7  A.  Never was written up.  None.
8  Q.  All right.  Let's go down to the bottom of Page 4 on
9  Exhibit 11 or within Exhibit 11.  You indicate
10  under Employer 3 that you worked for Cadillac Plastics
11  Manufacturing.  Do you see that?
12  A.  Yes, I do.
13  Q.  All right.  Did you actually work there?
14  A.  Yes, I did.
15  Q.  Okay.  And were you a production supervisor as you
16  indicate on your job application?
17  A.  No.  I was actually getting promoted to that position
18  when I decided to leave.
19  Q.  Why did you represent to Ford that you were a
20  production supervisor at Cadillac Plastics
21  Manufacturing if you were not?
22  A.  Well, actually in my interview, if I recall, that came
23  up, and I explained to them that I was on my way to
24  being a supervisor at that time, because I think the
25  young man that interviewed me knew my former

Page 305

1  supervisor and he had just passed and he knew about
2  the changeover.  We had changed that during my
3  interview.
4  Q.  Why did you put it in the application itself that that
5  was your job title if that was not your job title?
6  A.  Probably to get a better position.  Could have smudged
7  it.
8  Q.  Smudged it to get a better position?
9  A.  Because that was the position that I was going for and
10  that was the position that I knew that I could handle
11  and what I was basically coming from.
12  Q.  But you'd never performed that job, had you?
13  A.  I performed that job but not that title.
14  Q.  You'd never held the --
15  A.  Title.
16  Q.  -- position of production supervisor prior to coming
17  to Ford Motor Company, had you?
18  A.  I've never held that title, but I had performed
19  several duties in that field.
20  Q.  You wanted Ford to believe you'd been a production
21  supervisor prior to coming to Ford because you were
22  applying for a production supervisor job; correct?
23  A.  Correct.
24  Q.  All right.  So who is it at Ford who you claim knew
25  your supervisor at Cadillac Manufacturing?

JOHNSON, DEANNA
12/19/2019



Pages 306–309

Page 306

1   A.   I can't quite remember.  Whomever interviewed me.
2   Q.   You have no idea who it is?
3   A.   Whomever interviewed me.
4   Q.   All right.  And how did you know that they knew your
5        supervisor at Cadillac Plastics Manufacturing?
6   A.   Because we had a conversation about him.
7   Q.   All right.  Who was the supervisor you're referring to
8        at Cadillac Plastics Manufacturing?
9   A.   His name was Dave.  I think he's passed.
10  Q.   Do you know what Dave's last name was?
11  A.   No.  But -- no, I don't.
12  Q.   Where did you -- how did you learn that he'd passed?
13  A.   Because someone had told me that he passed that used
14       to work there.
15  Q.   When did he pass away?
16  A.   I don't -- I don't quite know the dates.  I wasn't
17       there when he passed away.
18  Q.   Do you have any idea when he passed away?
19  A.   I didn't know Dave that well and I didn't get any
20       information from his funeral because I wasn't there
21       anymore.  So no.  No one would have contacted me and
22       said, hey, Deanna, Dave died.
23  Q.   Well, but somebody obviously told you and the question
24       is when did they tell you and what did they tell you?
25  A.   When I was just talking about Cadillac gradually to a

Page 307

1        ex-coworker, I can't remember who or when, but they
2        told me that he had passed, and then when I got to my
3        interview they also confirmed that he had passed, and
4        I said yeah, I heard that.
5   Q.   All right.  So he'd already passed away at the time of
6        your interview for the Ford job?
7   A.   I believe so.
8   Q.   All right.  So what job -- jobs did you hold at
9        Cadillac Plastic Manufacturing since your resume only
10       indicates production supervisor and that's not
11       correct?
12  A.   I held quality.
13  Q.   What job in quality did you hold?
14  A.   It was several jobs.  Quality details from going place
15       to place in the plant, different jobs.
16  Q.   What were your job titles?
17  A.   Just quality control.
18  Q.   Were you ever a supervisor?
19  A.   I was on my way to being a supervisor, but no, I
20       didn't get a chance to get that title.
21  Q.   So you'd never supervised anybody at Cadillac Plastics
22       Manufacturing?
23  A.   I don't recall.  I was going through a trial period,
24       so . . .
25  Q.   Prior to going to Ford Motor Company had you ever held

Page 308

1        the title of supervisor?
2   A.   Yes.
3   Q.   In what job?
4   A.   Several jobs, Publix, a management company, several --
5        several jobs.  I'm 55.  I've had several jobs since
6        way before then.  I can't remember the names or a lot
7        of the titles, but I've had supervisor --
8   Q.   Can you recall any company that you claim you held a
9        supervisory position other than Publix?
10  A.   A management company that I worked for.  Oh, my
11       goodness.  I can't think of off the top of my head,
12       but I have held supervisor positions before.
13  Q.   All right.  So let's go back to Cadillac Plastic
14       Manufacturing.  How long did you work for that
15       company?
16  A.   I can't remember how long.
17  Q.   Well, let's look at your job application with Ford
18       Motor Company and what you represented to them.  You
19       indicate August 20th, 2008, through March 2, 2015.  Is
20       that accurate?
21  A.   No.  That's not accurate.
22  Q.   Okay.  Well, you have no idea what's accurate?  Is
23       that off by a little, off by a lot?
24  A.   It's -- it's off.
25  Q.   Okay.  How much is it off by?

Page 309

1   A.   I'm not quite sure how much it's off by, but it's off.
2   Q.   Well, did you work for them for a year, less than a
3        year, two years, three years?
4   A.   Less than a year.
5   Q.   Less than a year.  And you indicate here that you'd
6        worked for them for seven years, in the neighborhood
7        of seven years; correct?
8   A.   Correct.
9   Q.   Why did you tell Ford you'd worked for them for seven
10       years if you'd actually worked for them less than a
11       year?
12  A.   I don't recall saying that I worked for them for seven
13       years.  I don't know.
14  Q.   You have no idea why you put that into your
15       application?
16  A.   No.
17  Q.   Let's look at your resume that you submitted to Ford
18       Motor Company.  Let's look at Page 13 under
19       "Production Supervisor."  You put on your resume
20       August 2008 to March 2015.  Do you have any idea where
21       Melinda got that idea that you'd worked for them for
22       nearly seven years?
23  A.   No.  I don't know where she got that idea from.  Maybe
24       she smudged it to make me look better to get the
25       position.  I don't know.

JOHNSON, DEANNA
12/19/2019



Pages 310–313

Page 310

```
1   Q.  And then when you filled out the application with
2       Ford, you decided to smudge it, too, and make it look
3       just like the resume?
4   A.  I didn't say that.  You said that.  And I don't
5       know -- I don't recall if I did that or not.  So I
6       can't say that -- you said that.  I don't recall if I
7       did that.
8   Q.  Well, what do you mean you don't recall if you did it?
9       You filled out the application; correct?
10  A.  I think so.  Yes.
11  Q.  Yeah.  And you're the one that signed it after
12      reviewing it; correct?
13  A.  I didn't review it, but I signed it.
14  Q.  Okay.  And you signed it -- you filled it out and
15      signed it all at the same time; correct?
16  A.  Correct.
17  Q.  Okay.  And is it just coincidental that your job
18      application with Ford purports that you worked for
19      Cadillac Manufacturing from August 2, 2008, to
20      March 2, 2005, and the resume that you submitted to
21      Ford has the exact same dates?
22  A.  I don't know.  Is there a way that your resume
23      transfers over to your application?
24  Q.  You're not here to ask me questions.
25  A.  Well, I'm sorry.  I don't know.  Because I think
```

Page 311

```
1       that's a possibility.
2   Q.  You think that somehow the Ford application just picks
3       up everything in the resume and inserts it all on its
4       own or corrects what you put in there and inserts
5       information from your resume?
6   A.  Well, some companies, they do them.
7   Q.  Well, all right.  You don't have any reason to believe
8       that Ford does that, do you?
9   A.  I don't know what Ford's does with their process on
10      their applications and their resumes.
11  Q.  So what do you mean you were on your way to becoming a
12      supervisor at Cadillac Plastics Manufacturing?
13  A.  Well, there was a supervisor position opening and I
14      was training for that position.
15  Q.  Were you formally training for it?
16  A.  I was training for it before I left.
17  Q.  Okay.  And who had put you in a training position for
18      that job?
19  A.  Dave.
20  Q.  Dave who?
21  A.  The supervisor, my former supervisor.
22  Q.  Who passed away?
23  A.  Yes.
24  Q.  Okay.  And how long had you been training for that
25      job?
```

Page 312

```
1   A.  Just a couple of weeks.
2   Q.  Had it been promised to you once you completed the
3       training?
4   A.  Yes.
5   Q.  By Dave?
6   A.  Yes.
7   Q.  The guy who passed away?
8   A.  Yes.
9   Q.  And you don't have any information about his last
10      name; correct?
11  A.  No, I don't.
12  Q.  Why did you leave Cadillac Plastic Engineering?
13  A.  The pay was not enough and it was just -- it was just
14      too far.
15  Q.  Where was it located?
16  A.  Roseville.
17  Q.  Was your departure completely voluntary on your part?
18  A.  Yes, it was.
19  Q.  Okay.  And was there ever any suggestion that you had
20      an attendance or tardiness problem?
21  A.  No.  They hated when I left.
22  Q.  They were really disappointed when you left?
23  A.  Yes, they were.
24  Q.  Okay.  Who was disappointed when you left?
25  A.  All of my coworkers, HR.
```

Page 313

```
1   Q.  Can -- who in HR?
2   A.  I can't remember her name in HR.  But they did not
3       want me to leave.
4   Q.  Do you have the first and last name of anybody that
5       you worked with at Cadillac Plastics Engineering who
6       was really disappointed when you left?
7   A.  First and last names?  No.  Just all of my coworkers
8       there.
9   Q.  Can you -- can you give me the name of anybody?
10  A.  I can give you first names, but I can't remember all
11      of -- all of their last names.  I don't --
12  Q.  Can you remember anyone's last name?
13  A.  The only person -- the last name that I knew was the
14      head of HR.
15  Q.  What name is that?
16  A.  That is Rena Cross.
17  Q.  R-E-N-A Cross, --
18  A.  Yes.
19  Q.  -- C-R-O-S-S?
20  A.  Yes.
21  Q.  Has she passed away too?
22  A.  Excuse me?
23  Q.  Has she passed away?
24  A.  No.  She's not passed away.
25  Q.  Okay.  Have you been in touch with her since you left?
```

JOHNSON, DEANNA
12/19/2019



Pages 314–317

---

Page 314

1  A.  No, I have not.

2  Q.  Did she tell you she was going to be very disappointed

3      if you left?

4  A.  No.  She just asked me, "Why are you leaving?  You're

5      doing so good."

6  Q.  Now, you said earlier that rather than seven years it

7      was less than a year.  Was the one seven months?  Is

8      that your testimony?

9  A.  No.  Because I'm not quite sure of the dates.  I don't

10     want to give you a date that's not the right date.

11 Q.  Well, can you give me any idea whether it was a couple

12     weeks, couple months?

13 A.  Less than a year.

14 Q.  Less than a year is as specific as you can be?

15 A.  Yes, it is.

16 Q.  Was it as short as two months?

17 A.  Less than a year is as specific as I can be.

18 Q.  Okay.  Let's turn to Publix Supermarkets.  You -- you

19     worked there according to your resume, and I'm

20     referring specifically to Page 13, from January 2004

21     to July 2008, and this is the resume you submitted to

22     Ford.  Is that accurate?

23 A.  Yes, it is.

24 Q.  Okay.  And what was your job with Publix?

25 A.  I was a customer service supervisor.

---

Page 315

1  Q.  The entire time you were with Publix?

2  A.  Yes.

3  Q.  Who did you report to?

4  A.  Natasha.  I can't remember her last name as well.

5      It's been a while.

6  Q.  Did you report to anyone other than Natasha in the

7      course of your over four years of employment, four and

8      a half years actually?

9  A.  I think the general manager was Eric Bell.  I'm not

10     quite sure.

11 Q.  Now, were you a actual supervisor of other employees?

12 A.  Yes.

13 Q.  Who did you supervise?

14 A.  About 20 to 25 people.

15 Q.  What level were those employees?

16 A.  They were cashiers, baggers.

17 Q.  Were you hourly or salaried?

18 A.  Hourly.

19 Q.  Were you a union member in that position?

20 A.  I don't recall.

21 Q.  What was your job duties as customer service

22     supervisor?

23 A.  As it states here, I was responsible for my daily

24     start-up, appearance of the products, different things

25     in the store, prepared the tills for the cashiers.  I

---

Page 316

1      would help the baggers.  I would help with any

2      complaints that anyone had in the store.  I had

3      various job duties.  I would prepare the safe drops,

4      the safe pickups.  Things like that of that nature.

5  Q.  Did you ever hear any criticisms of your job

6      performance while you were employed by Publix?

7  A.  No.

8  Q.  Were there ever, to your knowledge, any criticisms of

9      your attendance or suggestions of a tardiness issue?

10 A.  No.

11 Q.  Were there ever any concerns expressed about your

12     ethics or integrity?

13 A.  No.

14 Q.  Was your departure from Publix completely voluntary on

15     your part?

16 A.  Yes.

17 Q.  Why did you depart?

18 A.  My brother -- my father had just died and my brother

19     passed right behind him, which left my mom here in

20     Michigan alone.

21 Q.  So was your reason for leaving to relocate

22     geographically?

23 A.  Yes.

24 Q.  Where did you relocate from?

25 A.  From Georgia.  That's where Publix is at.

---

Page 317

1  Q.  Sandy Springs, Georgia?

2  A.  (Nodding.)

3  Q.  So you moved back to Michigan in July 2008?

4  A.  I can't remember when I moved back here.

5  Q.  But you left the job for the purpose of moving here?

6  A.  Yes.  To take care of my mom.

7  Q.  Look at Page 5 of Exhibit Number 11.  At the bottom of

8      the bold language it says, "By typing my name

9      before" -- or "below and clicking 'Save,' I hereby

10     certify that the information above is true and correct

11     to the best of my knowledge."  And then you after

12     reading that language, you clicked and signed your

13     name; correct?

14 A.  Yes.

15         MS. HARDY:  Let the record reflect I'm

16     marking as Exhibit Number 12 the subpoenaed documents

17     from Z Technologies.  I'm providing a copy to the

18     witness, counsel, and the court reporter.

19            (Marked EXHIBIT 12 at 1:52 p.m.)

20 BY MS. HARDY:

21 Q.  And these documents have been Bates stamped Ford/D.

22     Johnson 449 through 543.  And, Ms. Johnson, I will be

23     identifying documents based upon the numbers that

24     appear in the lower right-hand corner.

25 A.  Okay.

---

JOHNSON, DEANNA
12/19/2019



Pages 318–321

Page 318

1  Q.  Okay. Can you please turn to Page 458 of Exhibit 12?
2      This purports to be from 458 through 461 an
3      Application for Employment with Z Technology that you
4      submitted. Take a moment and review this document.
5              Is that your handwriting under "Personal
6      Information" on Page 458?
7  A.  Yes, it is.
8  Q.  Okay. Is there any handwriting under the -- the title
9      "Personal Information" that is not yours on 458?
10 A.  No.
11 Q.  Please turn to 459. Is that your handwriting on that
12     page?
13 A.  Yes.
14 Q.  Okay. Turn to 460. Is that your handwriting?
15 A.  Yes.
16 Q.  Okay. And turn to 461. Is that your signature?
17 A.  Yes.
18 Q.  And you dated it yourself, 6/18/14?
19 A.  Yes.
20 Q.  And you're verifying that the information you have
21     provided to Z Technologies is true, correct, and
22     complete? Look at the signature page, please.
23 A.  Yes.
24 Q.  Okay. And is all of the information that you provided
25     to Z Technologies true, correct, and complete?

Page 319

1  A.  I'm not quite sure. Yes. Yes. I believe so.
2  Q.  Okay. And on Page 459 you represent that your
3      supervisor was Rena Cross; correct?
4  A.  Probably, because it's the only name I could think of
5      there.
6  Q.  So you just --
7  A.  I'm not good with names.
8  Q.  -- filled in a name even though it wasn't accurate?
9  A.  Well, Rena Cross is who hired me, so I don't think
10     that's far-fetched.
11 Q.  She wasn't -- well, but you know what a supervisor is,
12     different from HR; correct?
13 A.  Well, Ms. Cross also supervised the lines as well as
14     did HR.
15 Q.  But Rena Cross was HR?
16 A.  Yes.
17 Q.  That's what you told me before?
18 A.  Yes.
19 Q.  Okay. But you claim she was also a supervisor?
20 A.  Well, she would walk the lines and supervise and make
21     sure everything in the plant was going correctly.
22 Q.  But she wasn't who you reported to as a supervisor,
23     was she?
24 A.  No. Not all the time.
25 Q.  You never reported to her as your supervisor, did you?

Page 320

1  A.  No.
2  Q.  Then why did you put her name down as your supervisor
3      on the Ford application?
4  A.  I'm not quite sure, but seeing that she is the head of
5      HR and name of supervisor Rena Cross, I think if Ford
6      would have contacted they would have told her
7      she's HR and given her my supervisor.
8  Q.  So your application with Z Technologies you represent
9      on Page 459 that your job at Cadillac Plastic was line
10     work; correct?
11 A.  Similar, yes.
12 Q.  Yeah. You don't indicate that you were a supervisor
13     as you told Ford, did you?
14 A.  I don't know at that time if I was training to be or
15     not.
16 Q.  So you weren't a supervisor at all times at Cadillac
17     Plastics?
18 A.  I was training to be. We covered that.
19 Q.  You're training to be a supervisor at --
20 A.  Yes. But I was not, but I hadn't gotten the title
21     yet.
22 Q.  Okay. You represented to Z Technologies on Page 459
23     of Exhibit 12 that you were employed at Cadillac
24     Plastics from 6/13 to 11/13. Was that accurate?
25 A.  I'm not quite sure of the dates of when I was employed

Page 321

1      at Cadillac. I told you earlier less than a year.
2  Q.  All right. Well, do you know why you would have
3      provided dates that weren't accurate to Cadillac
4      Plastics?
5  A.  I don't know if they're accurate or not. Once again,
6      I told you less than a year.
7  Q.  All right. Let's turn to Page 468 in Exhibit 12.
8      This is another page of your application for
9      employment with Z Technologies. Is that your
10     handwriting on that page?
11 A.  Correction. This is not a page from my application
12     from Z Technologies. This has nothing to do with my
13     application for Z Technologies.
14 Q.  Well, at the top it says in bold "Application for
15     Employment."
16 A.  But it was not my Application for Employment. I have
17     a real Application for Employment. This was put in my
18     file. I don't know for what reason. But this is not
19     my application of employment because, as you can see,
20     I was not born a man.
21 Q.  Is this your handwriting on Page 468?
22 A.  Yes, it is. Yes, it is.
23 Q.  All right. All right. So you filled this out in
24     exactly the fashion it appears in front of us today;
25     correct?

JOHNSON, DEANNA
12/19/2019


EXHIBIT B

Pages 322–325

Page 322

```
 1   A.   I filled this out.
 2   Q.   All right.  And you gave it to Z Technologies, which
 3        is why it's in Z Technologies' files that they
 4        produced in response to a subpoena?
 5   A.   Well, no.  It didn't actually go like that, Ms. Hardy.
 6   Q.   Well, how did it go?
 7   A.   This application was not my application that I filled
 8        out for an employment.  If you read this application,
 9        you would not hire this person.  You can look at this
10        application and tell that this application is not real
11        at all.  I don't know why this was in my file and why
12        you would have this.  This was made by my plant
13        manager when I sat with him together to deter the
14        gentleman that -- not gentleman.  The man that bent me
15        over the desk to deter him from bothering me.  That's
16        why this was made.  This is not my application for
17        employment.  I don't think Z Technologies would have
18        hired me off of this application or anyone.
19   Q.   All right.  So you're claiming that this was a
20        document made during the course of your employment for
21        the purposes of deterring someone from sexually
22        harassing you?
23   A.   Yes.
24   Q.   All right.  And that you filled this out and did what
25        with it?
```

Page 323

```
 1   A.   My plant manager had me to fill this out.
 2   Q.   What's his name?
 3   A.   Wayne Hall.
 4   Q.   So tell me what Wayne Hall told you when he suggested
 5        you fill this out.
 6   A.   He told me that the -- that Dan or I can't think of
 7        his last name did not like -- he had a thing about
 8        transgenders or any LGTBQ people, anything like that,
 9        and he says, "I know how to get this guy off your
10        back."  And he was laughing.  He's like -- and this is
11        during the lunch break.  He's like, "Look, fill this
12        out.  Let's say you were born a man."  We sat together
13        and we laughed about it.  Well, he laughed about it.
14        And I said anything to do to get this guy off my back
15        because, you know, I'm not trying to make waves.  I
16        never try to make waves unless it's something really,
17        really important.  So this was filled out in the
18        presence of my plant manager.
19   Q.   When did you fill it out?
20   A.   I'm not quite sure what day that I filled this out,
21        but it was well after I was working there for months.
22   Q.   And you gave it to Wayne Hall?  That's your testimony?
23   A.   He was sitting next to me.  And where is my real
24        application?
25   Q.   So you filled this out at Wayne Hall's suggestion; is
```

Page 324

```
 1        that accurate?
 2   A.   Yes.
 3   Q.   All right.  And he came up with the idea to indicate
 4        that you were born a man?
 5   A.   Yes.
 6   Q.   But -- and that's because the individual who you
 7        claimed was bothering you did not like transgender
 8        people?
 9   A.   The individual that was bothering me, that was
10        sexually harassing me and sexually assaulted me did
11        not care for transgender people from what I was told.
12   Q.   So why do you say if that -- if the whole purpose is
13        to deter this person because he doesn't like
14        transgender people, why do you write at the bottom
15        that you're not transgender?
16   A.   The reason why I wrote that -- excuse me.  Where is
17        that?
18   Q.   Look down at the bottom.  It says but had a full sex
19        change, is not transgender.
20   A.   That's sort of a statement if you read that.
21        That's -- that would deter someone.  If someone has a
22        full sex change and says that they're a woman now,
23        maybe I don't know quite what a transgender is, but I
24        think that would deter any person that didn't care for
25        transgenders away from you.
```

Page 325

```
 1   Q.   Do you know what Wayne Hall did with Page 468, if
 2        anything?
 3   A.   I don't know.  He told me that he was going to go give
 4        it to -- to -- to show it to Dan or whatever his name
 5        was, but apparently he kept it and you have it as my
 6        real application.  It also states that I learned of
 7        the organization from a friend from the clinic.
 8   Q.   What's the significance of that?
 9   A.   I don't know, but I don't think that this is a real
10        application.  I don't think anyone would know that or
11        think that.  Any stable person at least.
12   Q.   So you did this against your will; is that correct?
13        Is that what you're telling me?
14   A.   It wasn't more so against my will.  It was more so a
15        deterrence.  It wasn't nothing that I thought of.  It
16        was something that he thought of and he thought that
17        it would be a good idea to get him away from me with
18        that, because I guess he didn't want to get him fired.
19        They had been friends for years.  I'm not quite sure.
20   Q.   Did you ever work for a company named TDMK Silkscreen?
21   A.   Yes.
22   Q.   When did you work for that company?
23   A.   Oh, I worked for that company for years off and on.  I
24        can't quite remember all the dates, but it was just
25        off and on.  I'd come back to Michigan and I'd work
```

JOHNSON, DEANNA
12/19/2019



Page 326

1    for them.  I worked for them for years off and on.  I
2    can't quite remember all the dates for them.  I know
3    that they're -- I don't think they're in business
4    anymore.
5  Q.  What does that company do?
6  A.  They do silkscreening for a lot of the huge schools
7    and like the Spartans S and the things that you see
8    the logos for the T-shirts, funerals, different things
9    like that.
10 Q.  What did you do for them?
11 A.  I managed with a lot of the customers and overseeing
12   their orders and just supervised a lot of work that
13   the -- the print and the -- what do you call those
14   things?  The silkscreeners would do.
15 Q.  Where was the company located when you worked for it?
16 A.  They've had a couple of locations.  I think their last
17   location was on Hubbell Street, I think, if I recall.
18 Q.  In Detroit?
19 A.  Yes.
20 Q.  All right.  Is that where you worked?
21 A.  Yes.  I've worked at that address as well.
22 Q.  Who did you work for at that company?
23 A.  I worked for -- at that time it was a -- they've kind
24   of taken over a couple different ownerships at that
25   time.  I think it was -- it was Frank at that time.  I

Page 327

1    can't remember.  It was a few different people that
2    went in and out through there.
3  Q.  You can't recall the name of anyone that you worked
4    for?
5  A.  Yeah.  It's been a few different people.  I think it's
6    changed hands a few times.
7  Q.  Can you recall the name of anyone that you worked for?
8  A.  There was a -- there was Frank.  I know that.  And I
9    can't remember any other coworkers or anyone else that
10   worked there.
11 Q.  You can't recall the first and last name of any
12   supervisor?
13 A.  Of none of them.  No.  Not there.  That's been a
14   little while now.
15 Q.  Or anyone who had the ability to hire or terminate
16   you?
17 A.  No.
18 Q.  All right.  Did you work for them from 11/12 through
19   6/13?
20 A.  I can't remember.  I can't remember the exact dates I
21   worked for them.
22        MS. HARDY:  Let the record reflect I'm
23   showing the witness Exhibit Number 13, which are the
24   records produced pursuant to a subpoena of Cadillac
25   Plastics Manufacturing.  I'm handing a copy to the

Page 328

1    witness, to counsel, and the court reporter.
2        (Marked EXHIBIT 13 at 2:08 p.m.)
3  BY MS. HARDY:
4  Q.  Exhibit Number 13 has been Bates stamped Ford/D.
5    Johnson 29 through 57.  I will be referring to the
6    numbers in the lower right-hand corner, and I'd now
7    like you to look at Pages 31 through 35.  Is the
8    handwriting on 31 your handwriting in the category of
9    "Personal" and "Employment Desired"?
10 A.  Yes.
11 Q.  On Page 32 that's your handwriting in the checked
12   boxes under "Employment Experience"?
13 A.  I don't know.  They're checked boxes.
14 Q.  Do you have any reason to think that's anyone else's
15   handwriting other than yours?
16 A.  No, I don't.
17 Q.  Okay.  Page 33.  That's your handwriting on that page;
18   correct?
19 A.  Yes.
20 Q.  Okay.  And on Page 34 that's your signature?
21 A.  Yes, it is.
22 Q.  And it's dated 7/6/13; correct?
23 A.  Yes.
24 Q.  All right.  And then Page 35 is a resume, and that's a
25   resume you submitted in conjunction with your

Page 329

1    Application for Employment with Cadillac Plastics
2    Engineering -- or Manufacturing; correct?
3  A.  Yes.
4  Q.  And did you prepare this resume?
5  A.  No.
6  Q.  Who prepared this?
7  A.  Same person.
8  Q.  Melinda?
9  A.  Yes.
10 Q.  So you knew Melinda back in --
11 A.  I'm not quite sure.
12 Q.  -- 2013?
13 A.  I could have or it could have been someone else, a
14   resume person that I use.  I'm not good with doing
15   resumes.
16 Q.  Did you review the resume that's Bates stamped 35 and
17   is part of Exhibit Number 13 before submitting it to
18   Cadillac Plastics Manufacturing for accuracy, that is?
19 A.  I can't remember if I did or not.
20 Q.  That's not a practice of yours I assume; correct?  You
21   don't take the time to review information that you
22   submit for accuracy in connection with your employment
23   applications?
24 A.  Well, I wouldn't say that.  I just didn't interview --
25   I just didn't take the time for those two.

JOHNSON, DEANNA
12/19/2019



Pages 330–333

Page 330

| | | |
|---|---|---|
| 1 | Q. | For this one here and for the one that you gave to |
| 2 | | Ford Motor Company? |
| 3 | A. | Correct. |
| 4 | Q. | Okay.  Now, let's look at Pages 53 and 54.  These are |
| 5 | | your time clock records.  And they indicate that your |
| 6 | | employment began on 8/13/2013 and -- or actually I'm |
| 7 | | sorry, on 8/12/2013 and your last time clocked was on |
| 8 | | 10/14/2013.  You don't have any reason to question the |
| 9 | | accuracy of those dates, do you? |
| 10 | A. | No.  I don't think so. |
| 11 | Q. | So the time clock records indicate that you worked for |
| 12 | | Cadillac Manufacturing or Cadillac Products Automotive |
| 13 | | Company more specifically for all of two months; |
| 14 | | correct? |
| 15 | A. | I thought it was longer than that.  I'm not sure about |
| 16 | | the date, like I told you earlier. |
| 17 | Q. | You don't have any reason to question the records that |
| 18 | | were produced by Cadillac Products Automotive, |
| 19 | | otherwise known as Cadillac Manufacturing? |
| 20 | A. | I think I worked there longer, but I'm not sure. |
| 21 | Q. | Let's get the name straight just for the record.  You |
| 22 | | indicate you worked for Cadillac -- let's go back to |
| 23 | | your Ford application.  Please go back to Exhibit |
| 24 | | Number 11.  Your resume on Page 13 indicates you |
| 25 | | worked for Cadillac Products, Inc.; correct? |

Page 331

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Okay.  Your application for Ford uses a slightly |
| 3 | | different title on Page 4 and it says Cadillac |
| 4 | | Plastics Manufacturing; correct? |
| 5 | A. | Correct. |
| 6 | Q. | All right.  Those are the same companies in your mind; |
| 7 | | correct? |
| 8 | A. | Yes. |
| 9 | Q. | You're not differentiating between two different |
| 10 | | places, are you? |
| 11 | A. | No. |
| 12 | Q. | Okay.  And the actual proper name is Cadillac Products |
| 13 | | Automotive Company; correct? |
| 14 | A. | Cadillac Plastics.  That's what I know.  Not products. |
| 15 | | Cadillac Plastics Automotive. |
| 16 | Q. | Well, that's not what your resume indicates and you |
| 17 | | indicated that that was correct.  It indicates that |
| 18 | | you worked for Cadillac Products. |
| 19 | A. | Okay.  Maybe there's a -- here's the logo.  Cadillac |
| 20 | | Products Automotive. |
| 21 | Q. | Okay.  That was the name of the company you worked |
| 22 | | for; correct? |
| 23 | A. | Yes. |
| 24 | Q. | That's the name of the company reflected on your |
| 25 | | resume that you gave to Ford and that's the company |

Page 332

| | | |
|---|---|---|
| 1 | | you were referring to on your job application; |
| 2 | | correct? |
| 3 | A. | Correct. |
| 4 | Q. | All right.  And you worked for Cadillac Products for |
| 5 | | two months; correct? |
| 6 | A. | I'm not quite sure. |
| 7 | Q. | You see the time records that are -- |
| 8 | A. | Yes, I do. |
| 9 | Q. | -- Pages 56 and 57 of Exhibit Number 13 and they |
| 10 | | indicate -- excuse me.  The time records are Pages 53 |
| 11 | | and 54 of Exhibit Number 13, and they indicate that |
| 12 | | you worked for Cadillac Products from August 12, 2013, |
| 13 | | through October 14, 2013.  You don't have any reason |
| 14 | | to question those time records, do you? |
| 15 | A. | No. |
| 16 | Q. | All right.  Now, turn to Page 55 of Exhibit 13. |
| 17 | A. | Yes. |
| 18 | Q. | Okay.  Do you know who Melody Sienkowski is? |
| 19 | A. | No. |
| 20 | Q. | All right.  But you do know Rena Taylor-Cross; |
| 21 | | correct? |
| 22 | A. | Yes. |
| 23 | Q. | And you see a email from Rena to Melody and she's |
| 24 | | asking for your pay records and she indicates that you |
| 25 | | worked for the company from August 2013 through |

Page 333

| | | |
|---|---|---|
| 1 | | October 2015.  Do you see that? |
| 2 | A. | Yes, I do. |
| 3 | Q. | Okay.  And then she gets a -- Rena receives an email |
| 4 | | from Melody saying, "She only worked for us for 2 |
| 5 | | months hired and terminated in 2013." |
| 6 | A. | Um-hmm. |
| 7 | Q. | Do you see that? |
| 8 | A. | Yes, I do. |
| 9 | Q. | Okay.  You were, in fact, terminated; correct? |
| 10 | A. | No.  I left the job.  They did not fire me. |
| 11 | Q. | They cannot fire you? |
| 12 | A. | They did not fire me. |
| 13 | Q. | Okay. |
| 14 | A. | I quit.  That's very inaccurate. |
| 15 | Q. | And you're testifying to that under oath? |
| 16 | A. | 100 percent. |
| 17 | Q. | Have you had any contact with Rena Taylor-Cross or |
| 18 | | Rena Cross since leaving Cadillac Products? |
| 19 | A. | No, I haven't. |
| 20 | Q. | And do you have any idea where she is today? |
| 21 | A. | No, I don't.  At Cadillac Plastics I assume. |
| 22 | | MS. HARDY:  Let's go off the record. |
| 23 | | VIDEO TECHNICIAN:  Going off the record |
| 24 | | 2:16 p.m. |
| 25 | | (Recess taken at 2:16 p.m.) |

**JOHNSON, DEANNA**
12/19/2019



Page 334

```
1                  (Back on the record at 2:26 p.m.)
2           VIDEO TECHNICIAN:  We are now back on the
3      record.  The time is 2:26 p.m.
4   BY MS. HARDY:
5   Q.  You never supervised employees at Z Technologies;
6       correct?
7   A.  No.
8   Q.  You never supervised employees at Cadillac Products or
9       Cadillac Plastics; correct?
10  A.  No.
11  Q.  You were never a production supervisor prior to being
12      hired by Ford in an automotive related business;
13      correct?
14  A.  I can't answer that.  I'm not sure.  I've had so many
15      several jobs and I've been supervisors at a lot of
16      different jobs that deal with automotive -- that deal
17      with, you know -- with cars and, you know, that type
18      of situation, but not for --
19  Q.  What -- what position are you talking about?
20  A.  You -- could you -- could you tell me the question
21      again?
22           MS. HARDY:  Read the question back, please.
23           COURT REPORTER:  You were never a
24      production supervisor prior to being hired by Ford in
25      an automotive related business; correct?
```

Page 335

```
1   A.  No.  That's incorrect.  I have been -- I can't
2       remember quite the names.  I've been in the automotive
3       business for a minute.  I can't --
4   BY MS. HARDY:
5   Q.  Take your time.
6   A.  I can't remember at this time.  I can't quite
7       remember.
8   Q.  You can't identify any business in the automotive
9       field that you were a production supervisor at prior
10      to Ford; correct?
11  A.  Production supervisor?  Correct.
12  Q.  Did you ever have any performance related problems
13      when you worked at Publix?
14  A.  No.
15  Q.  Did anyone ever suggest that you had attendance
16      issues?
17  A.  No.
18  Q.  Did anyone ever suggest that you had a problem with
19      tardiness?
20  A.  Not that I recall.
21  Q.  Or that you needed to improve with respect to your
22      ability to show up on time and your attendance?
23  A.  No.
24  Q.  Did anyone ever suggest that they had concerns about
25      your ethics or integrity?
```

Page 336

```
1   A.  No.
2   Q.  And your departure was completely voluntary on your
3       part?
4   A.  Correct.
5           MS. HARDY:  Let the record reflect I'm
6       showing the witness Exhibit Number 14.  Copy to the
7       witness, to counsel, and to the court reporter.
8           (Marked EXHIBIT 14 at 2:30 p.m.)
9   BY MS. HARDY:
10  Q.  This is a text message from your Samsung phone;
11      correct?
12  A.  Yes, it is.
13  Q.  And it was produced by your counsel and it's Bates
14      stamped 3194.  And the text messages on the left are
15      Mr. Rowan; correct?
16  A.  Yes.
17  Q.  And the ones on the right are you; correct?
18  A.  Yes, they are.
19  Q.  All right.  And the date of this text message is
20      July 30th, 2018; correct?
21  A.  Yes.
22  Q.  All right.  And Mr. Rowan writes to you, "Thanks for
23      leaving my marker erect," and you respond, "Lmao you
24      made me smile."
25  A.  Um-hmm.
```

Page 337

```
1   Q.  Correct?
2   A.  Correct.
3   Q.  Okay.  What does Lmao stand for in text language?
4   A.  Laughing my ass off.  But that wasn't in reference to
5       this.
6   Q.  What was that in reference to?
7   A.  It was that -- that was in reference to something that
8       he had said to one of the employees that was next to
9       us when I went in.  I think I got my marker from him
10      or something.  But this wasn't in what he said,
11      "Thanks for leaving my marker erect."
12  Q.  Well, it follows immediately after "Thanks for leaving
13      my marker erect" and the next response is "Lmao you
14      made me smile" --
15  A.  Yeah.
16  Q.  -- "I needed that."
17  A.  Yeah.
18  Q.  Correct?
19  A.  "I needed that."  Not that.  Not "Thanks for leaving
20      my marker erect."  That doesn't even match.  It
21      doesn't go together.  What I was talking to him is
22      about something that we had just discussed about an
23      employee there, that something that he did that was
24      funny that made me really laugh.
25  Q.  What was that?
```

JOHNSON, DEANNA
12/19/2019



Page 338

1   A.   I can't remember.  He did something nice for someone
2        or something.  It was really funny.  I think he
3        pretended to do something and didn't do it.  I don't
4        know.  It was something that was -- that was really
5        funny because I think -- I'm always having a rough day
6        since I was there.
7   Q.   Why didn't you just say to him that's funny, it made
8        me smile, I needed that as opposed to putting it in a
9        text message that immediately follows the message from
10       him "Thanks for leaving my marker erect"?
11  A.   First of all, it doesn't immediately follow.
12            MS. LAUGHBAUM:  Let me object first.  Yeah.
13       There's like a nine-hour time difference.  So I'm
14       going to object to your characterization of
15       immediately follow to the extent it's anything
16       different than that's the next message on the page.
17            MS. HARDY:  Counsel, that's a coaching
18       objection.  It's inappropriate.
19  BY MS. HARDY:
20  Q.   It is the next text that you sent him following his
21       message; correct?
22  A.   Nine hours later.
23  Q.   But why would you put that as the next response
24       following his message if it had nothing to do with his
25       message and you didn't want it to be construed as

Page 339

1        such?
2   A.   It's just like if someone -- if you have children or
3        not and someone texts you and they say, hey, mom, pick
4        me up some milk and they don't text you anymore.  Then
5        they text you next week and say, hey, mom, did you hit
6        the dog?  Do those two go together just because they
7        follow each other?  Because I'm sorry.  I'm not
8        getting what you're saying.
9   Q.   How was Mr. Rowan supposed to know when he sees this
10       text message following his message that you're
11       referring to something that he said on the floor?
12  A.   Because Mr. Rowan knows that.  You don't know that.
13  Q.   How was he to know that that message refers to
14       something he said on the floor as opposed to his text
15       message that was sent at 10:03 p.m.?
16  A.   Because he knows what we were talking about.
17  Q.   How would he know in this context of a text message
18       what on earth you're referring to?
19  A.   He knows what we're referring to because we had
20       previously been talking, discussing about what
21       something that he did that was actually nice for a
22       change.
23  Q.   What day and time of day did this humorous thing occur
24       with Mr. Rowan?
25  A.   I have no idea, but that's something that I should

Page 340

1        remember because those things never happened.
2   Q.   But you don't remember?
3   A.   I can't remember.  Not the exact day or time.
4        Somewhere around this time.  Whenever when I sent the
5        message.
6   Q.   You testified in your first deposition that you showed
7        Mr. Mahoney a horrible picture that Mr. Rowan had sent
8        to you and that you had allegedly complained about and
9        it was in the beginning of September 2018.  What
10       picture are you referring to?
11  A.   I can't quite remember what picture that it was.  I
12       just remember that it was an inappropriate picture.
13  Q.   Well, can you recall anything about it?
14  A.   I don't know.  It could have been one of the ones of
15       his penis.  Could have been one of the ones in his
16       underwear, one of the ones maybe where he was rubbing
17       his nipples holding the teddy bears.  I don't know.
18       They're all inappropriate, so . . .
19  Q.   What are you referring to by the beginning of
20       September?  Can you be at all specific as to the date
21       you're referring to?
22  A.   No, I can't.  It goes with the text messages and it's
23       there with the pictures.
24  Q.   All right.  So you don't have any idea what the
25       beginning of September means?

Page 341

1   A.   Whenever was on the picture, just the time stamp,
2        which I'm sure you guys have copies of.
3   Q.   But if you're saying it's a particular picture that's
4        time stamped, what picture are you referring to?
5   A.   I can't quite remember.  There were several pictures.
6        I mean, I don't want to say take your pick, but every
7        one was inappropriate, so . . .  I don't understand
8        how that matters.
9            MS. HARDY:  Let the record reflect I'm
10       showing the witness Exhibit Number 15.  Providing a
11       copy to counsel and to the court reporter.
12            (Marked EXHIBIT 15 at 2:36 p.m.)
13  BY MS. HARDY:
14  Q.   This is a text message from your Samsung phone;
15       correct?
16  A.   Yes.
17  Q.   And it is dated September 4, 2018; correct?
18  A.   Yes.
19  Q.   And the two of you are apparently having lunch
20       together; correct?
21  A.   No.  Incorrect.
22  Q.   All right.  So tell me what you're referring to in
23       this text if that's not a reference to the two of you
24       having lunch.
25  A.   First of all, he asked me am I going to cum, C-U-M,


Page 342

1   which is nasty, and get a burrito.  If we were having
2   lunch together, I wouldn't have to come anywhere.  I
3   would already be there.  Secondly, there's a guy that
4   sells burritos in the plant.  He bought me a burrito
5   that day or someone bought it or the guy just gave it
6   to me and he asked me was I going to come to his
7   station, cum, once again, C-U-M, very nasty, to get
8   the burrito.  It doesn't suggest anything on here
9   about us having lunch together.
10  Q.   The -- what does the message refer to at the bottom,
11       "65 which is no doubles but 'requested' training on
12       frame 4, engine 47.6"?
13  A.   65 is the number of a line.  Which is no doubles means
14       that they are not doubled up.  And he's requesting
15       training on the frame line, engine 47 through
16       whatever.
17  Q.   All right.  So that's a work related message; correct?
18  A.   Yes, it is.
19            MS. HARDY:  All right.  Let the record
20       reflect I'm showing the witness Exhibit C -- or I'm
21       sorry, Exhibit 16.  Copy to counsel and a copy to the
22       court reporter.
23            (Marked EXHIBIT 16 at 2:38 p.m.)
24  BY MS. HARDY:
25  Q.   And this is a text message from your Samsung phone;

Page 343

1        correct?
2   A.   Yes.
3   Q.   And it's dated September 11, 2018; correct?
4   A.   Yes.
5   Q.   And you write in this text message to Mr. Rowan,
6        "Don't leave me, you got me for a whole year";
7        correct?
8   A.   No.  Incorrect.  I didn't write "You got me for a
9        whole year."  Nick Rowan wrote that.  You have to read
10       the texts a little better than that.  This text was
11       actually about -- excuse me?  Excuse me?
12  Q.   I didn't say a thing.
13  A.   Okay.  I didn't say "You got me for a whole year."
14       Why would I say that?  This -- that actually part is
15       from Nick Rowan.  This next -- this whole line of text
16       messaging was a day when the plant went out.  The
17       whole power in Dearborn went out on that day.  That's
18       why I asked him to shine his light.  And I said don't
19       leave me because it's dark down there, and he
20       responded with that response.  It's not my response.
21  Q.   And so the "Don't leave me" you claim is referring to
22       you wanting him to stay because it was dark?
23  A.   No.  The "Don't leave me," we're downstairs.  We had
24       to look for other employees.  The power went out in
25       the plant.  It's very, very dark in there.  As

Page 344

1        supervisors we had to take flashlights and go and find
2        different people, make sure everyone was out of the
3        plant.  We had to make sure each other, everyone was
4        okay.  We are a part of a team, me and Nick Rowan,
5        unfortunately, so I had to go down there.  No one had
6        seen him.  So that's why I went.  I texted him and I
7        says, Nick, shine your light so I can see him because
8        it was dark in there.  And he goes, "I'm on the other
9        side."  I guess -- he starts yelling or something.  I
10       can't quite remember how that went that day.  But I
11       was down there.  I ended up being by myself on the
12       other side and I go, "Hey, don't leave me down here."
13  Q.   What does the message mean "Don't let them put that on
14       you" that Mr. Rowan sent to you?
15  A.   "Rich called the time change out at 11:00 . . ."  Oh.
16       The team leaders weren't paying attention to the time
17       change that Rich had called out, meaning Rich my boss,
18       time change that he -- that our bosses would call out,
19       and I guess he called out a time change and the team
20       leaders maybe didn't respond to that, and maybe Nick
21       was telling me don't let them put that on me, the time
22       change or something.  I'm not quite sure.
23  Q.   That's a supportive statement of you; correct?
24  A.   I would assume so.  And I said -- and also it says
25       "Don't let them put that on you."  And actually he was

Page 345

1        kind of saving my butt here.  No.  Not saving me.  Let
2        me change that.  This is something that I should have
3        known to do on my own, and this is something that he
4        did for me, because if you read the next line, I don't
5        know if you were going to read that or not, but it
6        says, "So you did...and I get...nothing," meaning,
7        once again, he did something for me and he gets
8        nothing, meaning a picture of my vagina or a picture
9        of my brown mountains or black mountains or whatever
10       he wanted to call them that day.
11  Q.   And you're claiming your text "Don't leave me" is
12       related to your earlier text "Nick shine your light"?
13  A.   It's not in the response to "Nick shine your light."
14  Q.   No.
15  A.   The "Nick shine your light," if you could -- first of
16       all, do you see the time difference?
17  Q.   Yes.  I do see the time difference.
18  A.   Okay.  6:15 a.m.
19  Q.   "Nick shine your light" is at 6:15 a.m.
20  A.   A.m.
21  Q.   Okay.
22  A.   On here the "Don't leave me," I don't know if that was
23       referring to either we were on our way upstairs to a
24       meeting or we were down there and it was still dark
25       when the power was off.  I don't quite remember.  But

JOHNSON, DEANNA
12/19/2019



Pages 346–349

---

Page 346

1  this definitely is not a don't leave me reference
2  which you're sort of trying to insinuate.
3 Q.  Well, don't worry what I'm thinking.  All right?
4 A.  I have to worry.
5 Q.  I'm just asking questions and your role is to answer
6  the questions.
7 A.  Okay.
8 Q.  All right.  So at 6:15 a.m. you claim the power went
9  out in the plant and it's dark and you're saying "Nick
10  shine your light."
11 A.  Um-hmm.
12 Q.  And at 4:32 p.m. you're suggesting that the power's
13  still out and that's why you're saying don't leave me?
14 A.  No.  At 4:32 p.m. I don't know what's going on in that
15  plant.  I'm telling you the power could have been out
16  or we could have been at the end of the shift and we
17  go up to the meeting or we go over to the board and we
18  walk to the board together.  We always -- because we
19  have to go in teams, where I'm always constantly
20  following behind him like a puppy dog.  So I tell him
21  don't leave me because I need the work, I need the
22  things that he's written out that I'm supposed to
23  have, the things that he's supposed to be teaching me,
24  so this very well could be in reference of that,
25  because, as you can see, it's 6:13 from the time, and

Page 347

1  then I look down here.  I didn't notice that before at
2  4:35 p.m.  I'm sure that the lights were on by then.
3  This is totally in reference to something else, not
4  leave me.
5 Q.  You went to Beaumont on September 19, 2018, because
6  you were feeling dizzy and nauseous after walking up
7  the stairs; correct?
8 A.  No.  Incorrect.  I went to Beaumont Hospital -- I
9  didn't go to Beaumont Hospital.  An employee found me
10  passed out in the back of the plant.  They put me in a
11  cart.  Don't do that.  It's kind of rude.  I'm sorry,
12  Ms. Hardy.  But that's rude.
13 Q.  Do what?
14 A.  When I'm speaking with you and I'm telling you about
15  an instance of when I'm going to the hospital and you
16  make a gesture like this.
17 Q.  I did not make any such gesture.
18 A.  Okay.  Well, I'm sorry.  Maybe it's on my part.  Maybe
19  I just looked at you wrong, because I want this to go
20  smoothly.  The day of that at the hospital, I didn't
21  send myself to the hospital.  Ford Motor Company, whom
22  you work for, their doctors said that I was stroking
23  out.  My blood pressure was 160 over a hundred and
24  something.  They immediately called an EMS and they
25  sent me to the hospital.  I didn't drive myself.  I

Page 348

1  didn't ask to go.  I didn't even know where I was.
2 Q.  You told the people attending at Beaumont that you had
3  become -- you'd sneezed the day before on the 18th and
4  you had gotten dizzy and nauseous and went to urgent
5  care; correct?
6 A.  I don't quite remember the date of that, but I
7  remember going to urgent care, but I don't remember I
8  sneezed and got dizzy.  I could have sneezed if
9  something -- I had a cold, but I don't remember that
10  conversation.
11 Q.  All right.  You don't recall telling Beaumont that you
12  had sneezed, got dizzy and nauseous and went to urgent
13  care on the 18th?
14 A.  I don't recall that.
15 Q.  Are you disputing you told Beaumont that if that's --
16 A.  No.  I'm not -- no.  I'm not disputing it.
17 Q.  Okay.
18 A.  I just don't recall what I did at that moment, at that
19  moment in Beaumont.  I -- I didn't even know where I
20  was.  I do recall telling them that I was on my way to
21  go swimming as well.
22 Q.  To go, I'm sorry, swimming?
23 A.  Yeah.  Did they tell you that?  I was going swimming.
24  I was waiting for my daughter to come and get me so I
25  could go swimming.

Page 349

1 Q.  Okay.  You also told Beaumont on September 19th, 2018,
2  that you had gotten dizzy walking up the stairs prior
3  to passing out; correct?
4 A.  No.  Because prior to passing out I was -- I walked to
5  the back where I go out for the break and I sat out
6  there.  I was found out there.  I weren't walking up
7  any stairs.  An employee found me and carried me
8  inside the plant.
9 Q.  If the Beaumont records indicate that you told
10  Beaumont on September 19th, 2018, that you went to
11  plant medical and then to ER because you got dizzy
12  walking up the stairs, are you disputing the accuracy
13  of their records?
14 A.  Definitely.  Because Rich Mahoney put me in a truck
15  and sent me to the hospital, Ford Hospital.  I didn't
16  walk to Ford doctors.  Someone found me passed out in
17  the back of the plant.  They called a cart, a medical
18  cart.  Rich Mahoney put me in the medical cart,
19  strapped me in, and they drove me to the other side of
20  the plant.
21 Q.  I'm asking you what you told Beaumont.  You're
22  disputing that you told Beaumont what's reflected in
23  their records?
24 A.  I can't remember what I told Beaumont because I -- my
25  blood pressure was a thousand.  I don't remember.  But

---



Page 350

```
 1        I know that I wasn't walking up any stairs.
 2   Q.   You told Nick Rowan on December 19 that you were at
 3        Beaumont with vertigo; correct?
 4   A.   I said that they thought that it could have been like
 5        vertigo because I got dizzy or something, but I wasn't
 6        labeled as vertigo.
 7   Q.   You told Nick Rowan that "my blood pressure is 175,
 8        130 with vertigo"; correct?
 9   A.   I'm not sure, but I could have because I was dizzy.  I
10        couldn't -- I was dizzy laying, sitting.
11   Q.   And after sending him that message, you sent three
12        laughing faces to him in a text message on
13        September 19th, 2019 -- or '18; correct?
14   A.   I don't -- I don't recall sending him three laughing
15        faces after I said I went vertigo.  Can you show me
16        that?
17   Q.   I sure will.
18   A.   Thank you.
19            MS. HARDY:  Let the record reflect I'm
20        showing the witness Exhibit Number 17.
21   A.   If I recall, wasn't that the time when he said "I
22        shouldn't have showed you that picture of my penis"?
23   BY MS. HARDY:
24   Q.   There's not a question pending on the table.
25   A.   Yeah.  That's what he said.
```

Page 351

```
 1            (Marked EXHIBIT 17 at 2:49 p.m.)
 2   A.   Yeah.  Like I said, I knew I shouldn't have showed you
 3        that picture of his penis.
 4   BY MS. HARDY:
 5   Q.   All right.  Look at Page 3216.  And Exhibit 17 for the
 6        record is Bates stamped by plaintiff 3215 and 3216.
 7        Look at Page 3216.  Do you see those three smiling
 8        faces or laughing faces at 3:27 p.m.?
 9   A.   Yeah.  Yes.
10   Q.   Those are yours; correct?
11   A.   Yes, they are.
12   Q.   And you sent those to --
13   A.   I sure did.
14   Q.   Okay.  And what's your explanation?
15   A.   My explanation is because when I sent those laughing
16        pics, those laughing pics meant you prick.  I cannot
17        wait to get your ass.  That's what those three
18        laughing faces was like.  I can't believe that you're
19        actually still texting me, you idiot, as a supervisor
20        at Ford.  You should know better.  Ha ha ha.  Shame on
21        you.
22   Q.   And he's supposed to know when you send him three
23        laughing faces that you're saying to him, you know,
24        I -- I take objection to your text message and this is
25        my disapproval of it?
```

Page 352

```
 1   A.   First of all, Ms. Hardy, before these three laughing
 2        faces here there were so many comp -- there were so
 3        many conversations with me and Nick.  He knew
 4        perfectly well that I objected.  You have that and
 5        several other text messages of me telling him to stop.
 6        This was the last of it.  I could care less what he
 7        thought about those laughing faces.  I didn't assume
 8        anything.  I know what I thought and you asked me what
 9        I perceived them to be, and I told you these three
10        laughing faces was you're gonna get it.
11   Q.   And for the record, that was sent on September 19,
12        2018; correct?
13   A.   I'm not sure if -- yes.  Correct.
14   Q.   All right.  September 26, 2018, do you recall sending
15        Mr. Rowan -- strike that.
16            MS. HARDY:  Let the record reflect I'm
17        showing the witness Exhibit Number 18 which is Bates
18        stamped 3223.  Copy to counsel and to the court
19        reporter.
20            (Marked EXHIBIT 18 at 2:53 p.m.)
21   BY MS. HARDY:
22   Q.   This is a text message that -- exchange of yours with
23        Mr. Rowan that is dated October 4, 2018; correct?
24   A.   Yes.
25   Q.   And it's strictly work related; correct?
```

Page 353

```
 1   A.   Yes.
 2   Q.   Right.  And he's offering to help you pull FTOV or to
 3        show you how to pull FTOV; correct?
 4   A.   Yes.
 5   Q.   All right.  He says, "See you in the morning!"  And
 6        there's nothing other than him offering to help you
 7        with a job duty; correct?
 8   A.   Correct.  On here.
 9   Q.   Okay.  And what's FTOV?
10   A.   FTOV are our -- these are sheets that we pull for
11        people who are for sick leaves and different things
12        like that.  I don't really quite know all of the terms
13        for that.  You know, he did not show me those things.
14        It says, "Remember to have my [sic] DROT instructions
15        set up."  I had my DROT instructions, but they were
16        partially set up, you know.  He didn't -- Nick didn't
17        provide me with everything that I needed.  And by
18        October the 4th I should have known how to do this
19        already.  And I had been begging him.  That's why I
20        said "I will thank you."
21   Q.   All right.  So by October 4, 2018, you did not know
22        how to set up DROT instructions?
23   A.   You mean set up DROTs, not DROT instructions.  To set
24        up the DROT.
25   Q.   Well, it says, "Remember to have the DROT instructions
```

JOHNSON, DEANNA
12/19/2019



EXHIBIT B

Pages 354–357

Page 354

```
1     set up."
2  A. Yeah.
3  Q. You didn't know how to do that --
4  A. Well --
5  Q. -- as of that date; is that correct?
6  A. As of that date I could barely do that, yes.
7  Q. Okay.  And you did not know how to pull FTOV as of
8     October 4, 2018?
9  A. No.  I ended up having to get someone else to show me.
10 Q. Who showed you?
11 A. Another team leader.  I can't remember.  Someone else
12    showed me.  One of the team leaders.
13 Q. You have no idea who it was?
14 A. I can't remember.  We only have so many team leaders
15    there.
16 Q. Okay.  And you didn't learn how to pull FTOV when you
17    were trained on the A crew?
18 A. No.  Probably not.
19 Q. And you didn't know how to prepare the DROT
20    instructions or get those set up when you were being
21    trained on the A crew?
22 A. On the A crew?  I wasn't there for that long to be
23    trained.
24 Q. You were there three weeks or more according to your
25    prior testimony.
```

Page 355

```
1  A. Yeah.  But things happen.  It's not like -- when
2     you're -- when you're -- when a supervisor is training
3     you, Ms. Hardy, you're working at the same time.  I
4     don't have like -- it wasn't a specific like we're
5     sitting down here and we're getting training, we're
6     getting everything that we need.  The line never stops
7     moving.  There's problems all day.  So you're getting
8     your training as you can just about, unless you have a
9     Nick Rowan, you know, and you have to be propositioned
10    to get your training.
11 Q. So when you were on the A crew, Nick Rowan wasn't even
12    part of the picture; correct?
13 A. Correct.
14 Q. Okay.  And you testified previously that it takes two
15    to three weeks to train a production supervisor and
16    you were --
17 A. No, I didn't.
18 Q. Yes, you did.
19 A. I didn't testify that it takes two to three weeks.
20    You said that it takes two to three weeks.  That there
21    is no specific time of when what I said, if you want
22    to look it up on the record, what I said --
23 Q. Well, whatever's on -- let's not dispute that.
24 A. But can I finish my statement?
25 Q. That's -- that's -- that's on the record.
```

Page 356

```
1  A. Can I finish my statement?
2  Q. Go ahead.
3  A. There is no specific time that a supervisor is
4     trained.  When a supervisor is trained, the person
5     that's training that person lets the bosses know
6     they're ready.  Simple as that.
7  Q. Were you taking an unusually long time to be trained?
8  A. No.  Not at all.  Not with Darnell.  I'm sorry.
9  Q. Do you know what cut-outs are on the line?
10 A. Yes.
11 Q. Okay.  Explain that, please.
12 A. Somewhat.  Cut-outs are -- let's see if I remember
13    correctly.  I can't quite remember.  Cut-outs are -- I
14    can't -- I can't quite remember what cut-outs are.
15    They're some --
16 Q. Just tell me whatever you can remember about them --
17 A. I can't quite remember -- I think --
18 Q. -- even if it's not complete.
19 A. I think cut-outs are -- I don't want to be incorrect.
20    I think cut-outs are different vehicles that we've
21    pulled for various reasons or we are -- this -- this
22    one does this and this one does that, so those certain
23    ones are -- are cut out from that spot because these
24    are maybe a Raptor and these maybe are something else,
25    a regular F-150, and this maybe be a different type of
```

Page 357

```
1     truck or things like that.  I don't -- I don't -- I
2     don't quite know because I never got my full training.
3  Q. Have you ever taken photos of the cut-outs on the line
4     for the purpose of documenting what's occurring?
5  A. I'm sure I probably have.  I've taken a lot of photos
6     on the line.
7  Q. Okay.  And why do you take those photos?  For what
8     purpose?
9  A. We take those photos because if something happens, if
10    something goes wrong, then Billy or LaDawn, when they
11    call us on the mike they're going to want to know
12    what's going on.  They want to go -- they want to see
13    the picture.  Sometimes we have to text that picture
14    to another team leader or another supervisor on the
15    other side of the plant so they can see what they have
16    or what's wrong or what number they're looking for,
17    what vehicle they're looking for, what specific part
18    is missing or what's broken.
19 Q. Okay.  So do you recall an exchange with your
20    supervisor, Mr. Markavich, on October 6, 2018, about
21    the cut-outs on the line in pictures that you sent him
22    concerning those cut-outs?
23 A. I don't quite remember, but that could have happened.
24 Q. Do you recall ever having had an exchange with him
25    where he responds to you "Don't" -- "Don't worry about
```

JOHNSON, DEANNA
12/19/2019



Pages 358–361

Page 358

1    anything, he was wrong, just write what happened and
2    we'll handle it tomorrow kid"?
3  A.  Not in regards to any cut-outs.  What does that have
4    to do with cut-outs?
5  Q.  All right.  Let me show you Exhibit 11 -- or I'm
6    sorry, Exhibit 19.  Please take a moment and review
7    that.
8         MS. HARDY:  Copy for counsel and for the
9    court reporter.
10        (Marked EXHIBIT 19 at 3:00 p.m.)
11 BY MS. HARDY:
12 Q.  Billy Boss is Billy Markavich; correct?
13 A.  Yes.
14 Q.  And Exhibit 19 is a series of text messages between
15   you and Mr. Markavich --
16 A.  Yes.
17 Q.  -- concerning a series of photos that you had taken --
18 A.  Yes.
19 Q.  -- of the line; correct?
20 A.  Um-hmm.  Correct.
21 Q.  That you were sending to Mr. Markavich; correct?
22 A.  Yes.  Correct.
23 Q.  And these are cut-outs; correct?
24 A.  No.  Actually what this is -- the pictures that I was
25   sending him is on the line you have -- from when they

Page 359

1    put the parts in, they just grab a handful of screws
2    or bolts, nuts, whatever it is that goes to that part,
3    and while they're putting them in they're constantly
4    dropping them everywhere, and when they drop them
5    everywhere, it causes the line to stop because it's on
6    the conveyor belt.  This is one of the things I do
7    know.  And we take a magnet and you clean up the line.
8    You have to get them all out.  And that's why I said I
9    did it all myself, and I'm showing how clean the line
10   is, that there are no nails or anything inside of the
11   line so the line can run smoothly.  If you notice how
12   clean the line looks going down.  That's what that is
13   referring to.
14 Q.  So you took all of the photos in Exhibit 19; correct?
15 A.  Correct.
16 Q.  And they were all sent to Mr. Markavich on October 6,
17   2018; correct?
18 A.  Correct.
19 Q.  And you believe these all demonstrate that you were
20   doing the correct, you know, the correct thing in
21   terms of performing your job duties?
22 A.  Correct.
23 Q.  Okay.  And why did you feel the need to send him all
24   these photos?
25 A.  Because he had just cursed me out about the line being

Page 360

1    filthy and knowing the different crews, they don't
2    clean up behind themselves, so he had made a mention
3    and says that, excuse me, he wants every fucking
4    supervisor to clean up their lines and to get all of
5    that stuff up or have their team leader do it or
6    somebody better do it, and, you know, Billy has talked
7    to me nasty in the past, so when I did it, like I take
8    pictures, I took the pictures of it and I showed him.
9  Q.  Okay.  Is there anything inappropriate in terms of
10   your exchange from your point of view with
11   Mr. Markavich --
12 A.  Not on this --
13 Q.  -- in Exhibit 19?
14 A.  In 19?  Oh, in here?  This has nothing to do -- this
15   has nothing to do with cut-outs or anything.  These
16   pictures have nothing to do.  You see these pictures
17   and then you -- all of a sudden you have this one text
18   that says, "Don't be worried about anything.  He was
19   wrong.  Just write what happened and we will handle it
20   tomorrow kiddo [sic]."  And I says, "Ok thank you."
21 Q.  All right.  So look at Page --
22 A.  It's nothing to do with cut-outs.
23 Q.  -- 2784.  You write to Mr. Markavich, "Did it myself
24   my team leader had cut outs and then he cut out."
25 A.  Yep.

Page 361

1  Q.  Yep?
2  A.  Yep.
3  Q.  You wrote that.  And you say that your text messages
4    have nothing to do with cut-outs?
5  A.  No.  I said this particular text message that says he
6    was wrong, write -- write down what he did, that has
7    nothing to do with this message.  Those two messages
8    have nothing to do with each other at all, whatsoever.
9    They don't even sound like they go together,
10   Ms. Hardy.  I did it myself.  My team leaders had
11   cut -- my team leader cut out -- had cut-outs and he
12   cut out.  And then he was wrong.  That doesn't go
13   together.  It's two totally different things.
14 Q.  All right.  So you sent on Page 2791 the photo to
15   Mr. Markavich at 8:19 p.m. on October 6, 2018;
16   correct?
17 A.  Yes.
18 Q.  And what do you claim that's a photo of?
19 A.  I can't even see that photo.  I have no idea what
20   that's a photo of.  It looks like part of the line --
21 Q.  All right.
22 A.  -- or something.
23 Q.  And four minutes later he responds, "Don't be worried
24   about anything.  He was wrong.  Just write what
25   happened and we will handle it tomorrow kid."  And



Page 362

1    you're claiming there's no relationship whatsoever
2    between your text at 8:19 p.m. and his text at
3    8:23 p.m.?
4 A.  None whatsoever.  Because during that time Billy was
5    walking over to me when we were doing these texts.
6    This is something that me and him was talking about in
7    regards to Nick Rowan.  I never got a chance to
8    explain my full self to him about Nick Rowan.  This
9    was after Rich had talked to him, and I'm assuming
10   this text has to be -- why would I -- you did it
11   again.  Why would I -- why would I tell him -- why
12   would he tell me write down what happened?  What
13   happened with what?  On the line?
14 Q.  All right.  So you're claiming in the four minutes or
15   three minutes between when you sent the text at 8:19
16   you had a conversation with Mr. Markavich --
17 A.  I could have --
18 Q.  -- and he sent -- and you sent -- he sent you a text?
19 A.  Absolutely.  Very well.  Because Mr. Markavich as
20   we're texting we're walking, and I could have been
21   texting him and he could have been right there where
22   Mr. Davis is sleeping at through the deposition.  He
23   could have been right there.  We do that all the time.
24   We walk up to people we're texting, and he could be
25   right there.  That's -- that's just how it goes in the

Page 363

1    plant.
2 Q.  You're just speculating; correct?
3 A.  No.  I'm not speculating at all.  I am telling you
4    100 percent -- have you ever worked in a plant?
5 Q.  So you recall sitting here today specifically that on
6    October 6, 2018, you had a conversation at 8:20, 8:21,
7    or 8:22 p.m. with Mr. Markavich on the plant floor
8    about Nick Rowan?
9 A.  No.  I could have had this conversation with him two
10   hours prior to that and he could have just had an
11   epiphany because he knew that I -- he knew -- he
12   cursed me out so much, and when I was going to go to
13   HR, I was telling everyone.  So this right here,
14   this -- this text, was another one of those I don't
15   believe you don't mean it come out the blue.  This
16   has nothing to do with this.  They don't go together.
17 Q.  You have no idea -- if this text does not relate to
18   your 8:19 p.m. text which immediately precedes it, you
19   have no idea what it's related to, do you?
20 A.  I have 100 percent idea what it's related to.  This
21   text says don't worry about anything, he was wrong,
22   just write down -- just write what happened and we'll
23   handle it tomorrow.  I have to know what this means.
24   He was wrong.  Who was wrong?  A screwdriver?
25 Q.  Your team leader.  The team leader.

Page 364

1 A.  No.  But you don't write -- Ms. Hardy, you don't write
2    down anything if my team leader was wrong.  I don't
3    tell Billy.  If I think my team leader is wrong, I
4    will have him thrown out or suspended.  I don't need
5    Billy for that.  You don't write down anything to give
6    to your boss because someone cut out on a cut-out.  He
7    can cut out whenever he wants.  That's just something
8    I was telling you.  You don't write down anything
9    because -- on your team leader.  You don't -- you
10   don't get a -- you don't do a write-up.  I don't do
11   write-ups.  I suspend people.  I send them out the
12   plant.
13 Q.  You had texted Mr. Markavich in this exchange about
14   your team leader having cut-outs and then he cut out
15   with a turned down, you know, disapproval face;
16   correct?
17 A.  Yes.  Correct.
18 Q.  Right?
19 A.  But it has nothing to do with this.  You're not
20   gonna -- what -- what -- what you're not gonna do is
21   make me say that goes with that.  It doesn't.  I
22   don't -- I don't understand what you're wanting me to
23   say.  But that and this were two totally different
24   conversations.  Anyone that works for the plant will
25   tell you.  I didn't have to write him -- that's not a

Page 365

1    write-up.  He was wrong.  Wrong for what?  Because he
2    left?  I told Billy that he left.  You don't write
3    anything down.  He couldn't get suspended for it.
4    It's UAW.  It doesn't -- it doesn't work like that,
5    Ms. Hardy.  These two things don't go together.  I'm
6    sorry.
7        MS. HARDY:  Let the record reflect I'm
8    showing the witness Exhibit Number 19.
9        MR. DAVIS:  I think it's 20.
10       MS. HARDY:  Is it?  Yes.  20.  I'm sorry.
11   Let the record reflect I'm showing the witness Exhibit
12   Number 20.  It's been Bates stamped by plaintiff 3138
13   through 3139.
14       (Marked EXHIBIT 20 at 3:10 p.m.)
15 BY MS. HARDY:
16 Q.  This is a text message between you and Mr. Rowan;
17   correct?
18 A.  Correct.
19 Q.  And it is dated October 20th, 2018; correct?
20 A.  Correct.
21 Q.  And look at Page 3139.  Is that a photo of you?
22 A.  Yes, it is.
23 Q.  Okay.  And you consider that to be an inappropriate
24   photo?
25 A.  Yes, I do.

JOHNSON, DEANNA
12/19/2019



EXHIBIT B
Pages 366–369

Page 366

1  Q.  And why is that?
2  A.  Because he took this picture when I wasn't looking.
3      It's like picture stalking.
4  Q.  Oh, okay.  Do you think it's inappropriate from a
5      sexual standpoint?
6  A.  Yes, I do.
7  Q.  Why is that?
8  A.  Because of the sexual references that he's made for
9      me, and what he says, "I see you" -- "I see you
10     pic" -- I said, "I see you pic stalking me."  From him
11     taking the pictures of me, it just shows what he's
12     always asked me for, pictures of my vagina.  Pictures
13     of anything.  He's always said that.
14 Q.  Do you think this is sexual, though, with the photo of
15     you?
16 A.  I think everything he does with me was sexual, yes.
17     So this is no different.  When you take some pictures
18     of someone behind them of my rear-end.
19 Q.  You consider this a photo of your rear-end?
20 A.  It's -- I can see my rear-end and it's not a picture
21     of me in the front smiling like saying jeez.
22         MS. HARDY:  Let the record reflect I'm
23     showing the witness Exhibit 21.  Copy for counsel and
24     for the court reporter.
25             (Marked EXHIBIT 21 at 3:11 p.m.)

Page 367

1  BY MS. HARDY:
2  Q.  This has been Bates stamped Plaintiff 3149.  Is this
3      from your Samsung phone?
4  A.  I guess so.  I guess so.
5  Q.  All right.  And this is a text exchange between you
6      and Mr. Rowan on October 27, 2018; correct?
7  A.  Okay.
8  Q.  Is that correct?
9  A.  Yes.
10 Q.  All right.  And you're asking him a question about "Is
11     Skillin considered an FTOV?"  Correct?
12 A.  Yes.
13 Q.  Okay.  And who's Skillin?
14 A.  It's a line worker.
15 Q.  All right.  This is just a normal work exchange;
16     correct?
17 A.  Yes.
18 Q.  All right.  What crew were you on at this point?
19 A.  At this point I don't know if I was on C crew or B
20     crew at this point.  I don't remember.
21 Q.  You don't recall when you went to C crew?
22 A.  No.
23 Q.  And you don't have any way of reconstructing when you
24     went to C crew, do you?
25 A.  Not really.

Page 368

1  Q.  All right.  You don't have any records to look to?
2  A.  For C -- for when I went to C crew?
3  Q.  Yeah.
4  A.  It would be on my -- well, we don't do time cards.  I
5      don't know.  But that's kind of easy to find out, for
6      you to find out.
7  Q.  Do you have any records you can look to to reconstruct
8      when you went to C crew?
9  A.  Not off the top of my head.
10 Q.  Do you have any records that you can look to to
11     reconstruct when you went from the engine line to
12     Line 4 and 5?
13 A.  Let me see.  When I went over to Line 4 and 5 it was
14     around November because Rich came and got me and said,
15     "Come on.  You and your mittens are finally moving to
16     4 and 5."  So I can't quite remember the dates of
17     that, of when I went to 4 and 5 or -- I can't quite
18     remember the exact dates.
19 Q.  What was does the term "mittens" refer to, to your
20     knowledge?
21 A.  I -- I -- I used to wear the gloves on the line with
22     the fingers cut out of the gloves and he called those
23     mittens.
24 Q.  All right.  Your testimony before was your best guess
25     was it was early November?

Page 369

1  A.  I think.  I'm not quite sure, though.
2  Q.  All right.  Who -- who did you work with for training
3      purposes on Line 4 and 5?
4  A.  For -- at that point no one because they were all -- I
5      was kind of shunned by that time.
6  Q.  So nobody was assigned to -- to assist you --
7  A.  No.
8  Q.  -- for training purposes?
9  A.  Not one person.  Well, actually.  Excuse me.  Shaun
10     was assigned.  But he was a little perturbed because
11     they demoted him out of the blue and sent him to the
12     engine line.  The guys didn't understand how all of a
13     sudden I was on that line just out of the blue.  I
14     hadn't been at the plant that long.  To get a
15     promotion to be moved to that line, that's a
16     promotion.  So it kind of pissed off the guys who were
17     on that line to get demoted for no reason.
18 Q.  How were they demoted?
19 A.  When you go -- the frame line and the engine line,
20     it's like a demotion when you go back there.  That's
21     the hardest place to work.
22 Q.  So somebody got sent to the engine line because you
23     went to the frame line?
24 A.  The person that worked -- no.  The person that worked
25     on Line 4 and 5, he was sent to the engine line when

JOHNSON, DEANNA
12/19/2019



Page 370

1    they sent me to --
2  Q.  That's what I just asked.  So is the frame line 4 and
3      5?
4  A.  No.
5  Q.  What is the frame line?
6  A.  The frame line is the frame line.
7  Q.  Are there numbers associated with it?
8  A.  No.  The frame line is -- well, you can say Line 1.
9      It's the first line into the building, the frame line.
10 Q.  So the frame line is 1.  What's the engine line?
11     What's -- what number corresponds with it?
12 A.  You can say 2, but the engine line is called the
13     engine line.  It's not called a number.
14 Q.  And 4 and 5, what -- what name is associated with
15     Lines 4 and 5?
16 A.  Chassis.
17 Q.  Chassis.  So when you went from the engine line to
18     chassis, was there somebody moved out of chassis
19     because you -- you were assigned there?
20 A.  Yes.
21 Q.  Who?
22 A.  Shaun.
23 Q.  And did Shaun then go to the engine line?
24 A.  Yes.
25 Q.  So you switched?

Page 371

1  A.  Yes.
2  Q.  Is there anyone other than Shaun who was impacted by
3      your move?
4  A.  I don't re -- I don't recall.  Yes.  Actually.  Shaun
5      went to Antoine's line and Antoine I think went to my
6      line.  Those two, Shaun and Antoine, were both
7      impacted.  They -- they switched those -- both of them
8      up for different lines.
9  Q.  All right.  So you didn't work with Shaun and Antoine
10     on the chassis line; correct?
11 A.  Well, I worked with them all the time actually.  We
12     all worked together.  But when -- sometimes they would
13     come over and try to help or do things like that.
14 Q.  But they weren't -- you were not assigned to the
15     chassis line at the same time Shaun and Antoine were
16     assigned to the chassis line?
17 A.  For -- at the beginning when I first went over to
18     Sean's line, he was still there with me in the
19     beginning.
20 Q.  For how long?
21 A.  I'm not quite sure how long because it was during the
22     end of my time there.
23 Q.  So you don't know when you went to the chassis line
24     and you don't know how long you worked with Shaun at
25     the chassis line and you don't know when Shaun left

Page 372

1      the chassis line to go to engine; correct?
2  A.  Incorrect.
3  Q.  Tell me -- let's take the first question.  When did
4      you go to the chassis line?
5  A.  The first time I recall going over to the chassis line
6      was sometime in November, if I can remember.  I think
7      it was sometime in November.
8  Q.  What do you mean the first time?
9  A.  Because I -- that was -- when I went to the -- when I
10     went over there the first time when Rich came and got
11     me, you and your mittens, you're moving over, and then
12     I was over there for maybe two weeks, and then I
13     started talking more to Rich and showing him more of
14     the pictures and the little pictures and I started
15     kind of talking, just saying it out loud about how
16     Nick's behavior was.  I was kind of getting frustrated
17     at that moment and -- not getting.  I was beyond
18     frustrated.  And then --
19 Q.  You weren't working with Nick anymore at that point;
20     correct?
21 A.  No.  I wasn't working with him, but it's not like I
22     didn't see him again.  You still work together.
23     You're still together.  You're still in your meetings
24     together.  You still have to work together.  Like if
25     something happened, like you said, for cut-outs, I

Page 373

1      still have to go back over there and talk to Nick or
2      he still would come over to my line and say something.
3      We're always passing.  We're still gonna be passing.
4      So during --
5  Q.  Go ahead.
6  A.  We were just always in passing.  That's it.
7  Q.  So you claim you went there for two weeks and then
8      what happened?
9  A.  And then they came back and got me and said, either
10     Billy or Rich, I can't remember which one it was, and
11     they said, "You gotta -- you're going back to the
12     frame line."  And I'm like, "No.  Why?"
13 Q.  Had you ever been at the frame line?
14 A.  Yeah.  That's where me and Nick, we run the frame and
15     the engine.
16 Q.  Well, so the frame and the engine are considered the
17     same area?
18 A.  Yes.
19 Q.  And when you were on the engine line, you were also
20     supervising hourly employees on the frame line?
21 A.  Yes.  I supervised both lines.
22 Q.  All right.  So when were you told you were going back
23     to the engine/frame line?
24 A.  Maybe a week or two before I left.  I'm not quite sure
25     the exact date, but it was during that time.

JOHNSON, DEANNA
12/19/2019



Page 374

1   Q.   And you claim Rich Mahoney told you that you were
2        going to be going back to the engine frame line?
3   A.   No. I said Rich and Billy. Both of them -- I can't
4        remember. One of them told me that I was going back.
5        Because they're the only two that make those
6        decisions. No one else can make those decisions but
7        them.
8   Q.   What did they tell you?
9   A.   That I'm going back to the engine line.
10   Q.   Did you ask why?
11   A.   Yes, I did.
12   Q.   And what were you told?
13   A.   I was told that because Mark, one of the employees,
14        didn't come in that day, and I says, well, I don't
15        want to go back over there, and then I get over there
16        and he's there that day.
17   Q.   So you're going back for just one day because there
18        was an absent employee?
19   A.   I don't know why I was going back or how long it was
20        going to be for.
21   Q.   How long did you stay back in the engine/frame line?
22   A.   I was back over there for a few days, and then I
23        started complaining profusely again, and they moved me
24        back.
25   Q.   Can you tell me when you went back to work on the

Page 375

1        engine/frame line in the month of November 2018?
2   A.   I can't remember the exact date. I can't --
3   Q.   Can you give me any idea when it was?
4   A.   November.
5   Q.   Just the month of November? You can't be more
6        specific?
7   A.   Just the month of Nov -- I can't because in November,
8        that's the time that they were moving me. They moved
9        me over there and then they moved me back and then
10        they moved me back over there. So I don't remember.
11        But that was all in the course of before I left. All
12        in the month of November.
13   Q.   All right. So it's your testimony that in early
14        November you were transferred from the engine/frame
15        line to the chassis line?
16   A.   Yes.
17   Q.   You stayed there for a couple of weeks and then you
18        went back for a few days to the engine/frame line due
19        to somebody being absent and you being asked to go
20        back and fill in for that person?
21   A.   Yes.
22   Q.   All right. And you stayed there for a couple days and
23        then you went back to your assignment at the chassis
24        line?
25   A.   I stayed there until I complained and told them that I

Page 376

1        want to go back or I'm going to go to HR because I'm
2        not staying here with Nick. Then I was sent back to
3        the chassis line.
4   Q.   And when do you claim you had that conversation?
5   A.   A couple of days probably before I left.
6   Q.   Couple of days before you -- before November 26?
7   A.   Before November 26. Yeah. Maybe a week before. I'm
8        not exactly sure on that date.
9   Q.   All right.
10   A.   But during that time.
11   Q.   So a couple days before November 26 you have a
12        conversation, according to your testimony, with
13        Mr. Mahoney and say that you're going to go to HR
14        unless he sends you back to the chassis line?
15   A.   Something like that. Not exactly like that, though.
16   Q.   Well, what -- what did you tell Mr. Mahoney?
17   A.   I didn't say I'm going to go back unless you send me
18        to chassis. I never gave anyone an ultimatum. I was
19        only the one who received ultimatums at that company.
20   Q.   Well, what did you tell Mr. Mahoney?
21   A.   I cannot work with Nick Rowan. You've seen all of the
22        pictures of his penis. He's still hounding me for
23        sex. I don't -- I don't know. It was just all of
24        that. He's still not teaching me -- he's not going to
25        teach me. I'm never going to learn if I stay over

Page 377

1        here with him because I'm never going to give him nude
2        pictures of myself, and that's the only way I can
3        learn is if I give him something. I have to give him
4        something for him to give me something, and I was
5        tired of that. You're gonna make me cry again. I was
6        tired of that. This is just . . .
7   Q.   Where did you have your conversation with Mr. Mahoney?
8   A.   On the plant floor.
9   Q.   Do you have a time of day?
10   A.   During our hours of work. During my shift.
11   Q.   Obviously during your hours of work.
12   A.   Yeah.
13   Q.   I understand that. But can you indicate when it was?
14   A.   I can't indicate a time. As you know, or you may not
15        know, there are no clocks in the plant. There are no
16        clocks. No clocks on the wall or anything.
17   Q.   You have a phone with time.
18   A.   Yeah. But I didn't grab my phone and say, well, you
19        know what, I'm going to make sure I know that it is
20        exactly 11:32 when I spoke with him. I have no idea
21        of the time, but I know I did.
22   Q.   Where were you at the time in the plant?
23   A.   On the plant floor.
24   Q.   Well, I understand you were on the plant floor because
25        that's where you work. Where on the plant floor?

JOHNSON, DEANNA
12/19/2019



Pages 378–381

Page 378

1  A.  I don't remember.  I could have been at my line or I
2      could have been at 4.  I could have been in the back.
3      I don't know.
4  Q.  Was there anyone within hearing range?
5  A.  There's always someone in hearing range.  But do -- do
6      they want to say anything or not?  There's always
7      someone in hearing range.
8  Q.  Is there anyone you believe overheard your
9      conversation with Mr. Mahoney?
10 A.  I have -- there's different employees there that has
11     worked close that were close by me and by my desk that
12     may have heard things before, employees that work
13     around me.
14 Q.  Can you identify anyone that you believe overheard
15     your conversation or was a witness to your
16     conversation with Mr. Mahoney?
17 A.  I don't know if she heard every word, but Carrie.  I
18     don't know Carrie's last name.  She works on axles on
19     the engine line.  But she -- she -- she works --
20     you -- I'm sorry.  You throw me off when I'm speaking
21     with you and you do things like -- it just throws --
22     it just throws me off.
23 Q.  You're totally fabricating that I'm doing that.
24              MS. LAUGHBAUM:  Objection.
25 A.  I wouldn't do that.

Page 379

1              MS. LAUGHBAUM:  We're on camera, so we've
2      got a record of whatever did or didn't happen.
3  A.  I wouldn't do that, Ms. Hardy.
4  BY MS. HARDY:
5  Q.  You are totally fabricating.
6  A.  It just throws me --
7  Q.  I am sitting here waiting for you to finish --
8              MS. LAUGHBAUM:  Maybe you don't realize
9      you're doing it, Ms. Hardy, but you are.
10             MS. HARDY:  Well, I'm not.
11 A.  I don't -- okay.  Maybe it's a twitch.  I don't know.
12     I'm sorry.
13 BY MS. HARDY:
14 Q.  Could be.
15 A.  Possibly.  But I don't know where I was on the frame
16     line or the engine line or whatever.  I just know I
17     was on the line.
18 Q.  I'm asking you right now about were there any
19     witnesses?
20 A.  It could have been.  Carrie works closely to me.  We
21     all work together.  It's all right there together.
22     There's a lot of witnesses around.  Everyone on the
23     plant line.  Everyone knows how eccentric and nasty
24     Nick is and Rich is.
25 Q.  All right.  So what was Mr. Mahoney's response?

Page 380

1  A.  I'm sorry.  I got thrown off when you did the eye
2      twitch.  His response to?
3  Q.  To what you told him.
4  A.  About what was going on with Nick?  Because I just got
5      totally lost.  I'm so sorry.  That just throws me off
6      when you do that.  It throws me off of the question
7      that you asked me.
8              MS. LAUGHBAUM:  Just ask to have the
9      question repeated, Deanna.
10             THE WITNESS:  Could you repeat that,
11     please, for me, the question that was --
12 BY MS. HARDY:
13 Q.  I think I -- you said that you went to him.  You
14     complained about Mr. Mahoney.  You said you wanted to
15     go back to the chassis line -- or I'm sorry.  Strike
16     that.  You went to Mr. -- you claim you went to
17     Mr. Mahoney.  You complained about Mr. Rowan.  You
18     told him how awful it was.  You wanted to go back to
19     the chassis line.  You can't recall when it was, where
20     it was when you talked to him, who heard it, if
21     anyone.  Now my next question is what was
22     Mr. Mahoney's response?
23 A.  Mr. Mahoney had several different responses several
24     different times.  I don't know if on this occasion
25     this could have been the one where he says, "Well, you

Page 381

1      want me to take him outside or you want me to go and
2      talk to him?"  He said that to me a few times before.
3      He said also, "You don't have to worry about him.
4      You're going to be over there.  You know, you don't
5      have to worry about him.  You still may have to
6      interact with him a little bit."
7  Q.  I'm asking specifically about the conversation you
8      claim you had with Mr. Mahoney a couple days before
9      November 26.  Do you recall what he said in response
10     to your complaint at that time?
11 A.  About Nick Rowan?
12 Q.  Yes.
13 A.  He didn't say anything.  Probably kiss and make up.
14     Could have sent me one of those awful texts like he
15     did.  You guys should just fuck and get it over with.
16     Maybe it was something along that line because that's
17     usually what it often was.
18 Q.  You don't have any recall of what he said?
19 A.  I can't remember at this time.  I just can't remember.
20     But I'm sure that it was always a lewd comment because
21     we have texts of that.
22 Q.  Did you move back to the chassis line after that
23     conversation with Mr. Mahoney?
24 A.  Yes, I did.
25 Q.  Okay.  And did you talk to anyone else about your

JOHNSON, DEANNA
12/19/2019



Pages 382–385

Page 382

1    desire to move back to the chassis line at that time?
2  A.  Yes.  Everyone knew I wanted to move back to chassis.
3       Shaun, Antoine.
4  Q.  Do you recall discussing it with anyone other than
5       Mr. Mahoney?
6  A.  About moving to chassis?
7  Q.  About your complaint about Mr. Rowan and the reason
8       and because of your complaints --
9  A.  Yes.
10 Q.  -- you wanted to go back to chassis?
11 A.  Yes.
12 Q.  Who?
13 A.  I spoke with Shaun about it.  I spoke with Antoine.
14      They all knew about the pictures and the -- it was a
15      running joke.  Show me those titties.  Show me those
16      black mounds.  All the guys knew about that.
17 Q.  Anyone else that you can recall?
18 A.  I can't recall, but, you know, the plant, we're --
19      we're like this with each other.  Everyone's working
20      this close to each other.
21 Q.  All right.  And you did move back to the chassis line
22      before you left employment on November 26?
23 A.  Yes.  They did accommodate me in that so I wouldn't
24      have to deal with Nick Rowan.
25             MS. HARDY:  Let the record reflect I'm

Page 383

1       showing the witness Exhibit Number 22.  It's Bates
2       stamped by plaintiff 3153.  Copy to counsel and to the
3       witness.
4               (Marked EXHIBIT 22 at 3:29 p.m.)
5  BY MS. HARDY:
6  Q.  This is a text message exchange between you and
7       Mr. Rowan; correct?
8  A.  Yes.  Correct.
9  Q.  And it is dated October 28, 2018; correct?
10 A.  Correct.
11 Q.  And you text him at 2:35 asking him, "Can you buy me a
12      coke I have 75 cents my wallet in my car"; correct?
13 A.  Correct.  Correct.
14 Q.  So this is the man who's been tormenting you and
15      you're asking him to buy you a Coke on October 28,
16      2018?
17 A.  Yes.
18 Q.  Why?
19 A.  Because he is who's handling over me.  He is the guy
20      that punches file cabinets.  He is a horrible person
21      that I have to work with.  I have to get along with.
22      I have to be nice to him.  I bought him a Coke before
23      before he turned into a, excuse me, asshole.  So it
24      was only right.  I only had 75 cents.  There's nothing
25      wrong with that.

Page 384

1  Q.  Even if he was everything you say he was, why on earth
2       would you ask him to buy you a Coke on October 28,
3       2018?
4  A.  Ms. Hardy, asking him to buy me a Coke is nothing like
5       him sending me a picture of his penis.
6  Q.  Why would you go to him of all people and ask for
7       money for a Coke?
8  A.  Because he was my partner on that line and he was
9       right next to me.  Maybe he had offered that day or
10      the day before.  To ask me to buy me a Coke?  You're
11      sitting like I asked him to marry me.
12 Q.  When did he start being an asshole?
13 A.  Probably way before the line that you didn't read on
14      this text message as you asked me about the Coke, but
15      the previous part on this text message that you didn't
16      read was "330 picture 500 meeting."  3:30 send me a
17      picture by 5:00 meeting.  So he became an asshole way
18      before that.
19 Q.  All right.  So you claim that you get a message from
20      him on the 28th asking you for an inappropriate
21      picture and you respond --
22 A.  Can you buy me a Coke?
23 Q.  -- buy me a Coke?
24 A.  Yeah.
25 Q.  Yeah.

Page 385

1  A.  You know why?
2  Q.  Yeah.
3  A.  And I always respond to stuff that --
4  Q.  I'd like to know why.
5  A.  Because you know why?  Let's get off of that subject
6       of you asking me for a picture so we won't be sitting
7       here and you won't be sitting across from me.  I'm
8       trying to resolve this as I was with them moving me to
9       a line, with doing it in the chain of command, with
10      telling my supervisors.  I didn't want any of this.  I
11      tried to deter him from every time he asked me for
12      something.  I said stop.  I talked about business.  If
13      you look back in all the text messages, you'll see.
14      You don't see me respond to one and I've never sent a
15      picture.
16             MS. HARDY:  Let the record reflect I'm
17      showing the witness Exhibit Number 22 --
18             MR. DAVIS:  23.
19             MS. HARDY:  23.  I'm sorry.  Bates stamped
20      by plaintiff 3072 through 3074.  Copy to the witness,
21      counsel, and the court reporter.
22             (Marked EXHIBIT 23 at 3:32 p.m.)
23 BY MS. HARDY:
24 Q.  This exhibit reflects text messages between you and
25      Mr. Rowan on October 31, 2018, your Samsung phone;

JOHNSON, DEANNA
12/19/2019



Pages 386–389

---

Page 386

1     correct?
2  **A.**  Yes.
3  **Q.**  And you text to Mr. Rowan that "thank you Nick for
4     being patient with me with pay."  And he responds,
5     "Np.  Obviously I am patient with other things..."
6     And you text, "And pic...lol."  And then you
7     indicate -- you send him a text "I know I know it's
8     worth the wait!"  Correct?
9  **A.**  Correct.
10  **Q.**  Okay.  And why are you sending him a text message to
11     this effect?
12  **A.**  First of all, we're gonna go back up here to the top.
13     Okay?  I'm not gonna just start right here.  So you
14     can get the full picture.  First of all, let's go back
15     to the text message.  Okay?  Mr. -- Mr. Rowan never
16     showed me anything.  I always have to come to his desk
17     to find out anything naturally.  Always had to go to
18     his desk.
19         MS. LAUGHBAUM:  And for the record, you're
20     referring to the first page of this exhibit?
21  **A.**  Yes.  I'm referring to the first page of this exhibit.
22     And also here where it says, "I know it's worth the
23     wait."  That's something that he would always tell me.
24     "I know it's gonna be worth the wait.  I know it's
25     gonna be worth the wait."  And that's why I said when

Page 387

1     he says no problem, obviously I am patient with other
2     things, he doesn't give me any type of lead way to get
3     any type of work done.  He doesn't show me nothing at
4     all, nothing at all unless I send him a picture.  I
5     wanted to keep my job.  I had to be nice -- I felt I
6     had to be nice to this guy.  So I said, oh, and a pic?
7     Because I know he always wants a pic.  This is not a
8     secret about this, and a pic, because we see from
9     previous text messages and previous pictures that he
10     wants a picture from me.  I'm trying to keep my job.
11     I could --
12  BY MS. HARDY:
13  **Q.**  Why do you text him with respect to the issue of a
14     picture "I know I know it's worth the wait"?
15  **A.**  Because I just told you that.  Because he told me I
16     can't wait to get that picture, it's gonna be so worth
17     the wait.  That's why I said I know, it's worth the
18     wait.  Because he's always said that.  Because I've
19     never sent anything to him.  He think it's gonna be
20     worth the wait whenever he gets it.
21  **Q.**  But why are you joking around with him?
22  **A.**  Because this man is crazy.  I just told you.
23         MS. LAUGHBAUM:  Objection.  She just said
24     she's repeating what she told her.
25  BY MS. HARDY:

Page 388

1  **Q.**  Let's go back to your reference to having to go to his
2     desk to shut down to close your DROT.  That's where
3     you have to go to shut down and close the DROT;
4     correct?
5  **A.**  No, that's not.  I can close a DROT down at my own
6     desk.
7  **Q.**  Did you know how to close the DROT?
8  **A.**  No, I did not.
9  **Q.**  Okay.  So if you're going to close the DROT and you
10     need his help, you've got to be where he's at;
11     correct?
12  **A.**  No, I do not.
13  **Q.**  Did you want him to do it for you?
14  **A.**  No.  I don't want him to do it for me, Ms. Hardy, but
15     he can come to my desk.  We can go to LaDawn's desk.
16     We can go to one big table where everyone can see us.
17     I don't have to always go into his little cubicle
18     where he can hound me for pictures and say nasty sex
19     things to me.  I don't have to go to his desk.
20  **Q.**  So he's the only one with the desk that's private and
21     not visible for other people to see?
22  **A.**  No.  Everyone has a desk, but if we go to someone
23     else's desk, Ms. Hardy, someone else will be there.
24     You get it?  Like other people will be there, instead
25     of cornering me in his own little cubicle so he can

Page 389

1     maybe like rip my breast off or something again.
2  **Q.**  Can you date when you claim he tried to rip your
3     breast off?
4  **A.**  I think I've already stated that.
5  **Q.**  That you don't know when?
6  **A.**  I've already stated that.  You asked me that the last
7     time we were here.
8  **Q.**  Well, answer me, please.
9  **A.**  I can't -- I can't quite remember now at this time,
10     but I know you asked me that.  That was right before I
11     got ready to leave the -- before I left the company.
12     So I don't quite remember when that day was, but you
13     asked me that the last time that we were here.  You
14     have that.
15  **Q.**  And you don't have any record of when that occurred
16     that you can look to to refresh your memory or when
17     you claim that occurred?
18         MS. LAUGHBAUM:  Objection.  It's been asked
19     and answered and she said you can refer to the text
20     message that references it, which has been produced.
21         MS. HARDY:  There's no text message that
22     references someone trying to rip her breast off.
23         MS. LAUGHBAUM:  She testified previously
24     that the hand slippage euphemism that Mr. Rowan so
25     cleverly used referred to that, if I'm not mistaken.

JOHNSON, DEANNA
12/19/2019



Page 390

```
 1              MS. HARDY:  Well, it's not what it -- it
 2   doesn't make any reference to the testimony she's
 3   provided about --
 4              MS. LAUGHBAUM:  Read the first transcript.
 5   It's right in there.
 6              MS. HARDY:  Let the record reflect I'm
 7   showing the witness Exhibit 24 which is Bates stamped
 8   3183 by plaintiff.  I'm handing a copy to counsel and
 9   to the court reporter.
10              (Marked EXHIBIT 24 at 3:38 p.m.)
11   BY MS. HARDY:
12   Q.   This is a text message exchange between you and
13        Mr. Rowan on November 22, 2018; correct?
14   A.   Yes.
15   Q.   And it's after you claim he tried to rip your breast
16        off; correct?
17   A.   I'm not quite sure of that date, but this is a text
18        message between me and Nick.
19   Q.   All right.  Well, the -- the -- the text message in
20        which -- referring to the word "hand slippage" is
21        dated 11/17/2018 and you claim --
22   A.   Oh, you knew about that one now.
23   Q.   -- you claim that that was a reference to Mr. Rowan
24        ripping your breast off; correct?
25   A.   Yes.  Correct.
```

Page 391

```
 1   Q.   Okay.  So that was 11/17, and now the exhibit you have
 2        in front of you which has been marked as 24 is dated
 3        11/22/2018, which is roughly a week after the
 4        so-called rip the breast off incident.
 5   A.   Um-hmm.
 6   Q.   And in this exchange message with Mr. Rowan you write,
 7        "Hey Nick first happy Thanksgiving hope I didn't wake
 8        you.  Are we off tomorrow just making sure."  So
 9        you're wishing Mr. Rowan happy Thanksgiving after you
10        claim he assaulted you, --
11   A.   Yes.
12   Q.   -- pushed you against the wall, pinned you, grabbed
13        your breast and tried to rip it off?
14   A.   Yeah.
15   Q.   Okay.  Why is that?
16   A.   Because Mr. Rowan -- what you don't know is Mr. Rowan
17        has a terrible temper.  I have to go back in there and
18        work with him.  I needed information about my job.
19        Mr. Rowan's cubicle and file cabinets -- Mr. Rowan
20        cubicle and file cabinets have punch holes in them
21        profusely everywhere.  He was a horrible, horribly
22        mean guy when it comes to not getting his way.  I
23        tried to keep him as nice as I could as long as I
24        wanted to keep my job and not tell anyone, but when it
25        came to the point of that type of stuff happening, I
```

Page 392

```
 1        had to tell someone.  But this, I had to say happy
 2        Thanksgiving because I needed to know if he was coming
 3        in.  It was something that I must have needed from
 4        work or I may have went in the day before, because I
 5        would always go in when I wasn't supposed to go in to
 6        work, you know, just to learn and try to -- things
 7        like that.  So this happy saying Thanksgiving, I don't
 8        know.  I was trying to figure out if he was coming in
 9        maybe because I wanted to take him to HR.  I'm not
10        quite sure.  But that's not -- that's -- I always
11        tried to be nice to him.  Because he was very mean.  I
12        didn't want to look like his file cabinets.
13   Q.   How long had he been that mean and that awful and
14        that, you now, outrageous?
15   A.   I don't know.  According to LaDawn's testimony, maybe
16        about eight years ago when they all had that big
17        meeting about him.
18   Q.   I'm talking about you.  When do you claim this
19        outrageous terrible conduct started with Mr. Rowan?
20   A.   When I first seen him punching his file cabinets.
21   Q.   When was that?
22   A.   Probably the first two weeks that I started working
23        with him.
24   Q.   So back in early September?
25   A.   Probably during that time, yeah.
```

Page 393

```
 1   Q.   Okay.  And you saw him punching his filing cabinets?
 2   A.   Oh, yes.  Everyone.
 3   Q.   Okay.  And were there any witnesses to him punching
 4        his filing cabinets?
 5   A.   Everyone seen him punching his file cabinets.
 6   Q.   Okay.  And he -- he'd just go up to the filing cabinet
 7        and just punch away?
 8   A.   Um-hmm.  Just punch away.
 9   Q.   And put dents in them?
10   A.   All over them.
11   Q.   All over them?
12   A.   All over them.
13   Q.   Just like they're all dented up?
14   A.   Yeah.
15   Q.   And they -- I mean, did they replace them every year
16        or constantly?
17   A.   You know what?  I don't know if they replaced them
18        because I wasn't there a year.  But I do know that
19        when I went and I told LaDawn that they were punched
20        all up and LaDawn told me she was gonna take a picture
21        of them, she came back with a picture of his desk, and
22        I would have thought, hmm, if they were pictures in
23        the file cabinet like I claimed, then LaDawn, who's
24        working with you all, she would have showed those
25        pictures, but instead she comes back with a picture of
```

JOHNSON, DEANNA
12/19/2019


Page 394

1     his desk. She told me she was gonna go take pictures
2     of his file cabinets.
3  Q.  Why didn't you take a picture of the filing cabinets?
4  A.  Why should I?
5  Q.  Because you --
6  A.  Les Harris --
7  Q.  -- took pictures of all kinds of things and you --
8  A.  No. I didn't --
9  Q.  -- sent all kinds of text messages. Why not?
10  A.  Excuse me. I didn't take pictures of all kinds of
11     things, Ms. Hardy.
12  Q.  You took pictures of things on the line and --
13  A.  I took pictures of my job, of my job, Ms. Hardy.
14  Q.  But if you wanted --
15  A.  Not of personal business. I'm not Nick Rowan.
16  Q.  -- to be -- if you wanted to be able to establish that
17     he is wildly punching up his, let me finish, his
18     filing cabinets and engaging in destruction of company
19     property on a regular basis, why would you not take a
20     photo with your phone so you could be able to show
21     that to Les Harris or somebody who needed to be in the
22     know about that misconduct?
23  A.  Because when I went to Les Harris, Les Harris left and
24     went to his cubicle to take pictures. LaDawn, another
25     employee that you're working for or worked for you or

Page 395

1     however that works, she went to his cubicle and told
2     me that she was going to take pictures. Why would I
3     go and risk my -- myself of taking pictures of his
4     cubicle of something that's been there before I got
5     there that Billy knows about, Rich knows about,
6     LaDawn, Jay Hetter? Everyone that works in that plant
7     knows this guy punches things. So now you're sitting
8     here and you're telling me, well, why didn't you go
9     and take a picture. This guy's been punching things
10     for years. I don't want him to catch me taking
11     pictures. That's not my job. My job -- my job what I
12     was supposed to do was what I was supposed to do.
13     Follow the practices of going through the chain of
14     command. When I got to HR, I told Les that there was
15     pictures of his file cabinet. They were all punched
16     out then when Les went to his office. When LaDawn
17     went to go take pictures of his file cabinets, why
18     didn't she take -- she's the bigger boss.
19  Q.  If they were punched out as early as --
20  A.  Of course. Why didn't LaDawn take pictures of them?
21  Q.  -- beginning of September, did they -- did they remain
22     punched out or did someone come in --
23  A.  They remained punched out.
24  Q.  -- and repair them or they just --
25  A.  Yeah. They remained punched out.

Page 396

1  Q.  All right.
2  A.  So why didn't LaDawn take pictures of them? Why
3     didn't she show us a picture of his desk? Why
4     wouldn't she take pictures of the file cabinet and
5     say, well, how come right now what you should be doing
6     is you should say, well, look, Deanna, here's pictures
7     of his file cabinets on that day, no punches.
8  Q.  You know, you're not responding to a question. You're
9     just making statements.
10  A.  I'm just -- I don't understand what you're saying.
11  Q.  But it -- well, that's not an issue for you to address
12     with me here. I'm not here to answer your questions,
13     as I've told you many times before. So let's move on.
14  A.  Okay.
15  Q.  Why did you complain to -- about Nick Rowan to Clemons
16     on November 25, 2018?
17  A.  Because Rich told me I had only been there a hot
18     fucking minute and my opinion didn't matter. Billy
19     told me he didn't give a fuck about me, a fuck about
20     my mother, a fuck about my back, a fuck about my job,
21     me period. Those are my two supervisors. If they
22     can't help me, then this woman that I've had
23     conversations with about her stuffed animals in the
24     back seat of her truck and we've laughed and we've
25     talked about things, contrary to what she said, we've

Page 397

1     talked about things, and then she told me she was the
2     head, which she is, of sexual harassment at Dearborn,
3     that was the right thing to do, to go and talk to
4     someone that's going to believe you, especially when
5     HR is closed and they close at 5:00. That's what you
6     do. When you can't take no more and you're finally
7     ready to tell, you know what I mean, you've told your
8     supervisors and no one will listen, then you go to
9     someone that will listen.
10  Q.  So why on November 25? Is there any particular reason
11     why on that particular date?
12  A.  Because I was told that I was gonna be moving back
13     again to the engine line, and I wasn't going back.
14  Q.  When were you allegedly told that?
15  A.  Probably that day. Could have been at that meeting
16     that morning or afternoon, whatever. They're all
17     called morning meetings to me because the hours that
18     we work, so whenever time I get there it's morning.
19  Q.  Who do you claim told you that?
20  A.  Probably Billy or Rich. They're the only two who has
21     the authority to move me.
22  Q.  You don't recall who?
23  A.  One of them, Billy or Rich.
24  Q.  But you don't recall which one?
25  A.  No, I don't recall which one, but it was one of them.

JOHNSON, DEANNA
12/19/2019


EXHIBIT B

Pages 398–401

Page 398

1        They're both my supervisors, so . . .

2 Q. Do you recall anything about that conversation other
3     than allegedly being told you're being moved back to
4     the engine line?

5 A. No.  Because I didn't hear anything else except for I
6     was being moved back to the engine line, and that
7     wasn't gonna happen anymore.

8 Q. All right.  Do you recall anything about your training
9     when you were on the A crew?

10 A. No.  Except for I was new and kind of walking around
11     with everyone and everyone was super busy and, you
12     know, Darnell was trying to help me as best he could,
13     you know, the little things that he could, but a lot
14     of things go on there and --

15 Q. Did you learn anything?

16 A. I'm sure I did.  I learned several things.  I'm sure I
17     did.

18 Q. Do you know what you were trained on?  Did you -- did
19     you become proficient in any aspect of the production
20     supervisor job after being on the A crew and being
21     trained?

22 A. I'm sure I did.  I was very proficient on a lot of
23     things.

24 Q. On what?

25 A. On several things.  I can't just give you a list of

Page 399

1     this.  It's like one million things in the aspect of a
2     job of a supervisor working the line.  There's not
3     like eight duties.  There are more like 800 duties.

4 Q. Well, can you identify anything that you became
5     proficient on with respect to the production
6     supervisor job by the conclusion of your A group
7     training?

8 A. Oh, I can't remember.  Several things.  Learning how
9     to -- the things about the UAW.  I've learned how
10     certain car parts and different things connect with
11     different things so the things to watch out for, what
12     pieces go where.  Things that I needed as I was going
13     to do my greenbelt training.  That was my focus.
14     Things of what I needed to watch out for.  Things
15     about water hoses.  Things about certain parts of the
16     truck.  Things that come out of my area.  Those
17     things.  Things to watch out for, you know.  Those
18     things that the first -- those are the initial things
19     that you learn before you get into deeper of the
20     coding of the different boxes and things like that of
21     what I had to do when I was with Nick, which he failed
22     to teach me.

23 Q. What did you still need to be trained on after you had
24     been on the A crew for training purposes?

25 A. Lots of -- lots of things.  That job is a daily

Page 400

1     learning job.  I needed to be trained on payroll.  I
2     needed to be trained more so on payroll.  I needed to
3     be trained on just a lot of things.  How to work -- we
4     have these different modules that are at the end of
5     each line and they go off constantly and they stop the
6     line.  When they stop the line, then the big bosses
7     are calling from upstairs.  When they stop the line,
8     you have to go to these boxes.  I have to demonstrate.
9     Would you allow me to demonstrate?

10 Q. Sure.

11 A. Okay.  You have to go to these boxes and the boxes are
12     up here.  Kind of short.  So I'd have to take my pen
13     and I -- there's certain codes for different aspects
14     of different things that you have to put in these
15     machines to make them stop or to tell them what to do
16     or whatever the case may be.  Your supervisors go,
17     puts a lot of different numbers.  So it's kind of
18     tricky, you know, if you don't do this every day.  And
19     so I'm trying to do this.  I don't have it all the
20     way.  Nick's not showing me anymore because he's fed
21     up because I'm not sending him a picture.  So various
22     occasions I'm trying to put the code in.  Everyone's
23     looking around.  The team leaders are going that's a
24     shame.  You know, they're all pissed because they know
25     he's not helping me.  Everyone can tell when someone's

Page 401

1     not helping you with something.  I turn around and I
2     look for Nick.  I'm calling him on the walkie-talkie
3     because I need his help.  I look.  He's down on the
4     other end, often, doing this.  And then when he hears
5     his name, when LaDawn gets in and she goes, "Nick,
6     where are you?"  Because she hears that I'm by myself
7     struggling.  Then here he comes.  He's running.  He's
8     coming to help me.  I'm here.  I got it now.  I'm
9     saving -- I saved you again.  Where's my picture?
10     This is a constant thing.  A constant thing.  I didn't
11     have that on A crew with that.  On A crew they allowed
12     me to train the proper way you're supposed to train.
13     When you have the stress of someone wanting something
14     from you so you can learn your job, that makes it a
15     million times harder.  Everything from a time sheet to
16     a FTOV to anything that I needed to know I owed him or
17     I had to give him something for it, and I wasn't
18     giving up any pictures of my body for no job.  I
19     wanted my job, but I wasn't giving up a picture of my
20     vagina, of my breasts, or giving in to nothing.  I
21     often took a lot of cursing out because I wasn't in
22     compliance of what he wanted me to do, and that's just
23     what it was.

24 Q. All right.  Let -- I want to go back to training.
25     What is it that you did not know after you had been

JOHNSON, DEANNA
12/19/2019



Page 402

1    through the formal training on A crew?
2  A.  Just about everything.  A -- 60 percent of the job at
3      least.  Because when you learn on A crew, the way that
4      Darnell was showing me things, you have to know first
5      what to look for, for accidents, safety first, other
6      things like that, the first things that you teach a
7      person.  You don't jump them in to and this box and
8      this and this, you have 19 codes and 14 codes and then
9      you have your codes for payroll and then you have your
10     codes for when they're sick or codes for when they're
11     in the UAW, a code for a part-time code.  It was a
12     million codes for a million different things.  That's
13     not the way Dar -- and plus I had someone that wasn't
14     asking to see pictures of my vagina or they weren't
15     going to show me the codes and just let me fall.
16  Q.  Were you competent in the performance of your job when
17     you were production supervisor?
18  A.  I was extremely confident in my job.  I had no
19     problems with anyone except for Nick Rowan.
20  Q.  And were you competent in performing the duties of
21     your job?
22  A.  I was very competent.  I was on my way to getting my
23     greenbelt.  I had just graduated from one of our
24     classes there.
25  Q.  So you were able to meet or exceed all expectations of

Page 403

1      Ford Motor Company in the performance of your job
2      duties?
3  A.  Every way 100 percent if I did not have someone
4      constantly asking me to see pictures -- excuse me.
5      You asked me a question.
6  Q.  No.  I asked if you actually performed all the duties
7      of your job in a fully competent way.
8  A.  Every job that I knew how to do, I performed it in a
9      fully competent way.  The jobs that I did not know how
10     to do was because I had not been trained.  When you
11     have something hovering over your head of someone
12     constantly saying to you they're not gonna teach you
13     this unless you show me this, every -- even when I --
14     excuse me.
15  Q.  All right.  I don't --
16            MS. LAUGHBAUM:  Please let her finish.
17  A.  Let me finish.
18  BY MS. HARDY:
19  Q.  You're just repeating the same thing over and over and
20     I've got very --
21  A.  I don't care.  This is my deposition.  Is this my
22     deposition, Ms. Hardy?
23  Q.  Look, you've --
24  A.  Excuse me.
25  Q.  -- said five times or ten or 15 that --

Page 404

1  A.  But excuse me, Ms. Hardy.  Is this my deposition,
2      Ms. Hardy?
3  Q.  You are here to answer --
4  A.  Excuse me.
5  Q.  -- Ford Motor Company's questions.
6  A.  Excuse me, Ms. Hardy.
7            MS. LAUGHBAUM:  And are you going to let
8      her finish the question posed?
9            MS. HARDY:  We're going -- we are going off
10     the record at the moment.  Please get your client
11     under control.  She has to respond to the questions.
12            MS. LAUGHBAUM:  Okay.  You need to --
13            VIDEO TECHNICIAN:  Going off the record --
14            MS. LAUGHBAUM:  Wait a minute.  You need to
15     please --
16            MS. HARDY:  As opposed to just giving
17     lectures.
18            MS. LAUGHBAUM:  Ms. Hardy, you're asking
19     questions and then when you don't like the answer, you
20     cut her off and lecture her.  You've got to let her
21     answer.  It goes both ways.
22            MS. HARDY:  I want to know what training
23     she had, she didn't have, what she could do, not do,
24     as opposed to listening to her say over and over and
25     over Nick Rowan was creating all these problems for

Page 405

1      me.  I've heard that.  We've all heard that.  That's
2      all over the record.  That's not responsive to the
3      questions.
4  A.  You asked me what training and I told you 60 percent.
5      You want me to list of everything that I knew.  How
6      can I do that if I didn't get the proper training?  I
7      don't even know what I'm supposed to know because I
8      didn't know -- he did not tell me.  I can't tell you
9      he didn't train me on this, this, and this because he
10     never told me, Ms. Hardy.  All he wanted to see was my
11     breast.  I'm sorry if you don't want to hear me say
12     that over and over again, but I can't tell you
13     everything that I was supposed to know.  I know
14     everything that I was taught.  I did it well.  I had
15     no complaints whatsoever, everything that I was taught
16     and I knew, which was the things that I told you.  But
17     I can't tell you something I don't know what you want
18     me to tell you.
19  BY MS. HARDY:
20  Q.  Can you identify what training you did not receive
21     that you needed to be able to competently perform your
22     job?
23  A.  Everything that goes along with this job, which I
24     don't know because I wasn't there long enough to know
25     any of that.  And the time that I was there I was

JOHNSON, DEANNA
12/19/2019



---

Page 406

1   hounded so bad how could I know that, Ms. Hardy?  How
2   could I know that?
3   Q.  So your answer to my question is that you don't know
4       what training you were lacking?  You can't even
5       identify what it is Nick Rowan should have done in the
6       way of training that he failed to do?
7   A.  No.  I'm not gonna let you say that.  That's not true.
8       No.  What I'm saying -- what I'm --
9   Q.  Well, then answer the question.  What training did he
10      fail to provide you that you still needed?
11  A.  I just --
12              MS. LAUGHBAUM:  To the extent you haven't
13      already answered because this has been asked and
14      answered.  If there's anything else you know of, go
15      ahead.
16              MS. HARDY:  Counsel, that's not --
17  BY MS. HARDY:
18  Q.  Answer the question in full.  I have not heard an
19      answer to it.
20              MS. LAUGHBAUM:  You're repeating,
21      Ms. Hardy.  That's why you're getting repetitive
22      answers from the witness.
23  A.  I just showed you.  I just demonstrated to you and I
24      showed you --
25  BY MS. HARDY:

---

Page 407

1   Q.  I want a list of what it is you did not receive in
2       training that you needed to be able to perform your
3       job.
4   A.  I think I just told you when I was explaining to you.
5       When I told you -- when I told you about the boxes.
6       When I told you about the codes.  When I told you
7       about codes for this, vacation codes, codes for that.
8       I told you about payroll.  I told you several things,
9       Ms. Hardy.
10  Q.  Is there anything else you claim you were not provided
11      in the way of training?
12  A.  So many things that I don't even -- that I can't think
13      of at this moment but things I know that I got stuck
14      with on the job so badly till they had to call and ask
15      where was he and why was I stuck.  If he's training
16      me, why am I stuck?
17              MS. HARDY:  Okay.  I'm going off the record
18      for about a ten-minute break.
19              VIDEO TECHNICIAN:  We're going off the
20      record.  The time is 3:56 p.m.
21              (Recess taken at 3:56 p.m.)
22              (Back on the record at 4:15 p.m.)
23              VIDEO TECHNICIAN:  We are now back on the
24      record.  The time is 4:15 p.m.
25  BY MS. HARDY:

---

Page 408

1   Q.  By the time of your last day of employment at Ford had
2       you fully mastered the job duty of paying hourly
3       employees?
4   A.  No.
5   Q.  What -- what did you not understand about how to pay
6       hourly employees by the time you left Ford Motor
7       Company?
8   A.  I didn't know the codes.  There were certain codes
9       that you had to know.  There were a lot of different
10      things with the pay, because you have part-time
11      workers and you have full-time workers, vacation days.
12      Just a lot of inputting.  How to get into the system
13      to remember to close out all the different DROTs.  I
14      had a lot of different people that I had to pay.
15  Q.  What else were you having problems with with respect
16      to the job duty of paying hourly employees by the time
17      you left Ford in November?
18  A.  With payroll or just the job duties?
19  Q.  Paying.
20  A.  Just payroll?
21  Q.  Just payroll.
22  A.  A lot of parts of the payroll I can't even really tell
23      you because I don't even know all of the parts of it.
24  Q.  You had hourly employees complaining that you weren't
25      paying them properly as of late November 2018;

---

Page 409

1   correct?
2   A.  Actually on that, I have no control over that payroll.
3       That was something that I did not do.  I don't know
4       where that came from.  I'm -- I'm assuming that it
5       came from Shaun and from Nick Rowan or Rich Mahoney,
6       because I didn't know how to pay -- I didn't even have
7       control over that.  They all -- well, not they all.
8       Nick was supposed to be helping me with that, so the
9       last days that I was there they were telling me about
10      payroll and not paying anyone, and I didn't do that.
11      I didn't not not pay anyone.  Because the things they
12      were asking me about I didn't even know how to do.
13  Q.  What do you mean it wasn't your responsibility to pay
14      hourly employees?
15  A.  I didn't say it wasn't my responsibility to pay hourly
16      employees.
17  Q.  Let me go back.  You said, "I had no control over that
18      payroll.  That was something that I did not do."  What
19      does that mean?
20  A.  It was in regards to what you said to me before that.
21      I can't remember.  What did you just say to me before
22      that?
23  Q.  That you were subject to criticism by hourly employees
24      in late November 2018 because you were not paying them
25      properly.

---

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

JOHNSON, DEANNA
12/19/2019


Page 410

1  A.   In late November I was being switched back and forth
2       from the lines.  That was Shaun's spot.  Shaun was
3       probably mad because I had took his position and so he
4       kept leaving payroll open.  Those were his people.  He
5       did all the pay over there.  I had nothing to do with
6       any of that because I didn't quite know how to pay
7       people yet.  So when I did pay people, I would always
8       have to have the help of Nick Rowan.  And during late
9       November there was no Nick Rowan helping me.
10 Q.   Is it your testimony you hadn't received any training
11      on how to pay people by late November 2018?
12 A.   No.  I had -- no.  I had some training.  I had some
13      training.
14 Q.   What training had you received?
15 A.   Nick showed me a couple of things.  We had one course,
16      if I'm not mistaken, like a 30-minute course in
17      regards to just all of the things that you do on the
18      job.  I think payroll may have been in there.  But it
19      wasn't -- it's not something that you agreed to do
20      with payroll.  It's something that you actually have
21      to do.
22 Q.   Had you had any other training on payroll?
23 A.   No.
24 Q.   All right.  And when was the 30-minute course?
25 A.   I can't quite remember.

Page 411

1  Q.   Was that something early in your employment?
2  A.   Something earlier or middle on.  I can't quite
3       remember the day.
4  Q.   Who taught the 30-minute course?
5  A.   I don't remember.  I don't know who that was.
6  Q.   Who attended the 30-minute course?
7  A.   Different people.  Different salary people from all
8       across plants and different places.
9  Q.   Was it training for process coaches, the 30-minute
10      course?
11 A.   It was process coaches and different -- not just
12      process coaches.  It was for anyone connected with
13      doing payroll.
14 Q.   And -- and it focused only on payroll, this 30-minute
15      course?
16 A.   No.  No.  It focused on a lot of different things.
17 Q.   What else did it focus on?
18 A.   On things of what a process coach should do.
19 Q.   So there was a 30-minute course for a whole variety of
20      different people, not just process coaches, on what a
21      process coach should do?
22 A.   Yes.
23 Q.   Who attended it with you?
24 A.   Just other process coaches.  Other process coaches.
25      Different people.  Different bosses.  It was a

Page 412

1       variety.  In like the life of a process coach, so to
2       speak.  Not every single duty and how you do the duty.
3       Because you can't tell all that in a course, in one
4       course with 30 minutes or however long it was.
5  Q.   Do you have any idea what else was addressed other
6       than payroll in that 30-minute course?
7  A.   I can't quite remember what everything that was
8       addressed all in that.
9  Q.   All right.  By the time you left Ford employment in
10      late November 2018 did you understand how to handle
11      overtime charges for hourly employees?
12 A.   No.
13 Q.   Okay.  Did you have any training in that at all?
14 A.   Not that I recall, and if I did, it was brief.
15 Q.   That was one of your job responsibilities, correct, to
16      be able to handle overtime charges for hourly
17      employees?
18 A.   Yes, it was.
19 Q.   And one of your job duties was also to ensure that
20      your hourly employees who reported to you were
21      properly paid; correct?
22 A.   Yes.  And in that aspect of that, Nick would often
23      handle the payroll because he would pay some people
24      more than he would pay others, so I would have to
25      often go to him about payroll and kind of, you know,

Page 413

1       let him walk me through it when he wanted to or, you
2       know, whenever, when I didn't want to go to his
3       cubicle or whatever.  He would pay certain people
4       different things.  We had the power to pay you an
5       extra hour or an extra two hours or things like that.
6  Q.   It was your job responsibility to properly pay
7       employees; correct?
8  A.   Yes.  One of them.
9  Q.   All right.  What were PPAs?
10 A.   PPAs are -- I forgot.  Personal something.  I'm not
11      quite sure.
12 Q.   Is that part of your job duty to handle PPAs?
13 A.   From different employees -- I'm not -- I forgot what
14      PPAs were.
15 Q.   Did you ever get any training on PPAs?
16 A.   I can't remember.
17 Q.   What's SPL borrow loan process?
18 A.   I have no idea what that is.
19 Q.   Did you ever get any training on that?
20 A.   I don't recall.
21 Q.   All right.  So let me show you Exhibit Number 25 which
22      has been Bates stamped by Ford 954.
23           MS. HARDY:  Copy to counsel and to the
24      court reporter.
25           (Marked EXHIBIT 25 at 4:22 p.m.)

JOHNSON, DEANNA
12/19/2019



Page 414

BY MS. HARDY:

2  Q.  This an email from Mr. Markavich to LaDawn Clemons and
3      Mr. Mahoney and the subject is "Process Coaches
4      Training Session" and it reads, "Darrell, Thank you -
5      Mike Hall, Deanna Johnson and Shaun Closurdo will be
6      attending."  And the email below from Mr. Darrell
7      Waldon dated November 8 -- or 9, I'm sorry, 2018
8      indicates that there will be a process coaches
9      training session concerning the following topics,
10     paying employees, overtime charging, PPA's, and SPL
11     borrow-loan process, and the training session was set
12     to occur on November 9, 2018, 10:30 a.m. to 11:30 --
13     to eleven a.m.  Did you attend that training session?
14  A.  I'm not quite sure if I attended.  If I did, then we
15     would have a sign-off sheet.
16  Q.  You were asked to attend; correct?
17  A.  Yeah.  I was asked to attend, but also looking at the
18     names up here, that means that everybody on the lines
19     would have been gone and there would have been no one
20     to run the lines, so we didn't all attend a lot of
21     times together.  It would be off -- you know, with
22     different meetings or sorts like that.
23  Q.  So you have no idea whether you attended or did not
24     attend?
25  A.  I can't quite remember.

Page 415

1  Q.  And you don't have any records that would reflect
2      whether you did attend or not, such as a calendar
3      entry or anything of that nature?
4  A.  No, I don't.
5  Q.  Have you made any effort to find employment since
6      leaving Ford Motor Company on November 26, 2018?
7  A.  I just started.
8  Q.  When did you first start?
9  A.  Looking for employment?
10  Q.  Um-hmm.
11  A.  Maybe a couple months ago.
12  Q.  And what efforts have you made in the past couple of
13     months?
14  A.  Walk-ins, online searches, whatever I can to find any
15     type of small job.
16  Q.  All right.  So this is December 2019.  Did you start
17     in October or September?
18  A.  I started after my doctor gave me a clearance.
19  Q.  And when was that?
20  A.  My doctor gave me a clearance to return to work I
21     think on August the 16th or something like that.
22  Q.  What doctor are you referring to?  Dr. Davis?
23  A.  Yes.
24  Q.  All right.  And -- and it's your testimony that your
25     physicians had told you were not cleared to return

Page 416

1      to work before August 16, 2018?
2  A.  100 percent.
3  Q.  Okay.  And which doctors had told --
4          MS. LAUGHBAUM:  Objection.  I think you
5      misspoke and said 2018.
6          MS. HARDY:  You're correct.  I did.  2019.
7  BY MS. HARDY:
8  Q.  So it's your testimony that prior to August 16, 2019,
9      your doctors had informed you that you were not
10     cleared to return for work?
11  A.  Yes.
12  Q.  Okay.  And which doctors are you referring to?
13  A.  Dr. Davis and Dr. Tillman.
14  Q.  Okay.
15  A.  As well as Dr. Petrilli, Dr. Shah.  They all told me
16     not to go back there.
17  Q.  And did you discuss returning to work with Dr. Hunter?
18  A.  I can't recall.  Dr. Hunter was only my doctor for a
19     mere not even 30 days.  I didn't see her quite often
20     because Dr. Hunter moved to a different facility.
21     They often rotate.  Dr. Tillman was my doctor after
22     that.
23  Q.  You saw Dr. Hunter in April, May, and June of 2019;
24     correct?
25  A.  One time or maybe twice a month.

Page 417

1  Q.  Okay.  And you told Dr. Hunter you didn't want to go
2      back to work; right?
3  A.  I'm not sure if I told her that.
4  Q.  You're not denying that, are you?
5  A.  No.  I'm not denying that.  No.  Not at all.
6  Q.  Okay.
7  A.  I told her -- excuse me.  I told Dr. Hunter I did not
8      want to go back to Ford Motor Company, not back to
9      work.  I didn't want to go back to Ford.
10  Q.  Okay.  And so as of that point in time, April, May,
11     June 2019, you decided you didn't want to return to
12     Ford Motor Company?
13  A.  Well, during that time my doctors decided that I
14     shouldn't return to Ford Motor Company.
15  Q.  But that was your opinion that you expressed to
16     Dr. Hunter; correct?
17  A.  I don't think so.  No.  I can't -- I can't quite say
18     that.
19  Q.  You just said it was.
20  A.  No.  What I'm saying is that I could have said yeah, I
21     don't want to go back there, but that's my doctor.  We
22     were probably talking in a deep conversation about
23     whatever about the job.  After me seeing -- doing an
24     open hospital stay for over a week and being evaluated
25     with several other doctors, I wasn't in the right

JOHNSON, DEANNA
12/19/2019



Page 418

```
1        state of mind to return back there.  So of course I
2        could have told her I don't want to return there, not
3        to work, return back to that particular plant.
4    Q.  The last time you saw Dr. Shah was in January 2019;
5        correct?
6    A.  I'm not sure of the date.
7    Q.  Do you recall seeing him after that?  That's what the
8        records reflect.
9    A.  I don't -- I don't remember.  I know it's been a while
10       since I seen Dr. Shah, though, yeah.
11   Q.  Okay.  Have you ever discussed with Dr. Hunter PTSD?
12   A.  No.  I don't think so.  I don't believe so.
13   Q.  And she has not raised that issue with you, has she?
14   A.  I think she probably read from my previous reports and
15       everything.  I think she -- she may have raised it
16       with me.  I'm not quite -- quite sure.  I'm not quite
17       sure to everything that we said in our -- in our
18       conversations.
19   Q.  You've never discussed PTSD with Dr. Davis, have you?
20   A.  I'm sure that she's mentioned it to me before because
21       it was on my reports from my previous doctors.
22   Q.  I'm asking what you recall.  I'm not asking you to say
23       I'm sure she must have.  I'm asking you if you recall
24       Dr. Davis ever specifically discussing PTSD with you.
25   A.  I believe so.
```

Page 419

```
1    Q.  What do you claim she said?
2    A.  I can't remember fully of the conversation, but we
3        just often talked about the post-traumatic stress that
4        I've been going through from the job that was in
5        reference of that type of talk.  I can't remember.
6    Q.  Tell me what you told Dr. Davis about post-traumatic
7        stress.
8    A.  I didn't tell Dr. Davis anything about post-traumatic
9        stress.  I said that it came up.  Maybe she may have
10       read it off of one of my files or something.
11   Q.  No.  I'm not asking what she may have done.  I'm
12       asking what you recall occurred in conversations with
13       her, if anything, on the issue of post-traumatic
14       stress.
15   A.  I don't remember anything.
16   Q.  What symptoms do you claim you were experiencing in
17       January 2019 that concerned your mental and emotional
18       health?
19   A.  I was concerned that -- I was having nightmares that
20       Nick Rowan was at the foot of my bed butt naked with a
21       knife in his hand.  I was having nightmares and I was
22       scared that Rich was going to send his goons or his
23       self and come and beat me up.  I'm still scared of
24       that to this day.
25   Q.  You're scared of Rich Mahoney --
```

Page 420

```
1    A.  Yes.
2    Q.  -- sending goons --
3    A.  Yes.
4    Q.  -- to beat you up?
5    A.  Or his self.  Yes.  Yes, I am.
6    Q.  Who are his goons?
7    A.  I don't know.  It's just that -- the way that he talks
8        and the way that he acts and the things he said on the
9        line before to people.  I'm just going by what -- the
10       way that I've seen him act, like seeing Nick Rowan
11       punch file cabinets.  I'm scared of the both of them.
12       I don't know what these men will do.  This is not
13       bubble gum here.  This is a big game, and so I'm
14       scared.  I'm scared of both of them.
15   Q.  What makes you scared of Rich Mahoney?
16   A.  What makes me scared of Rich Mahoney?  Because I just
17       told you that Rich Mahoney knows all of this.  Rich
18       Mahoney doesn't want to say that he knows everything.
19       Rich Mahoney doesn't want to say he's seen the
20       pictures of a penis because if he did, that means that
21       he wasn't doing his job and that means that he would
22       probably get fired, so that means that I put him in a
23       situation to be looked at, and it scares me.  It
24       scares me and I'm scared of him and I'm scared of Nick
25       and I'm scared of any other rest of them because I'm
```

Page 421

```
1        just -- that's -- I'm just scared of them.  That's
2        what it is.
3    Q.  Have you ever known Rich Mahoney to do or say anything
4        that would cause people to be fearful of him?
5    A.  Yes.
6    Q.  What?
7    A.  I've heard him talk to other employees and say --
8        whisper over there and say if you do that shit again
9        I'm gonna take you outside and fuck you up or I'm
10       gonna kick your ass or look, playa, this is not -- we
11       can do this in here, but he talks a different street
12       lingo when he pulls them to the side.  Everyone knows
13       that about Rich.
14   Q.  All right.  Who have you heard him speak to in that
15       fashion?
16   A.  A couple of people.  Dante Irving.  Different people
17       on the line before.
18   Q.  Is Dante Irving an hourly employee?
19   A.  Yes.
20   Q.  Okay.  Is he still at Ford, to your knowledge?
21   A.  I have no idea.
22   Q.  All right.  Who else, if anyone, have you heard Rich
23       Mahoney speak to in that way?
24   A.  I can't think of -- I didn't get to know everyone's --
25       a lot of names good.  I had some names I knew and some
```

JOHNSON, DEANNA
12/19/2019


**EXHIBIT B**

Pages 422–425

Page 422

1    I didn't.  I don't know what -- I don't -- I don't
2    know -- I can't think of their names.  Just someone
3    that you have a problem with.  He would go and give
4    them that street talk.  Like he told me do you want me
5    to go and have that talk with Nick.  You know, he has
6    that street talk.
7    Q.   All right.  Let's go back to your symptoms that you
8    were experiencing in January 2019.  You said you were
9    having nightmares of Nick Rowan at the foot of your
10   bed with a knife and Rich Mahoney's goons coming to
11   beat you up.
12   A.   Or Rich Mahoney.
13   Q.   Or Rich Mahoney.  Okay.  What else, if any, symptoms
14   were you experiencing at that time?
15   A.   Replaying the version over and over again of him
16   trying to rip my breast off.  Just him punching the
17   file cabinets.  The -- of Rich telling me to fuck him
18   and get it over with, kiss him, just the fact that --
19   the fact that they all knew that this guy was sleeping
20   with women there and doing things like that, and then
21   when I go and I tell you about it, then you act to me
22   like it's nothing and I should fall in line.  That
23   keeps me up at night wondering how can people be like
24   that.  That's what keeps me up.  That's what scares
25   me.  That's what has me scared in January.  That's

Page 423

1    what has me scared now.  In January now -- it's
2    January.  I don't have a job because of this asshole.
3    I take care of my autistic granddaughter.  I take care
4    of my mom.  My whole family depends on me.  And
5    because of one asshole -- two assholes, one asshole
6    that harassed me and the other asshole that wouldn't
7    do nothing about it.  If Rich would have just did
8    something about it as soon as I told him like he
9    should have, none of us would be sitting here.  We
10   wouldn't be sitting here.  I did what I was supposed
11   to do and now I feel like I'm being punished for it.
12   In January when I -- when I talked to my therapist, I
13   talked to her about how I feel, how this has made me
14   feel, what I am going through, what this has done to
15   me, how this has changed my life, and it's changed my
16   life in a horrible, horrible way.  This is not
17   anything fun.  This is nothing that I'm making up.
18   Q.   Were there any other symptoms in January 2019 that you
19   felt you were experiencing as a result of issues you
20   had with your employment at Ford Motor Company?
21   A.   Being -- I went to Outback with my daughter and my
22   granddaughter one day and there was a couple of people
23   in there.  There was a girl, I don't know her name,
24   but I know she works on one of the lines there, and
25   she's like, "That's that bitch that got Nick fired."

Page 424

1    And it -- and it -- I told my daughter let's get up
2    and let's just leave.  Because this guy was loved by
3    so many people and they've been there longer than me.
4    It's like -- it's like -- I felt like she was
5    threatening me, and she's walking up to me, and I
6    don't -- I don't know her and I don't know who --
7    this -- this guy was with so many women there.  It
8    just -- I just feel threatened now.  I know everybody
9    there and they just probably hate me because he's gone
10   now and he helped so many women with so many things.
11   He paid these women extra money, extra hours.  He --
12   you know, some of them he was having sex with, and
13   it's just now I've -- it's like I've spoiled this for
14   everyone.  Have you all sitting here and we're all
15   sitting here because I told.  What was I supposed to
16   do?  That worries me.  It worries me.  This has
17   changed my whole life.  This is what me and my
18   therapist we talk about of what would have happened if
19   I wouldn't have told or just . . .
20   Q.   Who do you claim Nick Rowan slept with?
21   A.   Who did I see on his phone him having sex with?
22   Q.   Yes.  Let's start there.
23   A.   On his phone I seen -- I seen pictures of different
24   women on his phone, nude pictures, in various
25   positions.

Page 425

1    Q.   Who?
2    A.   One explicit sexual act was with a young lady named
3    Frances.  She worked on my end of the engine line.
4    And he would just -- you know, like you said earlier,
5    you see the pictures on my phone where we -- something
6    was broken or something and we'd have to show, you
7    know, the other person if something is broken or
8    whatever, a picture says a thousand words, and he
9    would come and he'd say, you know, that such and such
10   coming out your line has got a such and such and he'll
11   go -- I said, well, what are you talking about?  And
12   he's, oh, I'm sorry, that's not it.  And it'll be him
13   and he's, excuse my expression, but he's -- he's
14   banging the -- I'm just gonna say it.  He's banging
15   the shit out of her, and she's backwards and her
16   breasts are flying and he's flying and he's behind her
17   and he's doing this.  I mean, pictures like that.  And
18   it just --
19   Q.   All right.  So was that a video?
20   A.   Yes.  A video.  Uh-huh.
21   Q.   And so how long did you watch the video?
22   A.   Two seconds.  Two seconds enough to go, oh, my God,
23   and turn around.  It's not -- I don't --
24   Q.   So she's completely naked and they're in a sex act in
25   the video?

JOHNSON, DEANNA
12/19/2019



Page 426

1   A.   Yes.
2   Q.   And is he completely naked?
3   A.   Yes.
4   Q.   All right.  And how do you know it's her?  What -- how
5        could you in two seconds pick out that this person in
6        the photo was Frances?
7   A.   This is a video.  This is a phone; right?  He's behind
8        her.  The camera has to be here because her face is
9        like this in the camera and it's going back and then
10       it goes back far enough to where you could see his
11       whole naked nasty body, and it goes back far enough
12       where you can see her boobs flopping around, and then
13       it goes back into the camera, and you can just see all
14       of that in the camera within a split second.  You can
15       see all of that.  It's like if a porno jumped up there
16       for two seconds.  You may not want to look at it, but
17       if it jumps in your face, you're gonna say, oh, my
18       God.  You're gonna remember if you seen a wiener or a
19       breast.  You're gonna remember what you -- what you've
20       seen.  It's not like it's lollipops or candy on the
21       screen.
22  Q.   All right.  So do you have any idea how this video was
23       created?
24  A.   I don't know.  They -- they created it when they were
25       having sex.  I don't know.

Page 427

1   Q.   It's a little difficult one would think to create that
2        kind of video if they're engaged in the act as you've
3        described it.
4   A.   Not really.  It's just like me and you sitting here
5        talking and if we were engaged in the act of doing
6        anything.  There's a tripod and there's a camera.
7   Q.   This was on his -- a video on his phone?
8   A.   Yeah.
9   Q.   Is that what you're claiming?
10  A.   Um-hmm.  It was a video on his phone.  But it doesn't
11       necessarily mean he made it with his phone.
12  Q.   Did you ask how he got such a video?
13  A.   I didn't care how he got a video.  The only part I
14       cared about was that that was one of our subordinates
15       on his phone that he was having sex with.
16  Q.   When did he show you that photo or video?  I'm sorry.
17  A.   I don't quite remember when the date was of that.  But
18       that day --
19  Q.   Okay.  Well, can you give me a month?
20  A.   I don't remember when it was, but I can tell you this.
21       That's the day that I went also to Rich Mahoney and I
22       told him exactly what I seen.  I told him exactly what
23       I seen.  I said if you go now and ask Nick for his
24       phone.  Ask him for his phone and take him to HR.
25       That never happened.

Page 428

1   Q.   All right.  Do you know Frances?
2   A.   Yes, I do.
3   Q.   Okay.  What's her last name?
4   A.   I can't think of her last name.  She worked on my
5        line.
6   Q.   She's an hourly employee?
7   A.   Yes.  Part time.
8   Q.   And you're claiming he overpaid her or gave her some
9        kind of perk as a result of his having a relationship
10       with her?
11  A.   I never said that.  I didn't say that.
12  Q.   All right.  So --
13  A.   What I said to you was Nick Rowan had the power, we
14       both had the power, all supervisors have the power to
15       pay someone an extra hour or an extra 30 minutes or
16       even an extra two hours, but he often did that with
17       all of his girls that now I would assume he was in a
18       relationship with, but the ones that I've seen on his
19       phone, he would always pay them a little extra.
20  Q.   What other ones have you seen on his phone?
21  A.   Oh, boy.  He has a -- I seen pictures of Kelly.  I
22       don't know what Kelly's last name is.  She works on
23       the engine line as well, probably at station 52 or
24       something like that.
25  Q.   Another hourly?

Page 429

1   A.   Yes.  Another -- they were all hourly.  Every one of
2        this was hourly.
3   Q.   Okay.  What did you see on Nick Rowan's phone that
4        pertained to Kelly?
5   A.   Kelly was bent over on his phone.  He goes -- he goes
6        look, and I go, oh, my God, and it's Kelly and she's
7        just --
8   Q.   Bent over --
9   A.   -- bent over.
10  Q.   -- in a work setting or in -- in a private setting?
11  A.   She's bent over in her bathroom I think.  Maybe a
12       bathroom or someplace with her cheeks with her ass
13       spreaded.
14  Q.   All right.  So she's naked?
15  A.   Butt naked.  Yes.
16  Q.   Okay.  And it's a photo or a video?
17  A.   That's just a photo.  I don't know because I didn't
18       look at it.  It could have been a video, but it was
19       one of those, Nick, come on, please.  It's one of
20       those.
21  Q.   All right.  So it's a photo of Kelly from the back and
22       you're looking at her rear-end?
23  A.   Yes.
24  Q.   All right.  And how is it that you knew it was Kelly?
25  A.   Because I seen her face.

JOHNSON, DEANNA
12/19/2019


**EXHIBIT B**

Page 430

```
 1   Q.   How did you see her face if it was a photo from the
 2        back of her rear-end and she's bending over?
 3   A.   Let's just say she's real talented.
 4   Q.   Explain that.
 5   A.   She was bent over.  Maybe her face was through her
 6        legs or something, but I seen her face.  Yeah.
 7   Q.   You can't recall how it is that you --
 8   A.   I tried to block that picture out my mind from the
 9        first time that I seen it.  All I know is that it's
10        Kelly and it was on his phone, but if you could have
11        gotten his phone, maybe you could have seen it instead
12        of me explaining it to you.
13   Q.   All right.  So you're -- you claim you could identify
14        her face from that photo on his phone even though it
15        was from the back and she's bent over?
16   A.   Pretty much.  She's kind of bent over like this.  I
17        don't even remember how the bent over was, but I --
18   Q.   While she was bent over you saw her head coming to the
19        side?
20   A.   I don't quite -- I can't -- I can't remember if it's
21        to the side, through her legs or however it was.  I'm
22        not even -- I'm not gonna sit here and give you yes,
23        it was that because I didn't look at it long enough.
24        I just knew it was Kelly, and I think he may have made
25        a reference to it being Kelly as well.  But, I mean,
```

Page 431

```
 1        Nick often bragged about the naked pictures and didn't
 2        care whose name -- he wouldn't care.  He'd go, look,
 3        this is Lisa, this is Kelly, this is Sharonne, this
 4        is -- whomever names they were.
 5   Q.   All right.  When did you see the photo of Kelly?
 6   A.   I -- I can't remember.  It was every day it was a
 7        photo of somebody else.  Every day it was a different
 8        photo.
 9   Q.   Every day he showed you a photo of him with a -- with
10        another employee who was naked?
11   A.   Just about or every other day or it could have been
12        maybe twice in one day and maybe not the next day
13        or . . .  You know, it was during my employment, but I
14        told you it was more than five times.  I tell you
15        that.  Of other women, of pictures that I -- that he
16        tried --
17   Q.   It had to be a lot more than five times --
18   A.   I said it was --
19   Q.   -- if it's happening every day or every other day and
20        two pictures in a day.
21   A.   I said it was over five times.
22   Q.   Okay.  What other women did you see in photos?
23   A.   I don't know their names.  I don't know any of their
24        names, but it was women that -- that work in the plant
25        and on the engine line.
```

Page 432

```
 1   Q.   Did you ever ask Frances about her being in a photo or
 2        video with Nick Rowan in a sex act and him showing
 3        that to you in the plant?
 4   A.   Actually I think a couple of days before I got ready
 5        to leave I went to approach Frances and I was gonna
 6        tell her because I talked to her about her kids and
 7        things like that every day and I wanted to let her
 8        know what he was doing in hopes that she would go with
 9        me, Kelly and any of the other women and we'd all go
10        to HR, and as soon as I get over to her Nick runs up
11        and he goes, "This is my girl.  Don't talk to her.
12        Don't say anything to her."
13             And she goes, "Yeah.  I love Nick."
14             And, you know, they're talking and
15        everything and the bond that that -- just I left it
16        alone.  I'm not gonna tell her.  I'm gonna leave it
17        alone, because it wouldn't have been anything for me
18        to ask her.  She would have confessed it to me.  But
19        she would have been scared to tell HR or anybody else.
20        These women weren't gonna go with me.
21   Q.   All right.  So you didn't talk to Frances?  You didn't
22        tell her that Nick Rowan had photos of her in a
23        compromising position on the phone and that he was
24        showing them to people in the plant?
25   A.   I don't think I had to tell her seeing that she was
```

Page 433

```
 1        the one in the picture.
 2   Q.   You didn't tell her that he had photos of her on his
 3        phone and was showing them to people in the plant?
 4   A.   I don't think I had to tell her since she was the
 5        one --
 6   Q.   Answer the question.  You didn't -- you did not ever
 7        alert her to that; correct?
 8   A.   No.
 9   Q.   All right.  Did you tell Kelly that Nick Rowan had a
10        picture of her naked on his phone who he -- that he
11        was showing to people in the plant?
12   A.   Why would I?
13   Q.   Did -- answer the question.
14   A.   No.  I didn't tell her.
15   Q.   Are there any other women that you claim Nick Rowan
16        was having a sexual relationship with at Ford Motor
17        Company?
18   A.   Several, but I do not know their names.  None of their
19        names.  I don't know those women's names.
20   Q.   How do you know that --
21   A.   They were on different lines, on my line.
22   Q.   How do you know that he was having relations with any
23        female at Ford Motor Company other than what you've
24        testified to about Frances and Kelly?
25   A.   Because of the naked pictures that I just two seconds
```

JOHNSON, DEANNA
12/19/2019



Pages 434-437

Page 434

1    ago told you about and also --
2 Q.  Yeah.  But they were about Frances and Kelly and --
3 A.  No.
4 Q.  -- I'm asking about other women.
5 A.  You're asking me about other women now; right?
6 Q.  Yeah.  Yes.
7 A.  And you just asked --
8        THE WITNESS:  What was -- what was the
9    question she just asked me?
10 BY MS. HARDY:
11 Q.  I'm going to repeat it for you.
12 A.  Okay.
13 Q.  How do you know that Nick Rowan was having a sexual
14    relationship with women at Ford other than what you've
15    told me about Frances and Kelly?
16 A.  Because Nick Rowan would often throw pictures in my
17    face of other women in the plant that were naked on
18    his phone or him in a sexual position with on his
19    phone.
20 Q.  How do you know they were Ford employees?
21 A.  Because I seen them at the plant.  I seen these women
22    at the plant.
23 Q.  Can you describe any of those photos other than what
24    you've already described about Frances and Kelly?
25 A.  They're -- they're naked or either he's in a sexual

Page 435

1    act with them.  Either they're bent over and he's
2    behind them.  It's -- they're all nasty pictures and
3    he's in it like -- he's like in the picture.  And
4    they're -- these are women that work there.  You know,
5    on one occasion or it could have been a couple of
6    occasion where he goes, you know, this is such and
7    such.  I go, Nick, please.  You know, get it out of my
8    face.  There was never a time -- we don't sit and
9    just -- it's horrible.  That would be horrible of me
10    as a boss.
11 Q.  You mentioned a medical treater, Tillman, who you've
12    treated with before.  What's the first name?
13 A.  Kendra.
14 Q.  Kendra.  And where -- where is she located?
15 A.  The same place as Dr. Hunter and Dr. Davis.
16 Q.  So she's with -- with the clinic?
17 A.  Yes.
18 Q.  All right.  The St. Joe clinic?
19 A.  Yes.
20 Q.  And when did you treat with her?
21 A.  I am currently under treatment with her now.  I've
22    been under treatment with her for -- ever since the
23    last day of Dr. Hunter.
24 Q.  So since June 2019?
25 A.  Yes.  Somewhere.

Page 436

1 Q.  All right.  So how often have you treated with her?
2 A.  Sometimes I go every week.  Sometimes I go twice a
3    week.  It depends about how bad I'm feeling.  I have
4    an appointment with her tomorrow.  But it's usually at
5    least once or twice a week.
6 Q.  Have you seen Dr. Petrilli since January 2019?
7 A.  Dr. Petrilli?  No, I have not.
8        MS. HARDY:  All right.  I'm going to take a
9    short break and then I will probably wrap up shortly.
10        VIDEO TECHNICIAN:  We're going off the
11    record.  The time is 4:48 p.m.
12        (Recess taken at 4:48 p.m.)
13        (Back on the record at 4:59 p.m.)
14        VIDEO TECHNICIAN:  We are now back on the
15    record.  The time is 4:59 p.m.
16        MS. HARDY:  I have no further questions.
17        MS. LAUGHBAUM:  Nothing for me.
18        VIDEO TECHNICIAN:  This concludes the
19    videotaped deposition.  We are now going off the
20    record at 4:59 p.m.
21        (The deposition was concluded at 4:59 p.m.
22    Signature of the witness was not requested by
23    counsel for the respective parties hereto.)
24
25

Page 437

1              CERTIFICATE OF NOTARY
2 STATE OF MICHIGAN )
3               ) SS
4 COUNTY OF WAYNE   )
5
6        I, Cheri L. Poplin, certify that this
7    deposition was taken before me on the date
8    hereinbefore set forth; that the foregoing questions
9    and answers were recorded by me stenographically and
10    reduced to computer transcription; that this is a
11    true, full and correct transcript of my stenographic
12    notes so taken; and that I am not related to, nor of
13    counsel to either party nor interested in the event of
14    this cause.
15
16
17
18
19
20
21
22    Cheri L. Poplin, CSR 5132, RPR, CRR
23    Notary Public,
24    Wayne County, Michigan
25    My Commission expires:  August 21, 2025