UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEANNA JOHNSON,

Plaintiff,

v.

FORD MOTOR COMPANY,

Defendant.

_____/

Case No. 19-cv-10167

U.S. District Court Judge
Gershwin A. Drain

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT (ECF No. 87) AND SETTING NEW DATES

### I.   INTRODUCTION

On January 17, 2019, Plaintiff DeAnna Johnson ("Plaintiff" or "Johnson") initiated the instant employment discrimination action against Defendant Ford Motor Company ("Defendant" or "Ford").  ECF No. 1.  Presently before the Court is Defendant's Renewed Motion for Summary Judgment.  *See* ECF No. 87.  The motion is fully briefed.  *See* ECF Nos. 90, 91.  Upon review of the Parties' submissions, the Court concludes that oral argument will not aid in the disposition of this matter.  Therefore, the Court will resolve the instant Motion on the briefs. *See* E.D. Mich. LR 7.1(f)(2).

1

## II.   Background

### A. Factual Background

Both this Court and the Sixth Circuit have already described the facts of this case in great detail.  *See generally* ECF Nos. 61, 74.  As such, the Court only summarizes those facts necessary to its analysis of the instant Motion.

### 1.  Johnson's Employment with Ford and Experiences with Rowan

On June 25, 2018, Ford hired Johnson as a "process coach"—also referred to as a "production supervisor"— at its Dearborn Truck Plant.  ECF No. 55-3, PageID.1202; ECF No. 51-4, PageID.799–800.  Johnson reported to Senior Process Coach Richard Mahoney, who in turn reported to Team Manager William Markavich.  *See* ECF No. 55-9, PageID.1456.

Johnson was initially assigned to the A-Crew of the frame and engine line, where she shadowed and received training from a more senior process coach named "Darnell" for about a month.  ECF No. 55-3, PageID.1203.  Although Darnell gave Johnson "appropriate training," she still required training on responsibilities such as paperwork, payroll, and how to address problems that might arise on the job.  *Id.* at PageID.1204.

Johnson rotated to the B-Crew of the frame and engine line in July 2018.  *See* ECF No. 55-3, PageID.1204.  There, Markavich assigned her to shadow and receive training from Nick Rowan, another more senior process coach, with the

2

understanding that Johnson would eventually take over half of Rowan's duties.  ECF No. 55-8, PageID.1420.  As a result, Rowan was in a position to evaluate and provide feedback on Johnson's performance to Markavich.  ECF No. 55-8, PageID.1419.  Johnson asserts that Rowan "made constant lewd and sexually inappropriate comments to [her] and the hourly female employees he supervised" from the time she began working with him.  ECF No. 55-4, PageID.1290.  She testified that his conduct escalated from "inappropriate talking" to "sexual harassment" in the form of daily asking her for pictures of her genitalia to sexual assault "when he pinned [her] in a corner and grabbed [her] breast."  ECF No. 55-3, PageID.1213.

Specifically, on November 16, 2018, as Johnson exited her cubicle, Rowan allegedly ran at her, pinned her against a wall, thrust his hand down her shirt, and forcefully grabbed her breast.  *Id.* at PageID.1213, 1233.  Johnson testified that Sean Closurdo, another process coach, was present in a nearby cubicle and heard her yell that Rowan had gone "too far" before she ran to the bathroom.  *Id.* at PageID.1233.  The next day, Rowan texted Johnson, "Sorry for my hand slippage yesterday."  ECF No. 51-7, PageID.900.  However, during his deposition, Rowan denied grabbing Johnson's breast and testified that the text message referred to him inadvertently placing his hand on her thigh.  ECF No. 55-9, PageID.1483.

Johnson testified that she was "scared" of Rowan because she had seen him "get so angry."  ECF No. 55-3, PageID.1239.  In particular, Johnson saw Rowan

punch the wall and filing cabinet in his cubicle to the point where they were "all busted." *Id.*, PageID.1277. Johnson started observing this behavior within the first two weeks of working with Rowan. *Id.* She also testified that "[e]veryone" saw him act this way. *Id.* During her official report on November 25, 2018, Johnson informed LaDawn Clemons, then-Crew Operations Manager and Markavich's supervisor's boss, that Rowan's filing cabinets were dented, and Clemons told Johnson that she would photograph them. *Id.*

Johnson was on the B-Crew for three months before rotating to the C-Crew. ECF No. 55-3, PageID.1205. She then moved to the chassis 4/5 line in early November 2018. *See* ECF No. 55-3, PageID.1271. However, she was only there for about two weeks before moving back to the frame and engine line, prior to the alleged sexual assault. *Id.* at PageID.1273. Even while they worked on different lines, Johnson and Rowan still interacted regularly in their capacities as process coaches. *Id.* at PageID.1272.

### 2. Ford's Alleged Knowledge of the Harassment Prior to the Official November 25, 2018 Report

In her declaration, Johnson stated that Rowan often made his sexual comments to her or the female hourly workers "out in the open, for everyone around to hear." ECF No. 55-4, PageID.1291. He would also regularly state or shout at her, "Show me those titties," which became a running joke among others at the Plant,

including Closurdo.[1]   *Id.* at PageID.1292.   Indeed, Johnson testified that when Johnson discussed the alleged sexual assault with Closurdo either later that day or the day after, Closurdo responded something along the lines of "so you showed [Rowan] those titties."  ECF No. 55-3, PageID.1238–39.  Johnson also stated in her declaration that Mahoney and/or Markavich were often present when Rowan told his "sexual 'jokes,' one-liners[,] and innuendoes" to female workers.   *Id.* at PageID.1290.   Mahoney and Markavich would laugh in response, or Markavich would sometimes reply, "Oh God."   *Id.* at PageID.1291.

Johnson testified that she spoke to Mahoney about her problems with Rowan between "three times a week" and "at least three times a day" beginning in August and through the end of her employment as the situation grew increasingly "over the top."   ECF No. 55-3, PageID.1212–13.   She further testified that she showed Mahoney several inappropriate pictures that Rowan sent her.  *Id*.  In her declaration, Johnson clarified that she told Mahoney about "the nasty texts pictures and comments" from Rowan, "including those that were race-related."  ECF No. 55-4, PageID.1293.   At one point, Mahoney texted Johnson and asked her to "kiss and make up" with Rowan so everyone could go home.  ECF No. 55-12, PageID.1540.

---

[1] Johnson also described an incident during which Rowan made a comment about her having nipple rings, which she does not, and Closurdo later mentioned hearing about them.  ECF No. 55-4, PageID.1292.

Johnson attested that after she showed him the image that Rowan texted her of Rowan's penis on September 13, 2018, Mahoney said she needed to warn him before showing him a "wienie" picture.  ECF No. 55-4, PageID.1292.

Additionally, Johnson testified that she told Mahoney before a team meeting between three weeks to a month before she made her official November 25, 2018 report that she intended to report Rowan to Human Resources.  ECF No. 55-3, PageID.1212.   Mahoney responded, "You've only been here for a hot fucking minute.  You better watch what you do and what you say.  I have kids to take care of.  I have a wife.  And you're running around saying shit.  You better watch what you say."  *Id*.  Johnson also testified that she told Mahoney about Rowan violently grabbing her breast "right after he did it."  ECF No. 55-3, PageID.1234.   Mahoney responded that he would "really tell[] [Markavich]," but he had told Johnson that he would do so before.  *Id.* at PageID.1236.

Likewise, Johnson testified that she started complaining to Markavich about Rowan "very early," before Rowan had even started directing his crude remarks at her.  ECF No. 55-3, PageID.1236.  Specifically, she warned Markavich that Rowan was "over there talking about his genitals and saying really nasty things . . . to a lot of these girls."  *Id.*   However, Markavich laughed off or dismissed Johnson's concerns as Rowan being "eccentric or weird" or "just Nick."  *Id.*   On several occasions, both before and after Rowan sent her a picture of his penis, Johnson spoke

6

with Markavich about moving away from Rowan, and Markavich replied that they were working on it. ECF No. 55-4, PageID.1294. After Johnson reported the inappropriate pictures to Mahoney, who in turn reported them to Markavich, Markavich began "getting nasty" with Johnson. ECF No. 55-3, PageID.1236–37. Specifically, soon after Rowan sent the image of his penis, Johnson told Mahoney that she "c[ould]n't do it anymore" and asked to be moved again, and Mahoney went to speak with Markavich. *Id.* at PageID.1215. Markavich then came and asked Johnson how bad things were "[o]n a scale of 1 to 10." *Id.* at PageID.1216. When Johnson responded "100," Markavich said he did not want to hear it. *Id.*; *see also id.* at PageID.1237. As Markavich was walking away, Johnson yelled after him that Rowan was "sending [her] naked pictures of his [weenie]." *Id.* at PageID.1216. After that point, he started to respond to Johnson's complaints by cursing her out and then apologizing, and she eventually "didn't feel confident telling [Markavich] anything" anymore. *Id.* at PageID.1236; *see also id.* at PageID.1209.

Clemons testified that she told Leslie Harris, the Salaried Personnel Supervisor at Ford's Dearborn Truck Plant, when Harris interviewed her on November 26, 2018 that she had known Rowan had had relationships with various female hourly employees across the Plant. ECF No. 55-5, PageID.1317. However, because none of the woman complained, "they" were unable to "prove it." *Id.* Nevertheless, the rumors were sufficient to result in Rowan being moved around the

7

Plant. *Id.* at PageID.1317–18.  In her declaration, Plaintiff attested that on November 3, 2018, she went to Clemon's office crying because "there was a lot of testosterone on the floor," "Rowan was inappropriate, saying nasty things to women on the floor," and Johnson did not want to work with him.  ECF No. 55-4, PageID.1294. Clemons told Johnson she knew Rowan was bad news even though he had never been written up, and she gave Johnson encouragement to "stick it out" along with a bracelet that had "Nevertheless, SHE PERSISTED" inscribed on it.  *Id.*; *see also* ECF No. 55-15, PageID.1545.

Johnson testified that she told Harris that she was "scared" of Rowan because of the cubicle punching.  ECF No. 55-3, PageID.1239.  As a result, Clemons hid Johnson in her office after Johnson finished making her report, and then another employee escorted Johnson out the backdoor of the plant and drove her to her car before following her on the expressway to make sure there were no issues.  *Id.*; *see also* ECF No. 55-5, PageID.1312.

Ford's "Anti-Harassment Policy at a Glance" states that Ford has a "a policy of zero tolerance for," *inter alia* [s]exual harassment," [r]acial or national origin harassment," and "[h]arassment based on sex, race, color, . . . [or] national origin." ECF No. 55-17, PageID.1548.  An employee can report a violation of the policy to her "supervisor or manager," her "local Human Resources representative," the "Company harassment hotline," or the "Corporate Diversity and Personnel Relations

Office.  ECF No. 55-17, PageID.1551.  As such, Harris testified that if Mahoney "was aware of behavior" such as an employee "sending coworkers naked pictures and asking them for naked pictures," then "he should have brought that forth to HR." ECF No. 55-6, PageID.1350.

### B. Procedural Background

Plaintiff initially brought claims for (1) sexual harassment/sexually hostile work environment in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101, *et seq.*; (2) racial harassment/racially hostile work environment in violation of 42 U.S.C. § 1981; and (3) sexual assault and battery.  ECF No. 1, 7–10.  After the Court partially granted her motion, Plaintiff filed a First Amended Complaint ("FAC") that added allegations of quid pro quo harassment to her ELCRA claim.  ECF Nos. 45, 46, PageID.662–63.

On May 12, 2020, this Court granted Defendant summary judgment on Plaintiff's § 1981 claim.  ECF No. 61, PageID.1644.  Of particular relevance for the instant Motion, the Court found that Paragraph 20 of the declaration Plaintiff attached as an exhibit to her response to Defendant's Motion for Summary Judgment (ECF No. 51), in which Plaintiff asserted that she informed Mr. Mahoney about Mr. Rowan's race-related texts, was "an attempt to create a sham fact issue" for summary judgment and struck the paragraph.  *Id.* at PageID.1626.  Having struck Paragraph 20, the Court found that the alleged racial harassment described by Plaintiff was

9

insufficiently severe or pervasive, from an objective standpoint and when compared to other cases within this Circuit, to survive summary judgment.  *Id.* at PageID.1637–41.  The Court then declined to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.  *Id.* at PageID.1644.

The Court denied Plaintiff's Motion for Reconsideration, ECF No. 68, and Plaintiff appealed, ECF No. 69.  On September 2, 2021, the Sixth Circuit Court of Appeals entered an Order reversing and remanding this matter to this Court for further proceedings.  *Johnson v. Ford Motor Co.*, 13 F.4th 493 (6th Cir. 2021); ECF No. 74.  Specifically, the Sixth Circuit concluded that this Court erred in striking Paragraph 20 because it "did not directly contradict Johnson's deposition testimony."  *Id.* at PageID.1764.  Likewise, the Sixth Circuit determined that this Court erred in finding that Plaintiff failed to satisfy the objective prong of the severe or pervasive factor of her § 1981 claim because, *inter alia*, the alleged racial harassment was "constant and ongoing" as well as "physically threatening or humiliating."[2]  *Id.* at PageID.1771.  As such, the Sixth Circuit directed this Court to "determine in the first instance whether there is a genuine dispute of material fact

---

[2] The Sixth Circuit also found that, because the alleged racial harassment was "intertwined" with the alleged sexual harassment, this Court also should have considered the overtly sexual harassment, along with Plaintiff's allegations of quid pro quo harassment, in determining severity and pervasiveness.  ECF No. 74, PageID.1772

10

regarding whether Ford knew or should have known about Rowan's race-based harassment and failed to act in response." *Id.* at PageID.1773.

Per agreement of the Parties, *see* ECF No. 80, PageID.1799, Plaintiff filed a Second Amended Complaint ("SAC") reinstating her state law claims before this Court on October 25, 2021, ECF No. 81. As such, the SAC brings claims for sexual harassment/quid pro quo and hostile work environment under the ELCRA (Count I); racial harassment/racially hostile work environment in violation of 42 U.S.C. § 1981 (Count II); and sexual assault and battery (Count III).

### III.   LAW & ANALYSIS

#### A. Legal Standard

Federal Rule of Civil Procedure 56(a) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). "A fact is material if its resolution will affect the outcome of the lawsuit." *F.P. Dev., LLC v. Charter Twp. of Canton, Michigan*, 16 F.4th 198, 203 (6th Cir. 2021). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, no genuine issue of material fact exists where "the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted).

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Pineda v. Hamilton Cty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Thus, if the nonmoving party will bear the burden of proof on a claim, the movant "need only demonstrate that the nonmoving party has failed to 'make a showing sufficient to establish the existence of an essential element' of that claim." *Id.* (quoting *Celotex*, 477 U.S. at 322). Thereafter, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *see also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[The] general rule [is] that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." (quotation marks omitted)).

12

### B. Discussion

#### 1. Sexual Assault and Battery (Count III)

Defendant first argues that it is entitled to summary judgment on Plaintiff's sexual assault and battery claim (Count III) because an employer cannot be held vicariously liable for an employee's torts that are beyond the scope of employment unless the employer knew or should have known about the employee's propensities and criminal record before the employee committed the intentional tort. ECF No. 87, PageID.1855 (citing *Hamed v. Wayne County*, 490 Mich. 1 (2011)). Plaintiff counters that the exception applies here because "Rowan's inappropriate sexual conduct toward Plaintiff and others (including his disturbing obsession with Plaintiff's body and breasts), and erratic and violent workplace behavior (including punching and damaging Ford property) are well documented." ECF No. 90, PageID.1897. At the very least, Plaintiff argues, whether Defendant knew or should have known of Rowan's propensities creates an issue of fact to be determined by a jury. *Id.* (citing *Hersh v Kentfield Builders*, 385 Mich 410, 413 (1971)).

As the Parties have agreed, in Michigan, "an employer is not liable for the torts . . . committed by an employee when those torts are beyond the scope of the employer's business." *Hamed*, 490 Mich. at 11 (alteration in original) (quoting *Zsigo v. Hurley Med. Ctr.*, 475 Mich. 215, 221 (2006)). However, "an employer can be held liable for its employee's conduct if the employer knew or should have known

of [the] employee's propensities and criminal record before that employee committed an intentional tort." *Id.* (cleaned up). This turns on "whether an employer had (1) actual or constructive knowledge of prior similar conduct and (2) actual or constructive knowledge of the employee's propensity to act in accordance with that conduct." *Id.*

This Court acknowledges that the development of the case law on whether an employer's actual or constructive knowledge should be treated as a question of law or question of fact is not linear. In *Hersh v. Kentfield Builders*, on which Johnson relies, the plaintiff was seriously injured in an unprovoked attack by one of the defendant's employees. 385 Mich. at 411. The employer had learned that the employee had a prior manslaughter conviction during the course of his employment. *Id.* at 413. The plaintiff subsequently brought a negligent employment/retention claim against the defendant, and the trial court submitted the question of whether the employer should have known of the employee's vicious propensities to the jury. *Id.* at 412. The Michigan Supreme Court affirmed the trial court, holding "[w]hether the employer knew or should have known of [the employee's] vicious propensities should not be determined by any court as a matter of law, but by the jury." *Id.* at 415.

Later, in *McClements v. Ford Motor Co.*, the Michigan Supreme Court explained in dicta, that while the court decides as a matter of law whether a

defendant-employer owes a duty to a particular plaintiff, "it is the province of the jury to determine whether an employer has breached" the "duty to exercise reasonable care in selecting and retaining its employees" by "retaining the employee in question."  473 Mich. 373, 381 n.6 (2005), *opinion corrected on reh'g*, 474 Mich. 1201 (2005).  The jury does this by "determin[ing] whether the employee knew or should have known that its employee had a propensity to engage in the conduct that caused the injury to the plaintiff."  *Id.* (quotation marks omitted).

However, the most recent Michigan Supreme Court cases to address the issue, seem to contravene the holdings in *Hersh* and *McClements*.  First, in *Brown v. Brown*, contradicting the dicta in *McClements*, the Michigan Supreme Court treated the question of whether the defendant had notice of the employee's propensity to rape as a factor in determining whether the defendant owed a duty to the plaintiff. 478 Mich. 545, 552–53 (2007).  The *Brown* Court ultimately held that

> where an employee has no prior criminal record or history of violent behavior indicating a propensity to rape, an employer is not liable solely on the basis of the employee's lewd comments for a rape perpetrated by that employee if those comments failed to convey an unmistakable, particularized threat of rape.

*Id.* 547–48 (2007).  The *Brown* Court specifically distinguished the facts at issue from *Hersh* because the employee in *Hersh* "had a criminal record and had committed a prior, violent criminal *act*" whereas the employee in *Brown* "had not

committed any prior *acts* that would have put [the] defendant on notice of [his] propensity to commit any criminal act, including rape." *Id.* at 562 (emphasis in original).

The Michigan Supreme Court again addressed foreseeability as a matter of law in *Hamed v. Wayne County*. The plaintiff in *Hamed*, who had been arrested, was subject to sexually charged comments and offers for better treatment in exchange for sexual favors by the only officer on duty in the inmate registration area of the jail. 490 Mich. at 6. After the plaintiff resisted his advances, the officer moved her to a part of the jail not monitored by surveillance cameras and sexually assaulted her. *Id.*

In determining whether defendants can be held liable for quid pro quo sexual harassment affecting public services, the Michigan Supreme Court determined whether the officer's actions were foreseeable such that his employer could be held liable for his conduct, instead of concluding that the question was one of fact to be submitted to the jury. *Id.* at 15. In so doing, the *Hamed* Court noted that the officer had grievances filed against him for making a threatening call to his landlord and engaging in a physical altercation with an inmate, that he did not initiate, thirteen years before the sexual assault at issue in *Hamed*. *Id.* at 16. The *Hamed* Court found that the defendants were "on notice" of the officer's "irresponsible and aggressive tendencies" but that this did not constitute "actual or constructive knowledge of prior

16

similar criminal sexual misconduct" because "violent actions do not inevitably lead to acts of criminal sexual conduct." *Id*.

To the extent these cases are reconcilable, this Court concludes that the question of whether the foreseeability of an employee's intentional tort must be submitted to a jury turns on whether the employer was aware of similar past criminal acts. Thus, because there is no evidence that Rowan had any prior criminal history of sexual assault, the Court can proceed with its regular summary judgment analysis.

The Court finds that Plaintiff has not presented evidence sufficient to create an issue of fact as to whether Defendant had actual or constructive knowledge of Rowan's propensity for sexual assault. Clemons testified that she was aware that Rowan had had relations with several female hourly employees, but "[t]here were zero complaints [of] harassment" and everything she heard about sounded "consensual." ECF No. 55-5, PageID.1317. Moreover, while Rowan sent Plaintiff several text messages requesting to see her breasts, the Michigan Supreme Court has already determined that "[c]omments of a sexual nature do not inexorably lead to criminal sexual conduct any more than an exasperated, angry comment inexorably results in a violent criminal assault." *Hamed*, 490 Mich. at 13 (quoting *Brown*, 478 Mich. at 555). Indeed, as reprehensible as the messages were, they did not "convey an unmistakable, particularized threat of" sexual assault. *Brown*, 478 Mich. at 548. Finally, even if Defendant had prior notice of Rowan's violent habit of punching his

17

cubicle,[3] the Michigan Supreme Court has also concluded that "violent actions do not inevitably lead to acts of criminal sexual conduct." *Id.* at 16. Accordingly, Defendant is entitled to summary judgment on Plaintiff's sexual assault and battery claim (Count III).

### 2. Notice

Next, Defendant argues that Plaintiff has failed to raise a genuine issue of material fact as to whether she put Defendant on notice that she was being sexually or racially harassed. ECF No. 87, PageID.1857.

### i.  Sexual Harassment and Hostile Work Environment Claims (Count I)

Defendant contends that Plaintiff cannot establish actual notice for purposes for the ELCRA via her reports to Mahoney because he was not "higher management." ECF No. 87, PageID.1859. Plaintiff counters that she has established constructive notice. ECF No. 90, PageID.1899–1900. She further argues that there is at least a dispute of fact as to whether Mahoney was "higher management." *Id.* at PageID.1900–01. Regardless, Plaintiff asserts, Ford's anti-harassment policy specifically allows employees to report sexual and racial harassment to their supervisors. *Id.* at PageID.1901.

---

[3] The Court acknowledges that the Parties dispute whether Ford had knowledge of Rowan's violent habit. *See* ECF No. 91, PageID.1911 n.1.

18

To establish constructive notice under the ELCRA, a plaintiff may show "the pervasiveness of the harassment, which gives rise to the inference of knowledge." *Sheridan v. Forest Hills Public Sch.*, 247 Mich. App. 611, 621 (Mich. Ct. App. 2001)) (citation omitted).   "[N]otice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Chambers v. Trettco, Inc.*, 463 Mich. 297, 319 (2000).

First and foremost, the Sixth Circuit has already found that "there is sufficient evidence in the record that Rowan's [] harassment was severe or pervasive enough for a reasonable person to find the work environment hostile."[4]   ECF No. 74, PageID.1771.   Regardless, this Court agrees that there is at least a genuine issue of fact as to whether Defendant was constructively notified of Rowan's behavior.   For example, as the Sixth Circuit noted, Plaintiff testified that Rowan was "constantly harassing" her and asking to see her "black mounds" during the four months they worked together.   ECF No. 74, PageID.1771 (quoting ECF No. 55-3, PageID.1226). Plaintiff also described and presented as evidence several sexually explicit text

---

[4] While the Sixth Circuit was referring to Johnson's racial harassment claim, the Sixth Circuit also noted "how intertwined the sexual and racial harassment was in the present case" and reversed this Court, in part, for "impermissibly pars[ing] out" Rowan's sexually harassing statements from the racially harassing ones.   ECF No. 74, PageID.1772.

messages that Rowan sent her.  Moreover, Plaintiff attested that Rowan often made sexually explicit comments about her and the female hourly employees in front of other employees, including Mahoney and Markavich, and that Mahoney and Markavich merely laughed the comments off.  Plaintiff has also presented evidence that Rowan's interest in seeing her breasts was a running joke at the Plant, at least to Closurdo.  Finally, Clemons, who was four levels of seniority above Rowan, testified that she was aware of rumors that Rowan had relations with several women in the Plant and that concern over those rumors had caused management to move Rowan to various crews around the Plant.  Thus, for these reasons, as well as others discussed in Section II, Subsection A, the Court finds there is at least a genuine issue of fact as to whether Defendant was on constructive notice "of a substantial probability that the sexual harassment was occurring." *Woods v. Dep't of Corr.*, No. 333825, 2018 WL 1611444, at *4 (Mich. Ct. App. Apr. 3, 2018) (finding issue of fact as constructive notice where defendant knew of employee's sexually harassing behavior before plaintiff even began working with him due to prior complaints and employee's reputation as a "womanizer" who violated boundaries with women).

Even if there was not constructive notice, the Court also finds there is at least a genuine issue of fact as to whether Plaintiff's alleged reports to Mahoney constitute actual notice.  To establish actual notice under the ELCRA, a plaintiff must show that she reported her harassment to someone in "higher management," which means

"someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee." *Matthews v. Detroit Pub. Sch. Cmty. Dist.*, No. 19-13277, 2021 WL 4427176, at *7 (E.D. Mich. Sept. 27, 2021) (quoting *Sheridan v. Forest Hills Public Sch.*, 247 Mich. App. 611, 622 (Mich. Ct. App. 2001)).

The Court finds that there is a genuine dispute of fact as to whether Mahoney was "higher management." For example, Markavich testified that Mahoney "owns the entire floor" while Markavich is in meetings and that when Markavich is not on the floor, Mahoney "assumes [his] role." ECF No. 55-8, PageID.1433. While this did not ordinarily include disciplinary action, Mahoney testified that he once, with support from a shift manager, wrote up "a whole group of" process coaches because the team manager was not there, and they had failed a safety audit. ECF No. 55-7, PageID.1387. Additionally, Clemons testified that Rowan's senior process coach would have had the authority to transfer Rowan when he was being moved around due to rumors of his relationships with female hourly workers. ECF No. 55-5, PageID.1318; *see also id.* at PageID.1323. Finally, both Plaintiff and Rowan considered Mahoney their supervisor, someone to whom they had to report and from whom they had to take orders. *See* ECF No. 55-3, PageID.123738; ECF No. 55-9, PageID.1456. These examples demonstrate that Mahoney had at least some

21

influence in the disciplining process coaches generally, and Rowan in particular. Thus, there is a genuine issue as to whether Mahoney had "'actual authority to effectuate change in the workplace' by, for example, firing or disciplining" Rowan.[5] *Carr v. Detroit Bd. of Educ.*, No. 329832, 2017 WL 603565, at *3 (Mich. Ct. App. Feb. 14, 2017) (quoting *Sheridan*, 247 Mich. App. at 622–23)).

*Sheridan v. Forest Hills Public Schools*, on which Defendant relies, is distinguishable. The "head custodian," to whom the plaintiff reported, and the plaintiff both reported to the same person, *Sheridan*, 247 Mich. App. at 614–15, and were thus at the same seniority level. Moreover, the "head custodian" had no authority over or input into hiring, termination, discipline, pay, hours, or job transfers. *Id.* at 15. Lastly, the *Sheridan* plaintiff did not regard the "head custodian" as her supervisor. *Id.* at 625. Similarly, in *Burton v. Ford Motor Co.*, there was "no record evidence that [the supervisor] had authority or influence regarding, hiring, firing, or disciplining" the offensive employee. No. 234129, 2003 WL 21279588,

---

[5] The Court also notes that at least one court in this District has found that reporting harassment to a supervisor who might not otherwise be considered "higher management" in compliance with the employer's sexual harassment policy is sufficient to establish actual notice under the ELCRA. *See Robinson v. Tendercare (Michigan), Inc.*, No. 07-10212, 2008 WL 11355460, at *12, *12 n.11 (E.D. Mich. Aug. 19, 2008) (citing *Sheridan*, 247 Mich. App. at 625). Notably, in addition to Ford's Anti-Harassment Policy instructing employees to report harassment to, *inter alia*, their supervisors, Harris testified that Mahoney had a duty to report harassment if he was aware of it.

at *1 (Mich. Ct. App. June 3, 2003).  As such, the Court concludes there is a genuine dispute of fact as to whether Mahoney was "higher management" such that Plaintiff's alleged reports to Rowan were sufficient to put Defendant on actual notice of Rowan's sexually harassing behavior.

Because the Court has determined there is a genuine issue of fact as to whether (1) Defendant received constructive notice of Rowan's sexual harassment and (2) Mahoney was "higher management" such that Plaintiff's reports to him constitute actual notice, the Court need not address Defendants' arguments regarding whether Markavich received legally sufficient notice as to Count I.  Accordingly, Defendant is not entitled to summary judgment on Plaintiff's ELCRA claim (Count I) due to lack of notice.

### ii.    Racial Harassment and Hostile Work Environment Claim (Count II)

Next, Defendant asserts that Plaintiff's reports to Mahoney were insufficient to establish notice under federal law because he was not sufficiently senior in Defendant's hierarchy to stop Rowan's harassment, and he was not a human resources or similar professional.  ECF No. 87, PageID.1860.

As a preliminary matter, the Court notes that claims for race discrimination under § 1981 are reviewed under the same standards as claims for sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII").  *Jackson v. Quanex*

*Corp.*, 191 F.3d 647, 658 (6th Cir.1999).  "For an employer to be liable for the sexual harassment of an employee by a coworker, the harassed employee must show that the employer both (1) knew or should have known of the harassment and (2) failed to take prompt and appropriate corrective action." [6]  *E.E.O.C. v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001).  A plaintiff may establish actual knowledge if she reported the harassment to any employee "who has been authorized—or is reasonably believed by a complaining employee to have been authorized—to receive and respond to or forward such complaints to management."  *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 277 (6th Cir. 2009) (citing *Bombaci v. Journal Community Pub. Group. Inc.*, 482 F.3d 979, 984 (7th Cir.2007)).

However, "to establish that the employer 'knew or should have known' of the co-worker harassment, the plaintiff need not necessarily have reported it to a supervisor."  *Gallagher*, 567 F.3d at 276 (quoting *Jackson*, 191 F.3d at 663).  "[K]nowledge may be imputed to the employer" where the harassment is "pervasive."  *Id.* (quoting *Jackson*, 191 F.3d at 663).

As discussed in the preceding section, the Sixth Circuit has already determined that there is a genuine issue of fact as to whether Rowan's racial harassment was pervasive.  *See* ECF No. 74, PageID.1772.  It thus necessarily

---

[6] Defendant only argues that it is entitled to summary judgment based on the notice prong.  *See generally* ECF No. 87, PageID.1859–60.

follows that there is a genuine issue of fact as to whether Defendant should have known about the racial harassment for that reason as well as all the others discussed *supra*. Additionally, the Court acknowledges that in *Gallagher*, which Defendant cited in its Motion, the Sixth Circuit noted that the plaintiff made her report to her immediate supervisor, who was expressly designated to receive such reports in her employer's sexual harassment policy, and that the defendant thus did not dispute the plaintiff's claim that her supervisor's knowledge was "properly imputed" to the defendant. *Gallagher*, 567 F.3d at 277. Similarly, here, Ford's Anti-Harassment Policy at a Glance instructs employees to report harassment to their supervisors, which Plaintiff did.

Accordingly, Defendant is not entitled to summary judgment on Plaintiff's § 1981 claim (Count II) due to lack of notice. *See Waldo v. Consumers Energy Co.*, 726 F.3d 802, 816 (6th Cir. 2013) (affirming district court's denial of summary judgment with respect to notice of sexual harassment claim where, *inter alia*, the plaintiff testified that she brought the harassing behavior to various supervisors' attention "on several occasions").

### 3. Quid Pro Quo Sexual Harassment Claim (Count I)

Finally, Defendant argues that Plaintiff has failed to establish quid pro quo sexual harassment. ECF No. 87, PageID.1863. Specifically, Defendant asserts that it cannot be held vicariously liable for Rowan's actions because the failure to train,

on its own, is not a "tangible employment action," and Rowan lacked supervisory, or de facto supervisory, authority over Plaintiff. *Id.* at PageID.1864–67.

To establish a claim of quid pro quo sexual harassment under the ELCRA, a plaintiff must show "(1) that she was subject to any of the types of unwelcome sexual conduct or communication described in [MCL 37.2013(i)], and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment." *Chambers v. Trettco, Inc.*, 463 Mich. 297, 310 (2000) (quoting *Champion v. Nationwide Security, Inc.*, 450 Mich. 702, 708–09 (1996), *overruled on other grounds*, *Hamed v. Wayne County*, 490 Mich. 1 (2011)). The second prong requires showing a decision regarding a "tangible employment action," by someone "with supervisory powers," in other words "'an individual [] in a position to offer tangible job benefits in exchange for sexual favors or, alternatively, threaten job injury for a failure to submit.'" *Id.* at 320–21 (quoting *Champion*, 450 Mich. at 713). Indeed, the Michigan Supreme Court went so far as to say that "only persons with supervisory powers could ever effectively make" a "decision regarding a tangible employment action." *Id.* at 321. The *Chambers* Court contrasted this to the harasser in "a pure hostile environment" claim where, generally, the harasser "acts outside the scope of actual or apparent authority to hire, fire, discipline, or promote." *Id.* at 311 (quoting *Radtke v. Everett*, 442 Mich. 368, 396 (1993)).

26

As a preliminary matter, the Court addresses Plaintiff's assertion that "[t]his Court already found, in the context of ruling on Plaintiff's motion to amend, "[T]here are enough disputed issues of fact with respect whether Mr. Rowan enjoyed sufficient supervisory authority over Plaintiff to support her *quid pro quo* claim." ECF No. 90, PageID.1902–03 (quoting ECF No. 45, PageID.646 (second alteration in original)). Plaintiff's characterization is misleading. This Court explicitly stated that the extra-circuit authority on which Plaintiff relied was "not persuasive;" however, the standard of review for motions to amend required the Court to "construe the complaint in a light most favorable to the plaintiff and accept all of her factual allegations as true." ECF No. 45, PageID.645. The standard of review at the summary judgment stage is not nearly so deferential, and thus the Court's prior statement is not, in and of itself, sufficient to establish that there is a genuine issue of fact as to whether Rowan was Plaintiff's supervisor for purposes of a quid pro quo claim.

Plaintiff acknowledges that Rowan was not her formal supervisor and instead argues that he had "de facto supervisory authority" over her. ECF No. 90, PageID.1902. Specifically, she asserts that Mahoney and Markavich delegated Rowan with supervisory authority over her by allowing Rowan "to train or not train Plaintiff as he saw fit and report her progress or lack thereof back to them, thereby jeopardizing her employment." *Id.* at PageID.1903. In support of her theory of

liability, Plaintiff relies on several cases outside of this District and Circuit.  *See id.* at PageID.1904.

The Court finds that these cases are unpersuasive for three reasons.  First, all the cases analyze discrimination statutes that are textually distinguishable from the ELCRA.  While Michigan courts are often "guided in [their] interpretation of the [ELCRA] by federal court interpretations of its counterpart federal statute," the Michigan Supreme Court specifically declined to do so in the context of vicarious liability for quid pro quo sexual harassment.  *Chambers*, 463 Mich. at 313–16. Specifically, the Michigan Supreme Court refused to follow *Faragher v. Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), in which the United States Supreme Court held that an employer subject to vicarious liability due to a hostile work environment created by a supervisor could raise an affirmative defense, under certain conditions, if no tangible employment action had been taken against the victimized employee.  *Chambers*, 463 Mich. at 308–09 (quoting *Faragher* 524 U.S. at 807–808; *Ellerth*, 524 U.S. at 765).  The *Chambers* Court expressed concern that, unlike the ELCRA, Title VII as interpreted by *Faragher* and *Ellerth*:

> (1) conflate[s] the concepts of quid pro quo harassment and hostile environment harassment, and (2) shift[s] the burden of proof from the employee to the employer regarding whether the employer should be held vicariously liable "for an actionable hostile environment created

by a supervisor with immediate (or successively higher) authority over
the employee."

*Id.* at 314 (quoting *Faragher* 524 U.S. at 807; *Ellerth*, 524 U.S. at 765).[7]

For example, Plaintiff cites *Barhouma v. Athenian Assisted Living, Ltd.*, No.
1:14-CV-02214, 2015 WL 5437786, at *3 (N.D. Ohio Sept. 15, 2015) for the
proposition that "a *quid pro quo* claim can rest on the harasser's authority to
influence an adverse employment decision, if the influence is so significant that the
harasser may be deemed the de facto decision maker." ECF No. 90, PageID.1904.
However, *Barhouma* cites a single Ohio case interpreting Ohio law. *Barhouma*,
2015 WL 5437786, at *4 (citing *Foster v. Ohio Bell Tel. Co.*, No. 92828, 2009 WL

---

[7] This Court notes that in the time since *Chambers* was decided, the United States
Supreme Court has adopted a definition of "supervisor" for purposes of vicarious
Title VIII liability that is closer in line with the standard articulated in *Chambers*.
*See Vance v. Ball State Univ.*, 570 U.S. 421, 424, 431 (2013) (holding that "an
employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or
she is empowered by the employer to take tangible employment actions against the
victim," *i.e.*, "to effect a significant change in employment status, such as hiring,
firing, failing to promote, reassignment with significantly different responsibilities,
or a decision causing a significant change in benefits." (quotation marks omitted)).

However, this does not save Plaintiff's quid pro quo claim. First, *Faragher* and
*Ellerth*, which the Michigan Supreme Court rejected, continue to be good law post-
*Vance*, and this Court was unable to find any case applying *Vance* to an ELCRA
quid pro quo claim. Second, Plaintiff has provided no evidence that Rowan had the
authority "to effect a significant change in [her] employment status" as described in
*Vance*. 570 U.S. at 431. Plaintiff's citation to *Martinez v. Bd. of Educ. of Prince
George's Cnty.*, No. CV PJM 19-0169, 2020 WL 4926610 (D. Md. Aug. 21, 2020),
which relies on *Vance* and *Ellerth*, is therefore unpersuasive.

29

4697733, at \*4 (Ohio Ct. App. Dec. 10, 2009)).  Notably, the Ohio statute addressed in *Foster* does not expressly provide for quid pro quo claims; they are a judicially created remedy in Ohio.  2009 WL 4697733, at \*3 (discussing Ohio Rev. Code § 4112.02 (A)).  In *Chambers*, the Michigan Supreme Court declined to follow the United States Supreme Court because "doing so would nullify a portion of the [Michigan] Legislature's enactment." *Chambers*, 463 Mich. at 314.  For the same reason, this Court declines to follow *Barhouma*, which carries far less persuasive weight.

Plaintiff's reliance on *LaMarca v. City of Niagara Falls, New York*, is similarly unpersuasive due to its inconsistency with *Chambers*.  *See* No. 13-CV-00970-WMS-JJM, 2016 WL 8674161, at \*11 (W.D.N.Y. Feb. 12, 2016) ("[T]he Second Circuit has rejected 'a rigid rule that would require plaintiffs to use the words "*quid pro quo*" or "hostile work environment[,]"'[] since 'these terms are judicially created for analytical purposes, not distinctions in the statute itself.'" (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006))).  The Court particularly notes that *Schiano* relies on *Ellerth*, one of the cases the Michigan Supreme Court declined to follow in *Chambers*.  *Chambers*, 463 Mich. at 314–16.

Second, some of the cases on which Plaintiff relies bring their claims for quid pro sexual harassment under a "cat's paw" theory of liability.  In *Scarbary v. Georgia Dep't of Nat. Res.*, the magistrate judge explained the theory as such:

30

> An adverse employment action recommendation by a person with no power to actually discharge an employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's adverse employment action. The plaintiff may use the so-called "cat's paw" theory to prove that the discriminatory animus behind the recommendation caused the discharge. This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In other words, the recommender [uses] the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus.

No. 115CV02183SCJAJB, 2017 WL 1132726, at *18 (N.D. Ga. Jan. 31, 2017) (alteration in original) (citations and quotation marks omitted), *report and recommendation adopted in part, rejected in part*, 245 F. Supp. 3d 1328 (N.D. Ga. 2017). These cases are thus factually distinct from the one at bar. *See Heskin v. Insite Advert.*, Inc., No. 03 CIV.2508 GBD AJP, 2005 WL 407646, at *18 (S.D.N.Y. Feb. 22, 2005) (finding prima facie case of quid pro quo sexual harassment where, *inter alia*, harasser was vice president of employer's largest client, harasser recommended plaintiff for her job at defendant, and defendant fired plaintiff a few days after harasser complained about her); *Gostanian v. Bendel*, No. 96 CIV. 1781 (LAP), 1997 WL 214966, at *6 (S.D.N.Y. Apr. 25, 1997) ("Although [harasser] is not [plaintiff's] official supervisor, [plaintiff] claims that [harasser] does hold the

power to alter the terms and conditions of his employment through the overwhelming influence [harasser] exerts over [supervisor].").

It is not clear whether the cat's paw theory of liability is recognized in Michigan. *See Jewett v. Mesick Consol. Sch. Dist.,* 332 Mich. App. 462, 474, 957 N.W.2d 377, 385 (2020) ("Even if the 'cat's paw' doctrine applies in Michigan, it is not relevant here."). Nevertheless, this Court does not address that issue at this time because Plaintiff does not seek relief under that theory. Plaintiff does not argue that Rowan influenced her official supervisors into taking an adverse employment action against her. Instead, she asserts that Rowan used his own authority, delegated to him by Mahoney and Markovich, to deny Plaintiff training, which was, in and of itself, an adverse employment action. This does not fit into the "cat's paw" theory of liability and *Heskin and Gostanian* are thus inapposite.

Third, those cases that do involve "de facto supervisory authority," concern harassers who presented themselves to the plaintiffs as having control or influence over traditional "supervisory" functions, *i.e.*, whether the plaintiffs would be hired or fired as well as their compensation. For example, in *LaMarca*, "there [were] triable issues of fact as to whether [the harasser] *held himself out to plaintiff as having* [supervisory] authority," specifically authority over hiring decisions. 2016 WL 8674161, at *3, *12. Similarly, in *Scarbury*, the harasser told the plaintiff he could get her a permanent position in exchange for sending him nude photos. 2017

32

WL 1132726, at *8. In concluding there were genuine issues of fact as to whether the harasser was the plaintiff's de facto supervisor, the magistrate judge noted that "[t]here was uncertainty with respect to the management structure" at the employer, and the harasser testified that he had "influence with [the supervisor] in determining which employees were assigned" to permanent roles. *Id.* at *9.

Additionally, in *Perks v. Town of Huntington*, the harasser, who was a city councilwoman, sponsored the plaintiff for a position on the board which she organized and then "told him that he would be required to report directly to her." 251 F. Supp. 2d 1143, 1148–49 (E.D.N.Y. 2003). The court found there was a genuine issue of fact as to whether the harasser was the plaintiff's de facto supervisor because she retaliated against him at the end of their relationship by reducing his overtime (and thus his compensation), changing his job duties, and threatening his job. *Id.* at 1155, 1155 n.11. Likewise, in *Hernandez v. Jackson, Lewis, Schnitzler & Krupman*, the harasser had "long-term relationship" with supervisor and promised to help the plaintiff get overtime and "remedy the oppressive working conditions" in exchange for her entering a sexual relationship with him. 997 F. Supp. 412, 414 (S.D.N.Y. 1998). In finding there was a genuine issue of fact as to whether the harasser was the plaintiff's de facto supervisor, the court noted that, *inter alia*, the harasser "undoubtedly enjoy[ed] more authority" than the plaintiff within the defendant's corporate hierarchy.

33

These "de facto supervisory authority" cases are factually distinguishable from the situation at bar.  Here, Plaintiff does not argue that Rowan presented himself as having authority over any traditional supervisory functions.  Instead, she argues that his delegated control over Plaintiff's training gave him supervisory authority over her.  However, Plaintiff provides no support for her argument that authority over training—when not coupled with authority over one of the traditional "supervisory" functions, such as hiring, firing, or compensation—is sufficient to give an employee supervisory authority.  Indeed, as stated *supra*, the Michigan Supreme Court contrasted a harassing "supervisor" in a quid pro quo claim to the harasser in "a pure hostile environment" claim where, the harasser "acts outside the scope of actual or apparent authority to hire, fire, discipline, or promote." *Chambers*, 463 Mich. at 311 (quoting *Radtke v. Everett*, 442 Mich. 368, 396 (1993)).

In summation, the Court is neither persuaded that Plaintiff's proposed de facto supervisor theory is consistent with Michigan law nor convinced that the theory is applicable to the case at bar.  Therefore, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's ELCRA quid pro quo sexual harassment claim in Count I.

34

## IV.   CONCLUSION

Accordingly, for the reasons articulated above, **IT IS HEREBY ORDERED** that Defendant's Renewed Motion for Summary Judgment (ECF No. 87) is **GRANTED IN PART AND DENIED IN PART**.   Specifically, the Motion is **GRANTED** with respect to the ELCRA quid pro quo sexual harassment claim in Count I and the sexual assault and battery claim (Count III); the Motion is **DENIED** with respect to the ELCRA sexual harassment and hostile work environment claims in Count I and the § 1981 racial harassment/racially hostile work environment claim (Count II).

**IT IS FURTHER ORDERED** that the following dates shall govern in this matter:

| | |
|---|---|
| Facilitation/Mediation:[8] | May 2023 |
| Settlement Conference | June 2023 |
| Motions *in Limine* cutoff: | July 3, 2023 |
| Joint Final Pretrial Order: | July 17, 2023 |
| Final Pretrial Conference: | August 1, 2023 at 2:30 p.m. |

---

[8] The parties shall submit the case to facilitation. A proposed stipulated order referring case to facilitation shall be submitted to the Court via the utilities function on CM/ECF <u>no later than March 20, 2023</u>. The proposed order must identify the facilitator and the date set for facilitation.  Facilitation must occur <u>no later than May 31, 2023</u>.

Trial date:                              August 22, 2023 at 9:00 a.m.

The practices and procedures set forth in this Court's November 19, 2021

Scheduling Order shall remain in effect.  ECF No. 85, PageID.1833–36.


**IT IS SO ORDERED**.




/s/ Gershwin Drain_____
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated:  March 8, 2023



CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
March 8, 2023, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager